## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| RNI WIND DOWN CORPORATION, et al., | : | |
| | : | Case No. 06-10110 (CSS) |
| Reorganized Debtors. | : | |
| ——————————————————— | : | (Jointly Administered) |
| | : | |
| CHARLES L. GRIMES, | : | |
| | : | |
| Appellant, | : | |
| | : | Civil Action No. 06-cv-00585 (GMS) |
| v. | : | |
| | : | |
| RNI WIND DOWN CORPORATION, et al., | : | |
| | : | |
| Appellees. | : | |
| ——————————————————— | : | |

---

## MOTION TO DISMISS APPEAL

---

**BROWN RUDNICK BERLACK ISRAELS LLP**
William R. Baldiga, Esq.
Cheryl B. Pinarchick, Esq.
Erika M. Holmes, Esq.
One Financial Center
Boston, MA 02111
Tel: 617-856-8200
Fax: 617-856-8201

**KLEHR HARRISON HARVEY BRANZBURG & ELLERS LLP**
Steven K. Kortanek (Del. Bar No. 3106)
Christopher A. Ward (Del. Bar No. 3877)
919 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-552-5500
Fax: 302-426-9193

*Attorneys for RNI Wind Down Corporation, et al.*

Dated: December 19, 2006

i

I.      INTRODUCTION ............................................................................................... 2

II.     RELEVANT BACKGROUND ........................................................................... 4

      A.     The Derivative Actions ........................................................................ 4

      B.     The California District Court's Approval of the Settlement Agreement and
            Mr. Grimes's Appeal ........................................................................... 5

      C.     The RNI Bankruptcy Filing and the Stay of the Ninth Circuit Appeal ................. 5

      D.     The Negotiation and Approval of the Amended Agreement and the Present
            Appeal .................................................................................................... 6

III.    LEGAL ARGUMENT ....................................................................................... 9

      A.     Mr. Grimes's Appeal is Expressly Barred by the Plain Language of a Final
            Order of the Bankruptcy Court. ............................................................. 9

      B.     Mr. Grimes's Pursuit of the Appeal Constitutes an Impermissible
            Collateral Attack on the Confirmation Order. ...................................... 10

IV.    CONCLUSION................................................................................................. 12

## TABLE OF AUTHORITIES

### FEDERAL CASES

Celotex Corp. v. Edwards, 514 U.S. 300 (1995) .............................................9, 10

GTE Sylvania, Inc. v. Consumers Union of U.S., Inc., 445 U.S. 375 (1980) ....................9

Huntsinger v. The Shaw Group, Inc., 410 F. Supp. 2d 968 (D.C. Ore. 2006)...................10

Jewelcor Inc. v. Asia Commercial Co., Ltd., 11 F.3d 394 (3rd Cir. 1993).........................8

Pratt v. Ventas, Inc., 365 F.3d 514 (6th Cir. 2004)...........................................10

### STATE CASES

DirecTV, Inc. v. Leto, 2006 WL. 3163232 (3rd Cir. 2006)..................................8

### DOCKETED CASES

In re Riverstone Networks, Inc. Derivative Litigation, Lead Case No. CV-
    8210290...............................................................................................3

Watterson v. Pereira, et. al., Case No. C-03-0637-SBA .................................3, 4

### STATUTES

11 U.S.C. §§ 1129(a) ...........................................................................6

28 U.S.C. § 157(b)(2) ..........................................................................9

28 U.S.C. Section 158(a) .....................................................................6

### MISCELLANEOUS

9th Cir. R. 27-11(a)............................................................................5

Fed. R. Bankr. P. 3020.......................................................................6, 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| RNI WIND DOWN CORPORATION, et al., | : | |
| | : | Case No. 06-10110 (CSS) |
| Reorganized Debtors. | : | |
| ————————————————— | : | (Jointly Administered) |
| | : | |
| CHARLES L. GRIMES, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 06-cv-00585 (GMS) |
| | : | |
| RNI WIND DOWN CORPORATION, et al., | : | |
| | : | |
| Appellees. | : | |
| ————————————————— | : | |

## MOTION TO DISMISS APPEAL

Pursuant to Rule 8011 of the Federal Rules of Bankruptcy Procedure, RNI Wind Down Corporation, et al. (collectively, the "Debtors" or "RNI")[1], by and through their undersigned counsel, hereby move to dismiss this appeal on the grounds that appellant Charles L. Grimes ("Mr. Grimes") is permanently enjoined from pursuing the appeal by a final order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Accordingly, RNI respectfully requests that this Court dismiss the appeal.

## I.    INTRODUCTION

This appeal arises out of the amendment of a settlement agreement between the Debtors and the plaintiffs in certain derivative actions brought against Riverstone Networks, Inc. (the "Company") and various of its former officers and directors. Those derivative actions were settled in or about November 2004 under a unitary settlement agreement which provided for

---

[1] The Debtors are RNI Wind Down Corporation, formerly known as Riverstone Networks, Inc., BlueCoast Software, Inc., The OASys Group, Inc., Riverstone Networks SPC, Inc,. and Pipal Systems, Inc.

certain corporate governance changes and the payment of $1.25 million in attorneys' fees to the derivative plaintiffs' counsel (the "Settlement Agreement"). Mr. Grimes, a shareholder of the Company, intervened and objected to the Settlement Agreement based upon its unitary nature and the amount of fees being paid to the derivative plaintiffs' counsel. The United States District Court for the Northern District of California ("California District Court") approved the Settlement Agreement over Mr. Grimes's objection. Mr. Grimes then appealed the approval of the Settlement Agreement to the United States Court of Appeals for the Ninth Circuit (No. 05-16588) ("Ninth Circuit Appeal").

Several months later, on February 7, 2006, RNI and several of its affiliates commenced chapter 11 proceedings (consolidated under Case No. 06-10110 (CSS)) in the Bankruptcy Court ("Chapter 11 Cases"). The commencement of the Chapter 11 Cases stayed the Ninth Circuit Appeal.

On June 30, 2006, the Debtors and certain co-sponsors filed the Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders, as Revised (the "Plan"). It was of significant importance to the Debtors and other Plan co-sponsors that any uncertainty and economic exposure arising from the Ninth Circuit Appeal be resolved prior to confirmation of the Plan. The Debtors therefore negotiated an amendment to the Settlement Agreement to address the concerns raised by Mr. Grimes in the Ninth Circuit Appeal ("Amended Agreement"), and approval of this Amended Agreement by the Bankruptcy Court was made a condition precedent to confirmation of the Plan. At the same time, the Debtors and other Plan co-sponsors also incorporated into the Plan a permanent injunction provision barring the continuance of any actions or other proceedings against the

Debtors and their properties, including the Ninth Circuit Appeal.[2]

Mr. Grimes, in his capacity as a shareholder of the Company, objected to the approval of the Amended Agreement, but the Bankruptcy Court approved the Amended Agreement over his objection. It is from the Bankruptcy Court's approval of the Amended Agreement that Mr. Grimes has appealed to this Court.

Subsequent to and notwithstanding the filing of the instant appeal, the Bankruptcy Court confirmed the Plan on September 12, 2006 ("Confirmation Order") and the Plan became effective September 25, 2006. Both the Confirmation Order and the Plan approved by the Confirmation Order *expressly and permanently enjoin* Mr. Grimes from pursuing this appeal. No appeal from the Confirmation Order has been taken and the time to do so has expired. The Confirmation Order is thus in all respects a final order. Accordingly, the appeal must be dismissed.

## II.     RELEVANT BACKGROUND

### A.     The Derivative Actions

Between August 2002 and April 2003, three derivative actions were filed against RNI and certain of its former officers and directors (collectively, the "Derivative Actions"). Two of the Derivative Actions were filed in the Superior Court for the State of California, County of Santa Clara, and were consolidated under the caption *In re Riverstone Networks, Inc. Derivative Litigation,* Lead Case No. CV-8210290. The third action was filed in the California District Court under the caption *Watterson v. Pereira, et. al.*, Case No. C-03-0637-SBA.

On May 6, 2004, the parties to the Derivative Actions entered into a memorandum of understanding to resolve such Actions. *See* Notice of Motion and Motion for Approval of

---

[2] On December 15, 2006, RNI filed a motion seeking dismissal of the Ninth Circuit Appeal on the grounds that, as here, Mr. Grimes is permanently enjoined from pursuing the Ninth Circuit Appeal by final order of the Bankruptcy Court. That motion is pending.

Derivative Settlement and Memorandum of Points and Authorities in Support Thereof ("Approval Motion") (Exhibit "A" hereto at 5). Under the agreed-upon settlement framework, RNI agreed to implement certain measures intended to improve corporate governance. *Id.* at 5-11. In addition, the Settlement Agreement provided for, *inter alia*, the payment of the plaintiffs' attorneys' fees in the Derivative Actions in the amount of $1.75 million. *Id.* at 19. In or about November 2004, the corporate governance measures and the attorneys' fees were submitted to the California District Court for approval as part and parcel of the proposed unitary settlement. *Id.* at 5.

   B.    The California District Court's Approval of the Settlement Agreement and Mr. Grimes's Appeal

Mr. Grimes, in his capacity as a shareholder of the RNI, objected to the Approval Motion and moved to intervene. *See* Order Granting Motion for Final Approval of Settlement (the "Approval Order") (Exhibit "B" hereto at 5). On July 22, 2005, the California District Court approved the Settlement Agreement over Mr. Grimes's objection but granted him limited standing to appeal the decision as an intervenor. *Id.* at 19. On August 12, 2005, Mr. Grimes appealed the Approval Order to the United States Court of Appeals for the Ninth Circuit on the alleged grounds that the $1.75 million to be paid in attorneys' fees was excessive, and that the attorneys' fees and corporate governance measures should not have been submitted to the California District Court in the form of a unitary settlement. *See* Docketing Statement (Exhibit "C" hereto).

   C.    The RNI Bankruptcy Filing and the Stay of the Ninth Circuit Appeal

On February 7, 2006, several months after the Ninth Circuit Appeal was filed, the Debtors commenced the Chapter 11 Cases. *See* Voluntary Petition of Riverstone Networks, Inc. (Exhibit "D" hereto). On March 29, 2006, the Ninth Circuit Appeal was stayed by the

commencement of the Chapter 11 Cases.[3]

        D.      The Negotiation and Approval of the Amended Agreement and the Present Appeal

Following the commencement of the Chapter 11 Cases, the Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Holders entered into a series of negotiations regarding the liquidation of the Debtor and the distribution of the Debtors' estate to their creditors and shareholders.  The agreements reached are embodied in the Plan.  In negotiating the Plan, the Plan sponsors were particularly concerned about resolving the Ninth Circuit Appeal in a manner that did not give rise to further indemnification obligations in favor of the Debtors' former officers and directors named as defendant-appellees.  *See generally*, Plan (Exhibit "E" hereto at ¶¶ 46, 76).  In order to resolve the uncertainty and economic exposure arising from the Ninth Circuit Appeal, the Debtors negotiated the Amended Agreement, pursuant to which counsel for the derivative plaintiffs agreed to repay the bankruptcy estate $950,000 of the $1,750,000 in attorneys' fees they had received under the Settlement Agreement and the unitary nature of the prior Settlement Agreement was eliminated.  *See* Debtors' Brief in Support of Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation and Agreement of Settlement dated as of November 12, 2004 [Docket No. 402] ("9019 Motion") (Exhibit "F" hereto at 4).  Resolution of the Ninth Circuit Appeal was of such importance to the parties negotiating the Plan that they expressly made Bankruptcy Court approval of the Amended Agreement a condition precedent to confirmation of the Plan.  Plan at ¶¶ 11-22.

---

[3] On November 24, 2006, the United States Court of Appeals for the Ninth Circuit issued an order that appears to lift the stay as to the former officers and directors but not as to the Debtors.  However, the filing of the motion to dismiss the Ninth Circuit Appeal has resulted in a stayed the briefing schedule in that proceeding as to all parties.  9th Cir. R. 27-11(a) ("Motions requesting [dismissal] shall stay the schedule for record preparation and briefing pending the Court's disposition of the motion.").

Additionally, to address the concern over any continuing indemnity obligations arising out of the Ninth Circuit Appeal, the Plan sponsors incorporated into the Plan a permanent injunction against "...**all Persons from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, right or Cause of Action against the Debtors or their Assets**." *Id.* at ¶ 6.10 (emphasis added).

On June 8, 2006, the Debtors filed a motion in the Bankruptcy Court seeking its approval of the Amended Agreement. *See* 9019 Motion. Mr. Grimes objected. *See* Charles L. Grimes' Objection to Motion of the Debtors for an Order Pursuant to Rule 9019 Approving the Amendment to the Stipulation and Agreement of Settlement dated as of November 12, 2004 (Exhibit "G" hereto). On August 23, 2006, the Bankruptcy Court approved the Amended Agreement over Mr. Grimes's objection (the "9019 Order") and Mr. Grimes filed the instant appeal (the "Appeal"). *See* 9019 Order (Exhibit "H" hereto); Notice of Appeal under 28 U.S.C. Section 158(a) from the Order (Docket 712) granting Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 and the Memorandum Opinion (Docket 711) entered on August 23, 2006 with Certificate of Service (Exhibit "I" hereto).

On June 30, 2006, the Debtors, the Debtors' Official Committee of Unsecured Creditors, and the Debtors' Official Committee of Equity Security Holders filed the Plan. The principal purpose of the Plan was to complete the liquidation of RNI and the other Debtors and to distribute the liquidation proceeds and any other recoveries to RNI's creditors and shareholders. Findings of Fact, Conclusions of Law, and Order under 11 U.S.C. §§ 1129(a) and (b) and Fed. R.

Bankr. P. 3020 Confirming Joint Plan of Reorganization and Liquidation under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders, as Revised ("Confirmation Order"). Confirmation Order (Exhibit "J" hereto) at ¶19.

On or about September 5, 2006, Mr. Grimes filed an objection to confirmation of the Plan. *See* Charles L. Grimes' Objection to the Proposed Joint Plan of Reorganization and Liquidation under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders, as Revised (the "Confirmation Objection") (Exhibit "K" hereto). Mr. Grimes <u>did not object</u> to the entry of the permanent injunctions set forth in Section 6.10 of the Plan and, in any event, each one of his objections were voluntarily withdrawn at the hearing on confirmation of the Plan as having been consensually resolved. Confirmation Order at ¶ 26. At the conclusion of the hearing on September 12, 2006, the Bankruptcy Court approved the Plan and entered the Confirmation Order. *See generally* Confirmation Order. The Plan became effective September 25, 2006. Plan at § 1.1; *see generally* Confirmation Order.

Consistent with Section 6.10 of the Plan, Paragraph 49 of the Confirmation Order provides for a permanent injunction of actions or proceedings against RNI or the assets of its estate. Specifically, Paragraph 49 provides, in relevant part:

> On or after the Confirmation Date, except as provided in the Plan or this Confirmation Order, all Persons that have held, currently hold or may hold a Claim, **Equity Interest**, or other debt or liability that is addressed in the Plan are permanently enjoined from. . . (i) **commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective properties that was or could have been commenced prior to the Effective Date**… .

8

Confirmation Order at ¶ 49 (emphasis added).    No appeal of the Confirmation Order has been
taken and the time for taking any such appeal has lapsed.  Thus, the Confirmation Order is, in all
respects, a final order.[4]

### III.    LEGAL ARGUMENT

    A.    Mr. Grimes's Appeal is Expressly Barred by the Plain Language of a Final Order
        of the Bankruptcy Court.

The plain language of a court order is not subject to interpretation and cannot be ignored.
*See DirecTV, Inc. v. Leto*, 2006 WL 3163232, *4 (3rd Cir. 2006)[5] (following the plain language
of a court's order required a certain conclusion); *see also Jewelcor Inc. v. Asia Commercial Co.,
Ltd.*, 11 F.3d 394, 396 (3rd Cir. 1993) (noting that the plain language and grammar of a
bankruptcy court order dictated a particular result).   Here, both the plain language of the
Confirmation Order and the Plan approved by that Order expressly bar Mr. Grimes from
pursuing this Appeal and, as such, the Appeal must be dismissed.

Specifically, Paragraph 49(i) of the Confirmation Order provides that "all Persons that
have held, currently hold or may hold … an Equity Interest" in RNI are permanently enjoined
from continuing any action or other proceeding against RNI or its properties.   Confirmation
Order at ¶ 49(i).   Similarly, Section 6.10 of the Plan permanently enjoins  "all Persons from
commencing or continuing in any manner any action or proceeding (whether directly, indirectly,
derivatively or otherwise) on account of or respecting any Claim, debt, right or Cause of Action
against the Debtors or their Assets."   Plan at § 6.10 (emphasis added).   Mr. Grimes is an
individual who admittedly holds an equity interest in the Debtors.   Confirmation Objection at 1.
The Debtors are the named appellees against which this Appeal is pending.   Accordingly,

---

[4] The deadline for appealing the Confirmation Order was September 22, 2006.  Fed. R. Bankr. P. 8002.
[5] Annexed hereto as Appendix "1".

continuation of this Appeal is expressly enjoined by the Confirmation Order and the Appeal must be dismissed.

Additionally, pursuit of the Appeal constitutes the impermissible continuation of a proceeding against RNI's property. As a result of the 9019 Order, $950,000 was added to the property of RNI. Mr. Grimes's Appeal challenges the 9019 Order. Thus, continuation of this Appeal places that property (that is, the $950,000 in cash that it holds as a result of the 9019 Order for distribution to its creditors and shareholders in accordance with the Plan) at risk and is expressly enjoined by the Confirmation Order.

B.    Mr. Grimes's Pursuit of the Appeal Constitutes an Impermissible Collateral Attack on the Confirmation Order.

Mr. Grimes did not object to the injunctive provisions of the Plan (and, as noted, ultimately withdrew all of the Plan objections he had previously asserted). He cannot now ignore the terms of the Confirmation Order embodying those provisions and pursue this Appeal. It is a well-established rule that "'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed… .'" *Celotex Corp. v. Edwards,* 514 U.S. 300, 306 (1995) (*quoting GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980)). "It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." *Celotex*, 514 U.S. at 313.

Here, the Bankruptcy Court had jurisdiction to enter the Confirmation Order. *See* 28 U.S.C. § 157(b)(2)(L) (confirmation of a plan of reorganization in a chapter 11 proceeding is a core proceeding and the bankruptcy court has exclusive jurisdiction to determine whether the plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed).

DEL1 65287-1

The Confirmation Order has not been modified or reversed. Indeed, no appeal from the Confirmation Order has been taken and the time to do so has now expired. Accordingly, Mr. Grimes is required to obey its terms and his pursuit of the Appeal of the 9019 Order constitutes an impermissible collateral attack against the Confirmation Order. *See Celotex*, 514 U.S. at 313 (case dismissed where respondents did not challenge an injunction entered by the bankruptcy court in that court but chose instead to collaterally attack the injunction in another court); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 523 (6th Cir. 2004) (affirming district court's dismissal of an action for lack of subject matter jurisdiction where action constituted a collateral attack on a bankruptcy order); *Huntsinger v. The Shaw Group, Inc.*, 410 F. Supp. 2d 968, 976 (D.C. Ore. 2006) (finding plaintiff's attempt to sue on a claim released by a bankruptcy court order and as to which the bankruptcy court enjoined prosecution amounted to an impermissible collateral attack on a bankruptcy order, and granting a converted motion to dismiss).

IV.    **CONCLUSION**

Mr. Grimes is permanently enjoined from pursuing this Appeal by a final order of the

United States Bankruptcy Court for the District of Delaware.  Accordingly, the Appeal must be

dismissed.

Dated:  December 19, 2006                    **KLEHR HARRISON HARVEY**
                                               **BRANZBURG & ELLERS LLP**

                                             By: _/s/ Christopher A. Ward_
                                                 Steven K. Kortanek (Del. Bar No. 3106)
                                                 Christopher A. Ward (Del. Bar No. 3877)
                                                 919 North Market Street, Suite 1000
                                                 Wilmington, DE 19801
                                                 Tel:  302-552-5500
                                                 Fax:  302-426-9193

                                                       -and-

                                             **BROWN RUDNICK BERLACK ISRAELS LLP**

                                                 William R. Baldiga, Esq.
                                                 Cheryl B. Pinarchick, Esq.
                                                 Erika M. Holmes, Esq.
                                                 One Financial Center
                                                 Boston, MA 02111
                                                 Tel: 617-856-8200
                                                 Fax: 617-856-8201

                                                 *Attorneys for RNI Wind Down Corporation, et al.*

DEL1 65287-1

# APPENDIX 1

Westlaw.

467 F.3d 842                                                    Page 1
467 F.3d 842
**(Cite as: 467 F.3d 842)**

Briefs and Other Related Documents
DirecTV, Inc. v. LetoC.A.3 (Pa.),2006.
United States Court of Appeals,Third
Circuit.
DIRECTV, INC., a California Corporation,
Appellant
v.
Bennie LETO.
**No. 05-3908.**

Argued Oct. 4, 2006.
Filed Nov. 6, 2006.

**Background:** Satellite cable company
brought action against consumer, alleging
illegal interception of its television
transmissions. The United States District
Court for the Western District of
Pennsylvania, Gary L. Lancaster, J.,
dismissed action. Company appealed.

**Holding:** The Court of Appeals, Ambro,
Circuit Judge, held that district court's
original order severed claims as to multiple
defendants.

Reversed and remanded.
West Headnotes
**[1] Federal Civil Procedure 170A** ☜⟶**81**

170A Federal Civil Procedure
    170AI In General
        170AI(E) Joinder of Claims and
Remedies
            170Ak81 k. In General. Most Cited
Cases
District court's original order properly
severed cable company's claims as to
multiple defendants accused of illegally

intercepting television transmissions, rather
than dismissing action as whole, for
purposes of company's subsequent action as
to single defendant; company, initially
having filed timely complaint that misjoined
defendants, would have been substantially
prejudiced on limitations grounds if claims
were deemed dismissed and not severed.
Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A**
☜⟶**387.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(J) Defects, Objections and
Amendments
            170Ak387 Misjoinder
                170Ak387.1 k. In General.
Most Cited Cases
"Misjoinder" occurs when there is no
common question of law or fact, or when
events that give rise to plaintiff's claims
against defendants do not stem from same
transaction. Fed.Rules Civ.Proc.Rule 21, 28
U.S.C.A.

**[3] Federal Civil Procedure 170A** ☜⟶**388**

170A Federal Civil Procedure
    170AII Parties
        170AII(J) Defects, Objections and
Amendments
            170Ak387 Misjoinder
                170Ak388 k. Striking Out or
Dropping Parties. Most Cited Cases

**Limitation of Actions 241** ☜⟶**130(8)**

241 Limitation of Actions
    241II Computation of Period of
Limitation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.3d 842
467 F.3d 842
**(Cite as: 467 F.3d 842)**

241II(H)  Commencement  of Proceeding; Relation Back
241k130  New  Action  After Dismissal or Nonsuit or Failure of Former Action
241k130(8)  k.  Failure  for Defects as to Parties. Most Cited Cases
When court drops defendant from action under misjoinder rule, that defendant is dismissed without prejudice; statute of limitations is not tolled, since court treats initial complaint as if it never existed. Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☜81**

170A Federal Civil Procedure
170AI In General
170AI(E)  Joinder of Claims and Remedies
170Ak81 k. In General. Most Cited Cases

**Limitation of Actions 241 ☜121(1)**

241 Limitation of Actions
241II  Computation  of  Period  of Limitation
241II(H)  Commencement  of Proceeding; Relation Back
241k121 Defects as to Parties
241k121(1) k. In General. Most Cited Cases
When court severs claim against defendant under misjoinder rule, suit simply continues against severed defendant in another guise; statute of limitations is held in abeyance, and severed suit can proceed so long as it initially was filed within limitations period. Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜388**

170A Federal Civil Procedure
170AII Parties

170AII(J)  Defects,  Objections  and Amendments
170Ak387 Misjoinder
170Ak388  k.  Striking  Out  or Dropping Parties. Most Cited Cases
Since district court's decision to remedy misjoinder by dropping and dismissing party, rather than severing relevant claim, may have important and potentially adverse statute  of  limitations  consequences, discretion delegated to trial judge to dismiss is restricted to what is just.  Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☜388**

170A Federal Civil Procedure
170AII Parties
170AII(J)  Defects,  Objections  and Amendments
170Ak387 Misjoinder
170Ak388  k.  Striking  Out  or Dropping Parties. Most Cited Cases
Court's discretion to drop and dismiss claims against misjoined defendants is abated when it prejudices any substantial right of plaintiffs, which includes loss of otherwise timely claims if new suits are blocked by statutes  of  limitations.  Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**\*843** Howard R. Rubin, Esquire, William E. Copley, III (Argued), Sonnenschein, Nath & Rosenthal, Washington, DC, Counsel for Appellant.
John W. Gibson,  Esquire  (Argued), Pittsburgh, PA, Counsel for Appellee.

Before McKEE, AMBRO, and NYGAARD, Circuit Judges.

OPINION OF THE COURT
AMBRO, Circuit Judge.
DirecTV, a satellite cable company, caught

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.3d 842
467 F.3d 842
**(Cite as: 467 F.3d 842)**

persons pirating (that is, intercepting without payment) its television transmissions. Its policy is to sue, and it did so here. Eight defendants, including Bennie *844 Leto, were joined in one suit brought in the United States District Court for the Western District of Pennsylvania. The claims against the defendants were timely brought.

The District Court, responding to a motion by the defendants under Federal Rule of Civil Procedure 21, entered in December 2003 what appeared to be an order severing DirecTV's claims against each defendant. The order reads:
It is hereby ORDERED that the case shall proceed under the caption of *DIRECTV v. Garry Bloch,* No. 03-0752, as to defendant Garry Bloch. As to each of the other defendants, the case shall proceed as a separate action under a separate civil action number upon payment by plaintiff of the requisite filing fee as to each defendant.
It is FURTHER ORDERED that all separate actions arising from this order shall be deemed RELATED and shall be assigned to the docket of the undersigned in anticipation of consolidation for the purposes of pretrial discovery.

Within days of the order, DirecTV paid a separate filing fee and filed a separate complaint against Leto. He responded by moving to dismiss on the ground that the later-filed complaint was outside the statute of limitations. This made sense only if the 2003 order dismissed DirecTV's complaint rather than severed one suit into eight separate suits. Counterintuitively, the District Court agreed with Leto that it had dismissed the initial DirecTV suit, and dismissed it with prejudice.

[1] Feeling blindsided, DirecTV appeals.

While we normally give great deference to a court's interpretation of its own orders, we cannot do so here, as the order is too clear to permit any interpretation but a severance. Even were that not the case, while district judges have discretion to remedy misjoinders either by severing claims or dismissing them without prejudice, that discretion, while accorded a wide fairway, ventures into unplayable rough when it prejudices substantial rights. Here DirecTV, initially having filed a timely complaint that misjoined defendants, is substantially prejudiced if that suit is deemed dismissed and not severed. We thus reverse and remand.[FN1]

FN1. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because DirecTV's causes of action arise under federal law. We have jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final order. We exercise plenary review of a District Court's grant of a Rule 12(b)(6) motion (the means by which Leto moved to dismiss here). *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 266 (3d Cir.2005). In so doing, "we apply the same test as the district court," accepting as true "all facts alleged in the complaint and view[ing] them in the light most favorable to [DirecTV]." *Id.* (internal quotation marks omitted). We review the District Court's decision to drop parties under Rule 21 for an abuse of discretion. *See, e.g., Letherer v. Alger Group, L.L.C.,* 328 F.3d 262, 266 (6th Cir.2003); *Coughlin v. Rogers,* 130 F.3d 1348, 1351 (9th Cir.1997). Under this standard, we must affirm the District

467 F.3d 842                                                                                           Page 4
467 F.3d 842
**(Cite as: 467 F.3d 842)**

Court's ruling unless we are "left with a definite and firm conviction that the trial court committed a clear error of judgment." _Letherer,_ 328 F.3d at 266 (internal quotation marks omitted).

[2] _Federal Rule of Civil Procedure 20(a)_ permits "joinder"-the joining together of more than one party-if the plaintiff's claim "aris[es] out of the same transaction ... and if any question of law or fact common to all defendants will arise in the action." Misjoinder, on the other hand, occurs when there is no common question of law or fact or when, as here, the events that give rise to the plaintiff's claims against defendants do not stem from the same transaction.

**\*845** Misjoinder is governed by _Rule 21,_ which reads:
Misjoinder of parties is not ground for dismissal of an action.    Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.    Any claim against a party may be severed and proceeded with separately.

To remedy misjoinder, then, a court may not simply dismiss a suit altogether.    Instead, the court has two remedial options:    (1) misjoined parties may be dropped "on such terms as are just";    or (2) any claims against misjoined parties "may be severed and proceeded with separately."    _Fed.R.Civ.P. 21._

[3][4] The effect of each option is quite different.    When a court "drops" a defendant under _Rule 21,_ that defendant is dismissed from the case without prejudice. _Publicker Indus., Inc. v. Roman Ceramics Corp.,_ 603 F.2d 1065, 1068 (3d Cir.1979); _see also Elmore v. Henderson,_ 227 F.3d

1009, 1011-12 (7th Cir.2000) (Posner, J.). When that occurs, the "statute of limitations is not tolled" because we treat the initial complaint "as if it never existed." _Brennan v. Kulick,_ 407 F.3d 603, 606 (3d Cir.2005) (internal quotation marks omitted).[FN2]    But when a court "severs" a claim against a defendant under _Rule 21,_ the suit simply continues against the severed defendant in another guise. _White v. ABCO Eng'g Corp.,_ 199 F.3d 140, 145 n. 6 (3d Cir.1999); _Elmore,_ 227 F.3d at 1012.    The statute of limitations is held in abeyance, and the severed suit can proceed so long as it initially was filed within the limitations period. _Id._

> FN2. _See also Elmore,_ 227 F.3d at 1011-12 (noting that, although "[w]e cannot find a case on the point," this "seems to us clear as a matter of first principles").

[5] Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under _Rule 21_ is restricted to what is "just." In this context, we turn to the DirecTV/Leto case.

While we normally "give particular deference to [a] district court's interpretation of its own order," [FN3] we cannot do so where the plain language of the order is completely contrary to the Court's interpretation.    The District Court's initial 2003 order on its face was a severance, rather than a dismissal, of DirecTV's claim against Leto. That order specifically stated that the case against Leto "_shall proceed_ as a separate action ... upon payment by plaintiff of the requisite filing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fee" (emphasis added). Taking this clear cue, within ten days DirecTV paid the filing fee and filed a separate complaint against Leto. Yet in a surprising response to Leto's subsequent motion to dismiss, the District Court interpreted its prior order as a drop and dismissal rather than a severance. It read "shall proceed" out of its 2003 order. To do so trades concise clarity for confusion.

> FN3. *In re Fine Paper Antitrust Litig., 695 F.2d 494, 498 (3d Cir.1982). Accord WRS, Inc. v. Plaza Entm't, Inc., 402 F.3d 424, 428 (3d Cir.2005); Pittsburgh Terminal Corp. v. Balt. & Ohio R.R. Co., 824 F.2d 249, 254 (3d Cir.1987)* (quoting *In re Fine Paper).*

In its 2003 order, the District Court made no reference to dropping-or even dismissing-any defendants. To repeat, it said that each case (other than against the first defendant) "shall proceed as a separate action under a separate civil action number." This language follows the language*846 in Rule 21: "Any claim against a party may be severed and proceeded with separately." In addition, this language also reflects our Court's description of severance: "[I]f claims are severed pursuant to Rule 21 they become independent actions with separate judgments entered in each." *White*, 199 F.3d at 145 n. 6 (internal quotation marks omitted).

Moreover, if the District Court had intended to drop the misjoined defendants, it should not have said that their "case[s] shall proceed." Dismissed cases do not proceed at all. In addition, the Court itself expected all, now separate, suits to continue, as it further ordered that "all separate actions

arising from this order shall be deemed RELATED and shall be assigned to [the Judge's docket] in anticipation of consolidation for the purposes of pretrial discovery."

For these reasons, the District Court's 2003 order was no doubt a severance. In light of the precise wording of the order, it cannot subsequently be deemed a dismissal.

Even if the language of the District Court's 2003 order had not clearly severed DirecTV's claim against Leto, it nonetheless would have been improper for the Court to choose dismissal instead, as this misjoinder remedy would have imposed adverse statute-of-limitations consequences on DirecTV. Although a district court has discretion to choose either severance or dismissal in remedying misjoinder, it is permitted under Rule 21 to opt for the latter only if "just"-that is, *if doing so "will not prejudice any substantial right." See Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3d Cir.1972)* (emphasis added). Hence, a court must analyze the consequences of a dismissal on a claimant's ability to meet the statute of limitations prior to choosing dismissal over severance.

This principle was recognized by the Court of Appeals for the Seventh Circuit in *Elmore v. Henderson.* That case, like the one at hand, involved a district court judge's decision to drop and dismiss-rather than sever-a claim under Rule 21 to remedy misjoinder. The judge subsequently dismissed the plaintiff's separately filed complaint as untimely because it was filed outside of the statute-of-limitations period. The Seventh Circuit held that the district court's decision was almost certainly erroneous because, "in formulating a remedy for a misjoinder[,] the judge is required to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

avoid gratuitous harm to the parties," and is therefore "duty-bound" to prevent a dismissal that would have adverse "statute [-]of[-]limitations consequences." *Elmore, 227 F.3d at 1012.* The district court instead should have severed the claim and allowed it "to continue as a separate suit so that it would not be time-barred" rather than dropping and dismissing the claim. *Id.*

[6] We follow suit and hold that the discretion to drop and dismiss claims against misjoined defendants under Rule 21 is abated when it "prejudic[es] any substantial right" of plaintiffs,[FN4] *see* *847*Sabolsky, 457 F.2d at 1249,* which includes loss of otherwise timely claims if new suits are blocked by statutes of limitations.

> FN4. Several district courts, both in and outside the Seventh Circuit, have followed this principle. *See, e.g., DIRECTV, Inc. v. Adrian,* No. 03-C-6366, 2004 WL 1146122, at *4 (N.D.Ill. May 18, 2004) ("We are duty-bound to sever claims rather than dismiss defendants if a dismissal would bring statute of limitations consequences."); *Direct TV, Inc. v. Delaney,* No. 03-C-3444, 2003 WL 24232530, at *5 (N.D.Ill. Nov.20, 2003) (same); *Berry v. Ill. Dep't of Human Servs.,* No. 00-C-5538, 2001 WL 111035, at *18 (N.D.Ill. Feb.2, 2001) (avoiding "a dismissal prejudicing a substantial right" by severing claims and tolling the statute of limitations for complaints refiled "within a reasonable period of time"); *Franconia Assocs. v. United States,* 61 Fed.Cl. 335, 337 (Fed.Cl.2004) ("[I]t is important to determine whether there is a statute of

limitations problem-if the filing of new suits is barred by the statute, severance is really the only appropriate option, as the original filing date carries over to the new cases."). *Contra DIRECTV Inc. v. Hudson,* No. 2:03-cv-457, at 3-4, 6-8 (S.D.Ohio July 1, 2004) (order) (remedying a misjoinder issue by dismissing, rather than severing, misjoined defendants and stating that DirecTV presumably, "as a part of its litigation strategy, chose to take that risk rather than file separate actions and incur substantial litigation costs in the process").

With this backdrop of cabined discretion, the outcome here writes itself. Even had the District Court been correct in interpreting its 2003 order as a dismissal and not a severance, this still would have affected adversely DirecTV's right to recover from Leto: the new suit, lacking a link back to the timely initial action, would be out of time. Because a dismissal improperly would have imposed adverse statute-of-limitations consequences on DirecTV, we hold that the District Court would have abused its discretion in choosing dismissal as a misjoinder remedy.

\* \* \* \* \*

The plain language of the District Court's 2003 order requires the conclusion that it severed, rather than dismissed, DirecTV's suit against Leto. That order was so direct and clear-crafted that no contrary conclusion was later conceivable. Once a District Court speaks with such clarity, any deference to its discretion falls away. In addition, even if the language of the District Court's 2003 order did not clearly constitute

467 F.3d 842
467 F.3d 842
**(Cite as: 467 F.3d 842)**

Page 7

a severance but instead a dismissal, Rule 21 requires that, in remedying misjoinder, the Court must analyze the consequences of choosing dismissal over severance, and is obliged to avoid prejudicing any substantial right in exercising its discretion. Under this principle, dropping and dismissing DirecTV's claim against Leto, rather than severing the claim and allowing it to continue as a separate suit so that it would not be time-barred, would have been an abuse of discretion.[FN5]

> FN5. Because of our holdings, we need not reach DirecTV's plea for equitable tolling. However, it is worth noting that equitable tolling would not fit here, as DirecTV does not allege that it was prevented from filing a complaint within the limitations period. Instead, it contends that its initial suit, which *was* filed within the limitations period, was improperly dismissed. As noted by the Seventh Circuit in *Elmore,* "equitable tolling is not a remedy for an erroneous judgment" by the District Court; instead, appeal of the erroneous judgment is the proper course. *Elmore,* 227 F.3d at 1013.

We therefore reverse the District Court's grant of dismissal in favor of Leto and remand this case to the Court for further proceedings consistent with this opinion.

C.A.3 (Pa.),2006.
DirecTV, Inc. v. Leto
467 F.3d 842

Briefs and Other Related Documents (Back to top)

• 05-3908 (Docket) (Aug. 22, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT A

ORIGINAL
FILED

04 DEC -2 AM 10: 34

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MURRAY FRANK & SAILER LLP
   ERIC J. BELFI
2  275 Madison Avenue, Suite 801
   New York, NY 10016
3  Telephone: 212/682-1818
   212/682-1892 (fax)
4
   EMERSON POYNTER LLP
5  JOHN G. EMERSON
   SCOTT E. POYNTER
6  2228 Cottondale Lane, Suite 100
   Little Rock, AR 72202
7  Telephone: 501/907-2555
   501/907-2556 (fax)
8
   ROBBINS UMEDA & FINK, LLP                LERACH COUGHLIN STOIA GELLER
9  BRIAN J. ROBBINS (190264)                   RUDMAN & ROBBINS LLP
   MARC M. UMEDA (197847)                   KEITH F. PARK (54275)
10 1010 Second Avenue, Suite 2360           MICHAEL J. DOWD (135628)
   San Diego, CA 92101                      JEFFREY D. LIGHT (159515)
11 Telephone: 619/525-3990                  401 B Street, Suite 1600
   619/525-3991 (fax)                       San Diego, CA 92101
12                                          Telephone: 619/231-1058
                                            619/231-7423 (fax)
13 Attorneys for Plaintiffs

14 [Additional counsel appear on signature page.]

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17

18 GREGORY WATTERSON, Derivatively On    )   No. C-03-0637-PJH
   Behalf of RIVERSTONE NETWORKS, INC.,  )
19                                        )   NOTICE OF MOTION AND MOTION FOR
                       Plaintiff,         )   APPROVAL OF DERIVATIVE
20                                        )   SETTLEMENT AND MEMORANDUM OF
             vs.                          )   POINTS AND AUTHORITIES IN SUPPORT
21                                        )   THEREOF
   ROMULUS PEREIRA, et al.,               )
22                                        )   DATE:       December 15, 2004
                       Defendants,        )   TIME:       9:00 a.m.
23                                        )   COURTROOM:  The Honorable
             – and –                      )               Phyllis J. Hamilton
24                                        )
   RIVERSTONE NETWORKS, INC., a           )
25 Delaware corporation,                  )
                                          )
26                     Nominal Defendant. )
                                          )
27

28

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | BACKGROUND OF THE DERIVATIVE LITIGATION | 2 |
| | A. Summary of Allegations | 2 |
| | B. State Court Derivative Actions | 3 |
| | C. The Federal Court Derivative Action | 4 |
| | D. The Settlement Negotiations | 5 |
| III. | THE SETTLEMENT TERMS | 5 |
| IV. | THE PROCEDURE FOR PRELIMINARY APPROVAL OF A DERIVATIVE ACTION IN FEDERAL COURT IS WELL ESTABLISHED | 12 |
| V. | THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE SETTLEMENTS | 12 |
| | A. The Law Favors Settlement | 12 |
| | B. The Role of the Court in Approval of a Derivative Settlement | 13 |
| VI. | THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND FINALLY APPROVED AFTER NOTICE TO RIVERSTONE SHAREHOLDERS | 14 |
| | A. The Risks of Establishing Liability | 15 |
| | B. The Settlement Was Negotiated By the Parties With a Thorough Understanding of the Strengths and Weaknesses of the Case | 16 |
| | C. The Settlement Is Wholly Reasonable in View of the Serious Risks Posed by Continued Litigation | 17 |
| | D. The Complexity, Expense and Likely Duration of the Litigation Would Be Considerable Were the Action to Proceed | 18 |
| VII. | THE AGREEMENT FOR THE PAYMENT OF FEES AND EXPENSES IS APPROPRIATE | 19 |
| VIII. | PROPOSED SCHEDULE OF EVENTS | 20 |
| IX. | CONCLUSION | 21 |

1

## TABLE OF AUTHORITIES

2

Page

3   *Berkey Photo, Inc. v. Eastman Kodak Co.,*
4        603 F.2d 263 (2d Cir. 1979) .................................................................18

    *Boyd v. Bechtel Corp.,*
5        485 F. Supp. 610 (N.D. Cal. 1979) ................................................16, 19

6   *Ellis v. Naval Air Rework Facility,*
         87 F.R.D. 15 (N.D. Cal. 1980),
7        aff'd, 661 F.2d 939 (9th Cir. 1981) .........................................13, 14, 19

8   *Fisher Bros. v. Cambridge-Lee Industries, Inc.,*
9        630 F. Supp. 482 (E.D. Pa. 1985) ..........................................................19

    *Girsh v. Jepson,*
10       521 F.2d 153 (3rd Cir. 1975) ...................................................15, 16, 18

11  *Hensley v. Eckerhart,*
         461 U.S. 424, 103 S. Ct. 1933,
12       76 L. Ed. 2d 40 (1983) .............................................................................19

13  *In re Apple Computer Sec. Litig.,*
         No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
14       (N.D. Cal. Sept. 6, 1991) ........................................................................18

15  *In re Continental Illinois Sec. Litig.,*
         962 F.2d 566 (7th Cir. 1992) ..................................................................20
16
    *In re M.D.C. Holdings Sec. Litig.,*
17       Master File No. CV 89-0090 E (M),
         1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) ....................20
18
    *In re Mego Financial Corp. Sec. Litig.,*
19       213 F.3d 454 (9th Cir. 2000) ..................................................................17

20  *In re Pacific Enterprises Sec. Litig.,*
         47 F.3d, 373 (9th Cir. 1995) ...................................................................16
21
    *In re Warner Communications Sec. Litig.,*
22       618 F. Supp. 735 (S.D.N.Y. 1985),
         aff'd, 798 F.2d 35 (2d Cir. 1986) ...........................................................16
23
    *In re Warner Communications Sec. Litig.,*
24       798 F.2d 35 (2d Cir. 1986) ......................................................................13

25  *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
         671 F. Supp. 819 (D. Mass 1987) ..........................................................13
26
    *MWS Wire Industries, Inc. v. California Fine Wire Co.,*
27       797 F.2d 799 (9th Cir. 1986) ..................................................................12

28

Page

1

2

3    *Maher v. Zapata,*
       714 F.2d 436 (5th Cir. 1983) ...................................................12, 13
4

5    *Marshall v. Holiday Magic, Inc.,*
       550 F.2d 1173 (9th Cir. 1977) ...................................................13
6

7    *Newman v. Stein,*
       464 F.2d 689 (2d Cir. 1972) ...................................................18
8    *Officers for Justice v. Civil Service Comm'n,*
       688 F.2d 615 (9th Cir. 1982) ...................................................*passim*
9    *Torrisi v. Tucson Electric Power Co.,*
       8 F.3d 1370 (9th Cir. 1993) ...................................................13, 14
10

11   *Williams v. First Nat'l Bank,*
       216 U.S. 582, 30 S. Ct. 441, 54 L. Ed. 625 (1910) ...................................................12
12   *Zimmerman v. Bell,*
       800 F.2d 386 (4th Cir. 1986) ...................................................12
13

14   STATUTES, RULES AND REGULATIONS

15   15 U.S.C.
       §78j-1(g) ...................................................9
16     §78m(k) ...................................................7

17   California Corporations Code
       §25402 ...................................................4
18

     Federal Rule of Civil Procedure
19     Rule 23(e) ...................................................12
       Rule 23.1 ...................................................13
20

21   SECONDARY AUTHORITIES

22   *Manual for Complex Litigation* (3d ed. 1995)
       §23.14 ...................................................12
23

24

25

26

27

28

1    TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2           PLEASE TAKE NOTICE that on December 15, 2004, at 9:00 a.m., or as soon thereafter as

3    counsel may be heard, plaintiffs will move before the Honorable Phyllis J. Hamilton, United States

4    District Judge, to grant preliminary approval of the settlement set forth in the Stipulation of

5    Settlement dated as of November 12, 2004, and filed contemporaneously herewith.  Plaintiff's

6    motion is based on the attached Memorandum in Support of Motion for Approval of Derivative

7    Settlement, the Stipulation of Settlement dated as of November 12, 2004 (the "Stipulation"), the

8.   declaration of Marc M. Umeda and such additional evidence or argument as may be required by the

9    Court.

10            MEMORANDUM OF POINTS AND AUTHORITIES

11   I.    PRELIMINARY STATEMENT

12           This memorandum is submitted by plaintiffs in support of approval of the proposed

13   settlement (the "Settlement") of the derivative claims brought on behalf of Riverstone Networks, Inc.

14   ("Riverstone" or the "Company") against certain of its officers and directors.  The terms of the

15   settlement are set forth in the Stipulation and Agreement of Settlement dated as of November 12,

16   2004 ("Stipulation"), submitted herewith. The Settlement resolves the derivative claims pending in

17   this Court as well as a consolidated derivative action pending in the Superior Court of the State of

18   California, County of Santa Clara ("State Court" or "Santa Clara Superior Court").  The Settlement

19   is the result of arm's-length negotiations between the parties with the substantial assistance of the

20   Honorable Charles A. Legge (Ret.)  As a result of the pendency and settlement of the litigation,

21   defendants have adopted significant corporate governance measures that directly address plaintiffs'

22   allegations and are designed to preclude the recurrence of the wrongdoing alleged in this litigation.

23   Derivative Plaintiffs were also an instrumental factor in obtaining from defendants' liability

24   insurance carriers approximately $11 million for the benefit of Riverstone in connection with the

25   defense and settlement of the Class Action. The Settlement constitutes an appropriate resolution of a

26   case of substantial complexity.

27           Plaintiffs currently ask the Court to enter the [Proposed] Order Preliminarily Approving

28   Settlement and Providing for Notice ("Notice Order"), (a) granting preliminary approval of the

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                    - 1 -

Settlement, (b) directing that notice be given to Riverstone shareholders, and (c) scheduling a hearing at which the Court will consider final approval of the Settlement. In determining whether preliminary approval is warranted, the issue before the Court is whether the proposed settlement is within a range of what might be found to be fair, reasonable, and adequate, such that notice of the proposed settlement should be provided to Riverstone shareholders and that a hearing be scheduled for final settlement approval. In accordance with the Court's past procedures employed in the settlement approval process of representative actions, this Memorandum is intended to be the primary brief in support of both preliminary and final approval.

## II. BACKGROUND OF THE DERIVATIVE LITIGATION

For the sake of brevity in this Memorandum, a more detailed factual background of this litigation, its procedural history, the claims asserted and the efforts of counsel to obtain the Settlement are set forth in greater detail in the Declaration of Marc M. Umeda in Support of Approval of Settlement ("Umeda Decl."), submitted herewith.

### A. Summary of Allegations

The shareholder derivative actions filed on behalf of Riverstone against certain directors and officers for insider trading, breaches of fiduciary duty, abuse of control, gross management, corporate waste and unjust enrichment that occurred between August 2001 and December 2002 (the "Relevant Period") alleged that defendants, realizing that Riverstone could not achieve its revenue and earnings per share projections, conspired to create the "appearance" of growth during the Relevant Period. Plaintiffs alleged that throughout the Relevant Period, defendants caused Riverstone to issue materially false and/or misleading public statements regarding the Company's business, financial condition and prospects. For instance, in August and September, 2001, defendants caused Riverstone to announce a purportedly lucrative deal with Hutchison Global Crossing ("Hutchison") that promised to provide nearly one million Hong Kong residents with last-mile Ethernet connectivity even though Hutchison had less than 150,000 customers and growth rate of less than 7% per month.

Similarly, defendants allegedly regularly caused Riverstone to improperly and prematurely record revenue in violation of Generally Accepted Accounting Principles ("GAAP"). A substantial

1  percentage of Riverstone's quarterly revenue was based on highly suspicious purchase orders that

2  were received and recorded on the last day of the fiscal quarter, allowing Riverstone to falsely claim

3  that it had "made its numbers." Customers would later return massive quantities of the products sold

4  as part of these "end-of-the-quarter" deals claiming them to be defective. But defendants later

5  placed these products back into inventory and re-sold them.

6        In addition to the improper recognition of revenue, several of Riverstone's investments in

7  telecommunications related companies had deteriorated dramatically in value by September 2001.

8  As the deterioration continued, defendants were increasingly aware that the impairment in value was

9  not temporary. Pursuant to GAAP, the Company should have recorded an impairment write-down

10 of millions of dollars. However, as part of their alleged accounting shenanigans, defendants caused

11 Riverstone to delay reflecting such losses, only gradually revealing them and finally fully disclosing

12 the loss on December 18, 2002.

13        By their alleged misconduct, defendants were able to inflate Riverstone's share price so that

14 they could sell their shares, protect and enhance their lucrative and prestigious positions and raise

15 money via a $150 million debt offering. Defendants' alleged misconduct resulted in Riverstone

16 losing over $2.6 billion in market capitalization and suffering damage to its reputation and goodwill.

17 In addition, on April 25, 2003, Riverstone was forced to announce that the SEC requested

18 information on Riverstone's accounting practices related to "certain financial transactions."

19   **B.    State Court Derivative Actions**

20        On August 13, 2002, the first derivative action filed on behalf of Riverstone and entitled

21 *Bruhn v. Pereira, et al.*, Case No. CV 810290 (the "*Bruhn*" action) was filed in Santa Clara Superior

22 Court. The *Bruhn* action alleges breach of fiduciary duty, abuse of control, gross mismanagement,

23 waste of corporate assets, unjust enrichment and violations of California Corporation Code against

24 certain officers and directors of Riverstone. Shortly after the filing of the *Bruhn* action, defendants

25 filed a motion to stay asserting that the *Bruhn* action should be stayed until a resolution was reached

26 in the consolidated federal securities class action, pending in this Court entitled *In re Riverstone*

27 *Networks, Inc. Securities Litigation*, Case No. CV-02-3581 (PJH) ("Class Action"). After briefing

28 and oral argument was complete, the State Court denied the stay.

1    On December 20, 2002, defendants filed a demurrer to the complaint filed in the *Bruhn*

2   action. Thereafter, on February 25, 2003, plaintiff in the *Bruhn* action filed an Amended

3   Shareholder Derivative Complaint. On April 9, 2003, *Carrico v. Pereira, et al.*, Case No. CV

4   816188 (the "*Carrico*" action), a shareholder derivative action brought on behalf of Riverstone, was

5   filed in Santa Clara Superior Court. The allegations in the *Carrico* action were similar to the

6   allegations in the *Bruhn* action. Shortly after the filing of the *Carrico* action, the State Court entered

7   an order consolidating the *Bruhn* and *Carrico* actions ("State Action") and appointed co-lead

8   counsel.

9    On May 28, 2003, plaintiffs Bruhn and Carrico filed the operative complaint in the State

10  Action, the Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint").

11  Thereafter, defendants filed a demurrer to the Consolidated Complaint asserting that plaintiffs had

12  failed to plead sufficient facts to show that a pre-lawsuit demand on the Riverstone's Board of

13  Directors would have been futile and did not plead sufficient facts to state a cause of action.

14  Defendants also argued that under Delaware law Riverstone's Certificate of Incorporation barred

15  plaintiffs' claims. Concurrently with the filing of the demurrer, defendants filed another motion to

16  stay. After full briefing and oral argument, on September 17, 2003, the Honorable Jack Komar, the

17  complex civil litigation judge for Santa Clara Superior Court, sustained defendants' demurrer,

18  dismissed plaintiffs' claims for failure to allege demand futility and granted the motion to stay.

19   **C.    The Federal Court Derivative Action**

20   On August 23, 2002, *Watterson v. Pereira, et al.*, a shareholder derivative action on behalf of

21  Riverstone was filed in this Court, Case No. CV-03-0637 (PJH) (the "Federal Action") (collectively,

22  the Federal Action and the State Action are referred to as the "Derivative Actions" or the "Actions").

23  The complaint filed in the Federal Action makes similar allegations as were made in the State

24  Action. The defendants in the Federal Action moved to dismiss the original complaint for failing to

25  adequately plead demand futility and for failure to state a claim. Instead of opposing defendants'

26  motion, on November 6, 2003, plaintiff filed a Verified First Amended Shareholder Derivative

27  Complaint ("FAC"). The FAC added additional factual information and claims pursuant to the

28  Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and for violations of California Corporations Code

1   §25402. Subsequently, on March 26, 2004, defendants moved to dismiss the FAC asserting similar

2   arguments made in support of their original motion in this Court and the demurrer filed in State

3   Court. Thereafter, the parties to the Federal Action agreed to extend the briefing schedule to allow

4   the parties to concentrate on settlement negotiations.

5       **D.    The Settlement Negotiations**

6       The Settling Parties, through their respective, highly experienced counsel, have engaged in

7   vigorous, good-faith, arm's-length negotiations to resolve the Derivative Actions. The Settlement

8   was only reached after extensive arm's-length negotiations among the parties with the substantial

9   assistance of the Honorable Charles A. Legge (Ret.). Beginning in the fall of 2003 and continuing

10  through the spring of 2004, the parties participated in several mediation sessions with Judge Legge

11  and conducted many telephonic conferences during which the terms of the Settlement were

12  extensively debated and negotiated. These negotiations culminated in the parties entering into a

13  Memorandum of Understanding on May 6, 2004 ("MOU"). The MOU ultimately gave way to the

14  comprehensive Stipulation that was arrived at after extensive negotiations over its terms.

15  **III.    THE SETTLEMENT TERMS**

16      As a result of negotiations among counsel, and with the substantial assistance of Judge

17  Legge, the parties have agreed to significant corporate governance measures that address the issues

18  raised in this litigation and enhance Riverstone's corporate practices.

19      Riverstone has acknowledged that the Derivative Actions were a substantial and material

20  factor in the decision to implement or formalize the following corporate governance enhancements,

21  including, changes to the composition and practices of the Riverstone Board of Directors and the

22  committees thereof, which have been and are being implemented:

23          (a)    The number of directors on Riverstone's Board will increase to seven.

24          (b)    Two-thirds of the members of the Board will be Independent Directors.

25          (c)    The Chairman or Lead Director of Riverstone's Board will be an Independent

26  Director (for purposes of this agreement, the terms "Chairman" and "Lead Director" are

27  synonymous).

28

(d)     The Chairman or Lead Director of the Board will be selected annually by the independent members of the Board.

(e)     The Chairman or Lead Director will serve in that capacity for a maximum of six consecutive years.

(f)     "Independent Director" means a person other than an officer or employee of the Company or its subsidiaries or any other individual having a relationship which would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.  To be deemed "independent" in any calendar year, a director would have to satisfy the following qualifications:

(i)     has not been employed by the Company or its subsidiaries or affiliates in an executive capacity within the last five calendar years;

(ii)     has no personal service contract(s) with the Company, or any member of the Company's senior management;

(iii)     is not an officer, director, trustee or fiduciary with a not-for-profit entity that receives significant contributions from the Company; and

(iv)     has not accepted (and has no Family Member who has accepted) any payments from the Company or any parent or subsidiary of the Company in excess of $60,000 during the current or any of the past three fiscal years, other than the following:

1)     compensation for Board or Board committee service;

2)     payments arising solely from investments in the Company's securities;

3)     compensation paid to the director's spouse, parents, children, siblings, mother-in-law, father-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, and

1    anyone who resides in such person's home ("Family Member") who is a non-executive employee of

2    the Company or a parent or subsidiary of the Company;

3

4                    4)       benefits under a tax-qualified retirement plan, or non-

5    discretionary compensation; or

6                    5)       loans permitted under Section 13(k) of the Securities Exchange

7    Act of 1934; or

8            (g)      Provided, however, that Audit Committee members are subject to the

9    following additional, more stringent requirements. To qualify as an Audit Committee member, he or

10    she:

11            (i)       is not a Family Member of an individual who is, or at any time during

12    the current or any of the past three years was, employed by the Company or by any parent or

13    subsidiary of the Company as an executive officer;

14           (ii)      is not, and has no Family Member who is, a partner in, or a controlling

15

16    shareholder or an executive officer of, any organization to which the Company made, or from which

17    the Company received, payments for property or services in the current or any of the past three fiscal

18    years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000,

19    whichever is more, other than the following

20                    1)       payments arising solely from investments in the Company's

21    securities; or

22

23                    2)       payments under non-discretionary charitable contribution

24    matching programs.

25           (iii)     is neither employed nor has a Family Member who is employed as an

26    executive officer of another entity where, at any time during the past three years, any of the

27    executive officers of the Company served on the compensation committee of such other entity;

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(iv)    is not, and has no Family Member who is, a current partner of the Company's outside auditor, or was a partner or employee of the Company's outside auditor who worked on the Company's audit at any time during any of the past three years; or

(v)    has not had any of the relationships described in subsections (f)(i)-(iv), (g)(i)-(iv) above, with any affiliate of the Company.

(h)    Independent Directors will conduct separate meetings in conjunction with regularly scheduled Board meetings, at which only Independent Directors will be present.  These meetings will occur at least twice per year.

(i)    Riverstone has an Audit Committee, a Compensation Committee, and a Nominating/Corporate Governance Committee.  All of these committees have three members, and are comprised entirely of Independent Directors.

(j)    The Audit Committee will have at least one member who has significant accounting or finance experience, and the remaining members will be generally knowledgeable regarding accounting matters.

(k)    The Nominating/Corporate Governance Committee shall be comprised of members who have demonstrated leadership skills or are generally knowledgeable regarding corporate governance matters.

(l)    The Audit, Compensation, and Nominating/Corporate Governance Committees shall have the authority to retain legal counsel or other advisors, if necessary in the exercise of their business judgment.

(m)    Audit partners will be rotated every five years.

(n)    Riverstone will not use an auditing firm at which the Company's CFO was an employee during the three years preceding the audit.

1          (o)       The outside auditor is precluded from providing certain non-audit services to

2  Riverstone, in accordance with 15 U.S.C. §78j-1(g), except for tax services.

3          (p)       Riverstone will have procedures for the confidential, anonymous submission

4  by employees of concerns regarding questionable accounting or auditing matters.

5

6          (q)       The Audit Committee regularly reports all "significant" audit findings to the

7  Board and relays information concerning all "material" aspects of litigation.

8          (r)       The Audit Committee will be responsible for overseeing a procedure

9  implemented and maintained by the Finance Department designed to track revenues for each

10  customer. The revenue tracking system shall be designed to provide the CEO and CFO with the

11  total amount of revenue recognized from sales to each customer on a quarterly basis.

12          (s)       The Compensation Committee determines or recommends compensation for

13

14  the CEO and all other executive officers. The CEO is not present during deliberations on his/her

15  compensation.

16          (t)       Director nominees are selected, or recommended for selection, by the

17  Nominating/Corporate Governance Committee. In assessing nominees, the Committee considers

18  whether the nominees are "independent."

19

20          (u)       The Nominating/Corporate Governance Committee meets at least quarterly.

21          (v)       The Nominating/Corporate Governance Committee recommends

22  compensation levels for the Board, including the Chairman.

23          (w)       The Nominating/Corporate Governance Committee oversees all proposed

24  amendments to the Articles, By-Laws, governance guidelines or committee charters.

25          (x)       The Nominating/Corporate Governance Committee is responsible for

26  reviewing with management the Company's compliance with the Sarbanes-Oxley Act.

27          (y)       The Audit Committee must approve all related party transactions.

28

1    (z)    The Audit Committee shall implement a Company-wide policy prohibiting

2    excessive fraternization between Company personnel and independent auditor personnel.

3    (aa)    Riverstone's CFO is responsible for formulating and applying the Company's

4    revenue recognition policy.

5    (bb)    The CFO reports to the Board on a regular basis regarding Riverstone's

6    revenue recognition policy.

7    

8    (cc)    The revenue recognition policy is distributed to each Riverstone employee

9    who is responsible for determining whether to record revenue.

10    (dd)    Riverstone maintains an insider trading policy, which imposes penalties for

11    violations of the policy.

12    

13    (ee)    Adoption of a Company-wide Code of Business Conduct, and appropriate

14    training regarding the Code.

15    (ff)    Implementation of quarterly sales certification process. Everyone from Vice

16    President of Sales to the entire sales force are required to certify compliance with revenue

17    recognition policy.

18    

19    (gg)    Implementation of process to ensure that for each customer transaction the

20    Company requires the sales organization to complete a questionnaire to ensure that the Company has

21    enough information properly to determine whether to recognize revenue. This questionnaire must be

22    completed to the satisfaction of the Vice President of Finance before the transaction can be

23    processed for shipment. The Vice President of Finance and/or the CFO review all transactions in

24    excess of $100,000.

25    (hh)    New internal audit function will be implemented. Internal audit will report

26    findings and results to the Audit Committee on a quarterly basis.

27    

28

1        (ii)    Company will provide quarterly sales force training for revenue recognition

2  policies and proper documentation of sales transactions, and compliance with applicable laws

3  regarding sales of products and services.

4       ~~In addition, plaintiffs in the Derivative Actions were instrumental in getting the defendants'~~

5  ~~insurers to pay the sum of approximately $11 million for the benefit of Riverstone in connection~~

6  ~~with the defense and settlement of the Class Action.~~

7       The significant corporate governance provisions adopted as a result of the prosecution and

8  settlement of this litigation directly address plaintiffs' allegations and seek to prevent any future

9  occurrence of the misconduct alleged.  As discussed in greater detail in the Umeda Declaration, these

10  changes provide for greater Board independence, strict internal financial controls and a vigorous

11  insider trading policy.  Umeda Decl., ¶¶31-32.  For example, by adopting a strict definition of

12  "independence," requiring that two-thirds of the Board be independent, ensuring that all members of

13  significant Board committees are independent, and providing for separate meetings of the

14  independent directors, the Settlement provides a structure for a Board that is free of influence from

15  management and capable of undivided loyalties to Riverstone.  With respect to the allegations

16  regarding accounting improprieties at Riverstone, the corporate governance provisions put in place

17  protections provided by a proper audit process and procedure including the rotation of Riverstone's

18  audit partners, prohibiting the Company's external auditor from providing non-audit services to

19  Riverstone, and strengthening and expanding the duties and responsibilities of the Audit Committee.

20  As to the allegations that certain Riverstone employees had knowledge of the alleged improper

21  accounting but failed to come forward for fear of retaliation, the corporate governance provisions

22  provide a procedure for the confidential and anonymous submission by employees of any suspected

23  accounting improprieties thus enabling them to assist the Company in preventing and identifying any

24  future misconduct.

25

26

27

28

1  IV.  **THE PROCEDURE FOR PRELIMINARY APPROVAL OF A DERIVATIVE ACTION IN FEDERAL COURT IS WELL ESTABLISHED**
2

3  As stated in the *Manual for Complex Litigation* §23.14, at 171 (3d ed. 1995), "[f]irst, the
4  court reviews the [proposed settlement] preliminarily to determine whether it is sufficient to warrant
5  public notice and a hearing." The preliminary approval criteria are as follows:

6  If the preliminary evaluation of the proposed settlement does not disclose
   grounds to doubt its fairness or other obvious deficiencies, such as unduly
7  preferential treatment of class representatives or segments of the class, or excessive
   compensation for attorneys, and appears to fall within the range of possible approval,
8  the court should direct that notice under Rule 23(e) be given to the class members of
   a formal fairness hearing, at which arguments and evidence may be presented in
9  support of and in opposition to the settlement.

10  *Id.* at §30.41, at 237.

11  The proposed settlement meets the foregoing criteria for notice as it is eminently fair,
12  reasonable and adequate and should be preliminarily approved by the Court.

13  V.  **THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE SETTLEMENTS**

14  A.  **The Law Favors Settlement**

15  There is a strong policy favoring compromises which resolve litigation. *Williams v. First*
16  *Nat'l Bank*, 216 U.S. 582, 30 S. Ct. 441, 54 L. Ed. 625 (1910); *MWS Wire Industries, Inc. v.*
17  *California Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986), including those in shareholder
18  derivative actions. *See, Maher v. Zapata*, 714 F.2d 436 (5th Cir. 1983). Derivative actions readily
19  lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome
20  and the typical length of the litigation. *See Maher*, 714 F.2d at 455 (settlements of derivative actions
21  are particularly favored because such litigation is "'notoriously difficult and unpredictable'")
22  (citation omitted). Settlements of derivative actions are "favored for the reasons that settlements
23  generally are favored: disputes are resolved; the resources of litigants and the courts are saved; and,
24  in the case of a derivative action, management can return its attention and energy from the courtroom
25  to the corporation itself." *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986).

26
27
28

1

**B.    The Role of the Court in Approval of a Derivative Settlement**

2        The settlement of a corporate derivative action requires court approval. Federal Rule of Civil

3  Procedure 23.1.[1]  In this regard, the court must determine whether a settlement is fair and reasonable.

4  *Maher*, 714 F.2d at 455 (settlement of shareholders' derivative action must be fair, adequate and

5  reasonable and without fraud or collusion). *In re Warner Communications Sec. Litig.*, 798 F.2d 35,

6  37.(2d Cir. 1986); *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982);

7  *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).  The proposed settlement

8  enjoys a presumption that it is fair and reasonable, because it is the product of extensive arm's-length

9  negotiations conducted by capable counsel who are well-experienced in class and derivative actions

10  with the substantial assistance of Judge Legge. *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,

11  671 F. Supp. 819, 822 (D. Mass 1987) ("Where, as here, a proposed class settlement has been

12  reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it

13  is presumptively fair.") (citation omitted); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D.

14  Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).

15        The Ninth Circuit has provided factors which may be considered in evaluating the fairness of

16  a class action settlement:

17        The district court's ultimate determination will necessarily involve a balancing of
    several factors which may include, among others, some or all of the following: the
18        strength of plaintiffs' case; the risk, expense, complexity, and likely duration of
    further litigation; the risk of maintaining class action status throughout the trial; the
19        amount offered in settlement; the extent of discovery completed, and the stage of the
    proceedings; the experience and views of counsel; the presence of a governmental
20        participant; and the reaction of the class members to the proposed settlement.

21  *Officers for Justice*, 688 F.2d at 625 (citations omitted). *Accord Torrisi v. Tucson Electric Power*

22  *Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

23

24

25  [1]    Federal Rule of Civil Procedure 23.1 states:

26        The action shall not be dismissed or compromised without the approval of the court,
    and notice ... shall be given to shareholders or members in such manner as the court
27        directs.

28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH

- 13 -

1        The district court must exercise "sound discretion" in approving a settlement. *Ellis*, 87

2    F.R.D. at 18; *Torrisi*, 8 F.3d at 1375. Therefore, in exercising its discretion, "the court's intrusion

3    upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit

4    must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the

5    product of fraud or overreaching by, or collusion between, the negotiating parties, and that the

6    settlement, taken as a whole is fair, reasonable and adequate to all concerned." *Officers for Justice*,

7    688 F.2d at 625. The Ninth Circuit defines the limits of the inquiry to be made by the court in the

8    following manner:

9            Therefore, the settlement or fairness hearing is not to be turned into a trial or

10           rehearsal for trial on the merits. Neither the trial court nor this court is to reach any
        ultimate conclusions on the contested issues of fact and law which underlie the
        merits of the dispute, for it is the very uncertainty of outcome in litigation and

11           avoidance of wasteful and expensive litigation that induce consensual settlements.
        The proposed settlement is not to be judged against a hypothetical or speculative

12           measure of what *might* have been achieved by the negotiators.

13   *Id.* (emphasis in original). As explained herein and in the Umeda Declaration, applying these criteria

14   demonstrates that this Settlement warrants the Court's preliminary and final approval.

15   VI.    **THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND**
        **FINALLY APPROVED AFTER NOTICE TO RIVERSTONE**

16       **SHAREHOLDERS**

17       Plaintiffs submit that the Settlement is a very good result for Riverstone. Plaintiffs' counsel

18   have achieved important benefits for the Company in the form of corporate governance changes that

19   are described above and were instrumental in obtaining approximately $11 million from defendants'

20   insurers for the benefit of Riverstone in connection with the settlement and defense of the Class

21   Action. The Settlement is the culmination of protracted arm's-length negotiations among the parties

22   with the substantial assistance of Judge Legge. The corporate therapeutics directly address

23   plaintiffs' allegations and    provide for, among other things greater Board and committee

24   independence and stricter financial controls which will create a corporate environment where the

25   events complained of are less likely to reoccur. As recent corporate debacles such as Enron, Tyco

26   and WorldCom demonstrate, strong corporate governance is fundamental to a corporation's well-

27   being and success.

28

1    Counsel for plaintiffs have conducted a careful analysis of the law and a thorough

2  examination of the facts relating to the allegations. Plaintiffs' counsel have also carefully weighed

3  the benefits of the Settlement against the substantial risks of continued litigation and have concluded

4  that the benefits to be conferred on Riverstone by the Settlement will, if approved by the Court,

5  result in a very good resolution of the derivative claims and allow Riverstone to prevent a recurrence

6  of similar matters in the future and to put these matters to rest.

7    A.    The Risks of Establishing Liability

8    In assessing the fairness, reasonableness and adequacy of the settlement, the court should

9  balance the benefits of the settlement against the continuing risks of litigation. *Girsh v. Jepson*, 521

10  F.2d 153, 157 (3rd Cir. 1975); *see also Officers for Justice*, 688 F.2d at 625. As discussed herein

11  and in the Umeda Declaration the settlement of this litigation provides substantial benefits to

12  Riverstone in the form of enhanced corporate governance provisions that directly address the

13  wrongdoing alleged and attempt to prevent future reoccurrences. Umeda Decl., ¶¶31-33. Derivative

14  plaintiffs were also an instrumental factor in obtaining from the Defendants' liability insurance

15  carriers a major part ($11 million cash) for the settlement of the Class Action for the benefit of

16  Riverstone.

17    Although plaintiffs believe that the claims asserted in the litigation were meritorious, liability

18  was by no means a foregone conclusion. For example, plaintiffs did not make a pre-litigation

19  demand for action by Riverstone's Board as is typically required and, though the complaints pled

20  excuses from the demand requirement, this issue is always fiercely litigated in derivative cases.

21  Indeed, the State Court granted defendants demurrer for failure to sufficiently allege demand futility.

22  At the time the Settlement was reached, defendants' motion to dismiss in this Court, which argued

23  that plaintiffs had failed to allege demand futility, was pending. As a result, there was a very real

24  risk that this Court would come to the same conclusion as the State Court and grant defendants'

25  motion to dismiss. Defendants also could be expected to contend that their actions were protected by

26  the business judgment rule, that Riverstone's Certificate of Incorporation bars plaintiffs' claims (an

27  argument they make in their motion to dismiss) or were otherwise non-actionable. The continued

28

1  litigation of these issues would utilize an abundant amount of the Court's time and would subject

2  Riverstone and its shareholders to the substantial risk of no recovery.

3      Defendants have vigorously denied the claims asserted by plaintiffs in the litigation. If

4  plaintiffs got past the pleading stage, defendants would assert that, at all times, they exercised sound

5  business judgment, acted in good faith and in a manner they believed to be in the best interest of

6  Riverstone and its shareholders. Based upon the record and applicable law, it is clear, however, that

7  there were serious risks in overcoming potential defenses and in establishing both liability and

8  damages. Indeed, the Ninth Circuit in affirming the district court's approval of a settlement of a

9  derivative action noted that "the odds of winning [a] derivative lawsuit [are] extremely small"

10  because "derivative lawsuits are rarely successful." *In re Pacific Enterprises Sec. Litig.*, 47 F.3d,

11  373, 378 (9th Cir. 1995). Even if liability was established, the amount of recoverable damages

12  would still have posed significant issues and would have been subject to further litigation. Counsel

13  was aware of indemnifying agreements between Riverstone and defendants that could have resulted

14  in Riverstone paying for any judgment entered against defendants. Thus, instead of the risk of

15  failure to achieve a potentially greater benefit for Riverstone inherent in continued litigation, the

16  proposed settlement guarantees a very good result with the implementation of important corporate

17  governance changes.

18  **B.    The Settlement Was Negotiated By the Parties With a Thorough**

19       **Understanding of the Strengths and Weaknesses of the Case**

20      The stage of the proceedings and the amount of discovery completed is another factor which

21  courts consider in determining the fairness, reasonableness, and adequacy of a settlement. *Officers*

22  *for Justice*, 688 F.2d at 625; *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 741

23  (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Girsh*, 521 F.2d at 157; *see also Boyd v. Bechtel*

24  *Corp.*, 485 F. Supp. 610, 616-17 (N.D. Cal. 1979).

25      This Settlement comes at a relatively early stage of the litigation, foreclosing the

26  extraordinary expense of protracted discovery and trial preparation, the incalculable cost of time and

27  attention diverted from the day-to-day business operations of the Company, and of course the burden

28  to the Court of protracted and complex litigation. Notwithstanding the relatively early stage in the

1  proceedings, both the knowledge of plaintiffs' counsel and the proceedings themselves have reached
2  a stage where an intelligent evaluation of the litigation and the propriety of settlement can be made.
3  As set forth in the Umeda Declaration, plaintiffs' counsel conducted an extensive investigation of the
4  allegations asserted in the Derivative Actions.  This investigation included a review and analysis of
5  available documents concerning Riverstone, interviews with numerous former employees of
6  Riverstone and third parties with knowledge of the allegations as well as consultation with experts.
7  In addition, the Settlement was reached only after the State Court had dismissed plaintiffs' claims in
8  response to defendants' demurrer, and the defendants had filed two motions to dismiss plaintiffs'
9  allegations in this Court.  The parties also participated in several mediation sessions where the
10  strengths and weaknesses of the parties respective claims and defenses were fully explored.  Thus,
11  the parties reached an agreement to settle this litigation at a point when they had a full understanding
12  of the legal and factual issues surrounding the case. *See In re Mego Financial Corp. Sec. Litig.*, 213
13  F.3d 454, 459 (9th Cir. 2000).

14        That the case settled before extensive formal discovery does not stand in the way of approval
15  of the Settlement.  Ninth Circuit law is quite clear that "'formal discovery is not a necessary ticket to
16  the bargaining table' where the parties have sufficient information to make an informed decision
17  about settlement." *Mego Financial*, 213 F.3d at 459 (citations omitted).  An extensive investigation,
18  the briefing on defendants' demurrers and motions to dismiss, the State Court's order dismissing
19  plaintiffs' claims and the mediation sessions provided plaintiffs and their counsel not only with a
20  clear picture of the strengths and weaknesses of their own case, but also of the sufficiency of the
21  legal and factual defenses that defendants would raise if litigation were to continue.  Having
22  sufficient information to properly evaluate the case, plaintiffs' counsel have managed to settle this
23  litigation on terms very favorable to Riverstone and its shareholders without the substantial expense,
24  risk and uncertainty of continued litigation.

25        C.     **The Settlement Is Wholly Reasonable in View of the Serious Risks**
               **Posed by Continued Litigation**
26
27        The determination of a "reasonable" settlement is not susceptible to a mathematical equation
28  yielding a particularized sum.  Rather, as one court explained, "there is a range of reasonableness

1    with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  As the Ninth

2    Circuit has made clear, "the very essence of a settlement is compromise, 'a yielding of absolutes and

3    an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624 (citation omitted).  Given the

4    obstacles and uncertainties inherent in this complex litigation, the settlement is a very good result

5    and is unquestionably superior to another "possibility" which certainly exists—little or no recovery.

6         It is also clear that even a victory at trial is no guarantee that the judgment would ultimately

7    be sustained on appeal.  Substantial judgments awarded by trial courts have been reversed on appeal.

8    *See, e.g., In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608

9    (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v.

10   entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.

11   1979) (reversing $87 million judgment after trial).  Add to these appellate risks the difficulty and

12   unpredictability of a lengthy and complex trial – where witnesses could suddenly become

13   unavailable or the factfinder could react to the evidence in unforeseen ways—and the benefits of the

14   Settlement become all the more apparent.

15       D.    **The Complexity, Expense and Likely Duration of the Litigation**
16             **Would Be Considerable Were the Action to Proceed**

17        Another factor militating in favor of the settlement is the complexity, expense and likely

18   duration of the litigation.  *Officers for Justice*, 688 F.2d at 625; *Girsh*, 521 F.2d at 157.  This case is

19   obviously complex.  If not for this Settlement, the case would have continued to be fiercely

20   contested by the parties.  Continued litigation here would be extremely complex, costly and of

21   substantial duration.  Assuming plaintiffs survived defendants' attack on the pleadings, document

22   discovery would need to be completed, depositions would have to be taken, experts would have to be

23   designated and expert discovery conducted.  Defendants' expected motion for summary judgment

24   would have to be briefed and argued, a pre-trial order would have to be prepared and motions *in*

25   *limine* would have to be filed and argued.  A trial could occupy attorneys on both sides and the Court

26   for weeks.  Moreover, any judgment favorable to plaintiffs would likely be the subject of post-trial

27   motions and appeal, which would prolong the case for years with the ultimate outcome uncertain.

28

E.    The Experience and Views of Counsel Favor Approval

Experienced counsel, operating at arm's length before a neutral and distinguished mediator, have weighed all of the foregoing factors and endorse the proposed settlement. As the courts have explained, the view of the attorneys actively conducting the litigation, is "entitled to significant weight." *Fisher Bros. v. Cambridge-Lee Industries, Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985); *see also Ellis*, 87 F.R.D. at 18; *Boyd*, 485 F. Supp. at 616-17.

Here, counsel for plaintiffs and defendants are seasoned practitioners in this specialized area of the law. The Settlement was reached only after counsel had conducted a substantial investigation, engaged in motion practice, informal discovery and protracted settlement negotiations. Umeda Decl., ¶¶19, 21, 25-28. These attorneys have considered the relative strengths and weaknesses of their respective cases and have reached the agreement embodied in the Stipulation and believe it is a very good result for Riverstone and its shareholders and therefore recommend its approval. Finally, the assistance of a neutral, respected mediator also assured a sound result for Riverstone's shareholders.

VII.    THE AGREEMENT FOR THE PAYMENT OF FEES AND EXPENSES IS APPROPRIATE

Significant corporate therapeutic benefits have been conferred upon Riverstone by plaintiffs' efforts in prosecuting the derivative claims and the Settlement that was ultimately obtained. As part of the Settlement, Riverstone has agreed to pay the sum of $1,750,000 in attorneys' fees and expenses to plaintiffs' counsel. The parties negotiated the attorneys' fees to be paid to plaintiffs' counsel after the substantive terms of the Settlement were agreed to and with the assistance of Judge Legge (Ret.).

The United States Supreme Court has endorsed this type of consensual resolution of attorneys' fee issues in these kinds of cases as the ideal toward which litigants should strive. In *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), the Supreme Court stated: "A request for attorney's fees should not result in a second major litigation. *Ideally, of course, litigants will settle the amount of a fee.*" (Emphasis added.)

1    In shareholder derivative cases, where the economic value of corporate therapeutic benefits

2    can be difficult to precisely quantify, an agreement on the parameters of a fee and expense award is

3    particularly appropriate.  In *In re M.D.C. Holdings Sec. Litig.*, Master File No. CV 89-0090 E (M),

4    1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) (a decision rendered by former Chief

5    Magistrate Judge Harry R. McCue, the court approved a $3 million fee as part of the settlement of a

6    shareholder derivative case).

7    Also, the fee here was negotiated under market conditions, a process which courts have

8    encouraged.  *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market

9    factors, best known by the negotiating parties themselves, should determine the quantum of

10   attorneys' fee).  Plaintiffs' counsel wished to maximize the fees to compensate them (as the case law

11   encourages) for their risk, innovation and creativity, while the Company wished to pay the

12   minimum.  The amount agreed to reflects the parties' experience as to what is appropriate for the

13   benefits obtained.  The result is a fee which was negotiated at arm's length and set by the market and

14   which is, therefore, a reasonable fee.

15   **VIII.   PROPOSED SCHEDULE OF EVENTS**

16   In connection with preliminary approval of the Settlement, the parties are requesting the

17   Court to establish dates by which notice of the Settlement will be sent to Riverstone shareholders,

18   dates by which Riverstone shareholders may object to the Settlement, and a final approval hearing.

19   The following schedule is proposed and may be inserted by the Court into the [Proposed] Order

20   Preliminarily Approving Settlement and Providing for Notice, submitted herewith:

21   Notice mailed to Riverstone            Ten days after Court enters order
     shareholders ("Notice Date")           preliminarily approving
22                                          settlement ("Notice Date")

23   Publication of Summary                 Ten days after Notice Date
     Notice
24

25   Last day for Riverstone                45 days after Notice Date
     shareholders to object to the
26   settlement

27   Final Approval Hearing                 60 days after Notice Date

28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                    - 20 -

1    This schedule is similar to those used in numerous derivative and class action settlements and

2   provides due process to Riverstone shareholders with respect to their rights concerning the

3   Settlement.

4   IX.    CONCLUSION

5          The Settlement achieved is a good result, given the risks and delays inherent in the litigation

6   and the complexity and expense if the case proceeded to trial.  Accordingly, plaintiffs and their

7   counsel respectfully submit that the Settlement is fair, reasonable and adequate and should be

8   approved by the Court.

9

10  DATED:  December 1, 2004                    Respectfully submitted,

11                                              LERACH COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
12                                              KEITH F. PARK
                                                MICHAEL J. DOWD
13                                              JEFFREY D. LIGHT

14

15                                              _____ for
                                                      MICHAEL J. DOWD

16                                              401 B Street, Suite 1700
17                                              San Diego, CA  92101
                                                Telephone:  619/231-1058
18                                              619/231-7423 (fax)

19                                              MURRAY FRANK & SAILER LLP
                                                ERIC J. BELFI
20                                              275 Madison Avenue, Suite 801
                                                New York, NY  10016
21                                              Telephone:  212/682-1818
                                                212/682-1892 (fax)

22                                              EMERSON POYNTER LLP
23                                              JOHN G. EMERSON
                                                SCOTT E. POYNTER
24                                              2228 Cottondale Lane, Suite 100
                                                Little Rock, AR 72202
25                                              Telephone:  501/907-2555
                                                501/907-2556 (fax)

26

27

28

# EXHIBIT B

1
2
3
4
NOT FOR CITATION

5
6
UNITED STATES DISTRICT COURT

7
NORTHERN DISTRICT OF CALIFORNIA

8
9
10
GREGORY WATTERSON, Derivatively
11
On Behalf of RIVERSTONE NETWORKS, INC.,
12
                 Plaintiff,              No. C 03-0637 PJH
13
14
      v.                       ORDER GRANTING MOTION FOR
FINAL APPROVAL OF DERIVATIVE
15
ROMULUS PEREIRA, et al.,         SETTLEMENT
16
                 Defendants
17
  -- and --
18
RIVERSTONE NETWORKS, INC.,
19
               Nominal Defendant.

20
      This matter came on for hearing on June 1, 2005, on the application of the parties for
21
final approval of the settlement of this shareholder derivative suit, as set forth in the Stipulation
22
and Agreement of Settlement dated November 12, 2004, and filed herein on December 17,
23
2004 ("the Stipulation"). Also before the court was the motion of objector Charles L. Grimes to
24
intervene. Plaintiff Gregory Watterson appeared by his counsel Jeffrey D. Light and Brian J.
25
Robbins. Defendants Romulus Pereira, Piyush Patel, Christopher Paisley, Eric Jaeger, Jorge
26
A. Del Calvo, Robert Stanton, and Suresh Gopalakrishnan, and nominal defendant Riverstone
27
Networks, Inc. ("Riverstone"), appeared by their counsel Paul T. Friedman and Craig D.
28
Martin. Also appearing for Riverstone was Noah D. Mesel. Objector and proposed intervenor

*United States District Court*
*For the Northern District of California*

1   Charles L. Grimes appeared by his counsel David A. Jenkins.

2       Due and adequate notice having been provided to the current Riverstone shareholders,

3   as required by the court's order of February 16, 2005, and the court having read the parties'

4   papers and carefully considered their arguments and the relevant legal authority, and good

5   cause appearing, the court hereby GRANTS the motion for final approval of the derivative

6   settlement, and GRANTS the motion to intervene, as follows and for the reasons stated at the

7   hearing.

8                   **BACKGROUND**

9       After Riverstone announced disappointing financial results in June 2002, twelve

10   complaints alleging violations of federal securities laws were filed in this court as proposed

11   class actions. The twelve suits were consolidated on September 24, 2002, as In re

12   Riverstone Networks, Inc., Securities Litigation. On March 14, 2003, defendants moved to

13   dismiss the consolidated complaint for failure to state a claim. Briefing was completed on

14   June 13, 2003, but the parties stipulated to continue the hearing to allow the parties to

15   participate in mediation.

16       Meanwhile, on August 13, 2002, a shareholder derivative action was filed on behalf of

17   Riverstone in the Superior Court of California, County of Santa Clara. (Bruhn v. Pereira, No.

18   CV-810290). The allegations in the derivative suit were virtually identical to the allegations in

19   one of the securities fraud complaints that had been filed in federal court the week before. In

20   December 2002, the defendants in the derivative action demurred. Rather than oppose the

21   demurrer, the plaintiff filed an amended complaint in February 2003.

22       Also in February 2003, Watterson v. Pereira, the above-entitled shareholder derivative

23   action, was filed in this court. The allegations in the present suit are substantially identical to

24   those of the original state court derivative complaint.

25       In April 2003, a second shareholder derivative action was filed in Santa Clara Superior

26   Court (Carrico v. Pereira, No. CV-816188). The superior court consolidated the two actions

27   as In re Riverstone Networks, Inc., Derivative Litigation, and in May 2003, plaintiffs filed a

28   single consolidated shareholder derivative complaint. Defendants demurred. On September

**United States District Court**
For the Northern District of California

2

1   17, 2003, the court sustained the demurrer and dismissed the consolidated complaint for

2   failure to allege demand futility. Rather than granting leave to amend, however, the court

3   stayed the action, on the ground that the state court complaint and the complaint in the

4   derivative action pending in federal court encompassed the same issues.

5        Meanwhile, on April 25, 2003, Riverstone announced that it had received a request

6   from the SEC for the voluntary production of documents relating to the company's accounting

7   practices, and had been notified that the SEC would open a formal investigation. On July 21,

8   2003, Riverstone announced that it had identified information calling into question the

9   appropriateness of its revenue recognition, and that it would restate its financial statements for

10  fiscal year 2002 and the first three quarters of 2003.

11       On September 26, 2003, defendants moved to dismiss the federal derivative

12  complaint, on the ground (among others) that plaintiff had failed to make a pre-litigation

13  demand on Riverstone's board and had failed to allege demand futility with particularity.

14  Shortly thereafter, plaintiff Watterson indicated his intention to file an amended complaint,

15  which he did on November 6, 2003, the motion to dismiss having been withdrawn.

16  Defendants again moved to dismiss, on March 26, 2004. The parties stipulated to extend the

17  deadlines for briefing the motion, and then, in May 2004, requested a stay of the action so that

18  they could discuss settlement.

19       In October 2003, the parties had commenced mediation in an attempt to negotiate a

20  settlement of the claims raised in In re Riverstone Networks, Inc. Securities Litigation (the

21  securities fraud suit.) On March 17, 2004, the parties reached an agreement in principle to

22  settle that suit. At some point thereafter, they also reached agreement on a settlement of the

23  state and federal derivative actions, and the Stipulation of Settlement was signed on

24  November 12, 2004.

25       The Stipulation provided for a general release of claims by Riverstone shareholders on

26  behalf of Riverstone, and also provided that Riverstone would implement certain corporate

27  governance measures, described in the Stipulation at ¶ IV.2.1. Riverstone also agreed "to

28  pay the fees and expenses (including, without limitation, the fees and expenses of all experts

**United States District Court**
For the Northern District of California

3

1   retained by Derivative Plaintiffs' Counsel to assist in the Derivative Actions) of Derivative

2   Plaintiffs' Counsel in an aggregate amount of $1,750,000 as a unitary part of the Settlement."

3   Stipulation ¶ VI.B.  In addition, the plaintiffs in the state court derivative suit agreed to file a

4   notice of dismissal in that case once the settlement agreement is approved by this court.

5          Defendants agreed to "cause the [D&O liability] insurers" to pay approximately $11

6   million "for the benefit of Riverstone in connection with the defense and settlement of" the

7   Riverstone Securities Litigation.  Derivative plaintiffs (in the state and the federal actions) also

8   assert that their counsel were "instrumental" in obtaining the $11 million from defendants'

9   insurers for settlement of the securities fraud suit.  Other than "caus[ing] the insurers" to pay

10  $11 million in towards the settlement of the securities fraud suit, the individual defendants are

11  not contributing monetarily towards the settlement.

12         On December 2, 2004, the parties filed their application for preliminary approval of the

13  derivative settlement.  At the initial hearing on January 20, 2005, the court stated that it was

14  not prepared to grant preliminary approval, and ordered further briefing, providing the parties

15  with specific issues that it wished to have addressed.  Plaintiffs[1] filed a supplemental brief on

16  January 26, 2005.  Defendants did not file a brief.

17         On February 16, 2005, the court conducted a further hearing on the application for

18  preliminary approval.  At that hearing, the court directed plaintiffs to provide additional

19  supplemental briefing -- specifically, to address the standard of law that applies to the court's

20  evaluation of the request to approve the settlement.  The court noted that plaintiffs hadn't

21  attempted to make a showing under the standard for approval of attorneys' fees requests, and

22  that even under the more generous standard for approval of settlement agreements -- that is,

23  "fairness" -- they still hadn't made any showing.

24         The court advised the parties that it had "real reservations," that it was "not satisfied

25  with the showing," and that it was "not exactly sure what to do to resolve it."  The court also

26  expressed dissatisfaction with the parties' failure to explain exactly which corporate

27  _____

28         [1]  The court refers throughout to "plaintiffs," as the Stipulation of Settlement was entered
       into by counsel for the derivative plaintiffs in the federal and state actions.

4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   governance measures were implemented as a result of the settlement, and which were

2   already in place before the settlement agreement. The court then indicated that it was willing

3   to preliminarily approve, "mostly based on the approval by the board," but added that "any

4   objections that I receive from any shareholders on this settlement will be scrutinized and could

5   very well block final approval of the settlement." Following the hearing, the court signed the

6   order preliminarily approving the settlement and providing for notice.

7       On May 2, 2005, Riverstone stockholder Charles L. Grimes filed a motion to intervene

8   and also filed objections to the settlement -- primarily, to the amount of attorneys' fees agreed

9   to by the parties. During the week between May 17, 2005, and May 25, 2005, the parties filed

10  additional briefs and declarations in support of the application for final approval of the

11  settlement. On June 1, 2005, the court conducted a hearing on the application for final

12  approval of the settlement.

13      At the June 1 hearing, plaintiffs argued that Mr. Grimes' motion to intervene should be

14  denied; that the agreed-to fee was an appropriate and reasonable term of the settlement; and

15  that plaintiffs had made a sufficient showing that they were entitled to the fee of $1.75 million.

16      Defendants argued that the settlement should be approved because it had been

17  approved by the current Riverstone board of directors, two-thirds of whom had joined the

18  board after the time of the wrongdoing alleged in the complaint. Defendants asserted that the

19  board had decided to accept the settlement because they believed it would be in the

20  corporation's best interest, in that continued litigation would be expensive, and a settlement

21  would provide finality and allow the company to proceed with its usual business.

22      The court advised the parties that finding the settlement fair, reasonable, and adequate

23  was difficult in view of the settlement term providing for payment of $1.75 million in fees to

24  counsel for plaintiffs in both the state and federal actions. The court indicated, however, that it

25  would approve the settlement, based primarily on the recommendation of Riverstone's board

26  of directors, as articulated at the hearing and in the supporting papers by defendants' counsel

27  Mr. Friedman. The court granted Mr. Grimes' motion to intervene, and invited him to appeal

28  the final judgment.

5

**DISCUSSION**

A.    Legal Standard

Federal Rule of Civil Procedure 23.1 requires the district court to review and approve the settlement and dismissal of any shareholder derivative suit. Fed. R. Civ. P. 23.1 ("The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal shall be given to shareholders or members in such manner as the court directs."). A similar rule applies in state court. See Fletcher v. A. J. Industries, Inc., 266 Cal. App. 2d 313, 324 (1968) (trial court in shareholder derivative action "is in a position to scrutinize the fairness of a settlement because the court alone can authorize the action's dismissal"). Before approving the settlement, the court must determine that it is "fundamentally fair, adequate, and reasonable." In re Pac. Enter. Sec. Litig., 47 F.3d 373, 377 (9th Cir. 1994).

In assessing whether the settlement of a derivative action is fair to the corporation and its shareholders, the court considers the same factors that are applied to class action settlements. Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1311 (3d Cir. 1993); see also 7 Newberg on Class Actions (4th ed.) § 22:110. The court should determine whether the proponents of the settlement have shown that it fairly and adequately serves the interests of the corporation on whose behalf the action was instituted. Id.

This determination involves a balancing of several factors, which may include the strength of the plaintiff's case; the amount offered in settlement; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the possibility of collusion among counsel in negotiating the settlement. Churchill Village L.L.C. v. Gen'l Elec., 361 F.3d 566, 575-76 (9th Cir.), cert. denied, 125 S.Ct. 56 (2004); see also Officers for Justice v. Civ. Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982). It is the settlement taken as a whole, rather than the individual component parts, which must be examined for overall fairness. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998), "The settlement must stand or fall in its entirety." Id.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  B.    Analysis

2      1.    Fairness Factors

3          a.    strength of plaintiff Watterson's case

4      The state court sustained the demurrer to the consolidated derivative suit because

5  plaintiffs had failed to make a pre-filing demand on Riverstone's board of directors, and had

6  failed to sufficiently allege demand futility.  The parties seeking preliminary approval of the

7  settlement of the derivative actions agreed in the application that the <u>Watterson</u> case might

8  similarly be subject to dismissal because Watterson had not made a pre-filing demand.

9  Defendants argued in addition that Watterson failed to allege his claims with specificity, a

10  requirement under the Federal Rules.  Both sides also asserted that Watterson's odds of

11  prevailing would be remote, because derivative suits are "rarely successful."  This factor

12  appears to favor settlement, because if plaintiff has no case, there is no point in continuing

13  with the litigation.

14          b.    the amount offered in settlement

15      This factor is not relevant, as no money is being offered in settlement of the derivative

16  claims.[2]  Rather, the Stipulation provides for implementation of new corporate governance

17  procedures.  It is difficult to assess the value of this benefit, even its non-pecuniary value, as

18  the parties have never clarified which procedures were in place prior to the filing of the

19  derivative suit, which procedures would have been implemented independent of the filing of

20  the derivative suit, or which procedures were implemented after the Stipulation was executed

21  or as a result of the settlement.[3]

22      The Stipulation states that "[d]uring the pendency of the Derivative Actions, Riverstone

23  implemented, or began to make best efforts to implement by the end of 2004," the corporate

24  governance procedures listed in the Stipulation.  Stipulation ¶ IV.2.1.  The Stipulation simply

25

26  _____

27      [2] Some cases discuss the value of the benefit conferred on the corporation under this
category.  <u>See, e.g.</u>, <u>Rosenbaum v. MacAllister</u>, 64 F.3d 1439, 1446 (10th Cir. 1995).

28      [3] The court made at least two requests for this information, but it was never forthcoming
in any detail.

7

1 | provides a list of corporate governance measures, and the parties offer no comparison
2 | between new procedures and old. Nor do plaintiffs provide expert testimony that clarifies the
3 | difference between the new and old procedures.[4] Moreover, based on the statements in the
4 | Stipulation, it appears that Riverstone may have implemented many if not all of the measures
5 | before the Stipulation was executed.

6 |　　　At the hearing on the application for preliminary approval of the settlement, the court
7 | also asked the parties to elaborate on the changes in corporate governance and the extent to
8 | which they were actually "changes." The court noted the lack of discussion (in the parties'
9 | papers) of the value of the changes, or of discussion of whether they were implemented after
10 | the settlement or were in progress before, or whether they were the result of the SEC action
11 | as opposed to the settlement.

12 |　　　In response, plaintiffs' counsel stated that the corporate governance provisions were
13 | negotiated during the mediation, and that some were the result of the derivative actions having
14 | been filed, while others were the result of settlement. Defendants' counsel stated that none of
15 | the changes resulted from the SEC investigation, that some resulted from the settlement, and
16 | that some were ongoing.

17 |　　　　　c.　　the extent of discovery completed, and the risk, complexity, and likely
18 |　　　　　　　　duration of further litigation
19 |　　　There has been no discovery and no motions heard in the federal derivative action.
20 | Defendants argue that this factor favors settlement, as Riverside would have incurred
21 | substantial costs in connection with any formal discovery, and would have had to make
22 | numerous employees and former employees and board members available for deposition.
23 | They assert that the settlement allows Riverstone to avoid the expenses that can accompany
24 | protracted litigation. Defendants also contend that continued litigation would have distracted
25 | Riverstone's management from the business of running the company. Plaintiffs concur, noting
26 |
27 |　　　[4] Plaintiffs provided a declaration from California attorney Harry R. McCue, a retired
28 | United States Magistrate Judge, and from Scott D. Hakala, a Chartered Financial Analyst, both
   | of whom state that in their opinion the changes in corporate governance procedures and internal
   | controls provide significant value to the corporation.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   that the settlement comes at an early stage of the litigation (of the present action), foreclosing

2   the extraordinary expense of protracted discovery and trial preparation, and the incalculable

3   cost of time and attention diverted away from the day-to-day business operations of the

4   company.

5        Neither party comments directly on the likely duration of further litigation. This factor is

6   difficult to assess, as there appears to be a conflict between the parties' assertion that

7   Watterson's case was weak (therefore presumably vulnerable to dismissal under Rule

8   12(b)(6)) and their claim that settlement will enable the parties to avoid protracted litigation.[5]

9           d.     possibility of collusion among counsel in negotiating the settlement

10       Both sides emphasize that the settlement negotiations were conducted at "arm's

11  length," with the essential participation of the mediator, former United States District Judge

12  Judge Charles A. Legge. The court is aware of no specific evidence of collusion.

13          e.     "fairness factors" taken as a whole

14       Based solely on defendants' representations, the court finds that the agreement to

15  implement changes in corporate governance confers a benefit on the corporation. In addition,

16  the settlement undoubtedly relieves defendants from the expense of additional litigation,

17  whatever the merit (or lack thereof) of Watterson's case. Taken together, the "fairness factors"

18  favor approval of the settlement.

19      2.    Request for Attorneys' Fees

20       Although the provision for payment of attorneys' fees and costs is included as a term of

21  the settlement agreement, the court addresses this factor separately in order to underscore its

22  concerns regarding this method of structuring a settlement that is required by statute to be

23  approved by the court.

24

25       [5] The court notes in addition that the derivative plaintiffs originally took the position (in their

26  motion for preliminary approval of the settlement) that the litigation was risky because Watterson
    had failed to make a pre-litigation demand on Riverstone's board of directors, and because the

27  case was likely to be dismissed for failure to allege demand futility with particularity, while they
    took the position in their supplemental briefing in support of the application for final approval that

28  Watterson's case was meritorious and that he was likely to prevail in any motion to dismiss, and
    that approval of the settlement would therefore eliminate this potential for protracted litigation.

United States District Court
For the Northern District of California

1    As stated above, the Stipulation provides that Riverstone shall pay attorneys' fees in

2    the amount of $1.75 million to plaintiff's counsel.[6]  Under the general rule in California and in

3    most jurisdictions, the party prevailing in an action may not recover attorneys' fees unless a

4    statute expressly permits such recovery.  See, e.g. Cal. Civ. P. Code § 1021 (California

5    expression of general rule); see also Hall v. Cole, 412 U.S. 1, 5 (1973) (general American

6    Rule is that prevailing litigants must pay their own attorneys' fees).

7    An exception to this rule is found in the "common-fund doctrine," an equitable doctrine

8    under which the beneficiaries of the fund pay their share of the expense necessary to make it

9    available to them. Fletcher, 266 Cal. App. 2d at 320; see also Boeing Co. v. Van Gemert,

10    444 U.S. 472, 478 (1980); Hall, 412 U.S. at 5 & n.7.  Courts in California apply the common

11    fund doctrine in favor of any plaintiff who has successfully maintained a stockholder's

12    derivative action on behalf of a corporation in the state. Fletcher, 266 Cal. App. 2d at 320-21

13    (citing cases).[7]

14    In a "common fund" settlement, the parties settle for the total amount of the common

15    fund and shift the fund to the court's supervision.  The plaintiffs' lawyers then apply to the court

16    for a fee award from the fund. Staton v. Boeing Co., 327 F.3d 938, 969-70 (9th Cir. 2003).

17    The court evaluates the request for approval of settlement (under the

18    factors identified in Hanlon and other cases) separately from the request for attorneys' fees.

19    A variant of the "common-fund doctrine" is the "substantial-benefit rule," where the

20    successful plaintiff in a derivative action may be awarded attorneys' fees against the

21    _____

22    [6]    Five law firms are listed on the plaintiff's application for preliminary approval of
settlement.  Of these, three -- the Murray firm, the Dreher firm, and the Emerson firm -- are the
23    counsel of record for plaintiff Watterson in Watterson v. Pereira.  Two other firms -- the Lerach firm
(successor to Milberg Weiss) and the Robins Umeda firm -- are counsel of record for the plaintiffs
24    in the state court derivative suit; in addition, counsel for Watterson filed a "Notice of Association
of Counsel" in May 2004, stating that plaintiff was associating in the Lerach and Robins Umeda
25    firms.

26    [7]    Riverstone is incorporated in Delaware, not California, and the general rule in diversity
suits is that the law of the place of incorporation applies. See Batchelder v. Kawamoto, 147 F.3d
27    915, 920 (9th Cir. 1998).  However, Watterson alleges claims under California law, and there are
no significant differences between federal law and the law in Delaware and California on the issue
28    of attorneys' fees. See Lewis v. Anderson, 692 F.2d 1267, 1270 (9th Cir. 1982); In re Oracle
Sec. Litig., 852 F.Supp. 1437, 1445 (N.D. Cal. 1994).

United States District Court
For the Northern District of California

1    corporation if the corporation received "substantial benefits" from the litigation, although the

2    benefits were not pecuniary and the action did not produce a fund from which they might be

3    paid. Fletcher, 266 Cal. App. 2d at 320, 324, cited with approval in Westside Cmty for Indep.

4    Living, Inc. v. Obledo, 33 Cal. 3d 348, 352 (1983). Under California law, an agreement to

5    implement improvements in corporate governance may provide a nonpecuniary "substantial

6    benefit" to the corporation that is sufficient to entitle plaintiffs to an award of attorneys' fees.

7    Fletcher, 266 Cal. App. 2d at 323-24.

8        It is irrelevant that the "benefits" achieved may have come from a settlement of the

9    plaintiff's action rather than by a final judgment following trial. Id. at 325; Lewis, 692 F.2d at

10   1270 (both federal and California law permit a fee recovery when a substantial benefit arises

11   from a settlement rather than a judgment). Federal law also permits a fee award if the benefit

12   arises from corporate remedial action that moots a plaintiff's claim. Lewis, 692 F.2d at 1270.

13       In either a "common fund" or a "substantial benefit" case, the court can follow the

14   "lodestar" approach, where the fee is determined based on the time and materials spent by

15   derivative counsel. In re Oracle, 852 F.Supp. at 1449. In evaluating the lodestar, the court

16   should consider any of the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th

17   Cir. 1975) that are relevant.[8] The following factors are pertinent to a derivative counsel fee

18   determination: the results achieved by counsel, plus the time and effort applied to a case by

19   counsel for plaintiff; the relative complexities of the litigation; the skills applied to their

20   resolution by counsel; and the standing and ability of petitioning counsel. In re Oracle, 852

21   F.Supp. at 1449.

22       At the hearing on the motion for preliminary approval of the settlement, the court asked

23   the parties whether the agreement as to attorneys' fees was an element of the settlement

24   agreement, or whether it was a separate agreement; and if it was part of the settlement

25   agreement, whether the agreement would fail if the fees were not approved. Plaintiff's

26   counsel indicated that the settlement was a unitary settlement, which would fail if the

27   _____

28   [8] The Ninth Circuit does not require that district courts address every factor listed in Kerr. Jordan v. Multnomah County, 815 F.2d 1258, 1264 n.11 (9th Cir. 1987).

United States District Court
For the Northern District of California

1  agreement to pay $1.75 million in fees was not approved as well. The court discussed with

2  the parties its concerns that, if the fee agreement was included as a term of the settlement

3  agreement, there could be no separate basis for determining whether fees should be

4  awarded, and the same "fairness" factors would govern approval of the fees provision.

5          The court advised the parties that it was particularly troubled by the fact that they had

6  offered no explanation whatsoever of the basis for $1.75 million requested. The court stated

7  further that it was impossible to perform a "reasonable fee" analysis based on a lodestar

8  calculation, as the application provided no information regarding hours, tasks performed, or

9  billing rates. In the supplemental briefing that followed the second hearing on the motion for

10 preliminary approval of the settlement, plaintiffs' counsel finally provided the court with lodestar

11 documentation, though they still failed to address the Kerr factors.

12          Where fees are paid to attorneys in a shareholder derivative suit, the idea is that the

13 corporation has benefitted from the suit, and the cost of that benefit should be spread among

14 all the shareholders. See James D. Cox & Thomas Lee Hazen, Cox & Hazen on

15 Corporations (2003) §15.20. Throughout the settlement approval process, defendants have

16 urged the court to approve the settlement on the ground that Riverstone continued to lose

17 money as a consequence of the litigation, and that settlement would thus benefit the

18 corporation. Defendants also asserted that if the litigation proceeded, Riverstone would likely

19 not have the assets to satisfy any judgment that plaintiffs might win. According to defendants,

20 Riverstone's D&O insurers aggressively disputed their respective coverage obligations and

21 threatened rescission during the mediation. Defendants asserted that Riverstone had

22 negotiated the settlement based on the assumption that it would have to fund it 100%,

23 although two of the three insurers eventually agreed to tender their policy limits. In addition,

24 defendants noted that Riverstone's bondholders had sued the company seeking immediate

25 repayment of $131 million, casting further doubts on Riverstone's cash reserves.

26          By contrast, plaintiffs' counsel's only effort at briefing was to cite cases that stand

27 generally for the proposition that courts should approve settlement agreements, and that a

28 court presented with an application for approval of a settlement should not turn the application

**United States District Court**
For the Northern District of California

1 into a "full-fledged hearing on the merits." Counsel also argued that because the economic

2 value of non-pecuniary corporate therapeutic benefits can be difficult to precisely quantify, "an

3 agreement on the parameters of a fee and expense award is particularly appropriate," and

4 urged the court to approve the $1.75 million because it was "negotiated under market

5 conditions."

6       In their supplemental brief in support of the application for preliminary approval of the

7 settlement, plaintiffs' counsel again provided no explanation as to the asserted

8 "reasonableness" of the $1.75 million fee request. Essentially, they asserted, just as in the

9 initial brief filed in support of the application, that the court should approve the request simply

10 because it was part of the parties' settlement agreement. Nor did they provide the information

11 the court had requested concerning the changes in corporate governance. The only additions

12 were three declarations -- one from an economist, one from a retired magistrate judge, and

13 one from plaintiffs' counsel Keith Park -- purporting to explain why the settlement should be

14 approved.

15       In the brief in support of the application for final approval of the settlement, plaintiffs

16 argued, primarily, that the court should approve the fee provision because the amount was

17 negotiated under "market conditions." In support of that proposition, they cited a wholly

18 inapposite case -- In re Continental Illinois Sec. Litig., 962 F.2d 566 (7th Cir. 1992). In that

19 case, a securities fraud action which had settled for $45 million, the Seventh Circuit reversed

20 the district court, which had cut the requested fees in half. Plaintiffs' counsel had sought the

21 lodestar, supported by the usual documentation. The lodestar also amounted to 20% of the

22 recovery. The district judge found the requested billing rates to be excessively high, and also

23 reduced the amount in several other respects. The Seventh Circuit criticized the district court

24 for placing a ceiling of $175/hour on the lawyers' hourly rates, and also (among other things)

25 for refusing to allow paralegal expenses to be compensated at market rates, stating that the

26 district court had made a mistake "by trying to determine the value of a service that the market

27 has set its own value on" and noting that the Supreme Court has disapproved the approach of

28 reimbursement for paralegal costs based on "cost" of the paralegal as distinct from the market

13

United States District Court
For the Northern District of California

1  value of the services. Plaintiffs' counsel misleadingly cited this case for the proposition that

2  "[i]t is inappropriate "to determine the value of a service that the market has set its own value

3  on" by reference to hours or hourly rates, and it is error not to award a premium "in order to

4  reflect the risky character" of representative litigation (citing In re Continental, 962 F.2d at

5  569).[9]

6          Plaintiffs' counsel argued further that the Supreme Court has stated that consensual

7  resolution of attorneys' fees is the ideal toward which litigants should strive and that a request

8  for attorneys' fees should not result in a second major litigation, citing Hensley v. Eckerhart,

9  461 U.S. 424 (1983). Hensley is not relevant here, as it involved a contested motion for

10 attorneys' fees under 42 U.S.C. § 1988. The request in the present case is not contested.

11 Moreover, settlement of civil rights cases does not require court approval or oversight, while

12 settlement of shareholder suits does.

13         Plaintiffs' counsel provided three additional reasons that the court should approve the

14 $1.75 million request: that the agreement regarding fees was the result of an arms'-length

15 negotiation between sophisticated counsel, defendants, their insurers, and Judge Legge; that

16 the settlement -- including the $1.75 million fee -- had been approved by Riverstone's board of

17 directors as being in the best interests of the company; and that the agreed-to fee and

18 expense provision is a "common settlement term" and is "consistent in amount with other

19 derivative settlements."

20         In support of the third argument, plaintiffs provided copies of eleven orders they

21 claimed were recent examples of court-approved derivative settlements that included an

22 agreement as to fees and expenses as part of the settlement. Of those eleven cases, one

23 was from a state court in Missouri, eight were from the Superior Court of California, and two

24 were from the United States District Court (one from the Southern District of Texas, and one

25 ―――――――――――――――――――――――――――――――――――――――――――

26     [9] Even if the Continental decision were somehow relevant to this case – which it is not –
   the Ninth Circuit has criticized the Seventh Circuit's position that in awarding fees in common fund

27 cases, courts should determine a reasonable fee by attempting to replicate the market rate. See
   Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1049 (9th Cir. 2002). Of course, plaintiffs' counsel

28 is not asking this court in this case to attempt the replicate the market rate – but simply to approve
   the agreement to pay $1.75 million because it was negotiated under "market conditions."

14

1   from the Northern District of Georgia).  None of the eleven opinions was a reported decision,

2   and plaintiffs provided the court with no information about the underlying facts or the details of

3   the settlements.

4         In short, apart from the persuasive arguments made by counsel for Riverstone, the

5   court was presented with little reason to approve the award of $1.75 million in fees and

6   expenses to plaintiffs' counsel.

7       3.     Arguments by the Objector, Charles Grimes

8         The court received papers from one objector -- Charles Grimes -- a Riverstone

9   stockholder with 3,500,000 shares.  He objected primarily to the amount of the fee request,

10   making several arguments in opposition to the motion for approval of the settlement.

11        First, he contended that it was improper for the settling parties to include an attorneys'

12   fees provision as part of the settlement agreement, relying on the Ninth Circuit's recent

13   decision in Staton v. Boeing Co.

14        Second, he asserted the suit was not meritorious, noting that the motion to dismiss

15   would in all likelihood have been granted, because of the lack of pre-litigation demand.

16        Third, he claimed that there had been no showing by the parties that the settlement

17   would result in a benefit to the corporation (primarily because the settlement required the

18   changes in corporate governance to be in effect for only 4 years, and because plaintiffs had

19   not shown any nexus between the derivative suit and the changes in corporate governance).

20        Finally, he argued that the amount requested is not reasonable — that the lodestar

21   information submitted by plaintiffs' counsel provided no basis for measuring whether the fee

22   was reasonable, that there was no evidence that derivative counsel had done much work other

23   than copying the state court complaints.  He asserted that the real reason the case had settled

24   was probably a combination of the SEC investigation and the work done by plaintiffs' class

25   counsel in the securities fraud suit.

26        Grimes also filed a motion to intervene in the action, for the purpose of preserving his

27   right to appeal any adverse decision regarding his objection to the settlement (i.e., to the

28   attorneys' fees provision in the settlement agreement).  In support of his request, he cited an

<div style="text-align:center">15</div>

1    unpublished decision, Karpp v. F.D.I.C., 921 F.2d 280, 1990 WL 212693 (9th Cir., Dec. 27,

2    1990), in which the Ninth Circuit found that the appellants lacked standing to appeal a class

3    action settlement because they had opted out of the settlement class, and had made no effort

4    to formally participate in the district court case, as, for example, moving to intervene.

5        The Ninth Circuit answered the question of the right of an objector to appeal the

6    settlement of a class action Powers v. Eichen, 229 F.3d 1249 (9th Cir. 2000), a case brought

7    under the Private Litigation Securities Reform Act. The court held that an unnamed class

8    member who failed to intervene in the proceedings below had constitutional standing to

9    appeal an award of attorneys' fees from the class settlement, because the size of his portion

10   of the settlement award was inversely related to the size of the attorneys' fees award. Powers,

11   229 F.3d at 1254-56.

12       In 2002, in Devlin v. Scardelletti, 536 U.S. 1 (2002), the Supreme Court held that a

13   "nonnamed class member" who objects in a timely fashion to a settlement may appeal without

14   first intervening. Devlin, 536 U.S. at 14. The Court characterized the dispositive question as

15   whether the class member should be considered a "party" for purposes of appealing the

16   settlement, finding it most important that the settlement would bind nonnamed class members.

17   Id. at 9-10.

18       However, this is not a class action, but a shareholder derivative action, in which there is

19   no question of a shareholder being able to "opt out." It does not appear that the Ninth Circuit

20   has ruled on this issue with regard to shareholder derivative suits. The court did note in the

21   Powers decision that the Seventh Circuit was (at the time) the only circuit to rule that nonparty

22   shareholders do not have standing to appeal a decision in a shareholder derivative suit.

23   Powers, 229 F.3d at 1255 (citing Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998)[10] and also

24   noting that both the Second and Third Circuits had allowed non-intervening unnamed parties

25   to challenge the fairness and accuracy of a settlement in the context of Rule 23.1). In Bell

26   _____

27       [10]  The Ninth Circuit in Powers noted that the Supreme Court had granted certiorari in
     Felzen, and then simply affirmed by an equally divided court, without answering that particular
28   question. Powers, 229 F.3d at 1255 (citing Cal. Pub. Employees' Retirement Sys. v. Felzen, 525
     U.S. 315 (1999)).

United States District Court
For the Northern District of California

1   _Atlantic Corp. v. Bolger_, the Third Circuit held that an objector who had not formally intervened

2   had standing to appeal the order approving settlement of a derivative suit. _Bell Atlantic_, 2

3   F.3d at 1310. In _Rosenbaum v. MacAllster_, the Tenth Circuit ruled the same way.

4   _Rosenbaum_, 64 F.3d at 1443.

5       Plaintiffs opposed the motion to intervene, arguing that because the corporation is the

6   plaintiff in a derivative suit, any individual claims of the company's stockholders are not at

7   stake and the shareholders are not parties. In support, they cited _Jones v. H.F. Ahmanson &_

8   _Co._, 1 Cal. 3d 93 (1969). While it is true that the individual claims of the company's

9   stockholders are not at issue in a derivative action, _Jones_ does not provide support for

10   plaintiffs' claim that the individual shareholders cannot challenge a settlement on behalf of the

11   corporation, which is what Mr. Grimes is attempting to do here. _Jones_ simply held that where

12   the complaint of a minority stockholder in a savings and loan association against majority

13   stockholders and a holding company did not seek recovery on behalf of the association for

14   injuries to the association or for injury incidental to any injury to the association but for injury to

15   herself and other minority stockholders, her suit was not derivative and could be maintained

16   without meeting the statutory requisites of derivative actions and without showing that the injury

17   was unique to her. _Jones_, 1 Cal. 3d at 106-07.

18       The court has carefully considered Mr. Grimes' persuasive objections, but has

19   reluctantly determined, on balance, that the benefit to the corporation warrants approval of the

20   settlement. The court does not agree that _Staton_ prohibits inclusion of an attorneys' fees

21   provision as a term in a unitary settlement agreement in a shareholder derivative action. In

22   that case, the Ninth Circuit held that it was improper in the settlement of an employment

23   discrimination class action for the class counsel to have negotiated, as a term of the

24   settlement, the amount of fees to be paid from the common fund, instead of following the

25   typical procedure of presenting a fee application to the court after approval of the class action

26   settlement.

27       The Ninth Circuit acknowledged that the Supreme Court had held that parties to a class

28   action may simultaneously negotiate merits relief and an award of attorneys' fees under a fee-

United States District Court

For the Northern District of California

17

**United States District Court**
For the Northern District of California

1   shifting statute, and might even condition the settlement on a waiver of fees. <u>Staton</u>, 327 F.3d

2   at 971-72 (citing <u>Evans v. Jeff D.</u>, 475 U.S. 717, 720 (1986)). However, the court added that

3   the effect of conditioning the settlement "on a set amount of attorneys' fees based on an actual

4   or putative common fund can be to inhibit district courts from engaging in independent

5   determinations of reasonable fees, as required by law." <u>Id.</u> Moreover, the basis of the Ninth

6   Circuit's objection to the settlement in <u>Staton</u> was that neither the parties nor the district court

7   had applied correct statutory fee principles, and that it was improper to apply common fund

8   fee principles where the parties had not treated the case as a common fund case. <u>Id.</u> at 969-

9   72.

10          With regard to Mr. Grimes' claim that the suit was not meritorious, the court is unable to

11   make a determination regarding the merit of the case without having had the benefit of

12   briefing by the parties in a motion to dismiss. With regard to the argument that there is no

13   showing that the settlement results in a benefit to the corporation, the court agrees that the

14   showing is thin, but has accepted the representations of Riverstone's counsel that the current

15   board of directors has concluded that the settlement is beneficial.

16          Finally, with regard to the claim that the $1.75 million fee request is not reasonable, the

17   court agrees, but is unwilling to refuse to approve the fees provision because the result will be

18   to invalidate the entire settlement agreement. The court notes, however, that the information

19   provided by plaintiffs with their application for final approval of the settlement does not support

20   their claim that a fee of $1.75 million is reasonable in this case. Plaintiffs have considered

21   none of the <u>Kerr</u> factors, and the court has no basis upon which to determine whether the work

22   performed was necessary or the time spent was reasonable.

23          Moreover, the $1.75 million less the claimed expenses of $38,347.20, equals

24   $1,711,652.80, which represents a multiplier of 2.39 of the lodestar.[11] Plaintiffs have provided

25

26   ―――――――――――――――――
        [11]  Plaintiff's counsel provide documentation showing that five law firms expended
27   1,850.90 hours, for a resulting lodestar of $716,180.50. The lodestar divided by the total hours
     equals an average of $386.94 per hour for every attorney, paralegal, and investigator. The $1.75
28   million fee, less claimed expenses, divided by the total hours equals an average of $924.77 for
     every attorney, paralegal, and investigator.

1    absolutely no valid justification for the application of a multiplier in this run-of-the-mill

2    shareholder derivative action.  Plaintiffs refer to the lodestar as "cross-check" – though it is not

3    clear of what – and then breezily assert that the 2.39 multiplier is "reasonable" because the

4    amount of the multiplier is "in line with" multipliers in other cases, without discussing the factors

5    that courts normally consider when deciding whether to apply a multiplier.

6          Nevertheless, as stated at the hearing, the court finds that the motion to intervene

7    should be GRANTED, primarily to ensure that Mr. Grimes is not prevented from appealing the

8    approval of the settlement to the Ninth Circuit.  The court would welcome guidance from the

9    Ninth Circuit on the question of the propriety of unitary settlements in shareholder derivative

10   actions, where the provision regarding payment of fees is a term of the settlement agreement;

11   as well as on the question of the standard to be applied by the court in evaluating the fairness

12   of such a settlement agreement that includes an attorneys' fees provision.

                            **CONCLUSION**

14         This is a settlement that was carefully constructed by plaintiffs' counsel to evade judicial

15   review.  Moreover, even after the court requested additional information from the plaintiffs, the

16   plaintiffs repeatedly failed to comply with those requests.  The court determined to approve the

17   settlement only because defendant's counsel, Mr. Friedman, was so persuasive in describing,

18   at the hearings, the ways in which the corporation had made the best of a difficult choice, and

19   the reasons that Riverstone's board of directors had determined that approval of the

20   settlement would be the best thing in the long run for the corporation.

21         In accordance with the foregoing, and as stated at the June 1, 2005, hearing, the court

22   hereby GRANTS the application for final approval of the settlement, and GRANTS the motion

23   of objector Charles Grimes to intervene in this action.

24

25   IT IS SO ORDERED.

26   Dated: July 22, 2005

27                                        PHYLLIS J. HAMILTON
                                          United States District Judge

28

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20

# EXHIBIT C

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

CIVIL APPEALS DOCKETING STATEMENT

INTERNAL USE ONLY

PLEASE TYPE OR PRINT. ATTACH ADDITIONAL PAGES IF NECESSARY

| TITLE IN FULL: | DISTRICT: Northern | JUDGE: Phyllis J. Hamilton |
|---|---|---|
| GREGORY WATTERSON, Derivatively On Behalf of RIVERSTONE NETWORKS, INC., Plaintiff, vs. ROMULUS PEREIRA, et al., Defendants, -and- RIVERSTONE NETWORKS, INC., a Delaware Corporation, Nominal Defendant. | DATE COMPLAINT FILED: 2/14/2003 | DISTRICT COURT DOCKET NUMBER: C-03-0637-PJH |

DATE NOTICE OF APPEAL FILED: 6/29/05   IS THIS A CROSS-APPEAL? YES ___ NO X

HAS THIS MATTER BEEN BEFORE THIS COURT PREVIOUSLY? ___ YES X NO
IF YES, STATE WHEN:

CASE NAME:

CITATION:    DOCKET NUMBER:

CHECK AS MANY AS APPLY

| JURISDICTION | | DISTRICT COURT DISPOSITION | | |
|---|---|---|---|---|
| 1. FEDERAL | 2. APPELLATE | 1. STAGE OF PROCEEDINGS | 2. TYPE OF JUDGMENT/ ORDER APPEALED | 3. RELIEF |
| () FEDERAL QUESTION [X] DIVERSITY () OTHER (SPECIFY) | [X] FINAL DECISION OF DISTRICT COURT () INTERLOCUTORY DECISION APPEALABLE AS OF RIGHT () INTERLOCUTORY ORDER CERTIFIED BY DISTRICT JUDGE (SPECIFY) () OTHER (SPECIFY) | [X] PRE-TRIAL () DURING TRIAL () AFTER TRIAL | () DEFAULT JUDGMENT [X] JUDGMENT/COURT DECISION () DISMISSAL/JURISDICTION () JUDGMENT/JURY VERDICT () DISMISSAL/MERITS () SUMMARY JUDGMENT () JUDGMENT NOV () DECLARATORY JUDGMENT () DIRECTED VERDICT () OTHER (SPECIFY) | () DAMAGES. AMOUNT SOUGHT $1.75 million in attorneys' fees AMOUNT () GRANTED () DENIED $_____ () INJUNCTIONS () PRELIMINARY OR () PERMANENT () GRANTED OR () DENIED |

BRIEF DESCRIPTION OF NATURE OF ACTION AND RESULT BELOW:

This is a derivative action against various directors of Riverstone Networks, Inc. alleging breaches of fiduciary duty, violations of the California Corporate Code, insider trading, breach of the duty for insider selling, receipt of incentive-based compensation, and seeking reimbursement under the Sarbanes-Oxley Act. Plaintiff and defendants negotiated a settlement that, over the objection of intervenor Charles L. Grimes, the District Court approved. The settlement approved by the District Court included a provision requiring the nominal defendant to pay $1.75 million in attorneys' fees to plaintiff's counsel without requiring the filing and consideration of a separate application for attorneys' fees.

ISSUES PROPOSED TO BE RAISED ON APPEAL:

1.    Whether the District Court erred when it denied Charles L. Grimes' Objection to the Settlement and approved the settlement of a derivative action that included a provision requiring the nominal defendant to pay $1.75 million in attorneys' fees to plaintiff's counsel without requiring the filing and consideration of a separate application for attorneys' fees.

2.    Alternatively, whether the District Court erred to the extent that it found as reasonable a settlement that included a provision requiring the nominal defendant to pay $1.75 million in attorneys' fees to plaintiff's counsel, even though the District Court described these fees as "exorbitant."

BASED ON YOUR PRESENT KNOWLEDGE:

Does this appeal involve a question of first impression? __X__ Yes _____ No

Will the determination of this appeal turn on the interpretation or application of a particular case or statute?
__X__ Yes _____ No    If yes, provide

Case name/statue: __Federal Rule of Civil__
_____ Procedure 23.1_____
Citation: _____
Docket number, if unreported: _____

Is there any case now pending or about to be filed in this court or any other court or administrative agency which:

a)    Arises from substantially the same case or controversy as this appeal?
__X__ Yes _____ No

b)    Involves an issue that is substantially the same, similar or related to an issue in this appeal?
__X__ Yes _____ No

Case name: __In re Riverstone Networks,__
__Inc. Derivative Litigation__
Citation: _____
Court or Agency: __Santa Clara County Super. Ct.__
Docket number, if unreported: __Lead Case__
__No. CV 810290__

Will this appeal involve a conflict of law within the Ninth Circuit?
_____ Yes __X__ No

Among circuits? _____ Yes __X__ No
If yes, explain briefly:
_____
_____

DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:

_____ Possibility of settlement;

_____ Likelihood of a motion to expedite the appeal;

_____ Multiple parties on either side for whom joint briefing is possible;

_____ Likelihood of motions to intervene on appeal;

_____ Likelihood of motions to file amicus briefs;

_____ Likelihood of motions to stay appeal pending resolution of a related case. Identify case name, docket number and court or agency:
_____
_____
_____

_____ Other procedural complexities:
_____
_____
_____

COUNSEL FOR APPELLANT(S):
NAME: __David A. Jenkins__
__Michele C. Gott__
__Joelle E. Polesky__
FIRM: __Smith Katzenstein & Furlow LLP__
ADDRESS: __800 Delaware Avenue__
__P.O. Box 410__
__Wilmington, DE  19899__

TELEPHONE: __(302)652-8400__

I CERTIFY THAT A COPY OF THIS CIVIL APPEALS DOCKETING STATEMENT WAS SUBMITTED TO THE CLERK OF DISTRICT COURT OR THE U.S. COURT OF APPEALS, AND THAT IT WAS SERVED ON EACH PARTY/COUNSEL SHOWN ON THE ATTACHED SERVICE LIST.

_____        __29 June 2005__
SIGNATURE                              DATE

**REMEMBER TO ATTACH COPIES OF ORDER/JUDGMENT APPEALED FROM AND SERVICE LIST WITH TELEPHONE NUMBERS**

# EXHIBIT D

(Official Form 1) (10/05)

| United States Bankruptcy Court<br>District of   DELAWARE | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>RIVERSTONE NETWORKS, INC. | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than one, state all): 95-4596178 | Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, and State):<br>5200 Great America Parkway<br>Santa Clara, California<br>ZIPCODE 95054 | Street Address of Joint Debtor (No. & Street, City, and State):<br>ZIPCODE |
| County of Residence or of the Principal Place of Business:<br>Santa Clara, CA | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIPCODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIPCODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>Various, including USA, India, Hong Kong, Japan and the U.K.   ZIPCODE | |

**Type of Debtor (Form of Organization)** (Check one box.)
- [ ] Individual (includes Joint Debtors)
- [✓] Corporation (includes LLC and LLP)
- [ ] Partnership
- [ ] Other (If debtor is not one of the above entities, check this box and provide the information requested below.)
  State type of entity: _____

**Nature of Business** (Check all applicable boxes.)
- [ ] Health Care Business
- [ ] Single Asset Real Estate as defined in 11 U.S.C § 101 (51B)
- [ ] Railroad
- [ ] Stockbroker
- [ ] Commodity Broker
- [ ] Clearing Bank
- [ ] Nonprofit Organization qualified under 15 U.S.C. § 501(c)(3)

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)
- [ ] Chapter 7
- [ ] Chapter 9
- [ ] Chapter 13
- [✓] Chapter 11
- [ ] Chapter 12
- [ ] Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- [ ] Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts** (Check one box)
- [ ] Consumer/Non-Business
- [✓] Business

**Filing Fee** (Check one box)
- [✓] Full Filing Fee attached
- [ ] Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- [ ] Filing Fee waiver requested (Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**
Check one box:
- [ ] Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- [✓] Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- [ ] Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less than $2 million.

**Statistical/Administrative Information**
- [✓] Debtor estimates that funds will be available for distribution to unsecured creditors
- [ ] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors

THIS SPACE IS FOR COURT USE ONLY

**Estimated Number of Creditors**

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | OVER 100,000 |
|---|---|---|---|---|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] | [✓] | [ ] | [ ] | [ ] | [ ] |

**Estimated Assets**

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [✓] |

**Estimated Debts**

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [✓] |

1-NY/1986921.1

(Official Form 1) (10/05)                                                                                          FORM B1, Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Riverstone Networks, Inc. | |
|---|---|---|
| **Prior Bankruptcy Case Filed Within Last 8 Years (If more than one, attach additional sheet)** | | |
| Location<br>Where Filed: | Case Number: | Date Filed: |
| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)** | | |
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>[✓] Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br>I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X _____<br>    Signature of Attorney for Debtor(s)     Date |

| **Exhibit C** | **Certification Concerning Debt Counseling<br>by Individual/Joint Debtor(s)** |
|---|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>[ ] Yes, and Exhibit C is attached and made a part of this petition.<br>[✓] No | [ ] I/we have received approved budget and credit counseling during the 180-day period preceding the filing of this petition.<br><br>[ ] I/we request a waiver of the requirement to obtain budget and credit counseling prior to filing based on exigent circumstances. (Must attach certification describing.) |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue** (Check any applicable box)

[✓] Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

[ ] There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

[ ] Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

---

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
*Check all applicable boxes*

[ ] Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

    _____
    (Name of landlord that obtained judgment)

    _____
    (Address of landlord)

[ ] Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

[ ] Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

(Official Form 1) (10/05)                                                                                      FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
| *(This page must be completed and filed in every case)* | Riverstone Networks, Inc. |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

Robert S. Brady, Esq.
Printed Name of Attorney for Debtor(s)

Young Conaway Stargatt & Taylor, LLP
Firm Name

The Brandywine Building, 1000 West Street, 17th Floor
Address
Wilmington, Delaware 19801

(302) 571-6600
Telephone Number

2/7/06
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

Michael W. Overby
Printed Name of Authorized Individual

Interim Chief Financial Officer
Title of Authorized Individual

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.

☐ Pursuant to § 1511 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
(Signature of Foreign Representative)

_____
(Printed Name of Foreign Representative)

_____
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section.Official Form 19B is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of Bankruptcy Petition Preparer or officer, principal, responsible person or partner whose social security number is provided above.

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate Official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. § 156.*

1-NY/1986221.1

ATTACHMENT TO VOLUNTARY PETITION

Pending Bankruptcy Cases Filed by Affiliates of the Debtor

On February 7, 2006, each of the affiliated entities listed below, including the Debtor in this chapter 11 case (collectively, the "Debtors"), filed a petition in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). Riverstone Networks, Inc. ("Riverstone") is the ultimate parent corporation of each of the other Debtors, which are direct and wholly-owned subsidiaries of Riverstone. Contemporaneously with the filing of their voluntary petitions, the Debtors filed a motion requesting that the Court consolidate their chapter 11 cases for administrative purposes only.

The Debtors are the following entities:

Riverstone Networks, Inc.
BlueCoast Software
The OASys Group, Inc.
Riverstone Networks SPC, Inc.
Pipal Systems, Inc.

064952.1001

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RIVERSTONE NETWORKS, INC., | : | Case No. _____ |
| | : | |
| Debtor. | : | |
| | : | |

---------------------------------------------------------- x

## EXHIBIT "A" TO VOLUNTARY PETITION OF
## RIVERSTONE NETWORKS, INC.

1.     The debtor's SEC file number is 001-05620.

2.     The following financial data is the latest available unaudited information and refers to the debtor's condition on December 24, 2005.

| | | |
|---|---|---|
| (a) | Total assets | $98,341,134 |
| (b) | Total liabilities | $130,071,947 |
| (c) | Debt Securities held by more than 500 holders | 0 |
| (d) | Number of shares of preferred stock | 0 |
| (e) | Number of shares of common stock | 131,064,542 |

3.     Brief description of debtor's business:  Manufacturer of data transmission routing equipment for metro Ethernet networks.  The debtor's metro routers and related products are designed to meet customers' IP networking requirements in support of voice, video and data services.

4.      List the name of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:

S Squared Technology Corp.
FMR Corp.
Amalgamated Gadget LP
Kern Capital Management LLC
Legg Mason Inc.

2

### Interim Chief Financial Officer's Certificate

The undersigned hereby certifies that he is the Interim Chief Financial Officer of Riverstone Networks, Inc., a Delaware corporation (the "Company"), and that as such he is authorized to execute and deliver this certificate in the name of and on behalf of the Company and represents, warrants and further certifies in his official capacity, in the name of and on behalf of the Company, as follows:

       (i)    Attached hereto as <u>Exhibit A</u> are true, correct and complete copies of certain resolutions duly adopted by the Board of Directors of the Company by unanimous oral consent with an effective date of February 5, 2006. Such resolutions have not been amended, modified, revoked or rescinded and are in full force and effect in the form adopted.

IN WITNESS WHEREOF, I have hereunto set my hand on this __ day of _____, 2006.

By: _____

Name: Michael W. Overby

Title: Interim Chief Financial Officer

3

Exhibit A

**Resolutions Adopted by the Board of Directors of**
**Riverstone Networks, Inc. (the "Company")**
**on February 5, 2006**

**RESOLVED** that, after consideration by the Board of Directors, it is desirable and in the best interests of the Company, its creditors, stockholders, employees, and other interested parties, that authority be granted, authorizing the filing of a petition by the Company in the United Stated Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by the Authorized Officers under chapter 11 of the Bankruptcy Code, seeking reorganization under the provisions of said law; and

**FURTHER RESOLVED** that each of Authorized Officers are, and each of them hereby is, authorized and directed (and each of the following as applicable to the extent previously performed is hereby ratified and approved), in the name of the Company and on its behalf, to take such actions as any Authorized Officer may deem necessary or advisable with respect to such filing; and

**FURTHER RESOLVED** that the Authorized Officers are, and each of them hereby is, authorized and directed to retain, on behalf of the Company, and on such final terms and conditions as the Authorized Officers deem to be in the best interests of the Company the law firms of Morgan, Lewis & Bockius LLP and Young, Conaway, Stargatt & Taylor, LLP, to render legal services to and to represent the Company in connection with the chapter 11 case and any related matters in connection therewith, if necessary pursuant to appropriate engagement letters and as authorized by the Bankruptcy Court; and

**FURTHER RESOLVED** that the Authorized Officers are, and each of them hereby is, authorized and directed to sell such assets of the Company, including, without limitation, operations in the United States and abroad, and to cause the sale of the assets of any subsidiary, as such Authorized Officers shall deem in the best interests of the Company, consistent, in all cases, with optimizing value for the Company's creditors and shareholders; and

**FURTHER RESOLVED** that the Authorized Officers are, and each of them hereby is, authorized and directed, in the name of the Company, to seek such orders from the Bankruptcy Court, including, but not limited to, orders regarding the operation of the business of the Company and the financing thereof, as any of them may deem necessary, appropriate, or advisable during the pendency of the Reorganization, and, in connection therewith, to execute and file with the Bankruptcy Court such motions, applications, pleadings, certifications, affidavits, or other materials as any Authorized Officer may deem necessary, appropriate, or advisable and to retain all assistance from legal counsel, accountants, investment bankers, and other professionals, and to take any and all actions, that they, or any one of them, deem necessary, appropriate or advisable in connection with the Reorganization; and

**FURTHER RESOLVED** that the Authorized Officers are, and each of them hereby is, authorized, empowered and directed, in the name of the Company, to do or cause to be done all such further acts and things and to execute, deliver, and seal all such other documents,

agreements, instruments, undertakings, or certificates as any of them may deem necessary or advisable to consummate the Reorganization and to carry into effect or implement the purpose and intent of the foregoing resolutions; and

**FURTHER RESOLVED** that all actions previously taken by any director, officer, employee, or agent of the Company regarding or relating to the reorganization or the subject matter of any and all of the foregoing resolutions are hereby authorized, ratified, approved and confirmed in all respects.

Signed this 05 day of February, 2006

Michael W. Overby
Interim Chief Financial Officer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                          :        Chapter 11
                                                :
RIVERSTONE NETWORKS,                            :        Case No. _____
INC., et al,[1]                                 :
                                                :
                         Debtors.               :        Joint Administration Requested
                                                :
------------------------------------------------------- x

## CONSOLIDATED LIST OF CREDITORS HOLDING THE
## TWENTY LARGEST UNSECURED CLAIMS AGAINST THE DEBTORS

The following is the consolidated list of creditors holding the twenty largest unsecured claims against Riverstone Networks, Inc. and certain of its subsidiaries, each a debtor and debtor-in-possession in the above-captioned cases (collectively, the "Debtors") (the "List of Creditors"). The List of Creditors reflects estimated amounts owed by the Debtors as of February 2, 2006 and may not reflect the actual amounts owing by the Debtors as of the Petition Date.

The Debtors take no position at this time regarding whether any of the parties included in the List of Creditors are "insiders" of the Debtors, as that term is defined in section 101(31) of title 11 of the United States Code (the "Bankruptcy Code"), and the inclusion or exclusion of any party in this List of Creditors shall not constitute an admission by, nor shall it be binding on, the Debtors in any respect. The Debtors expressly reserve the right to, in their sole discretion, challenge the validity, priority and/or amount of any obligation reflected herein.

---

[1] The Debtors are Riverstone Networks, Inc., BlueCoast Software, The OASys Group, Inc., Riverstone Networks SPC, Inc. and Pipal Systems, Inc.

| (1)<br>Name of creditor and complete mailing address, including zip code | (2)<br>Name, telephone number, and fax number of employee, agent or department of creditor familiar with claim | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, CORPORATE TRUST SERVICES, NEVADA FINANCIAL CENTER, 2300 WEST SAHARA, 3RD FLOOR, LAS VEGAS, NEVADA 89102 | Sandra Spivey<br>Phone: 800-934-6802<br>Fax: 651-495-8141 | Bond | | $65,875,000.00 |
| IXIA<br>26601 WEST AGOURA ROAD<br>CALABASAS, CA 91302 | Phone: 877-367-4942<br>Fax: 818-871-1805 | Trade | | $135,654.33 |
| HEWLETT-PACKARD ESPANOLA, S.L.<br>CARRETERA N-V1, KM<br>MADRID, SPAIN | Phone: 34-91-631-1600<br>Fax: 34-91-631-1830 | Trade | | $53,441.60 |
| EXHIBIT CENTRAL<br>273 MAIN STREET<br>BOSTON, MA 01740 | Fax: 978-779-6664 | Trade | | $15,275.00 |
| MOLEX CONNECTOR CORPORATION<br>PO BOX 101853<br>ATLANTA, GA 30392 | Phone: 630-969-4550<br>Fax: 630-416-4962 | Trade | | $13,621.50 |
| AVNET<br>PO BOX 60000<br>SAN FRANCISCO, CA 94160 | Phone: 480-643-2000<br>Fax: 480-643-7240 | Trade | | $12,516.01 |
| MIRACLE ENGINEERS<br>4027 CHAMBERER DR<br>SAN JOSE, CA 95135 | Phone: 408-489-8074<br>Email:<br>laxman@miracleengineers.com | Trade | | $8,000.00 |
| GRANT THORNTON LLP<br>PO BOX 51519<br>LOS ANGELES, CA 90051 | Phone: 213-627-1717<br>Fax: 213-624-6793 | Trade | | $4,948.68 |
| DENNEMEYER & CO LTD.<br>REGENT HOUSE HEATON LANE<br>STOCKPORT SK4 1BB | Phone: 44-161-477-2567<br>Fax: 44-161-429-8063 | Trade | | $3,341.28 |
| LIGHT READING INC.<br>459 COLUMBUS AVENUE<br>NEW YORK, NY 10024 | Fax: 212-898-1263 | Trade | | $3,200.00 |
| CDW COMPUTER CENTERS<br>PO BOX 75723<br>CHICAGO, IL 60675 | Phone: 847-465-6000<br>Fax: 847-465-3444 | Trade | | $2,560.13 |
| SPHERION CORPORATION<br>PO BOX 100365<br>PASADENA, CA 91189 | Fax: 408-727-7247 | Trade | | $1,680.00 |

| (1)<br>Name of creditor and complete mailing address, including zip code | (2)<br>Name, telephone number, and fax number of employee, agent or department of creditor familiar with claim | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| OFFICE DEPOT BUSINESS SERVICE<br>LOS ANGELES, CA 90074 | Phone: 888-263-9586<br>Fax: 888-263-9587 | Trade | | $911.76 |
| CALGREG ELECTRONICS<br>60 ALHAMBRA, SUITE 1<br>WARWICK, RI 02886 | Phone: 888-732-6100<br>Fax: 401-738-6231 | Trade | | $582.00 |
| CPR NETWORKS<br>1180 MIRALOMA WAY<br>SUNNYVALE, CA 94086 | Fax: 408-522-8105 | Trade | | $541.25 |
| MERITRONICS INC.<br>3020 KENNETH STREET<br>SANTA CLARA, CA 95054 | Fax: 408-969-0801 | Trade | | $440.00 |
| ELLIOTT LABORATORIES INC<br>684 WEST MAUDE AVE<br>SUNNYVALE, CA 94085 | Phone: 408-245-7800<br>Toll Free: 877-245-7800<br>Fax: 408-245-3499 | Trade | | $400.00 |
| AXESS LIMOUSINE, INC.<br>1933 O'TOOLE AVENUE<br># A-108<br>SAN JOSE, CA 95131 | Fax: 408-456-0863 | Trade | | $324.48 |
| NETPOWER TECHNOLOGIES<br>1680 PROSPECT DRIVE<br>RICHARDSON, TX 75081 | Phone: 972-560-0500<br>Fax: 972-560-0210 | Trade | | $221.25 |
| LEBOULANGER<br>305 N MATHILDA AVE<br>SUNNYVALE, CA 94086 | Fax: 408-523-9810 | Trade | | $152.23 |

3

## DECLARATION REGARDING THE LIST OF CREDITORS HOLDING
## TWENTY LARGEST UNSECURED CLAIMS AGAINST THE DEBTORS

      I, Noah D. Mesel, am senior vice president and general counsel of Riverstone Networks, Inc., one of the Debtors in these chapter 11 cases, and in such capacity, I am familiar with the financial affairs of each of the Debtors in these chapter 11 cases. I declare under penalty of perjury that I have read and reviewed the foregoing Consolidated List of Creditors Holding the Twenty Largest Unsecured Claims Against the Debtors and that the information included therein is true and correct to the best of my knowledge, information and belief.

Dated: February 6, 2006

                                  Noah D. Mesel
                                  Senior Vice President and
                                  General Counsel

# EXHIBIT E

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                :

RNI WIND DOWN CORPORATION, f/k/a     :
RIVERSTONE NETWORKS, INC., et al.,     :

             Debtors.      :

------------------------------------------------------------- x

Chapter 11

Case No. 06-10110 (CSS)
Jointly Administered

## JOINT PLAN OF REORGANIZATION AND LIQUIDATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
## PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY
## HOLDERS, AS REVISED

**MORGAN, LEWIS & BOCKIUS LLP**
Co-Counsel to Debtors
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6001
Attn: Neil E. Herman, Esq.
      Andrew D. Gottfried, Esq.
      Rebecca L. Booth, Esq.

**SCHULTE ROTH & ZABEL LLP**
Co-Counsel to the Official
Committee of Unsecured Creditors
919 Third Avenue
New York, NY 10022
Tel: (212) 756-2000
Fax: (212) 593-5955
Attn: Jeffrey S. Sabin, Esq.
      Adam Harris, Esq.

**BROWN RUDNICK BERLACK ISRAELS LLP**
Co-Counsel to the Official
Committee of Equity Holders
One Financial Center
Boston, Massachusetts 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
Attn: William R. Baldiga, Esq.
      Sunni P. Beville, Esq.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Co-Counsel to Debtors
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
Tel: (302) 571-6600
Fax: (302) 571-1253
Attn: Michael R. Nestor, Esq.
      Edmon L. Morton, Esq.

**LANDIS RATH & COBB LLP**
Co-Counsel to the Official
Committee of Unsecured Creditors
919 Market Street
Suite 600
Wilmington, Delaware 19801
Tel: (302) 467-4400
Fax: (302) 467-4450
Attn: Adam Landis, Esq.
      Kerri K. Mumford, Esq.

**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**
Co-Counsel to the Official
Committee of Equity Holders
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Tel: (302) 426-1189
Fax: (302) 426-9193
Attn: Steven K. Kortanek, Esq.

Dated: September 12, 2006

# TABLE OF CONTENTS

**Page**

ARTICLE I.      DEFINITIONS AND INTERPRETATION ................................................. 3
   1.1    Definitions.................................................................................................. 3
   1.2    Other Terms ............................................................................................. 15
   1.3    Construction of Certain Terms................................................................. 15

ARTICLE II.     TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
                PRIORITY TAX CLAIMS .................................................................... 16
   2.1    Non-Classification .................................................................................. 16
   2.2    Administrative Expense Claims ............................................................... 16
          (a)    Administrative Expense Claims (other than Professional
                  Fee Claims) .............................................................................. 16
          (b)    Professional Fee Claims and Expense Reimbursement
                  Claims ...................................................................................... 16
          (c)    Administrative Expense Claims Bar Date ................................. 17
          (d)    Insurance .................................................................................. 17
   2.3    U.S. Trustee Fees .................................................................................... 17
   2.4    Priority Tax Claims.................................................................................. 17

ARTICLE III.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................. 17
   3.1    Identification of Classes........................................................................... 17
   3.2    Elimination of Classes ............................................................................. 18

ARTICLE IV.     TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................ 19
   4.1    Classes 1a, 1b, 1c, 1d and 1e (collectively, "Class 1") - Secured Claims ........... 19
          (a)    Impairment and Voting ............................................................. 19
          (b)    Treatment and Distributions ..................................................... 19
          (c)    Deletion of Class....................................................................... 19
   4.2    Classes 2a, 2b, 2c, 2d and 2e (collectively, "Class 2") - Priority Claims ........... 19
          (a)    Impairment and Voting ............................................................. 19
          (b)    Distributions to Class 2 ............................................................ 19
          (c)    Deductions for Prior Payments ................................................ 19
          (d)    Deletion of Class....................................................................... 19
   4.3    Class 3 — Personal Injury/ Insured Claims............................................. 20
          (a)    Impairment and Voting ............................................................. 20

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | (b) | Distributions to Class 3 | 20 |
| 4.4 | | Classes 4a, 4b, 4c, 4d and 4e (collectively, "Class 4") - General Unsecured Claims | 20 |
| | (a) | Impairment and Voting | 20 |
| | (b) | Distributions to Class 4 | 20 |
| | (c) | Interest | 20 |
| | (d) | Deletion of Class | 20 |
| 4.5 | | Class 5 – Bondholder Claims | 20 |
| | (a) | Allowance of Claims | 20 |
| | (b) | Impairment and Voting | 20 |
| | (c) | Distributions to Class 5 | 21 |
| | (d) | Method of Distributions | 21 |
| | (e) | Fees and Expenses of Bond Trustee | 21 |
| | (f) | Cancellation of Bonds | 21 |
| 4.6 | | Classes 6a, 6b, 6c, 6d or 6e (collectively, "Class 6") – Indemnification Claims | 21 |
| | (a) | Impairment and Voting | 21 |
| | (b) | Sub-classification | 21 |
| | (c) | Distributions to Class 6 | 22 |
| | (d) | Effect of Insurance Coverage | 22 |
| | (e) | Interest | 22 |
| | (f) | Undertaking to Return | 22 |
| | (g) | Settlement and Treatment of Claims of Settling Officers and Directors | 22 |
| | (h) | Additional Settlement in Respect of Class 6a-2 Claims | 22 |
| | (i) | Class 6a-2 Reserve | 23 |
| | (j) | Additional Reserves | 24 |
| | (k) | Electing Directors/Officers | 25 |
| | (l) | Invalidation of Election | 26 |
| | (m) | Non-Complying Persons | 26 |

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | (n) | Payment of Indemnification Claims of Officers, Directors and Employees | 26 |
| | (o) | Cooperation | 27 |
| 4.7 | | Class 7a - Equity Interests (in Riverstone Networks, Inc.) | 27 |
| | (a) | Impairment and Voting | 27 |
| | (b) | Distributions to Class 7 | 27 |
| | (c) | Method of Distributions | 27 |
| | (d) | Cancellation of Equity | 27 |
| | (e) | Holders of Options | 28 |
| | (f) | Option Holder Schedule | 28 |
| 4.8 | | Classes 7b, 7c, 7d and 7e – Equity Interests in Debtors other than Riverstone Networks, Inc. | 30 |
| | (a) | Impairment and Voting | 30 |
| | (b) | Cancellation of Equity Interests | 30 |
| ARTICLE V. | | ACCEPTANCE OR REJECTION OF THIS PLAN | 31 |
| 5.1 | | Voting of Claims and Equity Interests | 31 |
| 5.2 | | Acceptance by a Class of Creditors or Equity Interest Holders | 31 |
| 5.3 | | Classes Entitled to Vote/Presumed Acceptances and Rejections of Plan | 31 |
| 5.4 | | Cram Down | 31 |
| ARTICLE VI. | | IMPLEMENTATION OF THE PLAN | 31 |
| 6.1 | | Implementation of the Plan | 31 |
| | (a) | Creation of Liquidating Trust | 31 |
| | (b) | Transfers to the Liquidating Trust | 31 |
| | (c) | The Liquidating Trustee | 32 |
| | (d) | Responsibilities of Liquidating Trustee | 32 |
| | (e) | Powers of the Liquidating Trustee | 32 |
| | (f) | Compensation of Liquidating Trustee | 32 |
| | (g) | Termination of Liquidating Trust | 33 |
| | (h) | Appointment of the Plan Administrator | 33 |
| | (i) | Rights, Powers and Duties of the Reorganized Debtors and the Plan Administrator | 33 |

## TABLE OF CONTENTS
### (continued)

|  |  | | Page |
|---|---|---|---|
| | (j) | Compensation of Plan Administrator | 33 |
| | (k) | Resignation of Officers and Directors | 34 |
| | (l) | Certificate of Incorporation and By-laws | 34 |
| 6.2 | | Post-Effective Date Committee | 34 |
| 6.3 | | Continuation of Bankruptcy Injunction or Stays | 35 |
| 6.4 | | Substantive Consolidation | 35 |
| 6.5 | | Intercompany Claims | 35 |
| 6.6 | | Full and Final Satisfaction | 35 |
| 6.7 | | Chapter 5 Avoidance Actions | 35 |
| 6.8 | | Administration Pending Effective Date | 35 |
| 6.9 | | Closing of Chapter 11 Cases | 36 |
| 6.10 | | Permanent Injunction | 36 |
| 6.11 | | No Discharge | 36 |
| 6.12 | | Continued Corporate Existence; Dissolution of the Reorganized Debtors | 36 |
| 6.13 | | Directors and Officers; Effectuating Documents; Further Transactions | 36 |
| ARTICLE VII. | | DISTRIBUTIONS AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS | 37 |
| 7.1 | | Method of Distributions Under this Plan | 37 |
| | (a) | In General | 37 |
| | (b) | Distributions of Cash | 37 |
| | (c) | Timing of Distributions | 37 |
| | (d) | Distributions to Holders as of the Confirmation Date | 37 |
| 7.2 | | Fund Reserve | 37 |
| 7.3 | | Objections to and Resolution of Administrative Expense Claims, Claims and Equity Interests | 37 |
| 7.4 | | Establishment and Maintenance of Reserve for Disputed Claims | 38 |
| 7.5 | | Distributions Upon Allowance or Disallowance of Disputed Claims | 38 |
| 7.6 | | Distributions Upon Allowance of Class 6 Indemnification Claims | 38 |
| 7.7 | | Estimation | 39 |
| 7.8 | | Disputed Payments | 39 |


**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 7.9 | Unclaimed Distributions | 39 |
| 7.10 | Setoffs | 40 |
| 7.11 | Professional Fees and Expenses | 40 |
| 7.12 | Minimum Distributions | 40 |
| 7.13 | Final Distribution | 40 |
| ARTICLE VIII. | EXECUTORY CONTRACTS; UNEXPIRED LEASES; RETIREE BENEFITS | 40 |
| 8.1 | Executory Contracts and Unexpired Leases | 40 |
| 8.2 | Approval of Rejection of Executory Contracts and Unexpired Leases | 40 |
| 8.3 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan | 40 |
| 8.4 | Retiree Benefits | 41 |
| 8.5 | Employee Benefit Plans | 41 |
| ARTICLE IX. | EXCULPATION, INJUNCTIONS AND RELEASES | 41 |
| 9.1 | Exculpation | 41 |
| 9.2 | Releases by the Debtors | 41 |
| 9.3 | Releases by Holders of Claims and Equity Interests | 42 |
| 9.4 | Injunctions | 42 |
| 9.5 | Investigation Period; Time to Bring Causes of Action Against Settling Officers and Directors | 43 |
| ARTICLE X. | RETENTION OF JURISDICTION | 44 |
| 10.1 | Jurisdiction of Bankruptcy Court | 44 |
| 10.2 | Venue | 45 |
| ARTICLE XI. | MISCELLANEOUS PROVISIONS | 46 |
| 11.1 | Successors and Assigns | 46 |
| 11.2 | Effectuating Documents and Further Transactions | 46 |
| 11.3 | Exemption from Transfer Taxes | 46 |
| 11.4 | Amendment, Modification, Withdrawal or Failure of this Plan | 46 |
| 11.5 | Post-Effective Date Fees and Expenses of Professionals and of Winding up the Estates | 47 |
| 11.6 | Payment of Statutory Fees | 47 |

# TABLE OF CONTENTS
### (continued)

Page

11.7    Dissolution of the Committees and of the Post-Effective Date Committee ........ 47

11.8    Courts of Competent Jurisdiction ................................................................ 47

11.9    Binding Effect ........................................................................................... 48

11.10   Notices ..................................................................................................... 48

11.11   Reservation of Rights ................................................................................. 49

11.12   Section 1146 Exemption ............................................................................. 49

11.13   Further Assurances ..................................................................................... 49

11.14   Filing of Additional Documents .................................................................. 50

11.15   Plan Supplement ....................................................................................... 50

11.16   Withholding and Reporting Requirements ................................................... 50

11.17   Headings ................................................................................................... 50

11.18   Inconsistency ............................................................................................ 50

11.19   Severability .............................................................................................. 50

11.20   Waiver of Ten Day Stay ............................................................................. 50

11.21   Governing Law .......................................................................................... 51

11.22   Conditions to Confirmation ....................................................................... 51

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                           :        Chapter 11
                                                 :
                                                 :        Case No. 06-10110 (CSS)
RNI WIND DOWN CORPORATION, f/k/a                 :        Jointly Administered
RIVERSTONE NETWORKS, INC., et al.,               :
                                                 :
                                                 :
          Debtors.                               :
------------------------------------------------------------ x

## JOINT PLAN OF REORGANIZATION AND LIQUIDATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
## PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

### INTRODUCTION

Each of (i) RNI Wind Down Corporation, f/k/a Riverstone Networks, Inc. ("Riverstone") and its wholly owned subsidiaries, Blue Coast Software, The OASys Group, Inc., Riverstone Networks SPC, Inc. and Pipal Systems, Inc. (collectively, the "Debtors"), each a debtor and debtor in possession in the above-captioned cases pending under chapter 11 of the Bankruptcy Code[1], (ii) the Official Committee of Unsecured Creditors and (iii) the Official Committee of Equity Security Holders, jointly submit the following Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, for the resolution of outstanding Claims against and Equity Interests in the Debtors. Reference is made to the "Disclosure Statement for Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, as Revised, dated August 9, 2006" for, among other things, (i) a discussion of the Debtors' history, business and results of operations, and (ii) a summary and analysis of the Plan. All Holders of Claims or Equity Interests entitled to vote to accept or reject the Plan are encouraged to review the Disclosure Statement and the Plan before voting to accept or reject the Plan. To the extent that the Plan is inconsistent with the Disclosure Statement, the Plan will govern.

This Plan provides for the liquidation and conversion of all of the Debtors' Assets to Cash and the Distribution of the net Proceeds therefrom to Creditors and Equity Interest holders in accordance with the priorities established by the Bankruptcy Code, this Plan and the orders of the Bankruptcy Court.

The Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders are co-proponents of this Plan and fully support confirmation of this Plan and

---

[1] Except as otherwise indicated, capitalized terms shall have the meanings ascribed to them in Article 1 hereof.

the treatment of Allowed Claims and Equity Interests as described herein.

## OVERVIEW OF TREATMENT UNDER THE PLAN

| Class | Treatment | Recovery |
|---|---|---|
| Unclassified Administrative Claims | Paid in full | 100% |
| Unclassified Priority Tax Claims | Paid in full | 100% |
| Classes 1(a)–1(e): Secured Creditors | Paid in full | 100% |
| Classes 2(a) – 2(e): Priority Claims | Paid in full | 100% |
| Classes 3(a) – 3(e): Personal Injury Claims | Covered by insurance; any portion of claim not covered by insurance will be a Class 4 General Unsecured Claim | 100% |
| Classes 4(a) – 4(e): General Unsecured Claims (trade claims, landlord claims, rejection claims, etc.). | Paid in full (including, where applicable, postpetition interest) | 100% |
| Class 5: Bondholder Claims | Paid in full plus pre- and postpetition interest, and including payment of Bond Trustee's reasonable, documented fees and expenses, including attorneys' fees. | 100% |

| <u>Class</u> | <u>Treatment</u> | <u>Recovery</u> |
|---|---|---|
| Classes 6(a) – 6(e): Indemnification Claims | Paid in full (including, where applicable, postpetition interest); <u>provided</u>, <u>however</u>, that Class 6 Indemnification Claims of Settling Officers and Directors shall be limited to available D&O Insurance and the Class 6a-2 Reserve. Settling Officers and Directors have also agreed to be subject to additional limitations as set forth herein | 100% of amount fixed by Court; <u>provided</u>, <u>however</u>, that Class 6 Indemnification Claims of Settling Officers and Directors are treated in an inferior manner and any such claims in excess of D&O Insurance and the Class 6a-2 Reserve are waived. |
| Class 7(a): Equity Interests in Riverstone Networks, Inc., including any Claim for damages by any current or former Shareholder of RNI Wind Down Corporation | Stock and options cancelled, but given effect for purpose of calculating amount of cash distribution. | Payment to each Holder of their Pro Rata share of all Available Cash after payment in full or reserves for Allowed Claims in Classes 1-6 |
| Classes 7(b) – 7(e): Equity Interests in all other Debtors | No distribution | 0% |

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

    **1.1**  <u>Definitions</u>. As used in this Plan, and unless the context otherwise requires, the following terms shall have the meanings specified below:

       "<u>Administrative Expense Claim</u>" means any Claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Assets of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, all compensation and reimbursement of expenses allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees and charges assessed against the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, all as may arise prior to the Confirmation Date.

       "<u>Administrative Claims Bar Date</u>" means August 7, 2006 with respect to all Administrative Claims (other than Professional Fee Claims) arising from and after the Commencement Date through June 1, 2006 and such additional other date or dates as may be established by the Bankruptcy Court as the last day or days by which requests for payment of Administrative Expense Claims must be filed against the Debtors with respect to Administrative Claims arising after June 1, 2006 (other than Professional Fee Claims).

"Allowed" means, with respect to a Claim, proof of which was timely and properly filed or, if no proof of Claim was filed, which has been or hereafter is listed by the Debtors on their Schedules as liquidated in amount and not disputed or contingent and, in either case, as to which no objection to allowance has been interposed on or before the expiration of the time within which to object to such Claim, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder. Unless otherwise specified in this Plan or by order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of computation of distributions under this Plan, include interest on such Claim from and after the Commencement Date or include any penalty on such Claim. If a Claim is Allowed in part and Disputed in part, the Allowed portion shall be paid and the balance treated as a Disputed Claim. Any claim estimated for allowance purposes under Bankruptcy Code Section 502(c) shall not be allowed unless a Final Order has been entered with respect thereto.

"Allowed Option Holder" means, to the extent the failure to timely exercise was legally excused, legally barred or was legally impossible under applicable law, (i) the holder of any option, warrant or right, contractual or otherwise, to acquire or receive an Equity Interest in the Debtors and (ii) any current or former employee of the Debtors who would have been entitled to "deferred stock grants" or "restricted stock units" had the Debtors not declined to issue such shares as of April 2, 2006, in both instances solely to the extent such Person is identified on the Option Holder Schedule approved by the Court at or prior to the Confirmation Hearing.

"Asset" means any asset, property or interest therein of the Estates as provided for under section 541 of the Bankruptcy Code.

"Available Cash" means all Cash of the Estates, net of the aggregate amounts deposited in the Plan Funding Reserve and/or transferred to the Plan Administrator and the Liquidating Trust pursuant to this Plan, available to be (i) distributed to the Holders of Allowed Claims and Allowed Equity Interests under the Plan, (ii) reserved for distribution on account of Disputed Claims that may subsequently become Allowed Claims (in whole or in part) in the Disputed Claims Reserve and (iii) reserved for distribution on account of Class 6a-2 Claims in the Class 6a-2 Reserve.

"Avoidance Actions" means the Estates' causes of action for, or defenses to Claims with respect to, any avoidance or recovery action under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such causes of action as of the Cause of Action Commencement Date.

"Ballots" means each of the ballots and/or master ballots distributed with the Disclosure Statement to Holders of Impaired Claims or Impaired Equity Interests entitled to vote on this Plan, for the purpose of indicating an acceptance or rejection of this Plan.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et. seq.</u>, as now in effect or hereafter amended and as applicable to these Chapter 11 cases or proceedings herein, as the case may be.

"<u>Bankruptcy Court</u>" means the United States District Court for the District of Delaware, having jurisdiction over these Chapter 11 Cases and, to the extent of the reference of the Chapter 11 Cases pursuant to 28 U.S.C. § 157(a), the United States Bankruptcy Court for the District of Delaware.

"<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, and the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"<u>Bar Date</u>" or "<u>Unsecured Claims Bar Date</u>" means June 1, 2006, the date designated by the Bankruptcy Court as the last date for creditors to file Proofs of Claim in the Chapter 11 cases, or, with respect to governmental units, August 7, 2006.

"<u>Bondholder Claim</u>" means any Claim held by the holder of a bond issued pursuant to the Bond Indenture or the Registration Rights Agreement. The Bondholder Claims (excluding Claims relating to the fees and expenses of the Bond Trustee) shall be equal to the sum of (a) the aggregate principal amount outstanding under the Bond Indenture as of the Commencement Date of $65,875,000, together with interest accrued on such principal from December 1, 2005 through and including the Commencement Date, computed on the basis of a 360-day year at a combined annual rate of 3.75%, plus (b) pursuant to section 2(e) of the Registration Rights Agreement, an amount equal to .5% of the aggregate principal amount outstanding as of the Commencement Date, plus (c) pursuant to sections 3.1 and 7.2 of the Bond Indenture, an amount equal to .75% of the aggregate principal amount outstanding as of the Commencement Date, plus (d) interest on the aggregate of all such amounts set forth in clauses (a), (b), and (c) from the Commencement Date through the Initial Distribution Date at the rate of 3.75% calculated on the basis of a 360-day year. In addition, pursuant to the terms of the Bond Indenture, the Debtor shall pay the reasonable and documented fees and expenses of the Bond Trustee; <u>provided</u>, <u>however</u>, that any dispute with respect to the amount and/or payment by the Debtor of such fees and expenses shall be resolved by the Bankruptcy Court in accordance with section 4.5(e) of this Plan.

"<u>Bond Indenture</u>" means that certain indenture, dated as of November 21, 2001, as subsequently amended, by Riverstone Networks, Inc. to State Street Bank and Trust Company of California, N.A., as trustee.

"<u>Bond Trustee</u>" means U.S. Bank, N.A., or its successors and assigns, in its capacity as trustee under the Bond Indenture.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"Cash" means cash and cash equivalents.

"Cause of Action" means any Claim, right of action, suit, or proceeding, if any, whether in law or in equity, whether known or unknown, that the Debtors, their Estates or the Equity Committee or the Liquidating Trustee on behalf of the Debtors, may assert against any Person.

"Cause of Action Commencement Date" means, with respect to a particular Cause of Action and Person, (i) with respect to Causes of Action against Named Defendants relating to conduct exculpated and released pursuant to Sections 9.1 and 9.2 hereof, the Effective Date or (ii) with respect to all other Causes of Action other than any EC Computer Cause of Action, the Effective Date or such other, later date as may be ordered by the Bankruptcy Court with respect to a Non-Complying Person, or (iii) with respect to an EC Computer Cause of Action, the tenth day after the date on which the Bankruptcy Court enters an order adjudicating the EC NC Motion.

"Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled and jointly administered under *In re RNI Wind Down Corporation f/k/a Riverstone Networks, Inc., et al.*, Case No. 06-10110 (CSS), currently pending in the Bankruptcy Court.

"Claim" shall have the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Claim Objection Deadline" means (i) for all Claims other than Administrative Expense Claims and Rejection Claims, one (1) business day before the Effective Date, (ii) for Rejection Claims, the later of (a) one business day before the Effective date or (b) such other period of time as may be specifically fixed by the Bankruptcy Rules or order of the Bankruptcy Court, and (iii) for Administrative Expense Claims (other than Professional fee Claims), one business day before the Effective Date.

"Claims Administrator" means JPMorgan Trust Company or such other entity as may be selected by Debtors, the Plan Administrator or the Court.

"Class" means any group of substantially similar Claims or Equity Interests classified by this Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

"Class 6a-2 Reserve" means the Cash to be set aside in an interest-bearing escrow account as described in Section 4.6 hereof and which, together with available insurance proceeds, shall be the sole and exclusive source of recovery of Indemnification Claims of Settling Officers and Directors.

"Collateral" means any Asset or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance

under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or other applicable law.

"Commencement Date" means February 7, 2006, the date on which the Debtors commenced their Chapter 11 Cases.

"Committees" means, collectively, the Creditors' Committee and the Equity Committee.

"Confirmation" means entry by the Clerk of the Bankruptcy Court of the Confirmation Order.

"Confirmation Date" means the date of entry of the Confirmation Order by the Clerk of the Bankruptcy Court.

"Confirmation Hearing" means the hearing to consider Confirmation of this Plan under section 1129 of the Bankruptcy Code.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be reasonably satisfactory in form and substance to each of the Committees and the Debtors.

"Creditor" means any Person who holds a Claim against any Debtor.

"Creditors' Committee" means the Official Committee of Unsecured Creditors, appointed by the United States Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as constituted from time to time.

"D&O Non-Indemnification Claims and Equity Interests" means (a) any Claim of a Settling Officer and Director that is not for the advancement of defense costs, contribution, indemnification and/or reimbursement to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law, and shall include, without limitation, any wage, salary, commission, fee, expense, bonus, severance, benefit, change-in-control or the like claim and (b) any stock, stock option interest or other Equity Interest belonging to any Settling Officer and Director.

"Debtors" means collectively RNI Wind Down Corporation f/k/a Riverstone Networks, Inc., and its wholly owned subsidiaries Blue Coast Software, The OASys Group, Inc., Riverstone Networks SPC, Inc. and Pipal Systems, Inc., as debtors in possession, pursuant to section 1107 of the Bankruptcy Code.

"Debtors Intercompany Claims" means a Claim held by a Debtor or any subsidiary or affiliate of a Debtor against any other Debtor.

"Disallowed Option Holder" means the holder of any option, warrant or right, contractual or otherwise, to acquire or receive an Equity Interest in the Debtors who is

not listed on the Option Holder Schedule in the form approved by the Court in connection with the Disclosure Statement Hearing.

"Disclosure Statement" means the Disclosure Statement for Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, approved by the Bankruptcy Court on August 9, 2006.

"Disclosure Statement Hearing" means the hearing to consider approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"Disputed Claim" means any (or such portion of a) Claim or Equity Interest (including any Option Holder listed on the Option Holder Schedule where an objection has been timely filed in accordance with section 4.7(f) of the Plan) that has not been Allowed by Final Order and (a) that is disputed pursuant to Sections 4.3(b), 4.4(e) or 4.6(c) hereof; (b) for which a proof of Claim was timely and properly filed and (i) which has been or hereafter is listed on the Schedules as unliquidated, disputed, or contingent, or (ii) as to which a timely objection or request for estimation has been or may be interposed, which objection or request for estimation has not been withdrawn or determined by Final Order, (c) for which a proof of Claim was required to be filed but as to which no proof of Claim was filed or was filed untimely or improperly; or (d) except with respect to Settling Officers and Directors, in respect of which there is a filed Cause of Action joined with a proper claim objection pursuant to section 502(d) of the Bankruptcy Code. Unless previously Allowed, prior to (x) the time that an objection has been filed and (y) the expiration of time within which to object to such Claim, for purposes of this Plan, a Claim shall be considered a Disputed Claim (A) to the extent that the amount of the Claim specified in the proof of Claim exceeds the amount of the claim scheduled by the Debtors as other than disputed, contingent or unliquidated, or (B) in the full amount of such Claim in the event that the Claim is not listed on the Schedules.

"Disputed Claims Reserve" means, in the event there exists any Disputed Claim on or after the Effective Date, Cash to be set aside by the Reorganized Debtors (or the Plan Administrator where applicable) in one or more separate, interest-bearing account(s), in amounts sufficient to pay in full all such Disputed Claims with postpetition interest as provided in this Plan through the Initial Distribution Date; provided, however, that a lesser amount may be estimated by the Proponents or the Plan Administrator, as the case may be, but only if approved by the Court.

"Distribution" means any payment of Cash or property required under the Plan.

"Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims and Allowed Equity Interests, which date shall be the Confirmation Date.

"EC Computer Cause of Action" means any Cause of Action commenced on or before the Cause of Action Commencement Date against any of the Named Defendants to the extent such Cause of Action arises from or relates to (i) the facts or occurrences described in the report of the Equity Committee delivered to the Debtors' board of

directors and the Office of the U.S. trustee in accordance with the Implementation Order, or (ii) information and/or documents, including without limitation, any electronic documents not provided to the Equity Committee prior to August 2,2006 or otherwise discovered or obtained by the Equity after August 23, 2006.

"EC NC Motion" means the motion of the Equity Committee, dated August 17,2006 seeking to designate Noah Mesel as a non-complying person under Section 4.6(m) of the Plan.

"Effective Date" means the first Business Day that is (a) at least ten (10) days after the Confirmation Date, and (b) on which no stay of the Confirmation Order shall be in effect.

"Electing Director/Officer" means any Settling Officer or Director who, if named (i) as a defendant in any suit timely filed by the Equity Committee on or before the Cause of Action Commencement Date or (ii) as a potential defendant in the Equity Committee's Statement of Reserved Causes of Action (as defined in Section 4.6(j)(i) hereof), elects (in his or her sole discretion) in writing on or before the Effective Date to (a) defer his or her Distributions under this Plan on account of his or her D&O Non-Indemnification Claims and Equity Interests until the later of (x) the Cause of Action Commencement Date and (y) the date in which such lawsuit against that named individual is settled, withdrawn or resolved by a Final Order and (b) allow his or her Distributions under this Plan on account of his or her D&O Non-Indemnification Claims and Equity Interests to be at risk for satisfaction of any judgment in such lawsuit, as described in Section 4.6(k) of this Plan. For the avoidance of doubt, Allowed Indemnification Claims of an Electing Director/Officer may be paid from the Class 6a-2 Reserve notwithstanding such Electing Director/Officer's election under Section 4.6(k) hereof.

"Employee Benefit Plans" means all employee benefit plans, policies, and programs sponsored by the Debtors, including, without limitation, all savings plans, health plans, disability plans, life insurance plans, deferred compensation plans, retirement plans, pension plans, severance plans, and executive incentive plans.

"Entity" means an 'entity' as defined in section 101(15) of the Bankruptcy Code.

"Equity Committee" means the Official Committee of Equity Security Holders, appointed by the United States Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as constituted from time to time.

"Equity Interest" means (i) the interest of any holder of equity securities of any of the Debtors represented by any issued and outstanding shares of common, preferred or any other type of stock, and (ii) any option, warrant or right, contractual or otherwise, to acquire or receive any such interest to the extent such option warrant or right is held by an Allowed Option Holder.

"Estates" means collectively the Debtors' estates in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code.

"Exculpated Parties" has the meaning set forth in Section 9.1 of this Plan.

"Face Amount" means, at any time, with respect to a particular Claim: (a) if the Holder of such Claim has not filed a Proof of Claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, the amount of such Claim that is listed in the Schedules as noncontingent, undisputed and liquidated; (b) if the Holder of such Claim has filed a Proof of Claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, and such Claim has not become an Allowed Claim or been estimated by Final Order of the Bankruptcy Court, the amount stated in such Proof of Claim; or (c) in all other cases, zero ($0) or such amount as shall be fixed or estimated by a Final Order of the Bankruptcy Court.

"Final Decree" means an order entered by the Bankruptcy Court closing the Chapter 11 Cases after substantial consummation of the Plan.

"Final Distribution Date" means the date on which a final Distribution of Available Cash is made pursuant to this Plan. The Final Distribution Date shall be a date that is after (i) the liquidation into Cash of all Assets of the Debtors or the Reorganized Debtors as applicable (other than those Assets abandoned by the Debtors, the Reorganized Debtors or the Liquidating Trustee) and collection of other sums due or otherwise remitted or returned to the Estates, (ii) all Allowed Claims have been paid in full plus postpetition interest as provided herein and (iii) all remaining Cash in the Disputed Claims Reserve and Class 6a-2 Reserve becomes available to the Reorganized Debtors for Distribution pursuant to this Plan, and (iv) the Plan Administrator receives a written notice from the Liquidating Trustee stating that the Liquidating Trust has been fully administered.

"Final Order" means an order or judgment of the issuing court entered by the Clerk of such court on the docket in which the order or judgment was entered, which has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for *certiorari*, or other reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, new trial, reargument, or rehearing thereof has been sought or (ii) which shall have been affirmed by the highest Court to which such order or judgment was appealed, or for which *certiorari*, a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

"Foreign Subsidiaries" means the entities set forth on Schedule 1 hereto.

"General Unsecured Claim" means any Claim against the Debtors other than any Administrative Expense Claim, Priority Claim, Secured Claim, Bondholder Claim, a Personal Injury Claim or Class 6 Claim.

"Holder" means a Person or Entity holding a Claim or Equity Interest as of the applicable Distribution Record Date, and with respect to a vote on the Plan, a Person or Entity holding the beneficial interest in a Claim or Equity Interest as of the Voting Record Date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Ballot has been completed and executed in accordance with the Voting Instructions.

"Impaired" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code and applicable law.

"Implementation Order" means that certain Agreed Order in Aid of Plan Process (Including Designation of Equity Committee to Investigate and Prosecute Certain Estate Causes of Action), dated May 28, 2006, as it may be amended from time to time, pursuant to which the Bankruptcy Court established procedures for the Equity Committee to investigate the acts, conduct, affairs and transactions relating to the Debtors.

"Indemnification Claims" means solely those Claims for the advancement of defense costs, contribution, indemnification and/or reimbursement by the Debtors of (i) Officers, Directors and Employees, (ii) the Settling Officers and Directors, and/or (iii) Specified Former Officers and Directors to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law. Excluded from this definition is (i) any claim for indemnity based on any commercial contract with the Debtors and (ii) any claim by any Person that is not for the advancement of defense costs, contribution, indemnification and/or reimbursement to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law, including, without limitation, any wage, salary, commission, fee, expense, bonus, severance, benefit, change-in-control or the like claim.

"Initial Distribution Date" means the first date on which Distributions of Available Cash are made to Holders of Allowed Claims and/or Equity Interests in accordance with this Plan, which date shall be no later than ten (10) days after the Effective Date and in no event later than September 30, 2006.

"Investigation Deadline" means that date which is fourteen (14) days prior to the first date fixed by the Bankruptcy Court for the Confirmation Hearing.

"Lien" means a lien, security interest, mortgage, deed of trust, right of setoff, or other charge or encumbrance on or in any Asset to secure payment of a debt or performance of an obligation of the Debtors.

"Liquidating Trust" means the trust created pursuant to the Liquidating Trust Agreement and this Plan.

"Liquidating Trust Assets" means the Causes of Action, if any, and proceeds thereof commenced on or before the Cause of Action Commencement Date, and Cash (in an amount to be determined by the Equity Committee, subject to objections by any party in interest and approval by the Bankruptcy Court), which shall be initially transferred to the Liquidating Trust on the Effective Date (and thereafter transferred in accordance with this Plan).

"Liquidating Trust Agreement" means the agreement filed by the Equity Committee with the Bankruptcy Court at least five (5) days prior to the Confirmation Hearing prescribing the powers, duties, rights and obligations of the Liquidating Trustee in administering the Liquidating Trust.

"Liquidating Trustee" means the independent third party designated by the Equity Committee to administer the Liquidating Trust. The Equity Committee will file with the Bankruptcy court a written notice of the identity of the Liquidating Trustee and the terms of his or her engagement at least five (5) days before the Confirmation Hearing. The Liquidating Trustee and the Plan Administrator may be the same person. If no Cause of Action has been commenced by the Cause of Action Commencement Date, all provisions in this Plan relating to the Liquidation Trust and the Liquidating Trustee shall be deemed eliminated and of no force or effect.

"Mesel" means Noah Mesel.

"Mesel Settlement Motion" means the motion of the Equity Committee and the Debtors dated August 29, 2006 to settle and compromise the treatment of claims against the Debtors by Mesel and certain potential claims by the Debtors against Mesel.

"Non-Complying Person" shall have the meaning provided to it in Section 4.6(m) hereof.

"Officers, Directors and Employees" means any present or former officer, director or employee of the Debtors other than the Specified Former Officers and Directors and the Settling Officers and Directors.

"Option Holder Schedule" means the list filed by the Debtors and approved by the Bankruptcy Court at or prior to the Confirmation Hearing setting forth each of the Allowed Option Holders, the number of each Allowed Option Holder's options and the "strike price" to be paid by each such Allowed Option Holder.

"Pending Action" means (i) any action, suit or legal proceeding commenced after June 30 2006, pursuant to a complaint or other moving paper then on file with any court, which has not been dismissed or withdrawn by Final Order, or (ii) any action commenced after June 30, 2006, for which a complaint or other moving paper (x) previously was filed with any court after June 30, 2006 (y) thereafter was dismissed or withdrawn without prejudice and (z) for which the applicable statue of limitations to recommence such

action has not yet expired.  For the avoidance of doubt, Pending Action shall not include the investigation by the Equity Committee.

"Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"Personal Injury/Insured Claims" means the portion of any Claim against the Debtors (other than Indemnification Claims) that is covered by insurance to pay all or any portion of the Allowed amount of such Claim.

"Plan" means this chapter 11 joint plan of reorganization and liquidation for the Debtors as proposed by the Debtors, the Creditors' Committee, and the Equity Committee, as the same may be amended, modified, or supplemented from time to time.

"Plan Administrator" means the independent third party designated by the Equity Committee to serve as the sole director and officer of the Reorganized Debtors on and after the Effective Date.  The Equity Committee will file with the Bankruptcy Court a written notice of the identity of the Plan Administrator and the terms of his or her engagement at least five (5) days before the Confirmation Hearing.  The Plan Administrator and the Liquidating Trustee may be the same person.

"Plan Funding Reserve" shall mean one or more reserves to be established on the Effective Date in an amount sufficient to satisfy the estimated costs of administering the Plan and closing the Chapter 11 Cases after paying all Allowed Claims in full plus postpetition interest to the extent required by this Plan.

"Post-Effective Date Committee" means the entity formed under Article 6 of this Plan.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expenses Claim.

"Priority Tax Claim" means any Priority Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Proceeds" means any Cash or other property obtained by the Estates through the liquidation of any of the Assets.

"Professional" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code.

"Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of expenses relating to services rendered, or any member of the Committees for reimbursement of expenses incurred, on and after the Commencement Date and prior to the Confirmation Date.

"Proponents" means collectively, the Debtors, the Creditors' Committee and the Equity Committee.

"Pro Rata Share" means, as of the date of any determination, (a) with respect to the share of any Claim within a Class of Claims, a fraction (expressed as a percentage) having as its numerator the Face Amount of such Claim and having as its denominator the aggregate Face Amount as of such date of all Allowed Claims and Disputed Claims in such Class and (b) with respect to an Equity Interest, a fraction (expressed as a percentage) having as its numerator the number of shares owned by a Holder and having as its denominator the aggregate number of all issued and outstanding shares in the same Class entitled to the same Distribution (after giving effect to the conversion or exercise of any options).

"Proof of Claim" means a proof of claim pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

"Registration Rights Agreement" means that certain agreement, dated as of November 21, 2001, between Riverstone Networks, Inc., and Morgan Stanley & Co. Inc., and Salomon Smith Barney Inc.

"Rejection Claims" means Claims arising from the rejection of an executory contract or unexpired lease of the Debtors.

"Reorganized Debtors" mean the Debtors, on and after the Effective Date.

"Riverstone" means RNI Wind Down Corporation f/k/a Riverstone Networks, Inc.

"Schedules" means the schedules of assets and liabilities and the statements of financial affairs, filed by the Debtors, as such schedules or statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

"Secured Claim" means a Claim held by any Person to the extent of the value, as agreed to by the Holder of such Claim and the Debtors or the Plan Administrator, as the case may be, or as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Estate securing such Claim; provided, however, that a Secured Claim shall not include any portion of the Claim that exceeds the value of the interest in property of the Estate securing such Claim.

"Settling Officers and Directors" means those Persons identified on Schedule 2 hereto.

"Solicitation Agent" means JP Morgan Trust Company, or such other Person or Entity as may be selected by the Debtors, in either case in its capacity as information, balloting, and noticing agent for the Debtors.

"Solicitation Procedures Order" means the order of the Bankruptcy Court or other court of competent jurisdiction approving the Debtors' proposed procedures to govern their solicitation of votes on this Plan.

"Specified Former Officers and Directors" means, collectively, Rom Pereira, Robert Stanton, William McFarland, John Kern, Daniel Harding, Andrew Feldman, Piyush Patel and any other former officer or director of the Debtors who as of the date of this Plan has received a "Wells Letter" from the Securities and Exchange Commission.

"Subsequent Distribution Date" means any date after the Initial Distribution Date (including the Final Distribution Date) on which a Distribution of Available Cash is made to Holders of Allowed Claims and/or Equity Interests in accordance with this Plan.

"Third Party Commencement Deadline" means September 1, 2006, the date established by the Bankruptcy Court for parties in interest other than the Equity Committee or the Liquidating Trustee to commence a cause of action against the Settling Officers and Directors.

"Transfer Agent" means Mellon Investor Services.

"Voting Deadline" means the date and time, as fixed by an order of the Bankruptcy Court and set forth in the Disclosure Statement, by which all Ballots to accept or reject this Plan must be received by the Solicitation Agent.

"Voting Instructions" means the instructions and related procedures for voting to accept or to reject this Plan, as approved by the Solicitations Procedures Order and set forth in the Disclosure Statement and on the Ballots.

"Voting Nominee" means any record holder, such as brokers, banks, commercial banks, transfer agents, trust companies, dealers and other agents or nominees of one or more Allowed Equity Interests or Allowed Bondholder Claims.

"Voting Record Date" means the record date for determining the Holders of Claims and Equity Interests entitled to vote to accept or to reject this Plan, as fixed by the Solicitation Procedures Order.

1.2    **Other Terms.** A term used in this Plan that is not defined shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

1.3    **Construction of Certain Terms**.

(a)    The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan;

(b)    wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter;

(c)    any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means

that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented;

(e)    unless otherwise specified, all references in this Plan to Sections and Articles are references to Sections and Articles of this Plan;

(f)    captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and

(g)    the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## ARTICLE II.
## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1    <u>Non-Classification</u>.  As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for the purposes of voting on or receiving distributions under this Plan.  All such Claims are treated in accordance with the terms set forth in this Article 2.

2.2    <u>Administrative Expense Claims</u>.

(a)    <u>Administrative Expense Claims (other than Professional Fee Claims)</u>.  All Allowed Administrative Expense Claims shall be paid in full, in Cash, or otherwise reserved for (1) when and as such Administrative Expense Claims become due and owing by their ordinary course terms, (2) in such amounts as are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (3) as may be agreed upon between the Holder of such Administrative Expense Claim and the Plan Administrator on or after the Effective Date.

(b)    <u>Professional Fee Claims and Expense Reimbursement Claims</u>.  All Persons or entities seeking an award by the Bankruptcy Court of professional fees, or of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, including members of the Committees, (1) shall provide the Debtors with an invoice for all accrued and unpaid fees and expenses as of the date of such invoice and an estimate of their fees and expenses to be incurred from the Confirmation Date through the Effective Date no later than ten (10) days before the Confirmation Hearing, (2) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date (each, a "<u>Final Fee Application</u>")

within thirty (30) days after the Effective Date, and (3) if such Final Fee Application is granted by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Administrative Expense Claim and the Plan Administrator or, on and after the Effective Date. Objections to Final Fee Applications must be filed and served on or before five (5) Business Days prior to the hearing set by the Bankruptcy Court to consider such Final Fee Applications, unless extended by agreement of the parties. All Professional Fee Claims for services rendered in connection with the Chapter 11 Cases and this Plan after the Effective Date, including, without limitation, relating to the resolution of Disputed Claims, shall be paid by the Plan Administrator upon receipt of an invoice therefor, or on such other terms as may be agreed by the applicable Professional and the Plan Administrator, without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Plan Administrator and any professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such professional, such amount shall be determined by the Bankruptcy Court. The Debtors shall reserve an amount sufficient to pay the aggregate sum of all unpaid Professional Fees that have been or are estimated to be incurred through the Effective Date.

(c)    <u>Administrative Expense Claims Bar Date</u>. Holders of Administrative Expense Claims, other than Professional Fee Claims and United States Trustee fees, or the expenses of the members of the Committee, not paid prior to the Effective Date must submit proofs of Administrative Expense Claim on or before the applicable Administrative Claims Bar Date. Failure to file a proof of Administrative Expense Claim on or before the applicable Administrative Expense Claims Bar Date shall cause such Administrative Expense Claim to be disallowed and be considered null and void and such Creditors shall have no further Claim against the Debtors and their Estates.

(d)    <u>Insurance</u>. Notwithstanding anything to the contrary herein, and except as set forth in Section 4.6(d) hereof, if any Allowed Administrative Claim is covered by insurance, such Claim shall first be paid from such insurance with the balance, if any, paid by the Debtors.

**2.3    U.S. Trustee Fees.** Quarterly fees of the United States Trustee arising under 28 U.S.C. §1930(a)(6) have been regularly paid during the case and on the Effective Date any outstanding amount will be paid in full. Amounts payable after the Confirmation Date until the Debtors' cases are closed shall be payable pursuant to Section 11.6 of this Plan.

**2.4    Priority Tax Claims.** Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) such other date and on such other terms as may be agreed to between Debtors or the Liquidating Trustee and any Holder of an Allowed Priority Tax Claim.

## ARTICLE III.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1    **Identification of Classes**.  Pursuant to section 1122 of the Bankruptcy Code, Claims (other than Administrative Expense Claims and Priority Tax Claims) and Equity Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to this Plan, as follows:

| | | |
|---|---|---|
| Class 1a -- | Secured Claims (Riverstone Networks, Inc.) | Unimpaired |
| Class 1b -- | Secured Claims (The OASys Group, Inc.) | Unimpaired |
| Class 1c -- | Secured Claims (Riverstone Networks SPC, Inc.) | Unimpaired |
| Class 1d -- | Secured Claims (Pipal Systems, Inc.) | Unimpaired |
| Class 1e -- | Secured Claims (Blue Coast, Inc.) | Unimpaired |
| Class 2a -- | Priority Claims (Riverstone Networks, Inc.) | Unimpaired |
| Class 2b -- | Priority Claims (The OASys Group, Inc.) | Unimpaired |
| Class 2c -- | Priority Claims (Riverstone Networks SPC, Inc.) | Unimpaired |
| Class 2d -- | Priority Claims (Pipal Systems, Inc.) | Unimpaired |
| Class 2e -- | Priority Claims (Blue Coast, Inc.) | Unimpaired |
| Class 3 -- | Personal Injury and Other Insured Claims against Riverstone Networks, Inc. | Unimpaired |
| Class 4a -- | General Unsecured Claims (Riverstone Networks, Inc.) | Impaired |
| Class 4b -- | General Unsecured Claims (The OASys Group, Inc.) | Impaired |
| Class 4c -- | General Unsecured Claims (Riverstone Networks SPC, Inc.) | Impaired |
| Class 4d -- | General Unsecured Claims (Pipal Systems, Inc.) | Impaired |
| Class 4e -- | General Unsecured Claims (Blue Coast, Inc.) | Impaired |
| Class 5 -- | Bondholder Claims | Impaired |
| Class 6a -- | Indemnification Claims (Riverstone Networks, Inc.) | Impaired |
| Class 6b -- | Indemnification Claims (The OASys Group, Inc.) | Impaired |

| Class 6c -- | Indemnification Claims (Riverstone Networks SPC, Inc.) | Impaired |
| Class 6d -- | Indemnification Claims (Pipal Systems, Inc.) | Impaired |
| Class 6e -- | Indemnification Claims (Blue Coast, Inc.) | Impaired |
| Class 7a -- | Equity Interests (in Riverstone Networks, Inc.) | Impaired |
| Class 7b -- | Equity Interests (in The OASys Group, Inc.) | Impaired |
| Class 7c -- | Equity Interests (in Riverstone Networks SPC, Inc.) | Impaired |
| Class 7d -- | Equity Interests (in Pipal Systems, Inc.) | Impaired |
| Class 7e -- | Equity Interests (in Blue Coast, Inc.) | Impaired |

**3.2    Elimination of Classes**.  Any Class of Claims that does not consist, as of the date of the Confirmation Hearing, of at least one Allowed Claim, Disputed Claim or a Claim temporarily Allowed under Rule 3018 of the Bankruptcy Rules, shall be deemed deleted from this Plan for all purposes.

## ARTICLE IV.
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Classes 1a, 1b, 1c, 1d and 1e (collectively, "Class 1") - Secured Claims.**

(a)    Impairment and Voting.    Class 1 is unimpaired by this Plan. Consequently, each Holder of an Allowed Secured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Treatment and Distributions.  Each Holder of an Allowed Secured Claim shall receive, in full and final satisfaction thereof, either (i) Cash in an amount equal to such Allowed Secured Claim, (ii) a return of its Collateral, or (iii) such other treatment as shall satisfy the requirements of section 1124(2) of the Bankruptcy Code, on the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Secured Claim agrees to a different treatment thereof.

(c)    Deletion of Class.  Currently, the Debtors are not aware of any claims in Class 1.  The Debtors reserve the right to delete this Class in accordance with Section 3.2.

**4.2**    <u>Classes 2a, 2b, 2c, 2d and 2e (collectively, "Class 2") - Priority Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 2 is unimpaired by this Plan.  Each Holder of an Allowed Priority Claim in Class 2 is presumed to have accepted this Plan and not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions to Class 2</u>.  Each Holder of an Allowed Priority Claim in Class 2 shall be entitled to receive Cash (w) in an amount equal to such Allowed Claim as soon as practicable on or after the later of (i) the Effective Date and (ii) the third (3rd) Business Day following the date on which such Claim becomes an Allowed Claim; (x) in such amounts and on such other terms as may be agreed between the Holder of the Priority Claim and the Debtors; or (y) with respect to any Allowed Priority Claim other than a Priority Tax Claim, in accordance with the terms of the particular agreement under which such Priority Claim arose.

(c)    <u>Deductions for Prior Payments</u>.  All amounts previously paid on account of a Holder's Allowed Priority Claim shall be credited towards the amounts to be paid under this Section 4.2.

(d)    <u>Deletion of Class</u>.  Currently, the Debtors are not aware of any claims in classes 2b, 2c, 2d or 2e.  The Debtors reserve the right to delete such classes in accordance with Section 3.2.

**4.3**    <u>Class 3 — Personal Injury/ Insured Claims</u>.

(a)    <u>Impairment and Voting</u>.    Class 3 is unimpaired by this Plan. Consequently, each Holder of an Allowed Personal Injury/Insured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions to Class 3</u>.  All Personal Injury/Insured Claims are Disputed Claims under this Plan, and the Debtors' liability, if any, shall be determined by the court with jurisdiction over each such Personal Injury/Insured Claims.  Any and all stays or injunctions imposed by this Plan shall be modified on the Effective Date for the limited purpose of allowing any pending litigation that may give rise to a Class 3 Claim to proceed to judgment.  Once judgment has been entered in any such litigation the holder of such judgment shall be deemed to hold an Allowed Class 3 Claim in the face amount of such judgment.  Distribution on account of such Allowed Class 3 Claims may be made exclusively from either available insurance or, to the extent any such Allowed Class 3 Claim is not covered by insurance, the uninsured portion of such Claim shall be treated as a General Unsecured Claim and paid in accordance with Section 4.4 below.

**4.4**    <u>Classes 4a, 4b, 4c, 4d and 4e (collectively, "Class 4") - General Unsecured Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 4 is impaired by this Plan.  Each Holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject this Plan.

(b)    <u>Distributions to Class 4</u>.  Each Holder of an Allowed General Unsecured Claim shall be entitled to receive Cash in an amount equal to 100% of the principal amount of

such Allowed Claim on or as soon as practicable after the Effective Date, but in any event no later than the Initial Distribution Date. Any other due date or maturity date in any agreement with a Class 4 claimant shall be disregarded and unenforceable.

(c)    Interest. Allowed General Unsecured Claims shall receive interest on the Allowed Portion of their Claims from and after the Commencement Date through the Initial Distribution Date at the rate of 5.00 percent per annum. No penalties or default rates of interest shall be paid.

(d)    Deletion of Class. Currently, the Debtors are not aware of any claims in classes 4b, 4c, 4d or 4e. The Debtors reserve the right to delete such classes in accordance with Section 3.2.

**4.5    Class 5 – Bondholder Claims**

(a)    Allowance of Claims. Subject to the provisions of Section 4.5(e) with respect to the payment of the reasonable documented fees and expenses of the Bond Trustee, the Bondholder Claims shall constitute Allowed Claims for purposes of this Plan and distributions to be made hereunder.

(b)    Impairment and Voting. Class 5 is impaired by this Plan. Each Holder of an Allowed Bondholder Claim in Class 5 is entitled to vote to accept or reject this Plan.

(c)    Distributions to Class 5. Each Holder of an Allowed Bondholder Claim in Class 5 shall be entitled to receive Cash in an amount equal to its Pro Rata Share of the Allowed Bondholder Claim. Notwithstanding anything in the Plan, the Confirmation Order, or any other document to the contrary, for the purpose of distributions to the holders of Bondholder Claims, the Bond Trustee shall be deemed to be the sole holder of all Bondholder Claims. Accordingly, all distributions on account of Bondholder Claims shall be distributed to the Bond Trustee on or as soon as practicable after the Effective Date, but in any event no later than the Initial Distribution Date for further distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date pursuant to Section 4.5 of the Plan. The Distribution Record Date shall be used as the record date for the distributions pursuant to the Bond Indenture.

(d)    Method of Distributions. Any and all Cash to be distributed to Holders of Allowed Bondholder Claims shall be distributed by the Plan Administrator to the Bond Trustee on behalf of the Holders of Allowed Bondholder Claims, and promptly thereafter from the Bond Trustee to Holders of Allowed Bondholder Claims in accordance with the terms of the Bond Indenture.

(e)    Fees and Expenses of Bond Trustee. Within ten (10) days of the Confirmation Date, the Bond Trustee shall provide the Debtors with a detailed statement of its fees and expenses incurred and/or estimated to be incurred in connection with the Chapter 11 Cases from and including the Commencement Date through the Confirmation Hearing. To the extent of legal fees and expenses incurred, such fees shall be described in sufficient detail to evaluate the reasonableness of such legal fees and expenses according to applicable standards and shall contain detailed time records, subject to protection for any privileged information. On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Debtors shall

pay the documented fees and expenses of the Bond Trustee, to the extent it agrees such fees and expenses are reasonable, as required by the terms of the Bond Indenture and this Plan. The Debtors shall simultaneously notify the Bond Trustee of any disputes it may have to any portion of the amount and/or payment by the Debtors of such fees and expenses, which dispute may thereafter, and if the parties so agree, be resolved by the Bankruptcy Court applying the applicable state law standard of reasonableness unless the Bankruptcy Court determines, after notice and a hearing, that state law does not apply, provided that the Debtors shall reserve any amounts in dispute pursuant to this section, pending resolution. In connection with any such dispute, the Debtors shall not object to any request made by a Holder of an Allowed Bondholder Claim to intervene in or be heard with respect to such dispute.

In addition, the fees and expenses of the Bond Trustee from and after the Confirmation Hearing and through the date of cancellation of the Bonds in accordance with subsection (f) of this Section, shall be paid in the same manner as provided for in the foregoing paragraph of this subsection 4.5(e), except that the Bond Trustee shall submit monthly invoices to the Plan Administrator who shall retain sufficient funds to ensure that all such fees and expenses shall be paid in full, and shall notify the Bond Trustee of any dispute it has concerning the reasonableness of such post-Confirmation fees and expenses within ten (10) Business Days of receipt of the invoice detailing the fees and expenses for which it has a dispute. Accordingly, the portion of any such invoice which has not been disputed within ten (10) Business Days of receipt by the Plan Administrator, shall be paid on the tenth (10th) Business Day after receipt of any such invoice detailing such fees and expenses. Thereafter, any dispute with respect to the amount and/or payment by the Plan Administrator of such monthly fees and expenses may, if the parties so agree, be resolved by the Bankruptcy Court applying the applicable state law standard of reasonableness unless the Bankruptcy Court determines, after notice and a hearing, that state law does not apply.

(f)    Cancellation of Bonds. Upon final payment to the Bond Trustee for distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date, the Bonds shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule.

**4.6    Classes 6a, 6b, 6c, 6d or 6e (collectively, "Class 6") – Indemnification Claims.**

(a)    Impairment and Voting. Class 6 is impaired by this Plan. Each Holder of a Class 6 Indemnification Claim is entitled to vote to accept or reject this Plan in the liquidated portion of their claim or in such amount fixed by the Court.

(b)    Sub-classification. Holders of Claims in Class 6a shall be divided into three sub-classes, as follows: Class 6a-1 (Specified Former Officers and Directors), Class 6a-2 (Settling Officers and Directors) and Class 6a-3 (Officers, Directors and Employees).

(c)    Distributions to Class 6. Unless otherwise specified herein, each Holder of a Claim in Class 6 shall be entitled to receive Cash in an amount equal to 100% of the amount of such Claim as fixed and determined by the Bankruptcy Court (or in such amount agreed to by the affected Creditor, the Debtors and the Committees in writing and approved by the Bankruptcy Court), with Distributions to be made in accordance with Section 7.6 hereof. Any

Class 6 Indemnification Claim filed by a Specified Former Officer or Director shall be deemed and treated as a Class 6 Disputed Claim. The amount of any reserves, if any, to be set aside in the Disputed Claims Reserve for each such claim shall be estimated for purposes of allowance under Bankruptcy Code Section 502(c), if necessary, and established by the Bankruptcy Court on or prior to the Confirmation Hearing.

(d)     Effect of Insurance Coverage. To the extent any Class 6 Indemnification Claim is or may be covered by available insurance, the Reorganized Debtors or the Plan Administrator, as applicable, shall pay the Holder of such Class 6 Indemnification Claim in accordance with the provisions of this Plan and shall bear the burden of recovery of any Distributions made to Holders of Class 6 Indemnification Claims from the applicable insurance company (subject to any insured person's duty to cooperate under Section 4.6(o) hereof).

(e)     Interest. Unless otherwise specified herein, interest on Class 6 Claims shall be paid in the same manner and rate as provided for holders of Class 4 General Unsecured Claims.

(f)     Undertaking to Return. Each Holder of a Class 6 Indemnification Claim shall provide a reasonable undertaking as required under any applicable law or agreement in respect of advancement of fees, expenses or costs. To the extent advancement is made from the Debtors, Reorganized Debtors or the Class 6a-2 Reserve, each recipient shall promptly return such amounts (i) with interest at the rate applicable to Class 4 Claims if a Final Order is entered under which the right of advancement is held to be unavailable under any applicable law or agreement or (ii) if the fees, expenses or costs covered by such advancement are later paid to the indemnitee from the applicable insurance carrier(s).

(g)     Settlement and Treatment of Claims of Settling Officers and Directors. Pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019, and by way of a settlement in order to assure payment in full to holders of Allowed Claims and maximize the recovery to holders of Allowed Equity Interests, each Settling Officer and Director agrees, and shall be deemed to have consented to, (i) limit his or her Indemnification Claim solely to the D&O Insurance and the Class 6a-2 Reserve, and (ii) waive and release any and all Indemnification Claims such Settling Officer and Director may have for amounts in excess of the D&O Insurance and the Class 6a-2 Reserve. Included in such waiver and release is any right that any Settling Officer and Director has or may have under his or her indemnification agreement with the Debtors to require the Debtors to obtain an irrevocable stand-by letter of credit in an amount no less than $1 million per indemnified individual

(h)     Additional Settlement in Respect of Class 6a-2 Claims. Pursuant to section 365 of the Bankruptcy Code, any executory contract (other than any insurance policies or related documents) giving rise to an Indemnification Claim shall be rejected as of the Confirmation Date. In lieu of assuming such executory contracts (and to satisfy any damages arising from rejection of such executory contracts), and in order to settle the Indemnification Claims of Settling Officer and Director, the Debtors (i) have purchased a six-year "tail" insurance policy (the "D&O Insurance") to cover claims made through April 27, 2012 under the existing D&O insurance policy relating to (x) acts or omissions of certain of the Debtors' Officers, Directors and Employees and Settling Officers and Directors that occurred on or before

April 27, 2006 and (y) acts or omissions of the employees of Riverstone who are executing the wind-down of the Debtors from April 27, 2006 through April 27, 2007 and (ii) shall, subject to Bankruptcy Court approval and at such times as the Bankruptcy Court may direct, advance or reimburse any reasonable and documented fees, expenses or costs, upon presentment, relating to (x) any investigation by any Committee or party in interest or by the Liquidating Trustee and (y) any threatened, asserted, filed or actual cause of action against any Officer, Director or Employee or Settling Officer and Director (to the extent covered by advancement or indemnification rights under existing agreements, Debtors' organizational documents or applicable law as approved by the Bankruptcy Court). Except as provided in an Order of the Bankruptcy Court, nothing in this Plan shall be deemed to affect whether such payments are entitled to be made ahead of payments on account of other Claims or in any manner different from payment on account of other Claims pursuant to this Plan. The Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, shall, after expending the retention amount provided in the applicable D&O Insurance policy, seek to have any Indemnification Claims of the Settling Officers and Directors reimbursed first from available D&O Insurance. Indemnification Claims of the Settling Officers and Directors shall be capped in the aggregate amount of, channeled solely to, and paid solely from the Class 6a-2 Reserve and/or the D&O Insurance. Each of those Settling Officers and Directors shall waive the rights they have under any indemnification agreements to require the Debtors to establish irrevocable stand-by letters of credit in an amount no less than $1 million per individual. Moreover, any Settling Officer or Director that elects to become an Electing Director/Officer shall also defer receipt of Distributions under this Plan until such time as all Causes of Action pending against them as of the Cause of Action Commencement Date are finally resolved. All of the Settling Officers and Directors agree that the amount of the initial reserve to be set aside for Class 6a-2 Indemnification Claims shall be Seven Million Dollars ($7,000,000) or such greater amount or lesser amount as may be established pursuant to this Plan. Thereafter, the Class 6a-2 Reserve shall be reduced as provided in Section 4.6(i), below. Moreover, as additional consideration, each Settling Officer and Director agrees to waive and release any right he or she may have to seek (i) disgorgement of any sums paid to the Holders of Equity Interests or to Holders of Allowed General Unsecured Claims or Allowed Bondholder Claims under this Plan in the event such Settling Officer and Director's Claim is not paid in full, despite the "absolute priority" rule and (ii) reconsideration of any Claim pursuant to section 502(j) of the Bankruptcy Code.

(i)    Class 6a-2 Reserve. The Class 6a-2 Reserve shall be established on the Effective Date. If there is no Pending Action against any Settling Officer and Director on the first anniversary of the Effective Date, the Class 6a-2 Reserve shall be reduced to $1 million on the first anniversary of the Effective Date. If there is no Pending Action against any Settling Officer and Director on the third anniversary of the Effective Date, the Class 6a-2 Reserve shall be reduced to $0 on the third anniversary of the Effective Date. If there exists a Pending Action against a Settling Officer and Director on the third anniversary of the Effective Date, any reduction of the Class 6a-2 Reserve shall be determined by the Bankruptcy Court. Any Cash removed from the Class 6a-2 Reserve in connection with a reduction thereof under this Section 4.6(i) shall be immediately available for distribution in accordance with the provisions of the Plan.

(j)     Additional Reserves. The initial amount of the Class 6a-2 Reserve set forth in Section 4.6(h) shall be adjusted by the Bankruptcy Court utilizing the following procedure:

(i)     On August 29, 2006, the Equity Committee shall submit to the Bankruptcy Court (under seal and solely for *in camera* review), and to the Creditors Committee, the Debtors, counsel for the Settling Officers and Directors and all potential defendants (the "Named Defendants") on a confidential basis, a detailed written explanation of those claims or Causes of Action the Equity Committee may commence as a result of the investigation described in Section 9.5 of the Plan (the "Reserved Causes of Action"), which statement shall include all Claims or Causes of Action, the name of each and every potential defendant, the form of relief requested, a description of the damages suffered by the Debtor, if any, the maximum amount of the claim or Cause of Action and the legal theory and summary of essential facts upon which the Reserved Cause of Action is based (the "Statement of Reserved Causes of Action"), provided however, that the Mesel Settlement Motion shall be deemed to constitute the Statement of Reserved Causes of Action with respect to Settling Officers and Directors. Any Claim, Cause of Action or person not identified in the Statement of Reserved Causes of Action shall be deemed exculpated and released in accordance with Sections 9.1 and 9.2 of the Plan. The Equity Committee may, but is not required, to disclose to third parties the scope of any releases it recommends be provided by the Debtors' Estates pursuant to the Plan or may disclose such other non-privileged information as it may decide in its sole discretion and may share such non-privileged information with other parties in interest for the purpose of requesting that such parties affirmatively consent to the releases to be provided under the Plan or such other purpose as the Equity Committee may determine consistent with the Plan.

(ii)     If the Equity Committee does not identify any Reserved Causes of Action as specified in (i), above, then (1) the releases and exculpation set forth in Sections 9.1 and 9.2 hereof shall become effective on the Effective Date and (2) the Class 6a-2 Reserve shall be $7 million and shall be administered as set forth in Section 4.6 hereof.

(iii)     If the Equity Committee does identify Reserved Causes of Action as specified in (i), above, then seven (7) days after receipt of the Equity Committee's Statement of Reserved Causes of Action, as applicable, the Named Defendants and the Equity Committee shall simultaneously submit to the Bankruptcy Court (under seal and solely for *in camera* review), with a copy to each other, the Creditors' Committee, the Debtors and counsel to the Settling Officers and Directors on a confidential basis, a written proposal for and explanation of each respective parties' proposed amount for the Class 6a-2 Reserve (which amount shall not be less than $7 million). To the extent that the Mesel Settlement Motion is approved by the Court on or before the commencement of the Confirmation Hearing, $7,000,000 shall be the proposed amount for the Class 6a-2 Reserve, which amount shall become the aggregate amount of the Class 6a-2 Reserve for all purposes without further order of the Court. If the Mesel Settlement Motion is not approved by the Court, or if approval thereof is subject to a stay by any court order, on or before the commencement of the Confirmation Hearing, the Court shall, in accordance with the provisions of Section 4.6 of this Plan determine the amount of the Class 6a-2 Reserve. The aggregate dollar value of all claims and Causes of Action set forth in the Equity Committee's Statement of Reserved Causes of Action will be the maximum amount recoverable on account of such Claims and Causes of Action.

(iv)    Thereafter, if the parties cannot agree on the amount of the Class 6a-2 Reserve, the Bankruptcy Court shall select one of the two proposals as the initial amount of the Class 6a-2 Reserve.

(v)    If the Bankruptcy Court has not selected one of the above-noted proposals by the Effective Date, then the amount of the Class 6a-2 Reserve shall be fixed at the higher of the amounts proposed by the Named Defendants and the Equity Committee in Section 4.6(j)(iii) (and shall remain at such amount) until the Bankruptcy Court has determined otherwise by entry of an order of the Bankruptcy Court.

(vi)    Under no circumstance shall any of the Debtors, the Named Defendants, or the Equity Committee (or other persons who have standing) request that that Bankruptcy Court delay its selection of one of the above-noted proposals beyond the Confirmation Date. Moreover, each of the Named Defendants and the Equity Committee shall reasonably cooperate with any discovery ordered by the Bankruptcy Court in connection with this Subsection 4.6(j).

(vii)    Any Settling Officer and Director who may be affected by the amount of the Class 6a-2 Reserve shall have standing to be heard in response to the proposed amounts to be reserved. The Debtors and the Committees may be heard on this matter.

(viii)    Upon resolution or release of all such Reserved Causes of Action, all funds in the Class 6a-2 Reserve in excess of $7 million reserved in accordance with Section 4.6(j)(ii) of this Plan shall be released to the Plan Administrator for distribution in accordance with the provisions of this Plan (unless a Settling Officer or Director obtains an Order prohibiting a release of such funds or a portion thereof due to additional reserves warranted and/or on account of any additional litigation brought or threatened by any third party and/or on account of the fact that a particular Cause of Action was so reserved or prosecuted).

(k)    Electing Directors/Officers. As additional consideration for the releases and exculpation contained in Article 9 hereof, any Settling Officer or Director shall have the option, in his or her sole discretion, to elect to (i) defer his or her distributions under this Plan for D&O Non-Indemnification Claims and Equity Interests and (ii) have such D&O Non-Indemnification Claims and Equity Interests distributions (collectively, the "At Risk Assets") be at risk of collection and/or setoff or as an asset available for the enforcement of a judgment obtained by the Liquidating Trustee for any Cause of Action commenced on or before the Cause of Action Commencement Date. For the avoidance of doubt, Indemnification Claims of an Electing Director/Officer may be paid notwithstanding such Electing Director/Officer's election under this Section. In exchange for such consideration, any Electing Director/Officer who has made such election shall have his or her liability for any Cause of Action limited solely to the D&O Insurance, the Class 6a-2 Reserve and such Electing Director/Officer's At Risk Assets (and, for the avoidance of any doubt, no assets of any Electing Director/Officer other than the At Risk Assets shall be at risk or otherwise subject to any collection, seizure, judgment, attachment, foreclosure or enforcement action of any kind relating to any Cause of Action, except for Causes of Action in which such court as identified in this Plan makes a finding of fraud, willful misconduct or some other action that is not indemnifiable or exculpated under Delaware law).

Notwithstanding the foregoing, (y) if the damages sought in the Cause of Action against an Electing Director/are less than the amount of his or her At Risk Assets, then the amount of At Risk Assets in excess of the damages sought in such Cause of Action shall be distributed on the Initial Distribution Date to such Electing Director/Officer and (z) if the Liquidating Trustee obtains a judgment on a Cause of Action against a Electing Director/Officer, then the Liquidating Trustee shall seek to satisfy such judgment first from the D&O Insurance, second from the Class 6a-2 Reserve and, only if the judgment then remains unsatisfied, third from the Settling Director/Officer's At Risk Assets. Any At Risk Assets of an Electing Director/Officer shall be held in a segregated interest-bearing account.

(l)    Invalidation of Election. If the Bankruptcy Court enters a Final Order determining that an Electing Director/Officer has (i) engaged in fraud, willful misconduct or some other action that is not indemnifiable or exculpated under applicable Delaware law, or (ii) materially and unreasonably obstructed or delayed the Equity Committee's investigation, then the election to immunize that Person's assets as set forth in subparagraph (k) above shall not be valid or available.

(m)    Non-Complying Persons. The Equity Committee may, at any time on or before the deadline established pursuant to Section 4.6(j)(i) hereof, seek an order of the Bankruptcy Court finding that an individual named Settling Officer and Director has materially and unreasonably obstructed or delayed the Equity Committee's investigation (each, a "Non-Complying Person"). Any such request by the Equity Committee shall be considered on an expedited basis by the Bankruptcy Court, subject to the Bankruptcy Court's availability. The entry of an order finding that a Settling Officer and Director is a Non-Complying Person shall excuse the Equity Committee from complying with the disclosure requirements set forth in Section 4.6(j)(i) hereof solely with respect to such Non-Complying Person, but shall not (i) excuse the Equity Committee from identifying the Non-Complying Person as a Named Defendant in its Statement of Reserved Causes of Action as set forth in Section 4.6(j)(i) nor (ii) alter the provisions of Sections 4.6(j)(ii) – (vi), above.

(n)    Payment of Indemnification Claims of Officers, Directors and Employees. Indemnification Claims of Class 6a-3 Creditors (Officers, Directors and Employees) shall be allocated between the Debtors' Estates and the Class 6a-2 Reserve as follows:

(i)    Indemnification Claims of Holders of Claims in Class 6a-3 that do not arise from the Equity Committee's investigation as described herein and are actually incurred through the earlier of (x) the commencement of a Cause of Action and (y) the Effective Date, shall be funded exclusively from the Debtors' Estates to the extent such Claims are reasonable, actual, necessary and properly documented in accordance with the Court's Order dated June 30, 2006.

(ii)    Indemnification Claims of Holders of Claims in Class 6a-3 arising from the Equity Committee's investigation and incurred prior to the Effective Date shall be paid by Debtors' Estates, but shall be allocated between the Debtors' Estates and the Class 6a-2 Reserve such that (x) the first $100,000 of such Claims shall be allocated to the Debtors' Estates, (y) the next $500,000 of such Claims shall be allocated fifty per cent (50%) to the

Debtors' Estates and fifty per cent (50%) to the Class 6a-2 Reserve[2] and (z) thereafter all such Claims shall be allocated to the Debtors' Estates.

(iii)    Indemnification Claims of Holders of Claims in Class 6a-3 incurred subsequent to the Effective Date shall be paid upon Allowance of such Claim from the Disputed Claims Reserve, but allocated 50% each to the Debtors' estates and the Class 6a-2 Reserve (provided, however, that in no event shall the reductions to the Class 6a-2 Reserve on account of claims paid under Sections 4.6(n) (ii) and (iii) exceed $250,000 in the aggregate).

(o)    Cooperation.  Any Creditor holding a Class 6 Indemnification Claim shall, as a condition to receiving any Distribution hereunder with respect to such Claim, cooperate with the Debtors, the Reorganized Debtors and the Plan Administrator as necessary to recover such Distributions from any applicable insurance company.

**4.7    Class 7a - Equity Interests (in Riverstone Networks, Inc.).**

(a)    Impairment and Voting.  Class 7 is impaired by this Plan.  Each Holder of an Allowed Equity Interest in Class 6 is entitled to vote to accept or reject this Plan.

(b)    Distributions to Class 7.  Each Holder of an Allowed Equity Interest in Class 7 shall be entitled to receive one or more Distributions of Available Cash in an amount equal to its Pro Rata Share of (i) the Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, the Class 6a-2 Reserve and all Allowed Claims or Disputed Claims in Classes 1-6 and (ii) the Liquidation Trust, if any, established under the Plan.  Such distribution shall be made on the Initial Distribution Date and any Subsequent Distribution Date on which Available Cash is available for distribution, provided, however, that the initial distribution to Class 7 Equity Interests may be reduced by additional reserves being added to the Class 6a-2 Reserve in accordance with Section 4.6, above.  Any surplus remaining in the Class 6a-2 Reserve following the settlement, withdrawal, dismissal, or payment of a judgment on the last remaining filed cause of action shall be paid to Class 7 Equity Interests on a Pro Rata basis.  In addition, any recoveries by the Liquidating Trustee on a Cause of Action shall be treated as Available Cash and distributed to the Holders of Allowed Class 7 Equity Interests.

(c)    Method of Distributions.  Any and all Cash to be distributed to Holders of Allowed Equity Interests shall be distributed by the Plan Administrator to the Transfer Agent on behalf of the Holders of Allowed Equity Interests, and thereafter from the Transfer Agent to each Holder of an Allowed Equity Interest.  Any subsequent distributions to be made by the Liquidating Trustee shall be made in the same manner by payment to the Transfer Agent.

(d)    Cancellation of Equity.  On the Effective Date, the common stock certificates and other instruments evidencing Equity Interests in Riverstone Networks, Inc. shall

---

[2] Allocations to the Class 6a-2 Reserve shall be paid in the form of a fifty cent per dollar reduction in the Class 6a-2 Reserve.  Any funds deducted from the Class 6a-2 Reserve as a result of this allocation shall immediately be treated as Available Cash and shall be returned to the Plan Administrator for Distribution in accordance with this Plan.

be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby shall be extinguished.

(e)    Holders of Options.  All Allowed Option Holders shall be treated as Holders of Class 7 Equity Interests, provided, however, that the initial distribution to any Allowed Option Holder shall be reduced by an amount equal to the option price which such Allowed Option Holder would have had to pay to exercise such option. By way of example, if an Allowed Option Holder held options to purchase 1,000 shares of stock at a strike price of $.50 per share, and if the initial distribution to Class 6 was $1.00 per share, then such Holder would be entitled to an initial distribution of $500 (i.e., 1,000 shares x $1.00 = $1,000 less the cost of exercising the options of $.50 x 1,000 results in a net initial distribution of $500 to such option Holder). After the initial Distribution made pursuant to this Plan, all Allowed Option Holders determined to be "in-the-money" as of the Initial Distribution Date will be treated as Equity Holders in all subsequent Distributions made under this Plan.  In addition, because the final calculation of the Available Cash to be distributed to Class 7a Equity Interests will not be made until all Disputed Claims are resolved, the Plan Administrator shall reserve such amounts as may be necessary to ensure that, if the per-share amount ultimately distributed to Class 7a Equity Holders results in additional Allowed Option Holders' options being "in-the-money," there will be sufficient funds available to make a Distribution to such additional option holders equal to the Distributions made to all other Equity Holders. Disallowed Option Holders shall not be entitled to any Distributions under this Plan. Nothing contained in this Plan shall create any new rights or extend any applicable deadline with respect to the exercise of options.

(f)    Option Holder Schedule.  The Option Holder Schedule setting forth the list of all Allowed Option Holders shall be approved by the Court in connection with the Disclosure Statement hearing.  A copy of the Option Holder Schedule setting forth the list of all Allowed Option Holders shall be filed within fifteen (15) days prior to the Disclosure Statement hearing.  An Option Holder set forth on the Option Holder Schedule shall become and shall be deemed and treated as an Allowed Option Holder upon entry of the order approving the Disclosure Statement. Notwithstanding the forgoing, an Allowed Option Holder shall be subject to becoming a Disputed Claim if (i) a written objection to the treatment as an Allowed Option Holder is timely filed and served upon such Option Holder on or before the Claims Objection Deadline, and (ii) such objection sets forth the specific factual and legal bases why the Option Holder should not be treated as an Allowed Option Holder, including, but not limited to, on the grounds that such option or options, under applicable law, were not validly issued or amended, not timely exercised or not properly modified.  If a timely and proper objection is filed, then the Option Holder shall be treated as holding a Disputed Claim and the Bankruptcy Court will determine the extent of any Allowed Option Holder's rights.

ANY PERSON OR ENTITY THAT IS NOT LISTED ON THE ALLOWED OPTION HOLDER SCHEDULE SHALL NOT RECEIVE ANY DISTRIBUTION AS AN EQUITY INTEREST UNDER THE PLAN UNLESS SUCH PERSON OR ENTITY (i) FILES A WRITTEN OBJECTION WITH THE UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 MARKET STREET, WILMINGTON, DELAWARE 19801, WITH COPIES TO THE PARTIES SET FORTH BELOW, BY THE DATE SET BY THE COURT FOR THE FILING OF OBJECTIONS TO APPROVAL OF THE DISCLOSURE STATEMENT

AND (ii) THE COURT APPROVES THE ADDITION OF SUCH PERSON OR ENTITY TO THE ALLOWED OPTION HOLDER SCHEDULE.

NOTICE OF SUCH OBJECTION MUST BE IN WRITING AND SERVED UPON:

Debtors:
    RNI Wind Down Corporation,
    f/k/a Riverstone Networks, Inc.
    5200 Great America Parkway
    Santa Clara, CA 95054
    Attn:  Noah D. Mesel

Debtors' counsel:
    Morgan, Lewis & Bockius LLP
    101 Park Avenue
    New York, NY 10178
    Attn:    Neil E. Herman, Esq.
            Andrew D. Gottfried, Esq.
            Fax:    (212) 309-6001

            and

    Young Conaway Stargatt & Taylor, LLP
    The Brandywine Building
    1000 West Street, 17th Floor
    P.O. Box 391
    Wilmington, Delaware 19899
    Attn:  Michael R. Nestor, Esq.
           Edmon L. Morton, Esq.
           Fax:    (302) 571-1253

Creditors Committee:
    Schulte Roth & Zabel, LLP
    Attorneys for the Official Committee of Unsecured Creditors
    919 Third Avenue
    New York, NY  10022
    Attn:  Jeffrey S. Sabin, Esq.
          Adam Harris, Esq.
    Fax:  (212) 593-5955

Equity Committee:
    Brown, Rudnick, Berlack, Israels LLP
    Attorneys for the Official Committee of Equity Holders
    One Financial Center
    Boston, Massachusetts 02111
    Attn:  William R. Baldiga, Esq.
    Fax:  (617) 856-8201

THE SAME PROCEDURE SHALL BE UTILIZED IF ANY PERSON OR ENTITY DISAGREES WITH THE DESCRIPTION OF THE AMOUNT OR STRIKE PRICE OF THEIR OPTIONS AS DESCRIBED ON THE ALLOWED OPTION HOLDER SCHEDULE (i.e., IF YOU DISAGREE WITH THE DESCRIPTION OF YOUR OPTIONS, YOU MUST FILE A WRITTEN OBJECTION WITH THE COURT AND THE ABOVE-NOTED PARTIES BEFORE THE DISCLOSURE STATEMENT HEARING AND OBTAIN COURT APPROVAL TO MODIFY YOUR DESCRIPTION ON THE ALLOWED OPTION HOLDER SCHEDULE).

**4.8   Classes 7b, 7c, 7d and 7e – Equity Interests in Debtors other than Riverstone Networks, Inc.**

    (a)   Impairment and Voting.  RNI Wind Down Corporation, as the sole member of classes 7b, 7c, 7d and 7e, will not receive any distribution of property under the Plan on account if its Equity Interest in each of the other Debtors.  Accordingly, classes 7b, 7c, 7d and 7e are impaired by this Plan, but are not entitled to vote thereon and are deemed to have rejected this Plan pursuant to section 1129(g) of the Bankruptcy Code.

    (b)   Cancellation of Equity Interests.  RNI Wind Down Corporation holds, either directly or indirectly, 100 per cent of the Equity Interests of each of the other Debtors.  On the Effective Date, the common stock certificates and other instruments evidencing RNI Wind Down Corporation's Equity Interests in each of the other Debtors shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and RNI Wind Down Corporation's Equity Interests in each of the Debtors evidenced thereby shall be extinguished.

## ARTICLE V.
## ACCEPTANCE OR REJECTION OF THIS PLAN

**5.1** **Voting of Claims and Equity Interests.** Except as provided in this Article V, Holders of Claims and Equity Interests in an impaired Class shall be entitled to vote to accept or reject this Plan as provided for in the Solicitation Procedures Order (a summary or copy of which was distributed together with the Disclosure Statement).

**5.2** **Acceptance by a Class of Creditors or Equity Interest Holders.** Consistent with section 1126(c) and (d) of the Bankruptcy Code and except as provided for in section 1126(e) of the Bankruptcy Code, (i) a Class of Creditors shall have accepted this Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan and (ii) a Class of Equity Interests shall have accepted this Plan if it is accepted by Holders of such Equity Interests that hold at least two-thirds in amount of the Allowed Equity Interests of such Class that have timely and properly voted to accept or reject this Plan.

**5.3** **Classes Entitled to Vote/Presumed Acceptances and Rejections of Plan.** Classes 4, 5, 6 and 7a are impaired and may vote to accept or reject this Plan. Classes 1, 2 and 3 are unimpaired under the Plan and, therefore, are conclusively presumed to accept this Plan. Classes 7b, 7c, 7d and 7e will receive no Distribution under this Plan and, therefore, are conclusively presumed to have rejected this Plan.

**5.4** **Cram Down.** The Proponents of the Plan reserve the right to utilize the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation if any Class or Classes rejects this Plan.

## ARTICLE VI.
## IMPLEMENTATION OF THE PLAN

**6.1** **Implementation of the Plan.**

(a)  **Creation of Liquidating Trust.** If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then the Liquidating Trust shall be created as of the Cause of Action Commencement Date, in accordance with the Liquidating Trust Agreement and funded by the Debtors' transfer to the Liquidating Trust of the Liquidating Trust Assets. The Liquidating Trust shall be a newly-formed Delaware trust with no prior assets or liabilities. The Liquidating Trustee shall serve as the trustee of the Liquidating Trust. The Holders of Allowed Equity Interests shall each hold a Pro Rata beneficial interest in the Liquidating Trust.

(b)  **Transfers to the Liquidating Trust.** If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then such Causes of Action shall be fully preserved and the Debtors and their Estates shall initially transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, for and on behalf of the Beneficiaries (as defined in the Liquidating Trust Agreement) of the Liquidating Trust, all of the Liquidating Trust Assets (but subject to all rights, defenses and setoffs of any defendant).

(c) The Liquidating Trustee. Prior to the Cause of Action Commencement Date, the Equity Committee shall have standing as "Liquidator" and shall have sole authority to commence any Causes of Action belonging to the Debtors and their bankruptcy Estates and/or any claims derivative thereof. If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then from and after the Cause of Action Commencement Date, the Liquidating Trustee shall serve pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation, or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets under title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). No current or former officer, director, stockholder, employee or professional of the Debtors nor member of either committee shall serve as the Liquidating Trustee.

(d) Responsibilities of Liquidating Trustee. The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following: (a) the receipt of the Liquidating Trust Assets; (b) the prosecution of any Cause of Action of the Debtors' Estates not otherwise released under the Plan; (c) the filing of all required tax returns and operating reports and paying of taxes and all other obligations on behalf of the Liquidating Trust, if any; and (d) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other Bankruptcy Court orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan, in accordance with the Liquidating Trustee's reasonable business judgment.

(e) Powers of the Liquidating Trustee. The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement. The Liquidating Trustee, subject to Section 10.2 hereof, may seek pre-judgment remedies against any Settling Officer and Director who is not an Electing Director/Officer (provided that nothing herein shall be construed as granting or expanding any such rights or limiting or waiving any defenses). The Liquidating Trustee shall have the sole and exclusive power and standing to prosecute any Cause of Action by or on behalf of the Estates and any derivative action on behalf of the Debtors, including, but not limited to, the pending derivative suit and appeal in the United States Court of Appeals for the Ninth Circuit. The Liquidating Trustee shall not engage in any business activities on behalf of the Liquidating Trust and shall promptly distribute out any cash or other investment assets or proceeds of any Causes of Action to the Plan Administrator when no longer needed to prosecute any Cause of Action or pay expenses.

(f) Compensation of Liquidating Trustee. The Liquidating Trustee shall be compensated pursuant to the terms of the Liquidating Trust Agreement to be approved by the Bankruptcy Court. Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee. The Liquidating Trustee may retain any professional of his or her choosing, including Professionals retained in the Chapter 11 Cases. The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

(g) **Termination of Liquidating Trust.** The Liquidating Trust shall terminate the earlier of (a) the fifth (5th) anniversary of the Confirmation Date or (b) the distribution of all property in accordance with the terms of the Liquidating Trust Agreement and the Plan; provided, however, that the Liquidating Trustee may extend the term of the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement.

(h) **Appointment of the Plan Administrator.** Prior to the Confirmation Date, the Plan Administrator shall be designated by the Equity Committee. No current or former officer, director, stockholder, employee or professional of the Debtors nor member of either Committee shall serve as Plan Administrator. The Person selected to be the Plan Administrator shall be approved by the Bankruptcy Court at the Confirmation Hearing. If the Person so selected is approved by the Bankruptcy Court, such approval shall be made part of the Confirmation Order. The Plan Administrator shall serve in such capacity (i.e., as Plan Administrator) until his or her resignation or discharge and the appointment of a successor Plan Administrator. The Plan Administrator shall post a bond to secure his or her obligations under this Plan.

(i) **Rights, Powers and Duties of the Reorganized Debtors and the Plan Administrator.** The Reorganized Debtors shall retain and have all the rights, powers and duties necessary to carry out their responsibilities under the Plan, which shall be carried out by the Plan Administrator in his or her reasonable business judgment and to the extent in the best interest of the Holders of Allowed Claims and Equity Interests, on behalf of the Reorganized Debtors. These rights, powers and duties, which shall be exercised by the Plan Administrator on behalf of the Reorganized Debtors and their Estates include, without limitation, the right to, without further Bankruptcy Court approval, (i) invest all or a portion of the Available Cash in any investment vehicle permitted by section 345 of the Bankruptcy Code; (ii) make, file and settle or otherwise resolve objections to Claims; (iii) hold Assets of the Estates for the benefit of Creditors and Equity Interest Holders; (iv) establish the various reserves required by or contemplated by under this Plan; (v) make Distributions to Holders of Allowed Claims and Equity Interests in accordance with the terms of this Plan, (vi) wind-down and dissolve (as may be necessary) the Foreign Subsidiaries and distribute any surplus proceeds of such non-Debtors to the Reorganized Debtors and (vii) take any and all other actions reasonably necessary to effectuate the purposes of this Plan. Moreover, the Plan Administrator shall have the power, subject to Section 10.2 hereof, to seek pre-judgment remedies against any Settling Officer and Director who is not an Electing Director/Officer (provided however that nothing herein shall be construed as granting or expanding any such rights or limiting or waiving any defenses). In addition, the Plan Administrator shall be responsible for establishing, maintaining and making timely distributions from the Class 6a-2 Reserve in accordance with this Plan and any orders entered relating thereto.

(j) **Compensation of Plan Administrator.** The Plan Administrator shall be compensated on an hourly basis at a rate to be agreed upon between the Plan Administrator and the Post-Effective Date Committee. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Plan Administrator in consultation with the Post-Effective Date Committee. The Plan Administrator may retain any professional of his or her choosing, including Professionals retained in the Chapter 11 Cases. The payment of fees and expenses of

the Plan Administrator and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

(k) <u>Resignation of Officers and Directors</u>. Upon the Effective Date, all of the Debtors' officers and directors in office immediately prior to the Effective Date shall be deemed to have resigned from their positions with the Debtors (without the necessity of any further action or writing or Bankruptcy Court order) and shall have no further responsibilities, duties and obligations arising after the Effective Date. None of the Debtors' present officers or directors shall have any liability for the acts or omissions of the Reorganized Debtors, Plan Administrator, Liquidating Trust, Liquidating Trustee or Post-Effective Date Committee, and each such person or entity will have a continuing obligation to enforce the Confirmation Order and the terms of this Plan so as to ensure that the Debtors' officers and directors are "held harmless" for any and all acts or omissions of the Reorganized Debtor, Plan Administrator, Liquidating Trust, Liquidating Trustee and/or the Post-Effective Date Committee.

(l) <u>Certificate of Incorporation and By-laws</u>. The certificates of incorporation and by-laws and/or other applicable organizational documents of the Reorganized Debtors shall be deemed amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and in accordance with applicable Delaware law. The applicable certificates of incorporation or other applicable organizational documents of the Reorganized Debtors shall be deemed amended to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized Debtors to matters related to the implementation of this Plan. The amended certificates of incorporation and by-laws will be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing. Upon cancellation of the Equity Interests, the Reorganized Debtor shall issue to the Plan Administrator one new share of stock of the Reorganized Debtor.

6.2 <u>Post-Effective Date Committee</u>. The Post-Effective Date Committee shall be comprised of four (4) members designated by the Equity Committee. The Plan Administrator shall consult regularly with the Post-Effective Date Committee when carrying out the purpose and intent of this Plan. The members of the Post-Effective Date Committee shall not receive compensation, but shall be reimbursed for their reasonable and necessary expenses by the Reorganized Debtors.

(a) In the case of an inability or unwillingness of any member of the Post-Effective Date Committee to serve, such member shall be replaced by designation by the remaining members of the Post-Effective Date Committee. If any position on the Post-Effective Date Committee remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Plan Administrator and without the requirement of a vote by the members of the Post-Effective Date Committee.

(b) Upon the certification by the Plan Administrator that all Assets of the Reorganized Debtors have been distributed, abandoned or otherwise disposed of, the members of the Post-Effective Date Committee shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(c)     The Post-Effective Date Committee may, by majority vote, remove the Plan Administrator in its discretion.  The Plan Administrator also may be removed by the Bankruptcy Court for cause shown after a hearing on notice to all interested parties and the Post-Effective Date Committee by the movant.  In the event of the resignation or removal of the Plan Administrator, the Post-Effective Date Committee shall, by a majority vote, designate a person to serve as successor Plan Administrator.  In the event majority consent cannot be obtained, the Bankruptcy Court shall select a new Plan Administrator.

(d)     The Post-Effective Date Committee may, by majority vote, enter into one or more agreements to carry out, implement and enforce the Plan, including but not limited to entering into one or more agreements with the Plan Administrator providing for the Plan Administrator's compensation.

(e)     Notwithstanding anything to the contrary in the Plan, neither the Post-Effective Date Committee nor any of its members, designees or any duly designated agent or representative of such party shall be liable for the act, default or misconduct of any other member of the Post-Effective Date Committee, nor shall any member be liable, and the Reorganized Debtors shall indemnify each member, for anything other than such member's own gross negligence or willful misconduct.

**6.3     Continuation of Bankruptcy Injunction or Stays.**  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed or dismissed or the property affected by such stay is no longer property of the Debtors' Estates.

**6.4     Substantive Consolidation.**  For the purposes of fully administering this Plan, the Debtors will not be substantively consolidated.

**6.5     Intercompany Claims.**  The Debtors or Reorganized Debtors, as applicable, shall pay or otherwise provide for any liabilities of any debtor and Foreign Subsidiaries, with any remaining surplus to be distributed as a dividend to the estate of RNI Wind Down Corporation. Upon such receipt, such funds shall constitute Available Cash and shall be distributed in accordance with the provisions of this Plan.  Thereafter, all Debtor subsidiaries and Foreign Subsidiaries of Riverstone shall be dissolved in accordance with local law and any Intercompany Claims extinguished.  Notwithstanding anything to the contrary in this Plan, each Debtor shall continue to be responsible for the payment of Quarterly Fees to the Office of the United States Trustee until a particular case is closed, dismissed or converted.

**6.6     Full and Final Satisfaction.**  All payments and all distributions hereunder shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests, except as otherwise provided in this Plan.

**6.7     Chapter 5 Avoidance Actions.**  Except with respect to Morrison & Foerster, LLP, except as provided in Section 7.10 hereof generally and except as provided in sections 549 and 550 of the Bankruptcy Code solely as such Bankruptcy Code sections relate to the Debtors' postpetition award or deemed exercise of certain stock options or shares of stock on behalf of

their directors, officers and employees and others, because the Debtors were solvent at all times prior to the Commencement Date the Debtors are not preserving any Avoidance Actions pursuant to this Plan.

**6.8    Administration Pending Effective Date.**    During the period after the Confirmation Date and prior to the Effective Date, the Debtors shall continue to operate their businesses in the ordinary course of business and in accordance with any applicable Orders of the Bankruptcy Court, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. After the Effective Date, the Plan Administrator (in consultation with the Post-Effective Date Committee) shall administer and close the Estates subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article 10 hereof.

**6.9    Closing of Chapter 11 Cases.**    When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by a Final Order, or otherwise resolved, and all Cash and Assets of the Reorganized Debtors have been distributed in accordance with this Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**6.10    Permanent Injunction.**    From and after the Confirmation Date, as provided for in the Confirmation Order, and except as otherwise expressly provided herein or as may be agreed to in writing by the Plan Administrator and approved by the Bankruptcy Court on notice, there shall be in place with regards to the Assets and any Claims against the Debtors or the Reorganized Debtors, their Estates, the Liquidating Trust or any Assets of the foregoing a permanent injunction (i) to the same extent and with the same effect as the stay imposed by section 362 of the Bankruptcy Code, and (ii) permanently enjoining all Persons from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, right or Cause of Action against the Debtors or their Assets. Such permanent injunction shall remain in effect notwithstanding the closure of the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

**6.11    No Discharge.**    Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge the Debtors.

**6.12    Continued Corporate Existence; Dissolution of the Reorganized Debtors.** The Reorganized Debtors shall continue to exist after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certification of incorporation, by-laws and/or other applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended in accordance with the Plan. The Plan Administrator, as applicable, may (a) effectuate the dissolution of any the remaining Reorganized Debtors and subsidiaries, and (b) cause the termination of the officers and directors of such Reorganized Debtors and subsidiaries.

**6.13    Directors and Officers; Effectuating Documents; Further Transactions.** From and after the Effective Date, the Plan Administrator (i) shall serve as the sole officer and sole director of the Reorganized Debtors and any subsidiaries thereof, including the Foreign

Subsidiaries and (ii) shall be the sole Person authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VII.
## DISTRIBUTIONS AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS

**7.1     Method of Distributions Under this Plan.**

(a)     In General.  Subject to Bankruptcy Rule 9010, unless otherwise expressly provided for herein, all distributions under this Plan shall be made (i) to the Holder of each Allowed Claim at the address of such Holder as listed in the Debtors' books and records or on the Schedules as of the Confirmation Date, unless the appropriate party has been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim or notice of transfer of claim filed by such Holder that provides an address, if any, for such Holder different from the address reflected in the Debtors' books and records or on the Schedules, (ii) to the Holders of Bondholder Claims, by payment to the Bond Trustee for distribution in accordance with Section 4.5(d) hereof, and (iii) to the Holders of Equity Interests, at the address of such Holder set forth in the records of the Transfer Agent on the Confirmation Date.

(b)     Distributions of Cash.  Any payment of Cash shall be made by check drawn on a domestic bank or by wire transfer of same day funds, provided, however, that any payment made to the Bond Trustee shall be made by wire transfer of same day funds.

(c)     Timing of Distributions.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)     Distributions to Holders as of the Confirmation Date.  As of the close of business on the Confirmation Date, the claims register and stock transfer ledgers of the Debtors (including those registers maintained by the Bond Trustee and the Transfer Agent) shall be closed, and there shall be no further changes in the record Holders of any Claims or Equity Interests. The Plan Administrator shall not have any obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Confirmation Date.

**7.2     Fund Reserve.**  The Debtors shall reserve funds to satisfy potential and/or contingent or unliquidated claims as required under the Plan and Disputed Claims as required under the Plan as of the Effective Date.  The total amount of such reserves cannot be determined at this time as such amounts will be fixed by the Bankruptcy Court on or prior to the Confirmation Hearing.

**7.3     Objections to and Resolution of Administrative Expense Claims, Claims and Equity Interests.**  Except as to Professional Fee Claims (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of this Plan, the Confirmation Order or

other order of the Bankruptcy Court), any party in interest may make and file objections to Claims, including Administrative Expense Claims, through and until the Claim Objection Deadline. All objections shall be litigated to Final Order; provided, however, that the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections without Bankruptcy Court approval, after consultation with the Post-Effective Date Committee. Unless extended by the Bankruptcy Court, upon motion of the Plan Administrator without notice or hearing, all objections to Claims (other than Professional Fee Claims), including Administrative Expense Claims, shall be filed and served upon the Holder of the Claim or the Administrative Expense Claim as to which the objection is made as soon as is practicable, but in no event later than the Claims Objection Deadline.

7.4    **Establishment and Maintenance of Reserve for Disputed Claims.**    The Disputed Claims Reserve shall (i) be established on the Effective Date and (ii) equal the estimated aggregate of any distributable amounts of Cash to which Holders of Disputed Claims would be entitled under this Plan if such Disputed Claims had been Allowed Claims on the Initial Distribution Date in the amount set forth in the Face Amount of such Disputed Claim or, if no amount was set forth in the Proof of Claim, in such other amount as provided by an Order of the Bankruptcy Court, plus any additional funds necessary to adequately provide for postpetition interest on such Claims in the amount provided for in this Plan. For the purposes of effectuating the provisions of this Section 7.4 and the distributions to Holders of Allowed Claims, the Bankruptcy Court, on appropriate motion made prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set (or as set forth in this Plan), may fix, estimate or liquidate the amount of Disputed Claims pursuant to section 502(c) or other provisions of the Bankruptcy Code and Section 7.7 of this plan. The Allowed amount of any Disputed Claim may be fixed by agreement in writing by and between the Debtors or the Plan Administrator, as applicable, and the Holder of a Disputed Claim.

7.5    **Distributions Upon Allowance or Disallowance of Disputed Claims.**    Except as otherwise provided in this Plan, no payments shall be made in respect of any Disputed Claim until (and only to the extent) it becomes an Allowed Claim. If a portion of a Disputed Claim becomes Allowed, such portion shall be paid and the balance shall continue to be treated as a Disputed Claim. The Holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order, but in no case more than five (5) business days after the date of the Final Order. Such distributions shall be made in accordance with this Plan based upon the distributions that would have been made to such Holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus applicable interest as required by Sections 4.4(c) or 4.6(e) plus actual interest accrued on the funds reserved to pay such Disputed Claim while in the Disputed Claims Reserve. Except as otherwise provided in this Plan, no Holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve until such Disputed Claim shall become an Allowed Claim. Cash resulting from disallowance or settlement of Disputed Claims (and any interest earned thereon) shall be treated as Available Cash and distributed, from time to time, to Holders of Allowed Equity Interests in accordance with the Plan.

**7.6    Distributions Upon Allowance of Class 6 Indemnification Claims.** Notwithstanding anything in Section 7.5 hereof to the contrary, the Settling Officers and Directors and Holders of Allowed Class 6 Indemnification Claims shall be entitled to submit to the Plan Administrator on or before the 15th day of each month an invoice detailing the actual incurred amount of their Indemnification Claims for the immediately preceding month. The Plan Administrator shall have twenty (20) days from receipt of any such invoice and detailed time records to review and object thereto. If no objection is timely made, the Plan Administrator shall pay such invoice promptly from the Disputed Claims Reserve (for Holders of Class 6 Indemnification Claims in Classes 6a-1 and 6a-3) or the Class 6a-2 Reserve (for Holders of Class 6 Indemnification Claims in Class 6a-2), subject to any allocation as may be required by Section 4.6. Any disputes regarding the Allowance or Disallowance of any such invoice that cannot be resolved by the parties shall be submitted to the Bankruptcy Court.

**7.7    Estimation.** Any of the Proponents of this Plan and/or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) or other provisions of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated (the "Estimated Amount") shall constitute the maximum Allowed amount, if any, for such Claim, as determined by the Bankruptcy Court. With respect to Indemnification Claims asserted by Settling Officers and Directors, the Estimated Amount shall be placed in the Class 6a-2 Reserve and the amount thereof fixed in accordance with Section 4.6 above. With respect to Indemnification Claims of Officers, Directors and Employees (other than Settling Officers and Directors) and Specified Former Officers and Directors, the Estimated Amount shall be placed in the Disputed Claims Reserve and the amount thereof fixed in accordance with this section 7.7. If the Estimated Amount constitutes a maximum limitation on the amount of such Claim, the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned rights (i.e., objection, estimation, and resolution procedures) are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. All rights, arguments, defenses and/or setoffs of any party to an estimation hearing are fully preserved.

**7.8    Disputed Payments.** In the event of any dispute between and among Holders of Claims, Equity Interests and/or the Holders of a Disputed Claim as to the right of any Person to receive or retain any payment or distribution to be made to such Person under this Plan, the Plan Administrator may, in lieu, of making such payment or distribution to such Person, instead hold such payment or distribution, until the disposition thereof shall be determined by a Final Order of the Bankruptcy Court or other court with appropriate jurisdiction.

**7.9    Unclaimed Distributions.** Any Person who receives a check pursuant to this Plan must present such check for payment within six (6) months of its date of issuance. Any checks not presented within such six (6) month period (including checks that have been returned to the Reorganized Debtors as undeliverable) will be void, and such funds shall be returned to the Reorganized Debtors for distribution by the Plan Administrator in accordance with this Plan.

None of the Reorganized Debtors, the Plan Administrator or the Liquidating Trustee shall have any obligation to attempt to redeliver any check returned as undeliverable unless notified in writing of a new or alternative address for the Person whose check was returned.

7.10    Setoffs.    All rights of setoff and/or recoupment of the Debtors and of any other Person, and any and all defenses thereto are fully preserved, together with the rights to assert disallowance in whole or in part of Claims under section 502(d) of the Bankruptcy Code, if any, arising from the Avoidance Actions preserved under section 6.7 of this Plan.

7.11    Professional Fees and Expenses.    In accordance with Section 2.2(b), each Professional or other Person requesting compensation in the Chapter 11 Cases pursuant to sections 330 or 503(b) of the Bankruptcy Code shall file an application for an allowance of final compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases (i.e., a "Final Fee Application"). Objections to any such application shall be filed on or before five (5) Business Days prior to the hearing set by the Bankruptcy Court to consider such Final Fee Application, unless extended by agreement of the parties. Any Professional fees and expenses arising on and after the Effective Date shall be paid in accordance with this Plan.

7.12    Minimum Distributions.    No Distribution in the aggregate amount of $10.00 or less shall be made to a Holder of an Allowed Claim or Equity Interest on the Initial Distribution Date or any Subsequent Distribution Date, notwithstanding any contrary provision of this Plan. Any undistributed Cash pursuant to Section 7.8 will become Available Cash for Distribution on the Final Distribution Date.

7.13    Final Distribution.    If after the estate has been fully administered there remains Cash on hand in an amount less than $15,000, the Plan Administrator, in consultation with the Post-Effective Date Committee, may donate the same to a registered charity of his or her choice in lieu of making a final Distribution.

## ARTICLE VIII.
## EXECUTORY CONTRACTS; UNEXPIRED LEASES; RETIREE BENEFITS

8.1    Executory Contracts and Unexpired Leases.    On the Effective Date, all remaining executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or, (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Confirmation Date.

8.2    Approval of Rejection of Executory Contracts and Unexpired Leases.    The Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of this Plan.

**8.3    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan.** Claims arising out of the rejection of executory contracts or unexpired leases pursuant to Section 8.1 of this Plan and the Confirmation Order must be filed with the Bankruptcy Court and/or served upon the Plan Administrator or as otherwise may be provided in the Confirmation Order by no later than fifteen (15) days after the entry of the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtors, the Reorganized Debtors, their Estates or the Liquidating Trust.

**8.4    Retiree Benefits.** The Debtors have never funded nor maintained any retiree benefit plans, funds or programs, as defined in section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants for medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise). Accordingly, the Plan does not make provisions to pay any such benefits under section 1129(a)(13) of the Bankruptcy Code.

**8.5    Employee Benefit Plans.** The Plan Administrator, on behalf of the Reorganized Debtors, shall consummate the termination of the Debtors' pension plan and the transfer of vested interest in the assets of such plan to the beneficiaries entitled thereto. The Plan Administrator, on behalf of the Reorganized Debtors, shall also effectuate the termination of any 401(K) plan that the Debtors administer and the transfer of the assets of such plan to the beneficiaries thereof.

# ARTICLE IX.
## EXCULPATION, INJUNCTIONS AND RELEASES

**9.1    Exculpation.** On the Effective Date of this Plan, no Person who was serving as an officer, director or employee of the Debtors on or after the Commencement Date, acting in their capacity as such, nor the Debtors, the Debtors' Estates, the Reorganized Debtors, the Committees or their present or former members, the Plan Administrator, the Liquidating Trustee or any of the foregoing's respective affiliates, members, stockholders, advisors, agents or Professionals, except with respect to Morrison & Foerster, LLP (collectively, the "Exculpated Parties") shall have or incur any liability to any Person for any act or omission taken or omitted on or after the Commencement Date in connection with, related to, or arising out of, the Chapter 11 Cases, the postpetition negotiation and/or sale of Debtors' assets to Lucent Technologies, Inc. ("Lucent"), the preparation, filing, negotiation or formulation of this Plan, the pursuit of confirmation of this Plan including without limitation, the consummation of this Plan or the implementation or administration of this Plan or the property to be distributed under this Plan, and any such Claim or Cause of Action shall be deemed released, except for: (i) any Claim or Cause of Action arising from the fraud or willful misconduct of any Exculpated Party; (ii) any Claim or Cause of Action arising from the gross negligence of any Professional; and (iii) any Claim or Cause of Action commenced by the Equity Committee on or before the Cause of Action Commencement Date, but solely as it may relate to the timing of the Lucent closing and/or any EC Computer Cause of Action. In all respects the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this

Plan; provided, however, that nothing in this Plan shall, or shall be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect, to any of the Exculpated Parties' obligations or covenants arising pursuant to this Plan or the Confirmation Order.

9.2     Releases by the Debtors.  Except as set forth in Section 9.1 of this Plan and except with respect to Morrison & Foerster, LLP, on the Effective Date of this Plan, each of the Debtors and the Estates shall unconditionally release, and hereby are deemed to forever release unconditionally, each of the Settling Officers and Directors from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and Causes of Action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, any prepetition act or omission and/or the negotiation and sale of the Debtors' assets to Lucent; provided, however, that in the event a Cause of Action has been timely commenced as provided for herein against any such Settling Officer and Director on or prior to the Cause of Action Commencement Date, then this release shall be suspended (i) solely with respect to the Settling Officer or Director named as a defendant in such suit, (ii) to the extent of the Cause of Action asserted in such suit and (iii) only to the extent of (x) available insurance, (y) the Class 6a-2 Reserve and (z) the amount of any At Risk Assets if the Settling Officer and Director elects to be a Electing Director/Officer.  Except with regard to the right of setoff solely as it relates to the Settling Officers and Directors, nothing in the Plan or the releases set forth herein shall affect any rights of the Plan Administrator to object to the allowance, amount, priority or secured status of the claims of any party receiving a release under the Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment.  For the avoidance of doubt, no personal assets of a Settling Officer and Director who elects to be a Electing Director/Officer (other than the At Risk Assets) shall be subject to any judgment, garnishment, collection, attachment, seizure or risk for any Cause of Action brought, assigned to and prosecuted by the Liquidation Trustee, except for Causes of Action in which a court of competent jurisdiction makes a finding of fraud or willful misconduct, and the sole source of recovery of any such Cause of Action shall be first, the D&O Insurance, second, the Class 6a-2 Reserve, and third such Electing Director/Officer's At Risk Assets.

9.3     Releases by Holders of Claims and Equity Interests.  Except as set forth in Section 9.5(f) hereof and except with respect to Morrison & Foerster, LLP, on the Effective Date, each Holder of a Claim or Equity Interest (including Allowed Option Holders and Disallowed Option Holders) who voted in favor of the Plan and/or who checked the box on the ballot marked "Third Party Release" shall be deemed to unconditionally release and forever waive all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any transactions or matters with the Debtors, their Estates or in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the sale of the Debtors' assets to Lucent, or for any act or omission that occurred or could have occurred on or prior to the Effective Date (collectively "Released Claims") against (i) any Debtor or Reorganized Debtor, (ii) any affiliate or subsidiary of any Debtor or Reorganized Debtor, (iii) the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (iv) each member of the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (v) any Officer, Director and Employee and (vi) any Settling Officer and Director. For the avoidance of doubt, nothing in this Plan or the Disclosure Statement shall affect the right of any Creditor or Equity Interest Holder who votes to reject the Plan or who fails to vote on the Plan or who otherwise objects to the Plan to receive a distribution under the Plan.

   9.4   <u>Injunctions</u>. As of the Effective Date, except as otherwise provided in this Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, or pursing any cause of action or Claim, or effectuating any set-off, whether directly, derivatively or otherwise against any or all of the Exculpated Parties, on account of or respecting any Claims, debts, causes of action, rights, Causes of Action (including Released Claims) or liabilities released or discharged pursuant to this Plan, except to the extent expressly permitted under this Plan.

   9.5   <u>Investigation Period; Time to Bring Causes of Action Against Settling Officers and Directors</u>.

      (a)   The primary purposes of this Plan are to (1) provide for the prompt payment in full of all Allowed Claims, (2) maximize the recovery to holders of Allowed Equity Interests and (3) ensure that distributions are made to holders of Allowed Equity Interests as quickly as reasonably possible. In order to implement these goals, the Debtors wish to reduce or avoid having to reserve Cash at the Effective Date to provide for payment of contingent or unliquidated claims that rank senior in priority to the rights of Holders of Allowed Equity Interests. For example, the Debtors are currently obligated to indemnify their officers, directors and employees under various indemnification agreements, under the By-laws and Certificate of Incorporation and under existing law. These obligations are broad and cover not only certain actual suits and claims but also certain "threatened" claims and even certain "investigations" of potential claims as well as certain defense and other costs such as legal fees.

      (b)   In an effort to reduce the potential reserves and increase the initial distribution to Holders of Allowed Equity Interests, the Settling Officers and Directors have agreed to the following settlement to be implemented in the Plan: (i) the Debtors and its officers and directors will comply with the Implementation Order so that the investigation results may be presented in accordance with Section 4.6 of the Plan (thus, if no Claim or Cause of Action is discovered, then the Class 6a-2 Reserve initially will be fixed with certainty at $7 million and the risk of an increased Class 6a-2 Reserve can be eliminated), (ii) ANY STOCKHOLDER, FORMER STOCKHOLDER, CREDITOR OR OTHER THIRD PARTY WHO WISHES TO FILE A CAUSE OF ACTION AGAINST AN INDIVIDUAL OFFICER OR

DIRECTOR OF THE DEBTORS AS OF THE COMMENCEMENT DATE SHALL COMMENCE ANY SUCH ACTION ON OR BEFORE THE THIRD PARTY COMMENCEMENT DEADLINE (i.e. SEPTEMBER 1, 2006), (iii) ALL SUCH CAUSES OF ACTION NOT TIMELY BROUGHT BY THE THIRD PARTY COMMENCEMENT DEADLINE (FOR THIRD PARTIES) OR BY THE CAUSE OF ACTION COMMENCEMENT DATE (i.e. SEPTEMBER 1, 2006) (FOR THE COMMITTEES) SHALL BE DEEMED RELEASED AND WAIVED and (iv) the Settling Officers and Directors will agree to reduce and limit their potential Indemnification Claims against the Debtors solely to the D&O Insurance and the Class 6a-2 Reserve and to limit any Indemnification Claims against the Debtors for amounts in excess thereof, will waive their existing contractual right to have the Debtors obtain irrevocable letters of credit in the amount of $1 million for each current officer and director, and will further agree that all Available Cash (after funding all required reserves including the Class 6a-2 Reserve) may be distributed on the Effective Date to Allowed Equity Interests without any right of recovery or disgorgement from Equity Interests in the event the Class 6a-2 Reserve is insufficient to cover all Class 6 Claims in full. Notwithstanding the foregoing, the Third Party Commencement Deadline shall not be effective to the extent that this Plan (including, without limitation, the third party releases contained herein), or any amendment, modification or supplement hereto, does not become effective.

   (c) The Debtors are not aware at this time of any viable Claim or Cause of Action against any Person who has served as a Settling Officer or Director. However, in order to support the exculpation and releases described in this Article 9, and to increase the distribution to Holders of Allowed Equity Interests by reducing the amount of potential reserves, the Debtors (i) have requested that the Equity Committee commence an investigation of the conduct, affairs, acts, omissions and transactions relating to the Debtors and/or its officers or directors, (ii) produced numerous documents to the Equity Committee (and have agreed to produce documents as the Equity Committee may reasonably request which are in the possession and/or control of Debtors and/or its officers and directors), and (iii) made their officers and directors available to meet with or to be deposed under oath by the Equity Committee.

   (d) The Debtors and their officers and directors shall continue to reasonably cooperate with the Equity Committee and to reasonably make themselves and their documents available for any investigation by the Equity Committee in accordance with the Implementation Order.

   (e) Any Cause of Action commenced by or on behalf of the Debtors or the Estates on or prior to the Cause of Action Commencement Date shall be deemed property of the Debtors' Estates and, to the extent not settled, dismissed or withdrawn as of the Cause of Action Commencement Date, shall be transferred and assigned to the Liquidating Trustee to prosecute as the sole and exclusive agent for the Debtors and the Estates, and shall be treated in accordance with the terms of this Plan.

   (f) Any cause of action properly commenced on or before the Third Party Commencement Date by any third party (including any creditor or former or current stockholders) against an Settling Officer and Director (other than a Cause of Action commenced by or on behalf of the Debtors or the Estates or any derivative claim on behalf of the Debtors or

the Estates) shall remain in effect and shall not be waived, released or affected by the Plan. HOWEVER, ANY SUCH CAUSE OF ACTION DESCRIBED IN SECTION 9.5 OF THE PLAN WHICH HAS NOT BEEN BROUGHT ON OR BEFORE THE THIRD PARTY COMMENCEMENT DATE BY A PERSON WHO RECEIVED ACTUAL NOTICE OF THE PLAN, OTHER THAN THE EQUITY COMMITTEE OR THE LIQUIDATING TRUSTEE, SHALL BE DEEMED RELEASED AND WAIVED IN ACCORDANCE WITH SECTION 9.3 ABOVE.

## ARTICLE X.
## RETENTION OF JURISDICTION

**10.1    Jurisdiction of Bankruptcy Court.** The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under or arising in or related to the Chapter 11 Cases and this Plan, pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, among other things, the following:

(a)    To hear and determine any motions for the assumption, assignment or rejection of executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

(b)    To determine any and all pending adversary proceedings, applications, and contested matters;

(c)    To hear and determine any objection to any Claim or Equity Interest;

(d)    To estimate or liquidate any Disputed Claim;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    To issue orders in aid of execution of this Plan pursuant to section 1142 of the Bankruptcy Code;

(g)    To interpret or consider any modifications of this Plan, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine all applications for compensation and reimbursement of expenses of Professionals, the Bond Trustee, any transfer agent or similar persons, or other Persons under sections 330, 331, and 503(b) of the Bankruptcy Code;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan and/or the Implementation Order;

(j)    To recover all Assets and property of the Estates wherever located;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code Filed, or to be Filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through, and including entry of the Final Decree);

(l)    To hear any other matter consistent with the provisions of the Bankruptcy Code or as otherwise provided in this Plan;

(m)    To adjust, as necessary, the Class 6a-2 Reserve and/or the Disputed Claims Reserve; and

(n)    To enter the Final Decree.

10.2    **Venue.**  Any Claim or Cause of Action against any Settling Officer and Director shall be filed solely in a federal or state court situated within the state of Delaware (each, a "Delaware Court" and collectively, the "Delaware Courts").  Each Settling Officer and Director shall be deemed to have consented to the personal jurisdiction of the Delaware Courts for any Cause of Action or Claim.  Should the initial Delaware Court (and not at the request of the Liquidating Trustee or Equity Committee) decline to exercise or abstain from exercising jurisdiction over any Claim or Cause of Action filed against any Settling Officer and Director and should the Liquidating Trustee or the Equity Committee desire to recommence such Claim or Cause of Action, the Liquidating Trustee or Equity Committee shall first use its best efforts to commence such Claim or Cause of Action in another Delaware Court until all available Delaware Court venue options have been exhausted and (ii) thereafter the Liquidating Trustee or the Equity Committee may recommence such Claim or Cause of Action in any court of competent jurisdiction.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

11.1    **Successors and Assigns.**  The rights and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of that Person.

11.2    **Effectuating Documents and Further Transactions.**  The Debtors or the Reorganized Debtors, the Liquidating Trustee and the Plan Administrator are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

11.3    **Exemption from Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of Assets contemplated by this Plan, shall not be subject to any stamp.

**11.4    Amendment, Modification, Withdrawal or Failure of this Plan**.    The Proponents of this Plan may alter, amend or modify this Plan at any time prior to the Confirmation Date, provided that this Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. This Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code. Material modifications to this Plan made prior to the Effective Date must be approved by each of the Proponents; provided, however, that such approval may not be unreasonably withheld. No amendment or modification to this Plan after the Effective Date can be effective without the written approval of the Post-Effective Date Committee; provided, however, that such approval may not be unreasonably withheld. A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder. The Debtors may, with written notice to the Committees but without notice to Holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such Holders, correct any defect or omission in this Plan and any exhibit hereto. Furthermore, no party may withdraw this jointly proposed Plan without the consent of each of the Proponents unless, at the time of such withdrawal, it has been determined by the Bankruptcy Court that one or more conditions to confirmation or the Effective Date cannot occur. If the Effective Date shall not have occurred on or before September 29, 2006, this Plan shall be deemed automatically revoked unless extended by agreement of each of the Plan Proponents. In the even the Plan is revoked or withdrawn, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors. If revoked or withdrawn, all provisions of this Plan shall be deemed null and void.

**11.5    Post-Effective Date Fees and Expenses of Professionals and of Winding up the Estates**. After the Effective Date until the entry of the Final Decree, the Plan Administrator shall, without further approval by the Bankruptcy Court, except as otherwise provided herein, pay the reasonable fees and expenses, accruing on and after the Confirmation Date, of the Professionals employed by the Reorganized Debtors and the Liquidating Trustee in accordance with the procedures herein. The Plan Administrator shall retain sufficient funds to ensure that all such ongoing fees and expenses of the Professionals employed by the Reorganized Debtors and the Liquidating Trustee shall be paid in full. Such fees and expenses shall be paid within fifteen (15) Business Days after submission of detailed invoices to the Plan Administrator, except as otherwise provided herein. If the Plan Administrator objects to any invoice, the Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for determination and the disputed portion of such invoice shall not be paid until the dispute is resolved. After the Effective Date, the costs associated with winding up the affairs of the Estate including statutory fees, if any, payable to the United States Trustee's Office, shall be paid in the ordinary course as they become due and without further approval by the Bankruptcy Court.

**11.6    Payment of Statutory Fees.** All fees payable pursuant to chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date. Any such statutory fees accruing on and after the Confirmation Date shall be paid in accordance with Section 11.5 of this Plan. In the event of a dispute as to the amount of such fees, the Bankruptcy Court will determine the amount, if any owed by the Debtors. Notwithstanding anything to the contrary in this Plan, each Debtor shall continue to be responsible for the payment of Quarterly Fees to the Office of the United States Trustee until a particular case is closed, dismissed or converted.

**11.7    Dissolution of the Committees and of the Post-Effective Date Committee.** The Post-Effective Date Committee shall continue in existence until entry of the Final Decree. Upon entry of the Final Decree, the Post-Effective Date Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases. The Equity Committee and the Creditors' Committee shall each be deemed dissolved as of the Effective Date and the members thereof deemed released and discharged from further duties relating thereto; provided, however, that the Equity Committee and Creditors' Committee shall remain in effect for the purpose of preparing, filing and prosecuting to Final Order any Professional Fee Claim.

**11.8    Courts of Competent Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**11.9    Binding Effect.** This Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and Equity Interests, the members of the Post-Effective Date Committee and their respective successors and assigns, including, without limitation, the Plan Administrator, the Liquidating Trustee, and any affiliates thereof.

**11.10    Notices.** Any notices to or requests by parties in interest under or in connection with this Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Debtors:

> RNI Wind Down Corporation,
> f/k/a Riverstone Networks, Inc.
> 5200 Great America Parkway
> Santa Clara, CA 95054
> Attn: Noah D. Mesel

With a copy to:

> Morgan, Lewis & Bockius LLP
> 101 Park Avenue
> New York, NY 10178
> Attn:  Neil E. Herman, Esq.
>        Andrew D. Gottfried, Esq.
> Fax:    (212) 309-6001

> - and -

> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899
> Attn:  Michael R. Nestor, Esq.
>        Edmon L. Morton, Esq.
> Fax:    (302) 571-1253

If to the Creditors Committee:

> Schulte Roth & Zabel, LLP
> Attorneys for the Official Committee of Unsecured Creditors
> 919 Third Avenue
> New York, NY  10022
> Attn:  Jeffrey Sabin, Esq.
>        Adam Har ris, Esq.
> Fax:    (212) 593-5955

If to the Equity Committee:

> Brown, Rudnick, Berlack, Israels LLP
> Attorneys for the Official Committee of Equity Holders
> One Financial Center
> Boston, Massachusetts 02111
> Attn:  William R. Baldiga, Esq.
> Fax:    (617) 856-8201

    **11.11    Reservation of Rights.**  Except as expressly set forth herein, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

    **11.12    Section 1146 Exemption.**  In accordance with Section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the making or

50

delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any stamp tax or other similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax or other similar tax.

**11.13 Further Assurances.** The Debtors, the Plan Administrator, the Liquidating Trustees and all Holders of Claims and Equity Interests receiving distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**11.14 Filing of Additional Documents.** On or before substantial consummation of the Plan, the Proponents of the Plan and such other parties as necessary shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**11.15 Plan Supplement.** Except as otherwise provided herein, as early as practicable (but in no event later than five (5) Business Days) prior to the first date set for the Confirmation Hearing, the Proponents of the Plan shall file with this Court copies of all documents necessary for confirmation of the Plan, including the Liquidation Trust Agreement (the "Plan Supplement"). Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Debtors or their counsel. The Plan Supplement is incorporated into and a part of the Plan as if set forth in full thereto.

**11.16 Withholding and Reporting Requirements.** In connection with the consummation of the Plan, the Reorganized Debtors, the Liquidating Trustee and/or the Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**11.17 Headings.** Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**11.18 Inconsistency.** In the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

11.19  Severability.  In the event that the Bankruptcy Court determines, on or prior to Confirmation, that any provision of this Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Proponents (which consent shall not be unreasonably withheld), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such determination, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such determination, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.20  Waiver of Ten Day Stay.  The Confirmation Order shall contain a provision waiving any stay of the Confirmation Order imposed by Bankruptcy Rules 3020(e) and/or 6004(h).

11.21  Governing Law.  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

11.22  Conditions to Confirmation.  It shall be a condition to the confirmation and effectiveness of this Plan that (a) an order has been entered approving the settlement of the 9th Circuit appeal of the consolidated derivative actions, captioned *Watterson v. Pereira*, et al., Case No. C-03-0637-PJH (N.D. Cal.) in form and substance satisfactory to the Debtors and the Committees, which order has not been stayed or vacated and remains in full force and effect, (b) the Bankruptcy Court shall have entered such orders as may be necessary to determine that, after giving effect to the funding of all reserves contemplated or required by this Plan with respect to Disputed Claims (including, without limitation, the Plan Funding Reserve and the Class 6a-2 Reserve) the Debtors shall have sufficient Available Cash to make all distributions, and establish all reserves, to or for the benefit of the Holders of Administrative Expense Claims, Secured Claims, General Unsecured Claims and Bondholder Claims required or contemplated by this Plan and (c) an order approving the Mesel Settlement Motion has been entered and is not stayed.

## [SIGNATURES FOLLOW ON NEXT PAGE(S)]

Respectfully Submitted

RNI WIND DOWN CORPORATION,
f/k/a RIVERSTONE NETWORKS, INC.
BLUECOAST SOFTWARE
THE OASYS GROUP, INC.
RIVERSTONE NETWORKS SPC, INC.
PIPAL SYSTEMS, INC.

By: _____
Name: Alan B. Miller
Title: Interim President RNI Wind Down Corporation


OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

By: _____
Name: Jeffrey Sabin
Title: Counsel to the Official Committee of Unsecured Creditors

OFFICIAL COMMITTEE OF EQUITY HOLDERS

By: _____
Name: William R. Baldiga
Title: Counsel to the Official Committee of Equity Holders

064952.1001

# *Schedule 1*

[Foreign Subsidiaries]

## Foreign Subsidiaries

Riverstone Networks India Private Limited India

Riverstone Networks Ireland Limited

Riverstone Networks International Limited

Riverstone Networks (Singapore) Pte Ltd

Riverstone Networks K.K.

Riverstone Networks UK Limited

Riverstone Networks UK Limited -Italian Branch

Riverstone Networks UK Limited Branch -Sweden

Riverstone Networks UK Limited Branch - Belgium

Riverstone Networks UK Limited Branch - Germany

Riverstone Networks UK Limited, Sucursal en Espana

Riverstone Networks UK Limited Branch - France

Riverstone Networks, Inc. Taiwan Representative Office

Riverstone Networks Limited (Hong Kong)

Hong Kong Riverstone Networks Limited Beijing Representative Office

Riverstone Networks Korea Yuhan Hoesa

Riverstone Networks Brasil LTDA

# *Schedule 2*

[Settling Officers and Directors]

## Settling Officers and Directors

Dale Booth

Jorge del Calvo

Michael P. Ressner

William Weyand

George McClelland

Sylvia Summers Couder

Oscar Rodriquez

Roger A. Barnes

Praveen K. Mandal

David Ginsburg

Scott McMillan

Michelle Mitchell

Dan Middleton

Noah D. Mesel

Michael W. Overby

Thomas M. Hecht

DB02:5454954.2

064952.1001

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RNI WIND DOWN CORPORATION, *et al.*,[1] | Case No. 06-10110 (CSS) |
| Debtors. | Jointly Administered |
| | Hearing Date: June 28, 2006 at 9:30 a.m. (ET)<br>Objection Deadline: June 21, 2006 at 4:00 p.m. (ET) |

### NOTICE OF MOTION

TO:   OFFICE OF THE UNITED STATES TRUSTEE, COUNSEL TO THE CREDITORS COMMITTEE, COUNSEL TO THE EQUITY HOLDER COMMITTEE, ALL PARTIES TO THE DERIVATIVE ACTIONS AND THEIR COUNSEL OF RECORD (IF ANY), ALL KNOWN STOCKHOLDERS OF RECORD, ALL KNOWN CREDITORS OF THE DEBTORS, AND ALL THOSE PARTIES REQUESTING NOTICE UNDER BANKRUPTCY RULE 2002

PLEASE TAKE NOTICE that the above-captioned debtors (the "Debtors")

filed the attached **Motion of the Debtors for an Order Pursuant to Rule 9019 of the**

**Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation**

**and Agreement of Settlement Dated as of November 12, 2004** (the "Motion").

PLEASE TAKE FURTHER NOTICE that objections to the Motion must be filed

on or before **June 21, 2006 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States

Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington,

Delaware 19801.  At the same time, you must serve a copy of the objection upon the Debtors'

undersigned counsel so as to be received on or before the Objection Deadline.

---

[1]  The Debtors are RNI Wind Down Corporation, formerly known as Riverstone Networks, Inc. (Tax ID No. XX-XXX6178), BlueCoast Software (Tax ID No. XX-XXX9415), The OASys Group, Inc. (Tax ID No. XX-XXX8093), Riverstone Networks SPC, Inc. (Tax ID No. XX-XXX3518) and Pipal Systems, Inc. (Tax ID No. XX-XXX6850) each with a mailing address of 5200 Great America Parkway, Santa Clara, CA  95054.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD <u>June 28, 2006 AT 9:30 A.M. (ET)</u> BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, WILMINGTON, DE 19801.

PLEASE TAKE FURTHER NOTICE that, if you fail to respond on or before the Objection Deadline, the Court may grant the relief requested in the Motion without further notice or hearing.

Date:    Wilmington, Delaware
         June 8, 2006

                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                        Michael R. Nestor (No. 3526)
                                        Kenneth J. Enos (No. 4544)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

                                               and

                                        MORGAN, LEWIS & BOCKIUS LLP
                                        Neil E. Herman
                                        101 Park Avenue
                                        New York, NY 10178
                                        Telephone: (212) 309-6000

                                               and

                                        Rebecca L. Booth (No. 4031)
                                        1701 Market Street
                                        Philadelphia, PA 19103
                                        Telephone: (215) 963-5000

                                        Attorneys for Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RNI WIND DOWN CORPORATION, *et al.*,[1] | Case No. 06-10110 (CSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: June 28, 2006 at 9:30 a.m. (ET)**<br>**Objection Deadline: June 21, 2006 at 4:00 p.m. (ET)** |

## MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING THE AMENDMENT TO THE STIPULATION AND AGREEMENT OF SETTLEMENT DATED AS OF NOVEMBER 12, 2004

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>") hereby move this Court (the "<u>Motion</u>") for the entry of an order, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 (the "<u>Stipulation</u>"), a copy of which is attached hereto as <u>Exhibit A</u>. As discussed in greater detail herein, the Stipulation renders moot the pending appeal of the order of the United States District Court for the Northern District of California (the "<u>California District Court</u>"), which approved the settlement of certain derivative actions commenced against the Debtors and their former directors and officers. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are RNI Wind Down Corporation, formerly known as Riverstone Networks, Inc. (Tax ID No. XX-XXX6178), BlueCoast Software (Tax ID No. XX-XXX9415), The OASys Group, Inc. (Tax ID No. XX-XXX8093), Riverstone Networks SPC, Inc. (Tax ID No. XX-XXX3518) and Pipal Systems, Inc. (Tax ID No. XX-XXX6850) each with a mailing address of 5200 Great America Parkway, Santa Clara, CA 95054.

064952.1001

## STATUS OF THE CASE AND JURISDICTION

1.      On February 7, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). On February 8, 2006, the Court entered an order granting joint administration of these chapter 11 cases.

2.      The Debtors have continued in possession of their respective properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The official committee of unsecured creditors was appointed on February 17, 2006 (the "Creditors' Committee"). An official equity holder committee was appointed on March 8, 2006 (the "Equity Holder Committee", and together with the Creditors Committee, the "Committees"). No trustee or examiner has been appointed. No request has been made for the appointment of a trustee or examiner.

4.      On March 23, 2006, the Court entered an Order authorizing the sale (the "Sale") of the majority of the Debtors' assets to Lucent Technologies Inc. ("Lucent"). The Sale closed on April 27, 2006.

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this matter is proper in this District and before this Court pursuant to 28 U.S.C. § 1409. The predicates for the relief requested herein are section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

## RELEVANT BACKGROUND

6.     On August 13, 2002, a shareholder derivative lawsuit, captioned *Bruhn v. Pereira, et al.*, No. CV810290, was filed in the Superior Court of California for Santa Clara County (the "California Superior Court)". The complaint that commenced the proceeding alleged, among other things, that the directors and officers of Riverstone Networks, Inc. (the "Company") made misrepresentations and/or omissions and breached their fiduciary duties to the Company in connection with the disclosure of the Company's publicly reported financial results and statements, and sought unspecified damages together with equitable and/or injunctive and other relief.

7.     On or about February 14, 2003, another shareholder derivative lawsuit was filed in the California District Court, captioned *Watterson v. Pereira, et al.*, No. C03-0637 (the "Federal Derivative Action").

8.     On or about April 9, 2003, a second shareholder derivative lawsuit was filed in the California Superior Court, captioned *Carrico v. Pereira, et al.*, No. CV816188. The *Carrico* complaint alleged substantially similar claims to the *Bruhn* complaint.

9.     On April 23, 2003, the *Bruhn* and *Carrico* actions were consolidated under the caption *In re Riverstone Networks, Inc. Derivative Litigation*, No. CV810290 (the "Consolidated State Derivative Action"). On or about May 28, 2003, the plaintiffs in the *Bruhn* and *Carrico* actions filed a consolidated shareholder derivative complaint. Thereafter, the Consolidated State Derivative Action was stayed pending the outcome of the Federal Derivative Action.

10.     In May 2004, the plaintiffs (collectively, the "Derivative Plaintiffs") in the actions in the California Superior Court and the California District Court (collectively, the

- 3 -

"Derivative Actions") reached a settlement in principle with the Company (the "Settlement Agreement"[2]). Under the agreed-upon settlement framework, the Company agreed to implement, or continue implementing, certain measures intended to improve corporate governance. In addition, among other things, the Settlement Agreement provided for the payment of the Derivative Plaintiffs' counsel fees of $1,750,000. The corporate governance measures and the counsel fees were submitted to the California District Court as a unitary settlement.

11.    Charles L. Grimes ("Grimes"), a stockholder of the Company, intervened and objected to the Settlement Agreement. Over Grimes' objection, the California District Court approved the Settlement Agreement on June 1, 2005. However, the California District Court granted Grimes limited standing as an intervenor to appeal the unitary nature of the Settlement Agreement and the counsel fees awarded to the Derivative Plaintiffs' counsel. Thereafter, Grimes appealed the California District Court's approval of the Settlement Agreement to the United States Court of Appeals for the Ninth Circuit (the "Circuit Court Appeal"), based upon his objection that the $1,750,000 in fees paid to the Derivative Plaintiffs' counsel under the terms of the Settlement Agreement were excessive, and that the counsel fees and the corporate government measures should not have been submitted to the California District Court as a "unitary" settlement.

12.    The Derivative Plaintiffs moved to dismiss the Circuit Court Appeal on the grounds that they had agreed to disband the fee provisions of the Settlement Agreement from the governance provisions (rendering the settlement no longer unitary), and agreeing that the California District Court could separately evaluate the reasonableness of counsel fees provided under the Settlement Agreement.

---

[2] A copy of the Settlement Agreement is annexed hereto as Exhibit B.

13.    The motion to dismiss the appeal (the "Motion to Dismiss") was denied on March 17, 2006, and on March 29, 2006, the Court of Appeals entered an order staying the appeal until September 20, 2006. The Court of Appeals did not rule on the merits of the Motion to Dismiss, but simply stated that the arguments made therein would be heard as part of the appeal.

14.    On May 5, 2006, Grimes filed the *Motion of Charles L. Grimes for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 of the Bankruptcy Code* [Docket No. 304], seeking this Court's permission for relief from the automatic stay to continue the Circuit Court Appeal.

## THE STIPULATION

15.    The salient terms of the Stipulation[3] are as follows:

    a.    The Debtors, their co-defendants in the Derivative Actions, and the Derivative Plaintiffs (collectively, the "Settling Parties") agree that the Settlement Agreement is amended to delete the provision that Derivative Plaintiffs' counsel fees were "a unitary part of the Settlement [Agreement]";

    b.    The Derivative Plaintiffs' counsel will repay these bankruptcy estates $950,000 of the $1,750,000 previously paid to them as a result of the California District Court's approval of the Settlement Agreement (the "Repaid Fees") as a compromise of all claims relating to the fees previously paid to such counsel;

    c.    Derivative Plaintiffs' counsel shall transfer or cause the transfer of the Repaid Fees to these bankruptcy estates within ten (10) business days of entry of an order by the United States Bankruptcy Court for the District of Delaware approving the Debtors' plan of liquidation, subject to the obligation of the Debtors to refund such amount to Derivative Plaintiffs' counsel (together with interest thereon) in the event of a reversal or modification on appeal of such Bankruptcy Court order; and

---

[3] This is a summary of the salient terms of the Stipulation and is qualified in its entirety by the Stipulation. If there are any inconsistencies between the summary contained herein and the Stipulation, the Stipulation shall control. Parties are strongly encouraged to read the Stipulation in its entirety.

    d.    The Debtors shall file a motion to dismiss the Circuit Court Appeal, and oppose any objection to the Settlement Agreement or the Stipulation.

## RELIEF REQUESTED

16.    By this Motion, the Debtors respectfully request entry of an order, pursuant to Bankruptcy Rule 9019, approving the Stipulation.

17.    The Debtors are seeking approval of the Stipulation prior to their plan of liquidation, because it is of significant importance to all parties-in-interest that the Stipulation be approved, and that they may rely on such approval in moving forward with confirmation of the plan and resolution of the various claims against these estates (including the contingent and unliquidated indemnity claims that could be materially different if the status of the resolution of the Derivative Actions remains uncertain).

## BASIS FOR RELIEF REQUESTED

18.    Section 105(a) provides, in pertinent part, that "[t]he court may issue any order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." In turn, Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement."[4] Fed. R. Bankr. P. 9019(a).

19.    Settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. *See In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979); *In re Sassalos*, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove a compromise ... rests in the sound discretion of the judge"). The Supreme Court has recognized

---

[4] A debtor-in-possession in a reorganization case has most of the rights of a trustee appointed under chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1106 and 1107.

DB02:5314245.6                                          064952.1001

that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." *In re Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146. The district court, as the intermediate bankruptcy appellate court, "has described the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'" *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998), *quoting In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). Bankruptcy Rule 9019 thus empowers this Court to approve compromises and settlements if they are in the "best interest[s] of the estate." *In re Marvel Entertainment Group*, 222 B.R. at 249 (holding that proposed settlement was in the best interest of the estate); *see In the Matter of Energy Cooperative, Inc.*, 886 F.2d 921, 927 (7th Cir. 1989).

20.    In determining whether to approve a motion or application to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining the following four factors: (i) the probability of success in the litigation; (ii) the complexity, expense and likely duration of the litigation; (iii) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (iv) whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest. *See TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996) (stating that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy" and citing the criteria set forth above in determination of reasonableness of particular settlements) (internal quotation marks and citation omitted); *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) (relevant factor is

- 7 -

"whether the terms of the proposed compromise fall within the reasonable range of litigation possibilities").

21.     Basic to the process of evaluating proposed settlements, then, is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry, Inc.*, 390 U.S. at 425. However, "[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (*citing In re Neshaminy Office Bldg. Associates*, 62 B.R. 798, 803 (E.D. Pa. 1986); *see also In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993).

22.     Finally, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." *Neshaminy Office Building Assoc.*, 62 B.R. at 803 (*citing In re Patel*, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984)).

23.     The Stipulation is fair, reasonable, adequate and in the best interests of the Debtors' estates and creditors because the terms and conditions thereof, as well as the surrounding circumstances, satisfy the aforementioned factors.

24.     First, it is important to remember that the Debtors are seeking this Court's approval of a Stipulation that resolves the Circuit Court Appeal, which relates to a matter already approved by the California District Court, on terms that will result in an additional benefit to these estates of $950,000. Second, the Stipulation enables the Debtors and their estates to avoid significant uncertainty and economic exposure. The Settlement Agreement that was approved by the California District Court consisted almost entirely of non-economic corporate governance

- 8 -

modifications which, at this time, are no longer as relevant to the administration of the Debtors since consummation of the sale to Lucent. If Grimes is successful on appeal and the Settlement Agreement is unwound, the non-economic mandates of the Settlement Agreement will most likely be converted to economic claims. The individual defendants who face those economic claims, will in turn, seek indemnification for those claims as well as advancement of their attorneys' fees and costs. Since all applicable insurance relative to the Derivative Actions has been exhausted, the attorneys' fees and any settlement or judgment would be paid directly from the Debtors at the expense of their current stakeholders.

25.    Rejecting the Stipulation therefore, would unwind the Settlement Agreement, effectively holding hostage the stakeholders of these estates and substantially prejudicing the Debtors' ability to wind-down their affairs and make a timely and demonstrable distribution of their assets to such stakeholders. Accordingly, the benefits of the proposed Stipulation are clearly in the best interests of the Debtors, their estates, and their stakeholders.

26.    Given the burdens, uncertainties, delay and expense associated with the Circuit Court Appeal and the Derivative Actions, the Stipulation represents a reasonable compromise and is in the best interests of the Debtors, their estates, and their stakeholders.

### NOTICE

27.    Notice of this Motion has been given to the United States Trustee, counsel to the Creditors' Committee, counsel to the Equity Holder Committee, all of the Debtors' current stockholders of record, all parties to the Derivative Actions and their counsel of record (if any), all of the Debtors' known creditors, and those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

DB02:5314245.6                                                                064952.1001

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto: (i) approving the Stipulation; and (ii) granting to the Debtors such other and further relief as the Court may deem just and proper.

Date:    Wilmington, Delaware
         June 8, 2006

                                      YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                      _____
                                      Michael R. Nestor (No. 3526)
                                      Kenneth J. Enos (No. 4544)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, DE  19801
                                      Telephone:  (302) 571-6600
                                      Facsimile:  (302) 571-1253

                                              and

                                      MORGAN, LEWIS & BOCKIUS LLP
                                      Neil E. Herman
                                      101 Park Avenue
                                      New York, NY 10178
                                      Telephone: (212) 309-6000

                                              and

                                      Rebecca L. Booth (No. 4031)
                                      1701 Market Street
                                      Philadelphia, PA 19103
                                      Telephone:  (215) 963-5000

                                      Attorneys for Debtors and Debtors-in-Possession

DB02:5314245.6                                                            064952.1001

**Exhibit A**

## AMENDMENT TO THE STIPULATION AND AGREEMENT OF
## SETTLEMENT DATED AS OF NOVEMBER 12, 2004

WHEREAS, this amendment to the Stipulation and Agreement of Settlement dated as of November 12, 2004 ("Stipulation" or "Settlement") is made and entered into by the Derivative Plaintiffs by and through their counsel and Defendants by and through their counsel;

WHEREAS, all capitalized terms not defined herein shall have the same meaning as set forth in the Stipulation;

WHEREAS, three derivative actions were filed between August 2002 and April 2003 on behalf of Riverstone Networks, Inc. ("Riverstone" or the "Company" – now known as RNI Wind Down Corporation) against certain directors and officers of the Company;

WHEREAS, two of these actions were filed in the Superior Court of the State of California, County of Santa Clara and were consolidated under the caption *In re Riverstone Networks, Inc. Derivative Litigation*, Lead Case No. CV-810290, and a third action *Watterson v. Pereira, et al.*, Case No. C-03-0637-SBA was filed in the United States District Court Northern District of California (collectively the "Derivative Actions");

WHEREAS, beginning in the fall of 2003 and continuing through the spring of 2004, the parties to the Derivative Actions participated in several mediation sessions with the Honorable Charles A. Legge (Ret.) and conducted many telephonic conferences to negotiate a settlement of the Derivative Actions;

WHEREAS, these negotiations culminated in the parties entering into an agreement-in-principal on May 12, 2004;

WHEREAS, on November 12, 2004, the parties entered into the Stipulation pursuant to Rule 23.1 of the Federal Rules of Civil Procedure that contains the terms of the Settlement among the Defendants and the Derivative Plaintiffs;

WHEREAS, the Settlement provided that Riverstone and its Board of Directors would implement certain corporate governance measures designed to enhance Riverstone's corporate practices;

WHEREAS, the Settlement also required the Individual Defendants to take all reasonable actions to cause the payment of approximately $11 million from available directors' and officers' insurance proceeds for the benefit of Riverstone in connection with the defense and settlement of pending and related federal class action litigation;

WHEREAS, the Settlement also provided that Derivative Plaintiffs' Counsel would be paid $1.75 million in attorneys' fees and expenses "as a unitary part of the Settlement";

WHEREAS, the attorneys' fees and expenses were negotiated with the assistance of Judge Legge after the substantive terms of the Settlement benefiting Riverstone were agreed upon by the parties;

WHEREAS, the Settlement was approved by Riverstone's Board of Directors;

WHEREAS, on February 16, 2005, the Honorable Phyllis J. Hamilton, United States District Court Judge for the Northern District of California (the "District Court") entered an Order Preliminarily Approving Settlement and Providing for Notice;

WHEREAS, after notice was mailed to Riverstone shareholders, Mr. Charles Grimes, a shareholder of Riverstone, filed an objection to the Settlement;

WHEREAS, the District Court allowed Mr. Grimes to intervene to object, but ultimately overruled his objections and approved the Settlement;

WHEREAS, on July 22, 2005 the District Court entered a Final Judgment and Order of Dismissal With Prejudice and an Order Granting Motion for Final Approval of Derivative Settlement;

sf-2131557

WHEREAS, pursuant to paragraph 5.1 of the Stipulation, Riverstone paid Derivative Plaintiffs' Counsel the sum of $1.75 million for their attorneys' fees and expenses;

WHEREAS, Mr. Grimes as an intervener and objector in the Derivative Actions filed a notice of appeal with the United States Court of Appeals for the Ninth Circuit appealing the July 22, 2005 Order Granting Motion for Final Approval of Derivative Settlement and the Final Judgment and Order of Dismissal With Prejudice (the "Appeal");

WHEREAS, Mr. Grimes contends that the District Court should not have approved the Settlement which provided for the payment of attorneys' fees and expenses as a unitary provision of the Settlement which, he maintained, prevented a meaningful review of the fees;

WHEREAS, in an effort to avoid unnecessary appeals, the parties to the Stipulation agreed to remove the unitary aspect of the attorneys' fee provision of the Settlement that formed the basis of Mr. Grimes' objection and agreed that the case be remanded back to the District Court for a determination of an award of attorneys' fees and expenses, thus disposing of Mr. Grimes' objections in their entirety;

WHEREAS, on November 25, 2005, as a result of their agreement to remove the unitary aspect of the attorneys' fees provision, Derivative Plaintiffs and Defendants filed a joint motion to dismiss Mr. Grimes' appeal as moot with the Ninth Circuit Court of Appeals ("Joint Motion");

WHEREAS, on December 2, 2005, Mr. Grimes filed an opposition to the Joint Motion;

WHEREAS, on March 17, 2006, the Ninth Circuit Court of Appeals denied the Joint Motion without prejudice to renewing the arguments in the answering brief;

WHEREAS, on March 29, 2006 the Ninth Circuit Court of Appeals issued an order staying the appeal until September 20, 2006, based on the bankruptcy filing of Riverstone;

sf-2131557

AND NOW, THEREFORE, in an effort to resolve all outstanding issues and to avoid the expense of unnecessary judicial proceedings and the unnecessary delay of Riverstone's plan of reorganization, the Settling Parties have agreed to the following subject to the approval of the United States Bankruptcy Court for the District of Delaware as follows:

1.    The Settling Parties agree that the Stipulation is amended to delete the provision that Derivative Plaintiffs' Counsel's attorneys' fees and expenses were "a unitary part of the Settlement"; and

2.    The Settling Parties agree that as a compromise of all claims relating to the attorneys' fees Riverstone paid to Derivative Plaintiffs' Counsel, that Derivative Plaintiffs' Counsel will repay to the Riverstone bankruptcy estate $950,000.00 of the $1,750,000.00 previously paid to them as a result of the District Court's approval of the Settlement, thus retaining $800,000.00 as their attorneys' fees and expenses. Derivative Plaintiffs' Counsel shall transfer or cause the transfer of the repaid fees to the Riverstone bankruptcy estate within ten business days of the United States Bankruptcy Court for the District of Delaware's Order approving the plan of bankruptcy, subject to the Riverstone bankruptcy estate's obligation to refund that amount to Derivative Plaintiffs' Counsel, plus interest thereon at the current 90-day T-Bill rate, in the event of a reversal or modification on appeal of the Bankruptcy Court's Order. Said refund shall be paid to Derivative Plaintiffs' Counsel within five business days after written notification of such event.

3.    Riverstone's bankruptcy estate will bring a motion for approval of this agreement before the United States Bankruptcy Court for the District of Delaware, file a motion to dismiss the Appeal, and cooperate with the Settling Parties in opposing any objection to the Settlement or this amendment.

- 4 -

sf-2131557

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
KEITH F. PARK
MICHAEL J. DOWD
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: 619/525-3990
619/525-3991 (fax)

MURRAY FRANK & SAILER LLP
BRIAN MURRAY
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone: 212/682-1818
212/682-1892 (fax)

EMERSON POYNTER LLP
JOHN G. EMERSON
SCOTT E. POYNTER
2228 Cottondale Lane, Suite 100
Little Rock, AR 72202
Telephone: 501/907-2555
501/907-2556 (fax)

THE DREHER LAW FIRM
ROBERT SCOTT DREHER
835 Fifth Avenue, Suite 202
San Diego, CA  92101
Telephone: 619/230-8828
619/687-0136 (fax)

_____ for
          MICHAEL J. DOWD
          Counsel for Plaintiffs

- 5 -

MORRISON & FOERSTER, LLP
PAUL T. FRIEDMAN
CRAIG D. MARTIN
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415/268-7000
415/268-7522 (fax)

*Paul T Friedman*

PAUL T. FRIEDMAN

Counsel for Defendants Romulus Pereira, Piyush
Patel, Christopher Paisley, Eric Jaeger, Jorge Del
Calvo, Robert Stanton, Suresh Gopalakrishnan and
C. Lee Cox

COOLEY GODWARD LLP
WILLIAM S. FREEMAN
GRANT FONDO
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: 650/843-5000
650/849-7400 (fax)

_____
GRANT FONDO
Counsel for Defendant John Kern

RNI WIND DOWN CORPORATION
(formerly Defendant Riverstone Networks, Inc.)
5200 Great America Parkway
Santa Clara, California 95054
Telephone: 650/283-4191

_____
NOAH D. MESEL
Interim President
RNI Wind Down Corporation

S:\Settlement\Riverstone.set\w1-MIS AMEND TO STIP 00030927.doc
sf-2131557

- 6 -

MORRISON & FOERSTER, LLP
PAUL T. FRIEDMAN
CRAIG D. MARTIN
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415/268-7000
415/268-7522 (fax)

_____

PAUL T. FRIEDMAN

Counsel for Defendants Romulus Pereira, Piyush
Patel, Christopher Paisley, Eric Jaeger, Jorge Del
Calvo, Robert Stanton, Suresh Gopalakrishnan and
C. Lee Cox

COOLEY GODWARD LLP
WILLIAM S. FREEMAN
GRANT FONDO
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: 650/843-5000
650/849-7400 (fax)

_____

GRANT FONDO
Counsel for Defendant John Kern

RNI WIND DOWN CORPORATION
(formerly Defendant Riverstone Networks, Inc.)
5200 Great America Parkway
Santa Clara, California 95054
Telephone: 650/283-4191

_____

NOAH D. MESEL
Interim President
RNI Wind Down Corporation

MORRISON & FOERSTER, LLP
PAUL T. FRIEDMAN
CRAIG D. MARTIN
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415/268-7000
415/268-7522 (fax)

_____
PAUL T. FRIEDMAN

Counsel for Defendants Romulus Pereira, Piyush
Patel, Christopher Paisley, Eric Jaeger, Jorge Del
Calvo, Robert Stanton, Suresh Gopalakrishnan and
C. Lee Cox

COOLEY GODWARD LLP
WILLIAM S. FREEMAN
GRANT FONDO
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: 650/843-5000
650/849-7400 (fax)

_____
GRANT FONDO
Counsel for Defendant John Kern

RNI WIND DOWN CORPORATION
(formerly Defendant Riverstone Networks, Inc.)
5200 Great America Parkway
Santa Clara, California 95054
Telephone: 650/283-4191

_____
NOAH D. MESEL
Interim President
RNI Wind Down Corporation

C:\WINDOWS\Temporary Internet Files\OLK11\Derivative Amendment (Final).DOC
sf-2131557

-6-

**Exhibit B**

1  MURRAY FRANK & SAILER LLP
   ERIC J. BELFI
2  275 Madison Avenue, Suite 801
   New York, NY 10016
3  Telephone: 212/682-1818
   212/682-1892 (fax)
4
   EMERSON POYNTER LLP
5  JOHN G. EMERSON
   SCOTT E. POYNTER
6  2228 Cottondale Lane, Suite 100
   Little Rock, AR 72202
7  Telephone: 501/907-2555
   501/907-2556 (fax)
8                                              LERACH COUGHLIN STOIA GELLER
   ROBBINS UMEDA & FINK, LLP                        RUDMAN & ROBBINS LLP
9  BRIAN J. ROBBINS (190264)                   KEITH F. PARK (54275)
   MARC M. UMEDA (197847)                      MICHAEL J. DOWD (135628)
10 1010 Second Avenue, Suite 2360              401 B Street, Suite 1600
   San Diego, CA 92101                         San Diego, CA 92101
11 Telephone: 619/525-3990                     Telephone: 619/231-1058
   619/525-3991 (fax)                          619/231-7423 (fax)
12
   Attorneys for Plaintiffs
13
   [Additional counsel appear on signature page.]
14

15                   UNITED STATES DISTRICT COURT

16               NORTHERN DISTRICT OF CALIFORNIA

17
   GREGORY WATTERSON, Derivatively On    )  No. C-03-0637-PJH
18 Behalf of RIVERSTONE NETWORKS, INC.,  )
                                         )  STIPULATION AND AGREEMENT OF
19              Plaintiff,               )  SETTLEMENT
                                         )
20     vs.                               )
                                         )
21 ROMULUS PEREIRA, et al.,              )
                                         )
22              Defendants,              )
                                         )
23     – and –                           )
                                         )
24 RIVERSTONE NETWORKS, INC., a          )
   Delaware corporation,                 )
25                                        )
                Nominal Defendant.        )
26 _____)

27

28

1        This Stipulation and Agreement of Settlement (the "Stipulation"), dated as of November

2    12, 2004, is made and entered into pursuant to Rule 23.1 of the Federal Rules of Civil Procedure

3    and contains the terms of a settlement (the "Settlement") among the Defendants and the

4    Derivative Plaintiffs, derivatively and on behalf of Riverstone Networks Inc. ("Riverstone" or

5    the "Company"), in connection with *Watterson v. Pereira, et al.*, Case No. C-03-0637 SBA (the

6    "Federal Action"), pending in this Court and *In re Riverstone Networks, Inc. Derivative*

7    *Litigation*, Lead Case No. CV-810290, pending in the Superior Court of the State of California,

8    County of Santa Clara, (the "State Action") (collectively, the Federal Action and the State Action

9    will be referred to as the "Derivative Actions").

10       The Stipulation is intended by the Derivative Plaintiffs and the Defendants (as defined

11   below in § IV.1), to fully, finally and forever resolve, discharge and settle the Released Claims

12   against the Defendants, upon and subject to the terms and conditions hereof and subject to the

13   approval of the Court.

14   **I.    THE DERIVATIVE ACTIONS**

15       On August 13, 2002, the initial derivative complaint in the State Action was filed in the

16   Superior Court for the State of California, County of Santa Clara.  The complaint in the State

17   Action alleges causes of action for insider trading, breach of fiduciary duty, abuse of control,

18   gross mismanagement, corporate waste and unjust enrichment between August 2001 and

19   December 2002.  On February 14, 2003, the Federal Action was filed in this Court, asserting

20   claims arising from the same allegations made in the State Action.

21   **II.   DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY**

22       The Defendants have denied and continue to deny each and all of the claims and

23   contentions alleged by the Derivative Plaintiffs in the Derivative Actions.  The Defendants

24   expressly have denied and continue to deny all charges of wrongdoing or liability against them

25   or any of them arising out of any of the conduct, statements, acts or omissions alleged, or that

26   could have been alleged, in the Derivative Actions.  The Defendants also have denied and

27   continue to deny, inter alia, the allegations that Riverstone has suffered damage or that

28   Riverstone was harmed by any of the conduct alleged in the Derivative Actions.

1       Nonetheless, the Defendants have concluded that further conduct of the Derivative

2 Actions would be protracted, expensive, and distracting.  The Defendants are entering into the

3 settlement because it will eliminate the burden, expense and risk inherent in any litigation,

4 especially in complex cases like the Derivative Actions.  The Defendants have, therefore,

5 determined that it is desirable that the Derivative Actions be settled in the manner and upon the

6 terms and conditions set forth in this Stipulation.

7       Neither this Stipulation nor any document referred to herein nor any action taken to carry

8 out this Stipulation is, may be construed as or may be used as an admission by or against the

9 Defendants, or any of them, of any fault, wrongdoing or liability whatsoever.  Entering into or

10 carrying out this Stipulation (or the Exhibits hereto), and any negotiations or proceedings related

11 thereto, shall not in any event be construed as, or be deemed to be evidence of, an admission or

12 concession with regard to Derivative Plaintiffs' claims or contrary to the Defendants' denials and

13 defenses, and shall not be offered by any of the Settling Parties or received in evidence in any

14 action or proceeding in any court, administrative agency or other tribunal for any purpose

15 whatsoever other than to enforce the provisions of this Stipulation (and the Exhibits hereto) or

16 the provisions of any related agreement or release; except that this Stipulation and the Exhibits

17 hereto may be filed in the Derivative Actions or related litigation, as evidence of the Settlement,

18 or in any subsequent action against or by the Defendants or the Released Parties to support a

19 defense of res judicata, collateral estoppel, release or other theory of claim or issue preclusion or

20 similar defense.

21  III.    **CLAIMS OF THE DERIVATIVE PLAINTIFFS AND BENEFITS OF**
           **SETTLEMENT**

22

23       The Derivative Plaintiffs believe that the claims asserted in the Derivative Actions have

merit.  However, Derivative Plaintiffs' Counsel recognize and acknowledge the expense and
24
length of continued proceedings necessary to prosecute the Derivative Actions against the
25
Defendants through trial and appeal.  Derivative Plaintiffs' Counsel also have taken into account
26
the uncertain outcome and the risk of any litigation, especially in complex actions such as the
27
Derivative Actions, as well as the difficulties and delays inherent in such litigation.  Derivative
28

1    Plaintiffs' Counsel also are mindful of the inherent problems of proof of, and possible defenses

2    to, the violations asserted in the Derivative Actions. Derivative Plaintiffs' Counsel believe that

3    the Settlement set forth in this Stipulation confers substantial benefits upon and is also in the best

4    interests of Riverstone.

5    **IV.    TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT**

6        NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the

7    Derivative Plaintiffs (derivatively on behalf of Riverstone), and the Defendants, by and through

8    their respective counsel or attorneys of record, that, subject to the approval of the Court, the

9    Derivative Actions, and the Released Claims, shall be finally and fully compromised, settled and

10   released, and the Derivative Actions shall be dismissed with prejudice, upon and subject to the

11   terms and conditions of the Stipulation, as follows.

12       1.    **Definitions**

13       As used in this Stipulation, the following terms have the meanings specified below:

14       1.1    "Current Riverstone Shareholders" means any Person who owned Riverstone

15   common stock as of November 12, 2004.

16       1.2    "Defendants" means nominal defendant Riverstone, and defendants Romulus

17   Pereira, Piyush Patel, Christopher Paisley, Eric Jaeger, C. Lee Cox, Jorge Del Calvo, Robert

18   Stanton, Suresh Gopalakrishnan, and John Kern.

19       1.3    "Derivative Plaintiffs" means Gregory Watterson, James Bruhn and James

20   Carrico.

21       1.4    "Derivative Plaintiffs' Counsel" means Brian J. Robbins and Marc M. Umeda,

22   Robbins Umeda & Fink, LLP, 1010 Second Avenue, Suite 2360, San Diego, CA 92101,

23   Telephone: (619) 525-3990; Keith F. Park and Michael J. Dowd, Lerach Coughlin Stoia Geller

24   Rudman & Robbins, LLP, 401 "B" Street, Suite 1700, San Diego, CA 92101, Telephone: (619)

25   231-1058; Eric J. Belfi, Murray, Frank & Sailer, LLP 275 Madison Avenue, Suite 801, New

26   York, NY 10016, Telephone: (212) 682-1818; Scott E. Poynter, Emerson Poynter LLP, 2228

27   Cottondale Lane, Suite 100, Little Rock, AR 72202, Telephone: (501) 907-2555; and Robert

28   Scott Dreher, 835 Fifth Avenue, Suite 202, San Diego, CA 92101, Telephone: (619) 230-8828.

1        1.5    "Effective Date" means the date upon which the Judgment approving the

2    settlement in accordance with the Stipulation becomes Final as a matter of law and is no longer

3    subject to appellate review.

4        1.6    "Family Member" means spouses, parents, children, siblings, mothers-in-law,

5    fathers-in-law, brothers-in-law, sisters-in-law, sons-in-law, daughters-in-law, and anyone who

6    resides in a Defendant's home who is a non-executive employee of Riverstone or one of

7    Riverstone's subsidiaries.

8        1.7    "Fee and Expense Amount" means Derivative Plaintiffs' Counsel's attorneys'

9    fees, expenses and costs, with interest thereon.

10       1.8    "Final" means: (a) the date of final affirmance on an appeal of the Judgment, the

11   expiration of the time for a petition for or a denial of a writ of certiorari to review the Judgment

12   and, if certiorari is granted, the date of final affirmance of the Judgment following review

13   pursuant to that grant; or (b) the date of final dismissal of any appeal from the Judgment or the

14   final dismissal of any proceeding on certiorari to review the Judgment; or (c) if no appeal is filed,

15   the expiration date of the applicable time for the filing or noticing of any appeal from the

16   Judgment.  Any proceeding or order, or any appeal or petition for a writ of certiorari, pertaining

17   solely to any application for or award of attorneys' fees or expenses, shall not in any way delay

18   or preclude the Judgment from becoming Final.

19       1.9    "Judgment" means the final judgment to be rendered by the Court in the Federal

20   Action, substantially in the form attached hereto as Exhibit B.

21       1.10   "Person" means an individual, corporation, limited liability corporation,

22   professional corporation, limited liability partnership, partnership, limited partnership,

23   association, joint stock company, estate, legal representative, trust, unincorporated association,

24   government or any political subdivision or agency thereof, and any business or legal entity and

25   their spouses, heirs, predecessors, successors, representatives, or assignees.

26       1.11   "Released Claims" means any and all claims, rights, causes of action, whether

27   based on federal, state, local, statutory or common law or any other law, rule or regulation,

28   including, without limitation, unknown claims and claims under Delaware statutory and common

1   law, federal and state securities laws and claims under any law governing fiduciaries or the

2   duties of fiduciaries, that have been, could have been, or in the future might be or could be

3   asserted in any form and in any forum by Riverstone shareholders on behalf of Riverstone

4   against Defendants or any of their families, parent entities, affiliates or subsidiaries and each and

5   all of their respective past, present, or future officers, directors, employees, attorneys,

6   accountants, auditors, heirs, executors, personal representatives, estates, administrators,

7   predecessors, successors and assigns that exist, could have existed, or may arise in connection

8   with or that relate to the transactions, matters or occurrences, or representations, or omissions

9   involved, set forth, referred to, or which relate in any way to the facts or allegations contained in

10  or which could have been contained in the Derivative Actions (including, but not limited to,

11  breach of any duty owed to Riverstone, including the duty of care, loyalty, and good faith),

12  including the period from February 16, 2001 through and including the date this Stipulation is

13  executed.

14       1.12   "Released Persons" means Defendants, and any of their families, parent entities,

15  affiliates or subsidiaries and each and all of their respective past, present, or future officers,

16  directors, employees, attorneys, accountants, auditors, heirs, executors, personal representatives,

17  estates, administrators, predecessors, successors and assigns.

18       1.13   "Settling Parties" means, collectively, each of the Defendants, and the Derivative

19  Plaintiffs on behalf of themselves and/or derivatively on behalf of Riverstone.

20       1.14   "Unknown Claims" means any Released Claims which each Derivative Plaintiff,

21  each Current Riverstone Shareholder, or Riverstone, respectively, does not know or suspect to

22  exist in his, her or its favor at the time of the release of the Released Persons which, if known by

23  him, her or it, might have affected his, her or its settlement with, and release of, the Released

24  Persons, or might have affected his, her or its decision not to object to this Settlement. With

25  respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the

26  Effective Date, the Derivative Plaintiffs and Riverstone (as a nominal defendant in the Derivative

27  Actions), and each of the Current Riverstone Shareholders, shall be deemed to have, and by

28

1    operation of the Judgment shall have, waived the provisions, rights and benefits of California

2    Civil Code Section 1542, which provides:

3          A general release does not extend to claims which the creditor does not know or

4          suspect to exist in his favor at the time of executing the release, which if known by

5          him must have materially affected his settlement with the debtor.

6    The Derivative Plaintiffs and Riverstone (as a nominal defendant in the Derivative Actions), and

7    each of the Current Riverstone Shareholders, shall be deemed to have, and by operation of the

8    Judgments shall have, waived any and all provisions, rights and benefits conferred by any law of

9    any state or territory of the United States, or principle of common law, which is similar,

10   comparable or equivalent to California Civil Code Section 1542. Each of the Derivative

11   Plaintiffs, Riverstone (as a nominal defendant in the Derivative Actions), and the Current

12   Riverstone Shareholders, may hereafter discover facts in addition to or different from those

13   which he, she or it now knows or believes to be true with respect to the Released Claims, but

14   each Derivative Plaintiff and Riverstone (as a nominal defendant in the Derivative Actions), and

15   each of the Current Riverstone Shareholders, upon the Effective Date, shall be deemed to have,

16   and by operation of the Judgments shall have, fully, finally, and forever settled and released any

17   and all Released Claims, respectively, known or unknown, suspected or unsuspected, contingent

18   or non-contingent, accrued or unaccrued, whether or not concealed or hidden, which now exist,

19   or heretofore have existed upon any theory of law or equity now existing or coming into

20   existence in the future, including, but not limited to, conduct which is negligent, intentional, with

21   or without malice, or a breach of any duty, law or rule, without regard to the subsequent

22   discovery or existence of such different or additional facts. The Derivative Plaintiffs,

23   Riverstone, and the Current Riverstone Shareholders, shall be deemed by operation of the

24   Judgment to have acknowledged that the foregoing waivers were separately bargained for and

25   are key elements of the Settlement of which this release is a part.

26          2.     Settlement of the Derivative Actions

27          2.1     Corporate Governance Measures: During the pendency of the Derivative

28   Actions, Riverstone implemented, or began to make best efforts to implement by the end of

1  2004, the following measures.  These measures were (or will be) adopted in material part due to

2  the efforts of Derivative Plaintiffs' Counsel in the Derivative Actions, and/or implementation of

3  certain measures was accelerated due to their efforts.  These measures will remain in effect for

4  four years, unless a prior modification is necessary in the good faith business judgment of a

5  unanimous vote of all of the independent members of Riverstone's Board of Directors, as a result

6  of a change in law or regulations, or other business necessity.

7      1.    The number of directors on Riverstone's Board of Directors ("Board") will

8  increase to seven;

9      2.    Two-thirds of the members of the Board will be independent directors;

10     3.    The Chairman or Lead Director of Riverstone's Board will be an independent

11 director (for purposes of this agreement, the terms "Chairman" and "Lead Director" are

12 synonymous);

13     4.    The Chairman or Lead Director of the Board will be selected annually by the

14 independent members of the Board;

15     5.    The Chairman or Lead Director will serve in that capacity for a maximum of six

16 consecutive years;

17     6.    "Independent director" means a person other than an officer or employee of the

18 Company or its subsidiaries or any other individual having a relationship which would interfere

19 with the exercise of independent judgment in carrying out the responsibilities of a director.  To

20 be deemed "independent" in any calendar year, a director would have to satisfy the following

21 qualifications:

22         (a)    has not been employed by the Company or its subsidiaries or affiliates in

23 an executive capacity within the last five calendar years;

24         (b)    has no personal service contract(s) with the Company, or any member of

25 the Company's senior management;

26         (c)    is not an officer, director, trustee or fiduciary with a not for profit entity

27 that receives significant contributions from the Company;

28

STIPULATION AND AGREEMENT OF SETTLEMENT
C-03-0637-PJH                                                    7

1    (d)    has not accepted (and has no Family Member who has accepted) any

2    payments from the Company or any parent or subsidiary of the Company in excess of $60,000

3    during the current or any of the past three fiscal years, other than the following:

4                    (i)    compensation for board or board committee service;

5                    (ii)    payments arising solely from investments in the Company's

6    securities;

7                    (iii)    compensation paid to the director's Family Member;

8                    (iv)    benefits under a tax-qualified retirement plan, or non-discretionary

9    compensation; or

10                    (v)    loans permitted under Section 13(k) of the Securities Exchange

11    Act of 1934.

12        7.    Provided, however, that audit committee members are subject to the following

13    additional, more stringent requirements.  To qualify as an audit committee member, he or she:

14            (a)    is not a Family Member of an individual who is, or at any time during the

15    past three years was, employed by the Company or by any parent or subsidiary of the Company

16    as an executive officer;

17            (b)    is not, and has no Family Member who is, a partner in, or a controlling

18    shareholder or an executive officer of, any organization to which the Company made, or from

19    which the Company received, payments for property or services in the current or any of the past

20    three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year, or

21    $200,000, whichever is more, other than the following:

22                    (i)    payments arising solely from investments in the Company's

23    securities; or

24                    (ii)    payments under non-discretionary charitable contribution matching

25    programs.

26            (c)    is neither employed nor has a Family Member who is employed as an

27    executive officer of another entity where, at any time during the past three years, any of the

28    executive officers of the Company serve on the compensation committee of such other entity; or

1         (d)    is not, and has no Family Member who is, a current partner of the

2 Company's outside auditor, or was a partner or employee of the Company's outside auditor who

3 worked on the Company's audit at any time during any of the past three years.

4         (e)    has not had any of the relationships described in §§ IV.6 or IV.7(a)-(d)

5 above, with any affiliate of the Company.

6     8.     Independent directors will conduct separate meetings in conjunction with

7 regularly scheduled Board meetings, at which only independent directors will be present. These

8 meetings will occur at least twice per year.

9     9.     Riverstone has an Audit Committee, a Compensation Committee, and a

10 Nominating/Corporate Governance Committee. All of these committees have three members,

11 and are comprised entirely of independent directors.

12     10.     The Audit Committee will have at least one member who has significant

13 accounting or finance experience, and the remaining members will be generally knowledgeable

14 regarding accounting matters;

15     11.     The Nominating/Corporate Governance Committee shall be comprised of

16 members who have demonstrated leadership skills or are generally knowledgeable regarding

17 corporate governance matters.

18     12.     The Audit, Compensation, and Nominating/Corporate Governance Committees

19 shall have the authority to retain legal counsel or other advisors, if necessary in the exercise of

20 their business judgment.

21     13.     Audit partners will be rotated every 5 years.

22     14.     Riverstone will not use an auditing firm at which the Company's Chief Financial

23 Officer was an employee during the three years preceding the audit.

24     15.     The outside auditor is precluded from providing certain non-audit services to

25 Riverstone, in accordance with 15 U.S.C. § 78j-1(g), except for tax services.

26     16.     Riverstone will have procedures for the confidential, anonymous submission by

27 employees of concerns regarding questionable accounting or auditing matters.

28

1        17.    The Audit Committee regularly reports all "significant" audit findings to the

2    Board and relays information concerning all "material" aspects of litigation.

3        18.    The Audit Committee will be responsible for overseeing a procedure implemented

4    and maintained by the Finance Department designed to track revenues for each customer. The

5    revenue tracking system shall be designed to provide the CEO and CFO with the total amount of

6    revenue recognized from sales to each customer on a quarterly basis.

7        19.    The Compensation Committee determines or recommends compensation for the

8    Chief Executive Officer and all other executive officers. The CEO is not present during

9    deliberations on his/her compensation.

10       20.    Director nominees are selected, or recommended for selection, by the

11    Nominating/Corporate Governance Committee. In assessing nominees, the Committee considers

12    whether the nominees are "independent."

13       21.    The Nominating/Corporate Governance Committee meets at least quarterly.

14       22.    The Nominating/Corporate Governance Committee recommends compensation

15    levels for the Board, including the Chairman.

16       23.    The Nominating/Corporate Governance Committee oversees all proposed

17    amendments to the Articles, By-Laws, governance guidelines or committee charters.

18       24.    The Nominating/Corporate Governance Committee is responsible for reviewing

19    with management the Company's compliance with the Sarbanes-Oxley Act.

20       25.    The Audit Committee must approve all related party transactions.

21       26.    The Audit Committee shall implement a Company-wide policy prohibiting

22    excessive fraternization between Company personnel and independent auditor personnel.

23       27.    Riverstone's CFO is responsible for formulating and applying the Company's

24    revenue recognition policy.

25       28.    The CFO reports to the Board on a regular basis regarding Riverstone's revenue

26    recognition policy.

27       29.    The revenue recognition policy is distributed to each Riverstone employee who is

28    responsible for determining whether to record revenue.

1    30.    Riverstone maintains an insider trading policy, which imposes penalties for
2    violations of the policy.

3    31.    Adoption of a Company-wide Code of Business Conduct, and appropriate training
4    regarding the Code.

5    32.    Implementation of quarterly sales certification process. Everyone from Vice
6    President of Sales to entire sales force is required to certify compliance with revenue recognition
7    policies.

8    33.    Implementation of process to ensure that for each customer transaction the
9    Company requires the sales organization to complete a questionnaire to ensure that the Company
10    has enough information properly to determine whether to recognize revenue. This questionnaire
11    must be completed to the satisfaction of the Vice President of Finance before the transaction can
12    be processed for shipment. The Vice President of Finance and/or the CFO review all
13    transactions in excess of $100,000.

14    34.    New internal audit function will be implemented. Internal audit will report
15    findings and results to the Audit Committee on a quarterly basis.

16    35.    Company will provide quarterly sales force training for revenue recognition
17    policies and proper documentation of sales transactions, and compliance with applicable laws
18    regarding sales of products and services.

19    2.2    Other Relief: Subject to the other terms of this Stipulation, and in accordance
20    with their determination that such payment is in the best interests of Riverstone, the Individual
21    Defendants shall approve, support and take all reasonable actions to cause the payment, from
22    funds made available by the Individual Defendants' Directors' and Officers' liability Insurers, of
23    the sum of approximately $11 million for the benefit of Riverstone in connection with the
24    defense and settlement of *In re Riverstone Networks, Inc. Sec. Lit.*, Case No. CV-02-3581 (PJH),
25    and related litigation and proceedings.

26    3.    **Preliminary Approval, Notice Orders and Settlement Hearing**

27    3.1    Promptly after execution of this Stipulation by all parties hereto, the Settling
28    Parties shall submit the Stipulation together with its Exhibits to the Court and shall apply for

1  entry of an order (the "Notice Order"), substantially in the form of Exhibit A hereto, requesting,

2  *inter alia*, the preliminary approval of the Settlement set forth in the Stipulation, and approval for

3  the mailing, posting on at least one of Derivative Plaintiffs Counsels' websites, and publication

4  of the settlement notices (the "Notices"), substantially in the form of Exhibits A-1 and A-2

5  attached hereto, which shall include the general terms of the Settlement set forth in the

6  Stipulation, the general terms of the fees and expenses to be paid pursuant to ¶5.1 below, and the

7  date of the Settlement Hearing as defined below.  Riverstone shall be responsible for providing

8  notice to the Current Riverstone Shareholders and shall pay all costs and expenses incident to

9  providing such notice.

10       3.2     The Settling Parties shall request that, after the Notices are mailed and published,

11  the Court hold a hearing (the "Settlement Hearing") to consider and determine whether an order

12  approving the Settlement as fair, reasonable and adequate and a Final Judgment should be

13  entered thereon dismissing the Federal Action with prejudice, and that the Court thereafter

14  approve the Settlement and dismiss the Federal Action with prejudice.  At the Settlement

15  Hearing, Derivative Plaintiffs' Counsel also will request that the Court approve their fees and

16  expenses as agreed to herein.

17       3.3     Within five (5) business days after the Effective Date, the Settling Parties shall

18  request that the State Court dismiss the State Action with prejudice with each party bearing their

19  own costs, except as otherwise set forth herein, to any of the Settling Parties.

20       4.      Releases and Bar

21       4.1     Upon the Effective Date, the Derivative Plaintiffs, Riverstone (as a nominal

22  defendant in the Derivative Actions), and each of the Current Riverstone Shareholders, on behalf

23  of themselves and each of their predecessors, successors, parents, subsidiaries, affiliates,

24  custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees, trust

25  beneficiaries, administrators, spouses, marital communities, and immediate family members,

26  shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever

27  released, relinquished and discharged all Released Claims (including all Unknown Claims), and

28

STIPULATION AND AGREEMENT OF SETTLEMENT                                                    12
C-03-0637-PJH

1  any and all claims relating to or arising out of or connected with the Settlement or resolution of

2  the Derivative Actions, against all of the Released Persons.

3      4.2    Upon the Effective Date, and except as provided in ¶7.12, the Derivative

4  Plaintiffs, Riverstone (as a nominal defendant in the Derivative Actions), and each of the Current

5  Riverstone Shareholders, and each of their predecessors, successors, parents, subsidiaries,

6  affiliates, custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees,

7  trust beneficiaries, administrators, spouses, marital communities, and immediate family

8  members, will be forever barred and enjoined from commencing, instituting or prosecuting any

9  of the Released Claims (including all Unknown Claims), or any action or other proceeding,

10  against any of the Released Persons, based on, arising out of, related to, or in connection with,

11  the Released Claims (including all Unknown Claims).

12      4.3    The Derivative Plaintiffs and Riverstone further agree that the approval of the

13  Settlement and the dismissal of the Derivative Actions shall act to bar the prosecution,

14  derivatively on behalf of Riverstone, of any duplicative or similar claims as those set forth in, or

15  that could or might have been set forth in, the Derivative Actions or of any of the Released

16  Claims.

17      4.4    Upon the Effective Date, each of the Released Persons shall be deemed to have,

18  and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and

19  discharged each other, the Derivative Plaintiffs, each and all of the Current Riverstone

20  Shareholders, Riverstone (as a nominal defendant in the Derivative Actions), and Derivative

21  Plaintiffs' Counsel, from all claims (including all Unknown Claims) relating to or arising out of,

22  or connected with the institution, prosecution, assertion, settlement or resolution of the

23  Derivative Actions and/or the Released Claims.  Specifically excluded from the releases in this

24  paragraph is any right of Riverstone's current and former officers and directors to receive (or

25  obligation to repay) indemnification or advancement of legal expenses arising from law and/or

26  statute, Riverstone's articles of incorporation and by-laws, any existing agreements, or any

27  resolution (or otherwise) of the Board of Directors of Riverstone; provided, however, that

28

1   Riverstone shall not seek from its former officers and directors repayment of payments made or

2   defense expenses incurred by them or on their behalf in the Derivative Actions.

3       4.5     Pending final determination of whether the Settlement should be approved and

4   applied in the Derivative Actions, all proceedings and all further activity between the Settling

5   Parties regarding or directed towards the Derivative Actions, and save for those activities and

6   proceedings relating to this Stipulation and the Settlement, shall be stayed.

7       4.6     Pending final determination of whether the Settlement should be approved,

8   neither the Derivative Plaintiffs, Riverstone (as a nominal defendant in the Derivative Actions),

9   nor any of the Current Riverstone Shareholders, shall commence, maintain or prosecute against

10  Defendants or the other Released Persons, or any of them, any action or proceeding in any court

11  or tribunal asserting any of the Released Claims.

12      5.      Derivative Plaintiffs' Counsel's Attorneys' Fees and Reimbursement
                of Expenses

13

14      5.1     If the Court approves the Settlement, Riverstone agrees to pay or cause the

15  Defendants Directors' and Officers' Insurers to pay the Fee and Expense Amount (including,

    without limitation, the fees and expenses of all experts retained by Derivative Plaintiffs' Counsel
16
    to assist in the Derivative Actions) of Derivative Plaintiffs' Counsel in an aggregate amount of
17
    $1,750,000 (one million seven hundred and fifty thousand dollars), as a unitary part of the
18
    Settlement. Riverstone shall transfer or cause Defendants' Directors' and Officers' Insurers to
19
    transfer to an account maintained by Lerach Coughlin Stoia Geller Rudman & Robbins such fees
20
    and expenses as the Court approves, not to exceed $1,750,000, within five business days of the
21
    Judgment granting final approval of this settlement, subject to the joint and several obligation of
22
    Derivative Plaintiffs' Counsel and their law firms (or their successors) to refund that amount,
23
    plus interest thereon at the current 90-day T-Bill rate, in the event of a reversal or modification
24
    on appeal or if the Effective Date does not occur. Said refund shall be paid to Riverstone within
25
    five business days after written notification of such event. Derivative Plaintiffs' Counsel shall
26
    have sole responsibility for apportioning and distributing such fees and expenses as the Court
27

28

1   awards among them, and in no event shall Defendants or Riverstone have any obligations or

2   liability with respect to that apportionment or distribution.

3       5.2     Except as otherwise expressly provided in paragraph 5.1, the Settling Parties shall

4   bear their own attorneys' fees and costs incurred in connection with the matters set forth in this

5   Stipulation.

6       6.      **Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

7

8       6.1     In the event that the Stipulation or Settlement is not approved by the Court or the

    Settlement set forth in the Stipulation is terminated for any reason, the Settling Parties shall be
9
    restored to their respective positions in the Derivative Actions as of May 6, 2004, and all
10
    negotiations, proceedings, documents prepared and statements made in connection herewith shall
11
    be without prejudice to the Settling Parties, shall not be deemed or construed to be an admission
12
    by any Settling Party of any act, matter or proposition and shall not be used in any manner or for
13
    any purpose in any subsequent proceeding in the Derivative Actions or in any other action or
14
    proceeding.  In such event, the terms and provisions of the Stipulation shall have no further force
15
    and effect with respect to the Settling Parties and shall not be used in the Derivative Actions or in
16
    any other proceeding for any purpose, and any Judgment or order entered by the Court in
17
    accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc.*
18
        7.      .Miscellaneous Provisions
19
        7.1     The Settling Parties (a) acknowledge that it is their intent to consummate the
20
    terms and conditions of this Stipulation; and (b) agree to cooperate to the extent reasonably
21
    necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise
22
    their best efforts to accomplish the foregoing terms and conditions of the Stipulation.
23
        7.2     Riverstone shall provide Derivative Plaintiffs' Counsel with the opportunity to
24
    conduct reasonable confirmatory discovery.
25
        7.3     The Settling Parties intend this Settlement to be a final and complete resolution of
26
    all disputes among them with respect to the Derivative Actions.  The Settlement compromises
27
    claims that are contested and shall not be deemed an admission by any Settling Party as to the
28

STIPULATION AND AGREEMENT OF SETTLEMENT                                                    15
C-03-0637-PJH

1  merits of any claim or defense. While the Defendants deny that the claims advanced in the

2  Derivative Actions were meritorious, Defendants agree and the Judgments in the Derivative

3  Actions will state, that the Derivative Actions were filed in good faith and in accordance with the

4  applicable California law and the Federal Rules of Civil Procedure, including Rule 11 of the

5  Federal Rules of Civil Procedure, and are being settled voluntarily after consultation with

6  competent legal counsel.

7      7.4     All agreements made and orders entered during the course of the Derivative

8  Actions relating to the confidentiality of information shall survive this Stipulation.

9      7.5     All of the Exhibits to this Stipulation are material and integral parts hereof and are

10  fully incorporated herein by this reference.

11     7.6     This Stipulation may be amended or modified only by a written instrument signed

12  by or on behalf of all Settling Parties or their respective successors-in-interest.

13     7.7     This Stipulation and the Exhibits attached hereto constitute the entire agreement

14  among the Settling Parties and no representations, warranties or inducements have been made to

15  any party concerning the Stipulation or its Exhibits, other than the representations, warranties

16  and covenants contained and memorialized in such documents. The Stipulation supersedes and

17  replaces any prior or contemporaneous writing, statement or understanding, including the

18  Memorandum of Understanding pertaining to the Derivative Actions. Except as otherwise

19  provided herein, all parties shall bear their own costs.

20     7.8     Counsel for the Settling Parties are expressly authorized by their respective clients

21  to take all appropriate actions required or permitted to be taken pursuant to the Stipulation to

22  effectuate its terms and conditions.

23     7.9     Each counsel or other Person executing this Stipulation or any of its Exhibits on

24  behalf of any party hereto hereby warrants that such Person has the full authority to do so.

25     7.10    The Stipulation may be executed in one or more counterparts. All executed

26  counterparts including facsimile counterparts and each of them shall be deemed to be one and the

27  same instrument. A complete set of original executed counterparts shall be filed with the Court

28  by Derivative Plaintiffs' Counsel.

1      7.11    This Stipulation shall be binding upon, and inure to the benefit of, the Settling

2 Parties and their respective successors, assigns, heirs, spouses, marital communities, executors,

3 administrators and legal representatives.

4      7.12    Without affecting the finality of the Judgment entered in accordance with this

5 Stipulation, the Court shall retain jurisdiction with respect to implementation and enforcement of

6 the terms of the Stipulation and Judgment, and the Settling Parties hereto submit to the

7 jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in

8 the Stipulation and Judgment.

9      7.13    This Stipulation and the Exhibits hereto shall be considered to have been

10 negotiated, executed and delivered, and to be wholly performed, in the State of California, and

11 the rights and obligations of the Settling Parties to the Stipulation shall be construed and

12 enforced in accordance with, and governed by, the internal, substantive laws of the State of

13 California without giving effect to that State's choice of law principles.

14      IN WITNESS WHEREOF, the parties hereto have caused the Stipulation to be executed,

15 by their duly authorized attorneys, dated as of November 12, 2004.

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
KEITH F. PARK
MICHAEL J. DOWD
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
1010 Second Avenue, Suite 2360
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

MURRAY FRANK & SAILER LLP
ERIC J. BELFI
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: 212/682-1818
212/682-1892 (fax)

EMERSON POYNTER LLP
JOHN G. EMERSON
SCOTT E. POYNTER
2228 Cottondale Lane, Suite 100
Little Rock, AR 72202
Telephone: 501/907-2555
501/907-2556 (fax)

THE DREHER LAW FIRM
ROBERT SCOTT DREHER
835 Fifth Avenue, Suite 202
San Diego, CA 92101
Telephone: 619/230-8828
619/687-0136 (fax)

_____
        MICHAEL J. DOWD
        Counsel for Plaintiffs

STIPULATION AND AGREEMENT OF SETTLEMENT
C-03-0637-PJH

18

1

2

3   MORRISON & FOERSTER LLP
    MELVIN R. GOLDMAN
4   PAUL T. FRIEDMAN
    CRAIG D. MARTIN
5   425 Market Street
    San Francisco, CA 94105-2482
6   Telephone: 415/268-7000
    415/268-7522 (fax)

7

8   _Paul T. Friedman_
    PAUL T. FRIEDMAN
9   Counsel for Defendants Riverstone Networks,
    Inc., Romulus Pereira, Piyush Patel, Christopher
10  Paisley, Eric Jaeger, Jorge Del Calvo, Robert
    Stanton, Suresh Gopalakrishnan and C. Lee Cox
11

12  COOLEY GODWARD LLP
    WILLIAM S. FREEMAN
13  GRANT FONDO
    3175 Hanover Street
14  Palo Alto, CA 94304-1130
    Telephone: 650/843-5000
15  650/849-7400 (fax)

16

17  _Grant Fondo_

18          GRANT FONDO
    Counsel for Defendant John Kern
19

20

21

22

23

24

25

26

27

28

STIPULATION AND AGREEMENT OF SETTLEMENT
C-03-0637-PJH                                          19
~1717277

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.    That on December 1, 2004, declarant served the STIPULATION AND AGREEMENT OF SETTLEMENT by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December, 2004, at San Diego, California.

ADRIANA DEL CARMEN

RIVERSTONE (Settlement)
Service List - 11/18/2004  (03-0124)
Page 1 of 1

**Counsel For Defendant(s)**

Williams S. Freeman
Cooley Godward LLP
One Maritime Plaza, Suite 2000
San Francisco, CA  94111-3580
    415/693-2000
    415/951-3699 (Fax)

Paul T. Friedman
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105-2482
    415/268-7000
    415/268-7522 (Fax)

**Counsel For Plaintiff(s)**

John G. Emerson, Jr.
Scott E. Poynter
Emerson Poynter LLP
2228 Cottondale Lane, Suite 100
Little Rock, AR  72202
    501/907-2555
    501/907-2556 (Fax)

Keith F. Park
Michael J. Dowd
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
    619/231-1058
    619/231-7423 (Fax)

Eric J. Belfi
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY  10016
    212/682-1818
    212/682-1892 (Fax)

Brian J. Robbins
Marc M. Umeda
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101
    619/525-3990
    619/525-3991 (Fax)

R. Scott Dreher
The Dreher Law Firm
835 Fifth Avenue, Suite 202
San Diego, CA  92101
    619/230-8828
    619/687-0136 (Fax)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RNI WIND DOWN CORPORATION, et al.,[1] | Case No. 06-10110 (CSS) |
| Debtors. | Jointly Administered |
| | Dkt. Reference No. |

ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE APPROVING THE AMENDMENT TO THE STIPULATION AND
AGREEMENT OF SETTLEMENT DATED AS OF NOVEMBER 12, 2004

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an

order, pursuant to Bankruptcy Rule 9019; and the Court having reviewed the Motion, and having

heard the statements of counsel and evidence adduced with respect to the Motion at a hearing

before the Court on the Motion (the "Hearing"), if any; and the Court finding that: (i) this Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper

under 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2), (iv) notice of the Motion and the Hearing was sufficient under the circumstances,

and (v) approval of the Stipulation is in the best interests of the Debtors' estates and creditors;

and after due deliberation the Court having determined that good and sufficient cause having

been shown;

---

[1] The Debtors are RNI Wind Down Corporation, formerly known as Riverstone Networks, Inc. (Tax ID No. XX-XXX6178), BlueCoast Software (Tax ID No. XX-XXX9415), The OASys Group, Inc. (Tax ID No. XX-XXX8093), Riverstone Networks SPC, Inc. (Tax ID No. XX-XXX3518) and Pipal Systems, Inc. (Tax ID No. XX-XXX6850) each with a mailing address of 5200 Great America Parkway, Santa Clara, CA 95054.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion of the Debtors for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004

IT IS HEREBY ORDERED THAT:

1.     The relief requested in the Motion is GRANTED.

2.     Pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Stipulation is APPROVED.

3.     The effectiveness of this Order shall be conditioned upon the entry of an order confirming a chapter 11 plan of liquidation for the Debtors.

4.     This Court retains jurisdiction over any and all matters or disputes with respect to any of the relief granted in this Order.

Dated: Wilmington, Delaware
      June __, 2006

              CHRISTOPHER S. SONTCHI
              UNITED STATES BANKRUPTCY JUDGE

DB02:5314245.6

064952.1001

# EXHIBIT G

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| RNI WIND DOWN CORPORATION., | ) | |
| et al., | ) | Case No. 06-10110 (CSS) |
| | ) | |
| Debtors. | ) | **Hearing Date: 6/30/06 @ 10:30** |
| | ) | **Related Docket No. 402** |

### CHARLES L. GRIMES' OBJECTION TO MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO RULE 9019 APPROVING THE AMENDMENT TO THE STIPULATION AND AGREEMENT OF SETTLEMENT DATED AS OF NOVEMBER 12, 2004

The Debtors' Motion for an Order Pursuant to Rule 9019 Approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 (the "Settlement Motion"), implicitly seeks to vacate and modify an order of the United States District Court for the Northern District of California (the "District Court"), (which is currently on appeal) that approved payment of $1.75 million in attorneys' fees to plaintiffs' counsel as a part of a unitary settlement of a derivative action.[1]  We do not believe that this Court has jurisdiction to do so.  Additionally, the Debtors (the appellees) are apparently attempting to settle an appeal, with Mr. Grimes (the only appellant), which they can not do.  Finally, the Debtors have made no showing that the proposed "settlement" is within the range of reasonable.  Thus, the Settlement Motion should be denied.

---

[1]As explained below, the issue on appeal is whether the District Court had authority to approve an award of attorneys' fees as a part of a unitary settlement, rather than subject the fee request to the judicial scrutiny routinely applied to fee applications by counsel in derivative cases. The Settlement Motion appears to be an attempt to now have this Court award plaintiffs' counsel $800,000 in fees, again with no court having first scrutinized the reasonableness of a fee for filing a derivative complaint that likely had no merit.

10015338.WPD                                    1

## BACKGROUND

### The State Derivative Action

1.      On August 13, 2002 a stockholder derivative suit was filed on behalf of Riverstone

Networks, Inc. ("Riverstone") in the Superior Court of California, County of Santa Clara (the "State

Court") (*Bruhn v. Pereira*, No. CV-810290), making virtually identical allegations to those made

in a previously-filed class action complaint against Riverstone.  Defendants demurred and plaintiffs

filed an amended complaint in February 2003.

2.      In April 2003, another derivative suit was filed in the State Court (*Carrico v. Pereira*,

No. CV-816188).  The two State Court actions were then consolidated as *In re Riverstone Networks,*

*Inc., Derivative Litigation* (the "State Derivative Action"), and in May 2003, a consolidated

derivative complaint was filed (the "Fourth State Derivative Complaint").  On September 17, 2003,

the State Court dismissed the Fourth State Derivative Complaint, explaining that:

> I have a lot of legal conclusions that are strung together in this
> pleading that I don't think satisfy the standard to either raise a doubt
> as to the independence and disinterest of the majority of the members
> of the board of directors, or that this [board] could not exercise its
> business judgment in deciding whether or not to initiate legal
> proceedings in this case.

*See* Defendants' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support

of Motion to Dismiss First Amended Complaint filed in this action on March 26, 2004 ("Motion to

Dismiss") at 5 (attached here to as Ex. A).  The State Court also expressed serious doubts that

plaintiff would ever be able to plead demand futility with the requisite particularity, having failed

to do so after four attempts (*Id.* at 6).  The State Court stayed further proceedings because the issues

in the State Derivative Action encompassed the same issues as the complaint which by then had

been filed in the United States District Court for the Northern District of California.

10015338.WPD                                    2

## The Federal Derivative Action

3.     The original complaint in the district court derivative action was filed on February 14, 2003, by Gregory Watterson.  The allegations in the complaint were substantially identical to those made in the original complaint in the State Derivative Action (the "Federal Derivative Action").[2]  As in the State Derivative Action, defendants moved to dismiss because plaintiff failed adequately to allege demand futility and to state a cause of action.  In response, plaintiff filed an amended complaint on November 6, 2003; the amended pleading was largely a verbatim recitation of allegations in the Fourth State Derivative Complaint, which by then had been dismissed.

4.     In response to the amended complaint in the Federal Derivative Action, the defendants filed a Motion to Dismiss, which presented numerous well reasoned grounds indicating that the amended complaint would suffer the same fate as its companion Fourth State Derivative Complaint.  For example, by the time plaintiff filed his original complaint in the District Court, Riverstone had appointed three new independent directors to its board of seven, and at the time of the amended complaint, the board consisted of the same seven directors (Motion to Dismiss at 6).  The amended complaint named only four of these directors as defendants, thus three faced no personal liability (Motion to Dismiss at 6-7, 9).  As to those three, the amended complaint also failed to allege particularized facts showing that they otherwise lacked independence (Motion to Dismiss at 20-21).

5.     With respect to the four defendants who were directors when the complaint was filed, the amended complaint alleged all four were liable with respect to two claims - violations of the duty of care and loyalty, and contribution and indemnification (Motion to Dismiss at 9).  The amended

_____

[2] *Watterson v. Pereira*, C.A. No. 03-637 (N.D. Cal.).

complaint failed, however, to plead particularized facts demonstrating a substantial likelihood of liability for any of these claims (Motion to Dismiss at 10-17). The other five claims of the amended complaint (violations of the California Corporate Code, insider trading, breach of duty for insider selling, receipt of incentive based compensation, and reimbursement under Sarbanes-Oxley) were asserted against only one or two directors. Thus, the majority of the board obviously was disinterested with respect to those claims (Motion to Dismiss at 10). Thus, there was a substantial likelihood that the amended complaint would have been dismissed.

### Settlement of the Federal Derivative Action

6.      Before briefing on the Motion to Dismiss was complete, the parties requested the proceedings be stayed while they participated in mediation. On November 12, 2004, a stipulation of settlement was signed (the "Stipulation"). The Stipulation provided for the settlement of the State Derivative Action and the Federal Derivative Action. The principal terms of the settlement were that Riverstone would implement certain corporate governance measures. These included changes to the composition and practices of the Riverstone Board of Directors and the committees of the Board. The Stipulation required that they remain in effect for, at the most, only four years. Stipulation ¶ 2.1. Indeed, they could have been modified before that if necessary "in the good faith business judgment of a unanimous vote all of the independent members of Riverstone's Board, as a result of a change in law or regulations, or other business necessity" *Id.* Thus, any alleged benefit from these changes could have been eliminated at any time, particularly under the amorphous concept of "other business necessity."

7.      In return, Riverstone agreed to pay $1.75 million in fees and expenses to derivative

plaintiffs' counsel ("Plaintiffs' Counsel") as a "unitary" part of the settlement.[3]

8.     On December 2, 2004, the parties filed an application for preliminary approval of the Stipulation. At a hearing on January 19, 2005, the District Court refused to grant approval because of the "unitary" attorneys' fee provision, which it found "troublesome" (Ex. A to the Declaration of Kathleen M. Miller, filed on May 18, 2006 (incorporated herein by reference)("Miller Dec.") at 55). Accordingly, the District Court ordered further briefing on whether it could allow the fees to be included within a "unitary" settlement (and thus reviewed under the less stringent standard applied to settlements), instead of having the District Court apply the standard traditionally used for fee applications (a standard which, the District Court noted, Plaintiffs' Counsel had thus far failed to meet) (Id. at 45-48, 50, 55-56).

9.     Plaintiffs filed a supplemental brief on January 26, 2005. At a hearing on February 16, 2005, the District Court, although still troubled by the fee provision, granted preliminary approval and ordered that notice be sent to Riverstone's stockholders, stressing that "any objections that I receive from any shareholders on this settlement will be scrutinized and could very well block final approval" (Ex. B to Miller Dec. at 20).

10.     On May 2, 2005, Mr. Grimes, one of Riverstone's largest stockholders, filed a motion to intervene, objecting to both the unitary settlement approach and the amount of the fees sought by Plaintiffs' Counsel. Between May 17 and May 25, 2005, the parties filed additional briefs and

---

[3] A "unitary" settlement includes an agreement that the company will pay a certain amount of attorneys' fees (here, $1.75 million) as part of the overall settlement. Unlike the typical settlement, because the fee agreement in a "unitary" settlement is just one part of the overall agreement, the court cannot disapprove the attorneys' fees without disapproving the entire settlement. Moreover, the attorneys' fees do not receive the heightened level of scrutiny afforded to fee applications outside of the "unitary" settlement approach.

declarations in support of the proposed settlement, and on June 1, 2005, the District Court held a

hearing on the application for final approval of the settlement. It began with the following

observation:

> It probably comes as no surprise that I still have problems
> with this case. This case has been very problematic since our hearing
> in January, and the supplemental briefing in February didn't clear it
> up much. And frankly I still have a lot of the same problems with the
> case today notwithstanding yet additional briefs on final approval
> motion.
>
> . . . .
>
> As I've stated on several occasions in the past, I am very
> troubled by the fact that you all are presenting me with a settlement
> in which the agreed upon attorneys fees is included which pretty
> much takes away or – inhibits the Court's ability to meaningfully
> evaluate whether or not the attorneys fees is reasonable.
>
> I'm not satisfied at all with the plaintiffs' attempt to establish
> some kind of a standard for the Court. I mean I've asked several
> times what standard applies in this case. The plaintiff's position is
> not entirely clear, even in this last round of papers, as to whether or
> not the Court should apply some generalized kind of reasonable fair
> and adequate standard to the whole settlement which necessarily
> would include the attorneys fees or whether or not the Court should
> follow the traditional substantial benefit analysis which would
> necessitate a showing that the suit was meritorious and that there was
> some benefit derived to the corporation, and then would require the
> Court to apply a Loadstar approach to evaluating fees.

(Ex. D to Miller Dec. at 3-4 of June 1 transcript).[4]

    11.    The District Court still was suspicious that the fee provision had been included as a

settlement term to evade the District Court's scrutiny of what it termed an *"exorbitant fee request"*

(*Id.* at 38) (emphasis added). Nevertheless, because the District Court found no authority clearly

---

[4] *See also* Ex. D to Miller Dec. at 18-19 of June 1 transcript ("Frankly, it seems to me as though this settlement was arrived at and engaged in and agreed to in part to take away from the Court the ability to determine if the fees were reasonable").

prohibiting a unitary settlement, it approved the settlement (including its provision for attorneys' fees), as fair, reasonable and adequate under established settlement standards (*Id.*). At the same time, the District Court granted Mr. Grimes' motion to intervene and invited him to appeal (*Id.* at 39). On July 22, 2005, the District Court entered the Order Granting Motion for Final Approval of Derivative Settlement (the "Settlement Order") and a Final Judgment and Order of Dismissal With Prejudice (the "Final Order"), again encouraging Mr. Grimes to appeal:

> *The court would welcome guidance from the Ninth Circuit on the question of the propriety of unitary settlements in shareholder derivative actions, where the provision regarding payment of fees is a term of the settlement agreement; as well as on the question of the standard to be applied by the court in evaluating the fairness of such a settlement agreement that includes an attorneys' fees provision.*

(Ex. D to Miller Dec.) (emphasis added).

### The Appeal

12.    On August 11, 2005, Mr. Grimes filed his Notice of Appeal of the unitary settlement with the United States Court of Appeals for the Ninth Circuit (the "Court of Appeals")[5] and on November 25, 2005 filed his opening brief in support of that appeal[6] (Ex. E to Miller Dec.). In response, Plaintiffs' Counsel filed a "joint" motion on behalf of all appellees (including Riverstone) to dismiss the Ninth Circuit Appeal as moot, because Plaintiffs' Counsel agreed to "unbundle" their fee award from the overall settlement and "requiring plaintiffs' counsel to justify their fee separate from the overall settlement" (Ex. F to Miller Dec.). This approach, Plaintiffs' Counsel argued, would allow the court to "assess the reasonableness of any attorneys' fees." *id.* Plaintiffs' Counsel

---

[5]*Watterson v. Pereira*, Case No. 05-16588 (9th Cir.)

[6]At some point during the latter half of 2005 Plaintiffs' Counsel received the entire $1.75 million in fees and expenses that they had been awarded.

recognized that if the case went back down to the District Court for consideration of their fees separate and apart from the overall settlement, that "some or all of [the $1.7 million] will be subject to repayment to Riverstone, depending upon the amount of any future fee award by the District Court." (See Ex. F to Miller Dec. at Ex. D).

13.    In the motion to dismiss, the plaintiffs appeared to believe that they and Riverstone together could unilaterally undo the settlement that had been approved by the District Court and eliminate its "unitary" aspect, thus mooting the Appeal. In making this argument, Plaintiffs' Counsel appeared to ignore the existence of the District Court's Settlement Order, which first had to be vacated (which required satisfying a standard that the plaintiffs could not meet).[7] On March 17, 2006, the Ninth Circuit denied the motion to dismiss the Appeal, telling plaintiffs that they could raise their jurisdictional argument in their brief on the merits (Ex. K to Miller Dec.). The Ninth Circuit Appeal has been stayed since then.

### The Bankruptcy

14.    On February 7, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

15.    On February 17, 2006, the Office of the United States Trustee (the "UST") appointed the Official Committee of Unsecured Creditors. On March 8, 2006, the UST appointed an Official Committee of Equity Security Holders.

---

[7]Plaintiffs' Counsel did appear to understand that, because the Appeal in the Ninth Circuit had divested the District Court of jurisdiction, they needed to have that appeal dismissed before the District Court could do anything. Hence, the motion to dismiss.

16.    On March 23, 2006, the Court entered an order authorizing the sale of substantially all of the Debtors' assets to Lucent Technologies Inc. This sale closed on April 27, 2006.

17.    On May 5, 2006, Mr. Grimes filed a Motion for Relief from the Automatic Stay (the "Motion for Relief") seeking a modification of the automatic stay under Section 362 of the Bankruptcy Code, so that the Ninth Circuit Appeal can proceed.

18.    On June 8, prior to responding to Mr. Grimes' Motion for Relief, the Debtors filed the Settlement Motion.

### The Proposed "Settlement"

19.    It is unclear from the Settlement Motion exactly what the Debtors are purportedly settling, but it appears to be the Appeal. Settlement Motion ¶ 24, *but see* Settlement Motion ¶ 15.b (the repayment of fees will be "a compromise of all claims relating to the fees previously paid to counsel.")). The terms of the "settlement" require Plaintiffs' Counsel to return $950,000 of the $1.75 million previously paid to them by Riverstone. This payment, however, is not to be made when the Court approves the proposed settlement, but rather, only if and when, the Court confirms a yet to be filed, plan of liquidation. Even more outrageous is the provision that requires the Debtors to return the $950,000 to Plaintiffs' Counsel, *with interest*, if the order granting confirmation is reversed (or modified) for any reason. For the reasons stated below, Mr. Grimes objects to the Settlement Motion.

### ARGUMENT

#### A.    This Court Does Not Have Jurisdiction to Reverse the District Court

20.    Rule 23.1 of the Federal Rules of Civil Procedure requires court approval of the settlement of derivative actions. The court's role in this process "ensures that the derivative suit

does not become a vehicle solely to benefit plaintiffs *and their lawyers*." *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 110-11 (D.R.I. 1996) (emphasis added). *See also Staton v. Boeing Co.*, 327 F.3d 938, 952-53 (9ᵗʰ Cir. 2003) (court must carefully consider proposed settlement of a class action, paying "special attention when the record suggests that the settlement is driven by fees; that is when counsel receive a disproportionate distribution of the settlement"); 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 13.18[A] at 13-89 (3d ed. 2005) ("Balotti & Finkelstein") (the purpose of Rule 23.1 is to have the Court meaningfully supervise derivative settlements to avoid abuses, such as paying a plaintiff and/or his counsel to discontinue litigation). Thus, Plaintiffs' Counsel and Riverstone were required to seek court approval of the Stipulation. They did so and obtained an order approving the unitary settlement, with the Court expressing great concerns that, because of the unitary nature of the Stipulation, it did not have the opportunity to analyze Plaintiffs' Counsel's request for fees *(See* Ex. D to Miller Dec. at 38 of June 1 transcript). Thus, as the record stands, there is a District Court order in place which approved the Stipulation. Completely ignoring this fact, the Debtors have now asked this Court to approve a modification of the Stipulation, which the District Court has already approved. In essence, the Debtors are asking this Court to vacate (or reverse) the District Court order to approve the settlement of the Federal Derivative Action on different terms.[8] The Debtors have cited no authority for this Court to do so and Mr. Grimes is aware of none. *Compare, In re Mahurkas Double Lumen Hemodialysis Catheter Patent Litigation*, 104 B.R. 969, 974 (N.D. Ill. 1992)("For one federal court to issue an injunction forbidding litigation in another is extraordinary, given the principles of

---

[8]Additionally, to do so would allow an award of attorneys' fees in a derivative action with the fees *ever* being scrutinized by the court.

comity among coordinate tribunals....For a bankruptcy judge to issue an injunction with the effect of preempting resolution of a pending motion in a district court is unheard of. Well, perhaps not *un*-heard of. I found one case in which a bankruptcy court did so, and the district judge brushed the order aside in derision, treating the order as so patently unauthorized that no further explanation was warranted."(*citations omitted*).

> **B.    The Debtors Can Not Settle the Ninth Circuit Appeal without Mr. Grimes**

21.    The District Court granted Mr. Grimes' motion to intervene . The District Court stated:

> However, given my overall . . . suspicions about this matter, there are two conditions to the settlement: One, is Mr. Grimes' request to intervene is granted, Mr. Grimes will be given an opportunity to appeal the Court's approval of the settlement.
>
> And I invite him to do so.
> . . . .

(Ex. D to Miller Dec. at 37-40 of June 1 trnascript) (emphasis added). Mr. Grimes accepted the court's invitation and appealed the District Court's order approving the Stipulation. Thus, Mr. Grimes is a party to the Ninth Circuit Appeal. The Debtors completely ignore this fact and have presented this Court with what appears to be an attempt to settle the Ninth Circuit Appeal. The Debtors provide no authority for settling an appeal without the one party that has standing to prosecute the appeal.

> **C.    The Debtors Can Not Satisfy the Requirements of Rule 9019**

22.    The determination of whether to approve a compromise under Rule 9019 is within the sound discretion of the court. *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del 2005). When exercising its discretion, the court must determine whether the proposed compromise

is "fair, reasonable, and in the best interest of the estate." 336 B.R. at 92. The court has a "duty to make an informed, independent judgment that the compromise is fair and equitable."*Id.* at 92  To be informed, the court must "'be appraised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate.'" *Id.* at 93 *(quoting In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)). While the court need not conduct a mini-trial, it should canvass the issues to determine whether the proposed settlement falls below the lowest point in the range of reasonable. *Key3media*, 336 B.R. at 93. The determination of whether to approve the compromise will require the court to "'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.'"*Id.(quoting Martin*, 91 F.3d 393). The debtor bears the burden to provide the court with sufficient information to make an informed determination. *Id.*

23.     In the Third Circuit, when considering a Rule 9019 motion, courts must consider the following four factors before approving a settlement:

(1)     the probability of success in litigation;

(2)     the likely difficulties in collection;

(3)     the complexities of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4)     the paramount interest of the creditors.

*See In re Martin*, 91 F.3d at 393. "The court must also consider 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'" *In re Marvel Enter. Group, Inc.*, 222 B.R. 243, 249 (D.Del. 1998). *See also, In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993) ("A bankruptcy judge may not simply accept a trustee's word that the settlement is reasonable, nor may [the judge] merely 'rubber stamp' a trustee's proposal.").

24.    The Debtors have completely failed to provide the Court with the necessary information for the Court to conduct an appropriate analysis. For that reason alone, the Settlement Motion should be denied. In addition, the Debtors did not provide the Court with an analysis of the factors to be considered on a 9019 motion. This omission is likely due to the fact that the factors clearly weigh against approval of the Settlement Motion.

### 1.    Probability of Success in Litigation

25.    The issues to be decided on appeal are the propriety of a unitary settlement, the standard of review on the award of attorneys' fees in connection with a unitary settlement of a derivative action and the amount of fees awarded to Plaintiffs' Counsel. If the Appeal is permitted to proceed, there is a very high probability that the award of $1.75 million in attorneys fees will be reversed, and once a court finally has the opportunity to properly examine the fees requested, they will be substantially reduced, if not denied all together.

26.    Typically, in derivative actions, plaintiff's counsel file an application for a court award of attorneys' fees and expenses upon approval of a proposed settlement. *See Staton,* 327 F.3d at 969-70. *(See also* Ex. A to Miller Dec. at 45)(in evaluating fee awards in derivative actions, the Court "requires a showing that the derivative action must create a substantial benefit, and that the derivative suit must be meritorious. That is the standard for awarding fees in a derivative action"). Many courts have recognized that an important aspect of the court's duty in this approval process is to "ensure[] that the derivative suit does not become a vehicle solely to benefit plaintiffs and their lawyers." *In re Fleet/Norstar Sec. Litig.,* 935 F. Supp. 99, 110-11 (D.R.I. 1996) (emphasis added). Plaintiff's Counsel never gave the District Court the opportunity to independently review the appropriateness of an award of fees due to the unitary nature of the settlement. The District Court

expressed its great concern over this (Ex. D to Miller Dec. at 38 of June 1 transcript). While the issues in the Appeal appear to be one of first impression at the Court of Appeals level, because unitary settlements in class actions are not permitted, and "clear sailing agreements"[9] in both derivative and class actions cannot prevent a separate review by the trial court of the agreed upon fee, there is a high likelihood that the Ninth Circuit will find that unitary settlements in derivative actions should be prohibited as well.

27.    If Plaintiffs' Counsel had properly filed a fee application for the District Court to review, it likely would have found that they had not satisfied the standards for an award of any fee (or at least awarded a significantly smaller amount than the $800,000 Plaintiffs' Counsel is now seeking to keep without any meaningful review by the court).

<div align="center">

**a.    Plaintiffs' Counsel never made a showing that the Federal Derivative Action was meritorious**

</div>

28.    The first requirement, that the derivative action be meritorious when filed, is considered "the most important criteria ... because otherwise baseless litigation may be encouraged." *In re Fleet/Norstar,* 935 F. Supp. at 113. In determining whether an action was meritorious when filed, the court determines whether it would withstand a motion to dismiss. *In re Oracle Sec. Litig.,* 852 F. Supp. 1437, 1445 (N.D. Cal. 1994); *In re Fleet/Norstar,* 935 F. Supp. at 113. The Federal Derivative Action likely would have been dismissed. Not only was the amended complaint in the Federal Derivative Action "largely a verbatim recitation of allegations in the Fourth State Derivative Complaint", which was dismissed by the State Court, Plaintiffs' Counsel essentially agreed that the

---

[9]A "clear sailing provision" is where defendants agree to pay plaintiffs' counsel fees not to exceed a certain amount.

amended complaint was likely to be dismissed. They acknowledged that because plaintiff "did not make a pre-litigation demand for action by Riverstone's Board as is typically required," and the similar State Derivative Action was dismissed for failure to have done so, there is a "very real risk that this Court would come to the same conclusion as the State Court and grant defendants' motion to dismiss" (Plaintiffs' Counsel Initial Notice of Motion at 15, attached hereto as Ex. B). Thus, there has never been a showing that the Federal Derivative Action was meritorious when it was filed.

        **b.**      **Plaintiffs' Counsel never made a showing that the Federal Derivative Action caused a substantial benefit to Riverstone**

    29.    Moreover, Plaintiffs' Counsel had not shown a causal connection between the alleged benefits of the settlement and the derivative action. Again, at the January 19, 2005 preliminary hearing, the District Court warned Plaintiffs' Counsel that their record on this factor was lacking. *See* Ex. A to Miller Dec. at 46 ("And it's not at all clear to me that the derivative action is the causative factor for the governance changes"); *Id.* at 47 ("I'm a little concerned that there isn't that nexus ... demonstrated between the derivative action and the substantial benefit to the corporation"). Plaintiffs' Counsel never addressed this concern in any supplemental pleadings.

        **c.**      **There has been no showing that any fee award is reasonable**

    30.    There is no escaping the requirement that the fee sought by Plaintiffs' Counsel must be *reasonable*. *See Staton,* 327 F.3d at 963 ("Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is 'fundamentally fair, adequate, and reasonable'").

31.   Where, as here, there was no common fund created by the settlement and the benefits were not quantifiable, courts typically look to the lodestar method in calculating a reasonable fee. *See Hanlon*, 150 F.3d at 1029 (courts often use a lodestar calculation where "there is no way to gauge the net value of a settlement).

32.   After warnings from the District Court that Plaintiffs' Counsel had not provided the court with any information from which to make an assessment of the reasonableness of the fees, Plaintiffs' Counsel finally provided the District Court with their lodestar as an alleged "cross-check" on the purported "reasonableness of the agreed-to fee and expense award" (although they failed to discuss the other factors courts traditionally consider when evaluating a lodestar) (Plaintiffs' Reply Memorandum 13-15 (attached hereto as Ex. C); Ex. D to Miller Dec. at 11-12).  The lodestar appears to include time spent repeatedly amending the complaint in the State Derivative Action, only to have it dismissed for failing to state a cause of action (thus achieving no benefit for the Company), and much duplication of effort (Ex. D to Miller Dec. at 9-10 of June 1 transcript).

33.   Thus, Plaintiffs' Counsel made none of the required showings in order to justify an award of attorneys fees.  Accordingly, the likelihood that the Appeal will be successful in gaining a significant benefit for the Debtors is very high.

## 2.    Likely difficulties in collection

34.   Plaintiffs' Counsel has known since before they received the payment of fees from Riverstone that the fees were at risk of having to be returned.  In fact, in Plaintiffs' Counsel's motion to dismiss the Appeal, they recognized that if the case went back down to the District Court for consideration of their fees separate and apart from the overall settlement, that "some or all of [the $1.7 million] will be subject to repayment to Riverstone, depending upon the amount of any future

fee award by the District Court." (Ex. F to Miller Dec. at Ex. D). Additionally, there is no suggestion by the Debtors that they entered the revised Stipulation due to issues of difficulty in collection. Thus, this factor does not weigh in favor of approving the proposed settlement.

### 3. Complexities of the litigation and the expense, inconvenience and delay necessarily attending it

35.     By the Stipulation, Riverstone can not take a position in opposition to Plaintiffs' Counsel request for an award of fees. In the Appeal, Plaintiffs' Counsel has taken the lead (and will likely continue to do so if the Appeal is permitted to proceed). The opening brief in the Appeal was filed prior to the Petition Date. Thus, Plaintiffs' Counsel need only file an answering brief and participate in oral argument, if the Ninth Circuit sets the matter for oral argument. Thus, there is little, if anything, for the Debtors to do in the Appeal (and thus, little if any, expense).

36.     The time that it will take to complete the Appeal will not have a material effect on the Debtors' estates. It does not prevent the Debtors from filing (and having confirmed) a plan of liquidation. It is not at all unusual for litigation, which could potentially brings assets back into the estates, to continue after a plan of liquidation has been confirmed.

### 4. Paramount interest of the creditor

37.     The sale to Lucent has generated enough proceeds that all of the Debtors' creditors will be paid in full. Thus, any additional money that comes into the estates will benefit the equity holders. Thus, it is the interest of the equity holders that should be taken into consideration here.

38.     It is obviously in the best interest of the equity holders to have the maximum amount of money come back into the estates. As discussed above, allowing the Appeal to proceed will not delay these proceedings; there is no reason that the Debtors can not proceed with a plan of

liquidation. Additionally, the Appeal will not take much, if any, involvement by the Debtors. Furthermore, as discussed above, there is a substantial likelihood that a significant portion of the fees paid to Plaintiffs' Counsel will be returned to the Debtors once a court has had the opportunity to review a properly filed fee application.

### 5.    Other factors - the Debtors' arguments for the settlement do not justify approval of the Settlement Motion

39.    The Debtors' first argument is that because the terms of the revised Stipulation will result in an additional $950,000 coming into the estates, the proposed settlement is fair and reasonable. Simply because some of the funds paid to Plaintiffs' Counsel are being returned does not support a finding that the proposed settlement is fair and reasonable. Moreover, as discussed above, there has never been a determination as to the reasonableness of the fees paid to Plaintiffs' Counsel pursuant to the Stipulation. Thus, there is no basis for a determination on the record presented by the Debtors that Plaintiffs' Counsel provided *any* benefit to the corporation, let alone a substantial benefit, justifying a fee award of $800,000.

40.    The Debtors next claim that the modification to the Stipulation should be approved because if Mr. Grimes is successful on appeal, the settlement will be unwound, the Debtors and their estates will be exposed to "significant uncertainty and economic exposure." Settlement Motion ¶ 24. This is so, according to the Debtors, because the non-economic consideration provided in the settlement will now become economic claims and the defendants in that action will assert indemnification claims against the Debtors. The Debtors, however, provide no explanation as to how these potential harms may come to pass (or the likelihood of their success if they did). In an effort to make the proposed settlement appear reasonable, the Debtors completely ignore the fact that because of the filing of the bankruptcy petition, Plaintiffs' Counsel has lost standing to prosecute

the Federal Derivative Action. Thus, if the Appeal is successful and the settlement is unwound, the Debtors have control of the litigation. Given Riverstone's strong opposition to the action in the Motion to Dismiss, it is extremely unlikely that it will choose to continue with the Federal Derivative Action. It is more likely that the claims will be dismissed. In that case, there will be no economic or indemnification claims made against the estates.

41.    Finally, the terms of the proposed settlement are very troubling. If the Court approves the settlement, Plaintiffs' Counsel is not obligated to return the funds to the Debtors once the order becomes final. Rather, the repayment is not to be made unless and until the Court confirms a plan of liquidation. Debtors have offered no justification for tying the payment of the settlement funds to a confirmed plan of liquidation. If the Appeal is to be settled (and according to the revised Stipulation, dismissed) it should be resolved independent of any plan. Moreover, if a confirmed plan is reversed or modified *for any reason*, the Debtors will be obligated to return the $950,000 to Plaintiffs' Counsel *with interest*. Clearly, this provision is an attempt to dissuade parties in interest from possibly appealing any plan which may be confirmed. Furthermore, it leads to great uncertainty with respect to the status of the Appeal. A settlement with such terms falls below the lowest range of reasonable, especially where it has never been shown that Plaintiffs' Counsel should have been awarded any fees.

WHEREFORE, Mr. Grimes requests that the Court deny the Settlement Motion.


Dated: June 26, 2006                    SMITH, KATZENSTEIN & FURLOW LLP


                                        /s/ Kathleen M. Miller
                                        David A. Jenkins (I.D. #932)
                                        Michele C. Gott (I.D. # 2671)
                                        Kathleen M. Miller (I.D. #2898)
                                        800 Delaware Avenue, 7th Floor
                                        P.O. Box 410
                                        Wilmington, DE 19899
                                        (Courier 19801)
                                        Telephone:  302-652-8400
                                        Telecopy: 302-652-8405

                                        *Attorneys for Charles L. Grimes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **26th** day of **June, 2006**, a copy of the foregoing **CHARLES L. GRIMES' OBJECTION TO MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO RULE 9019 APPROVING THE AMENDMENT TO THE STIPULATION AND AGREEMENT OF SETTLEMENT DATED AS OF NOVEMBER 12, 2004** was served on the following attorneys for Debtors and Debtors-in-Possession in the manner indicated:

Michael R. Nestor, Esq.
Kenneth J. Enos, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
*Hand Delivery*

Rebecca L. Booth, Esq.
1701 Market Street
Philadelphia, PA 19103
*By Facsimile*

Neil E. Herman, Esq
Morgan, Lewis & Bockius LLP
101 Park Avenue - 43rd Fl.
New York, NY 10178
*By Facsimile*

Kathleen M. Miller (ID No. 2898)

10015354.WPD

# Exhibit - A

1   MELVIN R. GOLDMAN (BAR NO. 34097)
    PAUL T. FRIEDMAN (BAR NO. 98381)
2   CRAIG D. MARTIN (BAR NO. 168195)
    ROBERT L. McKAGUE (BAR NO. 187461)
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California  94105-2482
    Telephone: (415) 268-7000
5   Facsimile: (415) 268-7522

6   Attorneys for Defendants
    Riverstone Networks, Inc., Romulus Pereira, Piyush Patel,
7   Christopher Paisley, Jorge A. del Calvo, Robert Stanton, and
    Suresh Gopalakrishnan

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13   GREGORY WATTERSON, Derivatively, on        Case No.  CV 03-0637 PJH
     Behalf of RIVERSTONE NETWORKS, INC.,
14                                              **DEFENDANTS' NOTICE OF**
                    Plaintiff,                  **MOTION, MOTION, AND**
15                                              **MEMORANDUM OF POINTS AND**
          v.                                    **AUTHORITIES IN SUPPORT OF**
16                                              **MOTION TO DISMISS FIRST**
     ROMULUS PEREIRA, PIYUSH PATEL,             **AMENDED COMPLAINT**
17   CHRISTOPHER PAISLEY, ERIC JAEGER,
     JORGE A. DEL CALVO, ROBERT STANTON,
18   SURESH GOPALAKRISHNAN and JOHN             Date:     May 12, 2004
     KERN,                                      Time:     9:00 a.m.
19                                              Courtroom:  3
                    Defendants,                 Judge:     Phyllis J. Hamilton
20
          and
21
     RIVERSTONE NETWORKS, INC., a Delaware
22   corporation.

23

24

25

26

27

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. CV 03-0637 PJH
pa-872592

1

<div align="center">**TABLE OF CONTENTS**</div>

2

<div align="right">**Page**</div>

3     NOTICE OF MOTION AND MOTION TO DISMISS ..................................................... 1

4     ISSUES TO BE DECIDED .............................................................................................. 1

5     MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 2

      INTRODUCTION ............................................................................................................ 2

6     FACTUAL BACKGROUND ........................................................................................... 3

7     PROCEDURAL BACKGROUND ................................................................................... 4

      ARGUMENT ................................................................................................................... 8

8
      I.     PLAINTIFF HAS NOT MET HIS BURDEN BY PLEADING
9            PARTICULARIZED FACTS SHOWING THAT A DEMAND ON
             RIVERSTONE'S BOARD WOULD HAVE BEEN FUTILE. ............................... 8

10           A.     Plaintiff Fails to Allege Facts Demonstrating That a Majority of the
                    Board Faced a Substantial Likelihood of Personal Liability...................... 9
11
                    1.     The Director Defendants Did Not Face a Substantial
12                          Likelihood of Liability for Breach of Their Duty of Care............. 10

13                          a.     Plaintiff Fails to Plead Particularized Facts
                                   Demonstrating That Riverstone's Directors
                                   Abdicated Their Oversight Role...................................... 10
14
                                   (1)     Outside Directors..................................................... 11
15                                 (2)     Pereira..................................................................... 12

16                          b.     The Amended Complaint Does Not Set Forth
                                   Particularized Facts to Show That Riverstone Made
17                                 Material Misrepresentations with Scienter...................... 13

18                                 (1)     Asset Values ............................................................ 14
                                   (2)     Cash Holdings .......................................................... 14
19                                 (3)     Projected Size of the HGC Network ...................... 15
                                   (4)     Revenue Recognition .............................................. 15
20
                            c.     Riverstone's Certificate of Incorporation Eliminates
21                                 Director Liability for Breach of the Duty of Care............. 16

22                  2.     Riverstone's Director Defendants Did Not Face a
                          Substantial Likelihood of Liability for Contribution and
23                        Indemnification. ............................................................................. 17

24                  3.     A Majority of Riverstone's Board Faced No Possibility of
                          Personal Liability for Breach of Their Duty of Loyalty................. 17

25                          a.     Insider Trading ............................................................... 17
                            b.     Incentive-Based Compensation ...................................... 19
26
                    4.     A Majority of Riverstone's Board Faced No Possibility of
27                        Personal Liability Under Sarbanes-Oxley. ................................... 19

28

1

**TABLE OF CONTENTS**
(continued)

2
                                                                              **Page**

3        B.    Plaintiff Has Not Pled Particularized Facts Showing That
              Riverstone's Directors Were Incapable of Exercising Independent
4             Judgment. ................................................................................. 20

5             1.    Weyand, Summers, and Lowenthal Did Not Lack
                    Independence Merely Because They Were Appointed to
6                   Riverstone's Board. ..................................................... 20

7             2.    Pereira's Position as a Riverstone Employee Did Not
                    Undermine His Independence. ...................................... 21

8             3.    A Bare Allegation of Prior Business Relationships Is
                    Insufficient to Undermine Director Independence. ........ 21
9
              4.    The Mere Receipt of Legal Fees Does Not Undermine
                    Director Independence. ................................................ 22
10
        C.    Riverstone's Board Never Conceded That Demand Was Futile. .............. 23

11    II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM. ....................... 23

12    III.   THE AMENDED COMPLAINT SHOULD BE DISMISSED WITHOUT
             LEAVE TO AMEND. ................................................................................. 24

13    CONCLUSION ................................................................................................. 25

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## CASES

Page(s)

1

2

3 *Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................. 20

4

*Andreae v. Andreae*,
5   No. 11, 905, 1992 Del. Ch. LEXIS 44 (Del. Ch. Mar. 3, 1992)............................... 20

6 *Aronson v. Lewis*,
   473 A.2d 805 (1984) ............................................................. 6, 8, 20, 21, 23

7

*Basic Inc. v. Levinson*,
8   485 U.S. 224 (1988) ................................................................... 15

9 *Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000)............................................................... 6, 22

10

*Employers Ins. of Wausau v. Musick, Peeler & Garrett*,
11   871 F. Supp. 381 (S.D. Cal. 1994) ....................................................... 17

12 *Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002)............................................................ 16

13

*Graham v. Allis-Chalmers Mfg. Co.*,
14   188 A.2d 125 (Del. 1963)............................................................. 11, 12

15 *Greenspun v. Del E. Webb Corp.*,
   634 F.2d 1204 (9th Cir. 1980) ........................................................... 9

16

*Guttman v. Huang*,
17   823 A.2d 492 (Del. Ch. 2003) ..................................................... 11, 13, 18, 22

18 *In re BankAmerica Sec. Litig.*,
   636 F. Supp. 419 (C.D. Cal. 1986)........................................................ 9

19

*In re Baxter Int'l, Inc. Shareholders Litig.*,
20   654 A.2d 1268 (Del. Ch. 1995) ......................................................... 17

21 *In re Caremark Int'l, Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)........................................................ 10, 11, 13

22

*In re Fuqua Indus., Inc. Shareholder Litig.*,
23   No. 11974, 1997 Del. Ch. LEXIS 72 (May 13, 1997) ........................................ 6

24 *In re Glenfed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994)........................................................... 14

25

*In re Mortgage & Realty Trust Sec. Litig.*,
26   787 F. Supp. 84 (E.D. Pa. 1991)......................................................... 23

27 *In re Oak Tech. Sec. Litig.*,
   No. 96-20552 SW, 1997 U.S. Dist. LEXIS 18503 (N.D. Cal. Aug. 1, 1997) ................... 15

28

1

# TABLE OF AUTHORITIES
(continued)

2

Page(s)

3    *In re Pacific Gateway Exch., Inc. Sec. Litig.,*
        169 F. Supp. 2d 1160 (N.D. Cal. 2001)....................................................16, 25
4
    *In re Riverstone Networks, Inc. Sec. Litig.,*
5        Case No. CV-02-3581 ..............................................................................5

6    *In re Sagent Tech., Inc.,*
        278 F. Supp. 2d 1079 (N.D. Cal. 2003)......................................................passim
7
    *In re Silicon Graphics, Inc. Secs. Litig.,*
8        183 F.3d 970 (9th Cir. 1999)................................................................15, 16

9    *In re Vantive Corp. Sec. Litig.,*
        283 F.3d 1079 (9th Cir. 2002)..............................................................15, 16
10
    *In re VeriFone Sec. Litig.,*
11        11 F.3d 865 (9th Cir. 1993)................................................................15, 25

12    *In re Walt Disney Co. Derivative Litig.,*
        731 A.2d 342 (Del. Ch. 1998)................................................................21
13
    *Kamen v. Kemper Fin. Servs., Inc.,*
14        500 U.S. 90 (1991)................................................................................9

15    *Kamen v. Kemper Fin. Servs., Inc.,*
        939 F.2d 458 (7th Cir. 1991)................................................................23
16
    *Kohls v. Duthie,*
17        765 A.2d 1274 (Del. Ch. 2000)................................................................22

18    *Lewis v. Chiles,*
        719 F.2d 1044 (9th Cir. 1983)..................................................................8
19
    *Maldonado v. Flynn,*
20        597 F.2d 789 (2d Cir. 1979)................................................................23

21    *McCall v. Scott,*
        239 F.3d 808 (6th Cir. 2001)................................................................18
22
    *Musick, Peeler & Garrett v. Employers Ins. of Wausau,*
23        508 U.S. 286 (1993)................................................................................17

24    *Neubauer v. Goldfarb,*
        108 Cal. App. 4th 47 (2003)................................................................18
25
    *Orman v. Cullman,*
26        794 A.2d 5 (Del. Ch. 2002)................................................................19

27    *Rales v. Blasband,*
        634 A.2d 927 (Del. 1993)................................................................9, 20
28

1

## TABLE OF AUTHORITIES
(continued)

2

Page(s)

3    *Rattner v. Bidzos,*
      No. 19700, 2003 Del. Ch. LEXIS 103 (Del. Ch. Sept. 30, 2003) ...................... 12, 13

4

      *Richardson v. Graves,*
5      No. 6617, 1983 Del. Ch. LEXIS 466 (Del. Ch. June 17, 1983) .............................. 23

6    *Seminaris v. Landa,*
      662 A.2d 1350 (Del. Ch. 1995) ................................................................................ 9

7

      *Solomon v. Interior Reg'l Hous. Auth.,*
8      313 F.3d 1194 (9th Cir. 2002) ................................................................................ 19

9    *Spiegel v. Buntrock,*
      571 A.2d 767 (Del. 1990) ........................................................................................ 8

10

      *State of Wis. Inv. Bd. v. Bartlett,*
11     No. 17727, 2000 Del. Ch. LEXIS 42 (Del. Ch. Feb. 24, 2000) .......................... 22

12   *Stein v. Orloff,*
      No. 7276, 1985 Del. Ch. LEXIS 418 (Del. Ch. May 30, 1985) .......................... 22

13

      *Stepak v. Ross,*
14     No. 7047, 1985 Del. Ch. LEXIS 508 (Del. Ch. July 24, 1985) .......................... 18

15   *Tuckman v. Aerosonic Corp.,*
      No. 4094, 1982 Del. Ch. LEXIS 452 (Del. Ch. May 20, 1982) .......................... 18

16

      *White v. Panic,*
17     783 A.2d 543 (Del. 2001) ........................................................................................ 8

18   *White v. Panic,*
      793 A.2d 356 (Del. Ch. 2000) .......................................................................... 20, 22

19

      *Yaw v. Talley,*
20     No. 12882, 1994 Del. Ch. LEXIS 35 (Del. Ch. Mar. 2, 1994) .................. 10, 17, 19

21                                          **STATUTES**

22   15 U.S.C.
           § 7243 ........................................................................................ 1, 19, 20, 24
23         § 7245 ........................................................................................................ 19

24   Fed. R. Civ. P.
           § 8 .............................................................................................................. 1
25         §. 9 ............................................................................................................. 1
           § 9(b) ......................................................................................................... 9
26         § 12(b)(6) .................................................................................................. 1
           § 23.1 .................................................................................................. 1, 8, 9
27
      Cal. Corp. Code §25402 .................................................................................... 1, 18
28

1

<div align="center">

**TABLE OF AUTHORITIES**

(continued)

</div>

2
<div align="right">

**Page(s)**

</div>

3    8 Del. Code. §102(b)(7) ................................................................................................. 17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          **NOTICE OF MOTION AND MOTION TO DISMISS**

2          TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

3          Please take notice that on May 12, 2004 at 9:00 a.m. in the courtroom of the Honorable

4     Phyllis J. Hamilton in United States District Court, Northern District of California, 450 Golden

5     Gate Avenue, San Francisco, California 94102, nominal Defendant Riverstone Networks, Inc.

6     ("Riverstone") and individual Defendants Romulus Pereira, Piyush Patel, Christopher Paisley,

7     Jorge A. del Calvo, Robert Stanton, and Suresh Gopalakrishnan ("the Individual Defendants")

8     will and hereby do move this Court pursuant to Federal Rules of Civil Procedure 8, 9, 12(b)(6),

9     and 23.1 to dismiss with prejudice the Verified First Amended Shareholder Derivative Complaint

10    ("the Amended Complaint") filed by Plaintiff Gregory Watterson.

11          This motion is based on this notice of motion and motion, the following memorandum of

12    points and authorities, the request for judicial notice and declaration of Cynthia L. Lopez filed

13    herewith, the pleadings, records, and papers on file in this action, oral argument of counsel, and

14    such other matters as may come before the Court.

15
16          **ISSUES TO BE DECIDED**
              **(Local Rule 7-4(a)(3))**
17
18          1.      Whether Plaintiff must plead facts establishing that a majority of Riverstone's

19    directors either faced a substantial likelihood of personal liability or were controlled by a director

20    who did.

21          2.      Whether Plaintiff has adequately stated a claim for violation of California

22    Corporations Code section 25402, breach of fiduciary duty, contribution and indemnification, and
      reimbursement under 15 U.S.C. § 7243.
23
24          3.      Whether Plaintiff has complied with the stock ownership requirement of Federal
      Rule of Civil Procedure 23.1.
25
26          4.      Whether Plaintiff should be permitted to file a further amended complaint.

27

28

DEFENDANTS' MOTION TO DISMISS                    1
Case No. CV 03-0637 PJH
pa-872592

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2                        **INTRODUCTION**

3          This derivative action should be dismissed because Plaintiff has neither made a

4    pre-litigation demand on Riverstone's board of directors, nor pled particularized facts showing

5    why demand should be excused.  The demand requirement serves a fundamental principle of

6    corporate law:  directors, <u>not</u> shareholders, manage the affairs of the corporation, including

7    decisions regarding litigation on the company's behalf.  To excuse demand – that is, to divest the

8    board of its authority to act on behalf of the corporation – Plaintiff must meet a heavy burden.

9    Plaintiff must allege <u>particularized facts</u> creating a reasonable doubt that a majority of

10   Riverstone's directors could have fairly evaluated the demand.  More specifically, Plaintiff must

11   plead facts establishing that a majority of the directors either faced a <u>substantial likelihood</u> of

12   personal liability or were controlled by a director who did.  *See In re Sagent Technology, Inc.,*

13   278 F. Supp. 2d 1079, 1086-88 (N.D. Cal. 2003).  Plaintiff has failed to do so.

14          Instead, based on the allegations in Plaintiff's Amended Complaint, it is clear that all of

15   Riverstone's directors were disinterested, independent, and capable of fairly considering a

16   demand.  Plaintiff now admits that seven directors sat on Riverstone's board at the time he filed

17   his original complaint.  Of these seven, three are not even named as Defendants.  The three non-

18   Defendant directors thus faced <u>no possibility of personal liability</u>, much less a substantial

19   likelihood.  In addition, five of Plaintiff's seven claims are asserted against only one or two

20   directors.  With respect to these five claims, then, a majority of the board was <u>*per se*</u> disinterested.

21   Plaintiff's allegations relating to his remaining two claims cannot excuse demand because the

22   Amended Complaint does not set forth particularized facts demonstrating that any of the four

23   director Defendants faced a substantial likelihood of personal liability.

24          Plaintiff's inability to allege demand futility and state a viable claim is rooted in the

25   history of this litigation.  Plaintiff's original complaint recycled flawed theories and allegations

26   copied from a derivative complaint filed in Santa Clara County Superior Court — a complaint

27   that has since been amended three more times.  Plaintiffs in the state court derivative action failed

28   in their <u>fourth</u> attempt to adequately plead why demand should be excused.  Recognizing that

1   plaintiffs have a significant burden "when [they] ask the court to permit a shareholder to take over

2   the business," (RJN[1] Ex. A at 9), Judge Jack Komar dismissed the fourth state derivative

3   complaint on September 17, 2003 for failure to allege demand futility and expressed strong

4   doubts that the derivative action could be salvaged by further amendment.[2]

5         The Amended Complaint has only served to prove Judge Komar right. It conforms even

6   more closely to its dismissed state court counterpart than did the original federal derivative

7   complaint, and should be similarly rejected. The Amended Complaint represents the sixth

8   unsuccessful attempt by would-be derivative plaintiffs, represented by a team of plaintiffs'

9   counsel, to allege demand futility and state a viable claim. Based on this history, Plaintiff cannot

10  plead any facts capable of saving his complaint, and the Amended Complaint should be dismissed

11  without leave to amend.

12                              **FACTUAL BACKGROUND**

13        Riverstone provides networking solutions that enable Internet service providers to supply

14  "profitable services" to their subscribers. (Amended Complaint ¶ 10.) On August 20, 2001,

15  Riverstone announced that one such provider, Hutchison Global Crossing ("HGC"), had agreed to

16  deploy Riverstone's routers in its anticipated metropolitan network. *See id.* ¶ 71. Riverstone

17  predicted that HGC, a Hong Kong telecommunications company, would buy several hundred

18  routers, bringing Internet "connectivity" to nearly one million Hong Kong residents. (*Id.*)

19        On September 20, 2001, Riverstone announced that it had broken even for the first time

20  during its second fiscal quarter 2002. *See id.* ¶ 73. Riverstone subsequently reported higher

21  revenues and earnings for its third fiscal quarter. *See id.* ¶ 77.

22        On February 28, 2002, however, the company warned that it was experiencing

23  "deteriorating market conditions" and that its customers were delaying "infrastructure build outs."

24        [1] "RJN" refers to Defendants' Request for Judicial Notice in Support of Motion to
    Dismiss First Amended Complaint filed herewith.
25

26        [2] Judge Komar is the complex civil litigation judge for Santa Clara County. As such, he
    has presided over virtually all of the numerous derivative actions filed in Santa Clara County in
    recent years. Judge Komar also granted defendants' motion to stay the state derivative action,
27  concluding that any derivative action should proceed, if at all, in federal court.

28

1    (*Id.* ¶ 81.) As a result, Riverstone stated that its earnings would not meet earlier projections, and

2    the company would take charges totaling $26 million to $30 million to account for "asset

3    impairments, write downs in equity investments, charges related to discontinued products and

4    costs associated with workforce reductions." (*Id.*)

5              Riverstone issued a press release on March 26, 2002 announcing a loss for the quarter

6    and the fiscal year. *See id.* ¶ 83. The release included a balance sheet disclosing, among

7    other things, the company's "Cash and cash equivalents," which totaled $123.1 million.

8    (RJN Ex. B.) The next day, March 27, a "published report" paraphrased Riverstone's Chief

9    Executive Officer ("CEO"), Romulus Pereira, as saying that the company had approximately

10    $450 million in cash. (Amended Complaint ¶¶ 11, 84.)

11              On June 5, 2002, Riverstone announced an anticipated net loss for the first fiscal quarter

12    2003. *See id.* ¶ 88. In its press release, the company stated that capital spending by

13    telecommunications companies "remain[ed] conservative." (*Id.*) Two weeks later, on

14    June 19, 2002, Riverstone reported a net loss for the first fiscal quarter 2003 consistent with its

15    earlier estimate. *See id.* ¶ 89.

16              On August 26, 2003, Riverstone announced that it would restate revenues for fiscal years

17    2002 and 2003. *See id.* ¶ 66. The company determined that it had previously overstated its net

18    revenues for these fiscal years by approximately $98.8 million. *See id.*

19                              **PROCEDURAL BACKGROUND**

20              Riverstone's losses precipitated the filing of twelve federal class action lawsuits ("the

21    Federal Securities Class Actions"), the action in Santa Clara County Superior Court ("the State

22    Derivative Action"), and, finally, this case ("the Federal Derivative Action"). *See* Complaint[3]

23    ¶¶ 25, 28-31, 42-44, 46-50, 53-63; RJN Ex. C ¶¶ 27, 30-33, 44-46, 48-52, 55-65; Lopez Decl.[4]

24    ───────────────────────────

25              [3] "Complaint" refers to Plaintiff's original complaint in this action filed February 14, 2003 and entitled Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control,

26    Gross Management, and Unjust Enrichment.

27              [4] "Lopez Decl." refers to the Declaration of Cynthia L. Lopez in Support of Defendants' Motion to Dismiss First Amended Complaint filed herewith.

28

1    ¶ 2. The first Federal Securities Class Action was filed against Riverstone and other defendants

2    on July 25, 2002.[5] *See* Lopez Decl. ¶ 2.

3        **State Derivative Action**

4        On August 13, 2002, one purported shareholder filed the first complaint in the State

5    Derivative Action ("the First State Derivative Complaint"). *See* RJN Ex. C. The allegations in

6    that complaint were largely a verbatim recitation of allegations in a federal class action complaint

7    filed just five days before. *See* Lopez Decl. Ex. A & ¶ 3. At the time, four directors sat on

8    Riverstone's Board: the company's CEO (Romulus Pereira) and three outside directors (Piyush

9    Patel, Jorge del Calvo, and Christopher Paisley). *See* RJN Ex. D ¶¶ 12-13, 16-17, 88.

10        On December 20, 2002, defendants in the State Derivative Action demurred to the First

11    State Derivative Complaint, arguing, among other things, that plaintiff had failed to make the

12    required pre-litigation demand on Riverstone's board. *See* Lopez Decl. ¶ 4. Rather than oppose

13    the demurrer, plaintiff in the State Derivative Action filed an amended complaint on or about

14    February 24, 2003. *See id.* On or about April 9, 2003, another derivative complaint was filed in

15    Santa Clara County Superior Court, this time by Milberg Weiss Bershad Hynes & Lerach LLP.

16    *See id.* Then, on or about May 28, 2003, plaintiffs in both pending state derivative actions filed a

17    Consolidated Shareholder Derivative Complaint ("the Fourth State Derivative Complaint"). *See*

18    RJN Ex. D. Thus, all told, plaintiffs in the State Derivative Action filed four state derivative

19    complaints. *See* RJN Exs. A (Transcript at 8), C, D; Lopez Decl. ¶ 4.

20        On September 17, 2003, Judge Komar dismissed the Fourth State Derivative Complaint

21    for failure to allege demand futility. *See* RJN Exs. A (Transcript at 8), E (Order ¶ 1). The court

22    explained:

23        I have a lot of legal conclusions that are strung together in this pleading
         that I don't think satisfy the standard to either raise a doubt as to the
24        independence and disinterest of the majority of the members of the board
         of directors, or that this [board] could not exercise its business judgment in
25        deciding whether or not to initiate legal proceedings in this case.

26        ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
            [5] The twelve Federal Securities Class Actions were ultimately consolidated into one
27    action, *In re Riverstone Networks, Inc. Sec. Litig.*, Case No. CV-02-3581 PJH. *See* Lopez Decl. ¶
      2.

28

1    (RJN Ex. A at 8.) Noting that the complaint in the State Derivative Action had already been

2    amended three times, Judge Komar expressed serious doubt that plaintiffs would ever be able to

3    plead demand futility with the requisite particularity. *See id.* Judge Komar also observed that the

4    State Derivative Action was "on a collision course" with the Federal Derivative Action and the

5    Federal Securities Class Actions because they encompassed "all of the very same issues." (*Id.* at

6    10.) To avoid this anticipated "collision," the court stayed the State Derivative Action. (*Id.* at

7    10-11; *accord* RJN Ex. E ¶ 2.)

8        **Federal Derivative Action**

9        Plaintiff in this action filed his original complaint ("the Complaint") on February 14,

10   2003. By that time, the composition of Riverstone's board had changed. Riverstone appointed

11   three new, independent directors – William Weyand, Sylvia Summers, and Richard Lowenthal –

12   between October 2002 and February 2003. *See* Amended Complaint ¶ 97(k)-(m). Thus, when

13   Plaintiff filed the Complaint,[6] Riverstone's board consisted of seven directors – Pereira, Patel, del

14   Calvo, Paisley, Weyand, Summers, and Lowenthal. *See id.* ¶ 97. The Amended Complaint

15   names four of those directors – Pereira, Patel, del Calvo, and Paisley – as Defendants, *See id.*

16   ¶¶ 11-12, 14-15, but Plaintiff has not sued the other three – Weyand, Summers, and Lowenthal.

17       The Complaint was almost an exact replica of the First State Derivative Complaint — a

18   complaint that the state derivative plaintiffs later conceded was insufficient when they withdrew it

19   in favor of filing an amended complaint. *See* Lopez Decl. Ex. B & ¶ 4. On September 26, 2003,

20   Defendants filed a motion to dismiss the Complaint, arguing, among other things, that Plaintiff

21   had failed to make the required pre-litigation demand on Riverstone's board. *See* Defendants'

22   Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Motion to

23

24   _____

25       [6] The demand futility analysis considers "the circumstances existing at the commencement of a derivative suit." *Aronson v. Lewis*, 473 A.2d 805, 810 (1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Upon amendment of a pleading, demand futility is still determined as of the date when the original complaint was filed unless plaintiff brings a new claim "not already validly in litigation." *In re Fuqua Indus., Inc. Shareholder Litig.*, No. 11974, 1997 Del. Ch. LEXIS 72, at *55 (Del. Ch. May 13, 1997).

26

27

28

1    Dismiss, Sept. 26, 2003.  Shortly thereafter, history repeated itself as Plaintiff withdrew the

2    Complaint in favor of filing an amended complaint.  *See* Lopez Decl. ¶ 6.

3            Plaintiff filed the Amended Complaint on November 6, 2003.  At that time, the same

4    seven directors – Pereira, Patel, del Calvo, Paisley, Weyand, Summers, and Lowenthal – still sat

5    on Riverstone's board.  Although the Amended Complaint, is very similar to the Complaint, it

6    borrows most heavily from the Fourth State Derivative Complaint which Judge Komar dismissed

7    for failure to allege demand futility.  *Compare* Complaint *with* Amended Complaint; *See also*

8    Lopez Decl. Ex. C.  Both the Amended Complaint and the Fourth State Derivative Complaint

9    assert that:

10       • Riverstone improperly recognized revenue, *see* RJN Ex. D ¶¶ 65, 72-76, 78-79;
            Amended Complaint ¶¶ 33-36, 50-51, 53-54;
11

12       • Riverstone overstated the carrying value of its investments, *see* RJN Ex. D ¶¶ 65-67,
            70-71; Amended Complaint ¶¶ 33, 55-56, 59-60;

13       • Riverstone's CEO overstated the Company's cash holdings on March 27, 2002, *see*
            RJN Ex. D ¶¶ 55, 56(b); Amended Complaint ¶¶ 84, 85(b); and
14

15       • Riverstone inaccurately projected the reach of HGC's anticipated Internet network, *see*
            RJN Ex. D ¶¶ 42-43, 45(b), 49(b); Amended Complaint ¶¶ 71-72, 74(b), 78(b)).

16
    Moreover, the Amended Complaint and the Fourth State Derivative Complaint both proceed
17
    under the theory that Defendants breached their fiduciary duties of care and loyalty.  *See* RJN
18
    Ex. D ¶¶ 28-29, 92-95, 97-99, 102-104, 108, 113, 118, 122; Amended Complaint ¶¶ 25-26,
19
    101-104, 106-08, 111-13, 122-23, 126.  The Amended Complaint also adds claims for
20
    reimbursement under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") as well as contribution
21
    and indemnification.  *See* Amended Complaint ¶¶ 117-118, 120.
22
            The demand futility allegations in the two complaints are very similar as well.  Both the
23
    Amended Complaint and the Fourth State Derivative Complaint allege that any demand on
24
    Riverstone's board would have been futile because:
25
         • Riverstone's directors caused or allowed the company to misstate its financial
26          condition and prospects, *see* Amended Complaint ¶ 97(b), (c), (h), (i); RJN Ex. D
            ¶ 88(d);
27
         • Defendants Pereira and Patel were liable for alleged insider trading, *see* Amended
28          Complaint ¶ 97(e), (h), (n); RJN Ex. D ¶ 88(a);

1

- Business relationships among directors gave rise to "prejudicial entanglements," *see* Amended Complaint ¶ 97(a), (i)(ii), (n); RJN Ex. D ¶ 88(c), (e); and

2

3

- Riverstone stated its intent to "vigorously defend" the Federal Derivative Action and the State Derivative Action, *see* Amended Complaint ¶¶ 97(j), 98; RJN Ex. D ¶¶ 88(b), 89.

4

5    The Amended Complaint further explains that demand was futile because Weyand, Summers, and

6    Lowenthal were appointed by purportedly interested directors rather than elected. *See* Amended

7    Complaint ¶ 97(k)-(m).

8                                 **ARGUMENT**

9    **I.     PLAINTIFF HAS NOT MET HIS BURDEN BY PLEADING PARTICULARIZED FACTS SHOWING THAT A DEMAND ON RIVERSTONE'S BOARD WOULD HAVE BEEN FUTILE.**

10

11            The law invests a corporation's board of directors — not its shareholders — with the

12    authority to initiate (or to refrain from initiating) litigation asserting the corporation's legal rights.

13    *See White v. Panic*, 783 A.2d 543, 550 & n.18 (Del. 2001). A shareholder may only initiate

14    litigation on behalf of the corporation without the board's approval if (1) a demand for board

15    action is wrongfully refused, or (2) a demand would be futile because a majority of the directors

16    suffer from self-interest or lack independence. *See id.* at 550. The demand requirement reflects

17    the principle that a shareholder may usurp the board's authority only in extraordinary

18    circumstances. *See Aronson*, 473 A.2d at 811-12; *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.

19    1990).

20            Plaintiffs must meet a stringent pleading standard to excuse demand. Federal Rule of

21    Civil Procedure 23.1 requires plaintiffs to plead demand futility with "particularity."[7] Thus, a

22    complaint must:

23                  allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . .

24

25    _____

26        [7] Rule 23.1 also requires a derivative plaintiff to indicate when he bought stock in the corporation. *See Sagent*, 278 F. Supp. 2d at 1096; *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir.

27    1983). Since it does not state when Plaintiff bought stock in Riverstone, the Amended Complaint is defective on its face and should be dismissed.

28

1    and the reasons for the plaintiff's failure to obtain the action or for not
      making the effort. . .

2    Fed. R. Civ. P. 23.1. This heightened pleading standard is akin to the standard set forth in

3    Rule 9(b). *See In re BankAmerica Sec. Litig.*, 636 F. Supp. 419, 421 (C.D. Cal. 1986) (comparing

4    the particularity requirements of Rules 23.1 and 9(b)).

5        While federal law governs how demand must be pled, state law governs what must be

6    pled. It is well-settled that courts "must apply the demand futility exception as it is defined by the

7    law of the State of incorporation." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-109

8    (1991). Since Riverstone is a Delaware corporation, *see* Amended Complaint ¶ 10, Delaware law

9    determines whether demand was excused in this case. *See Sagent*, 278 F. Supp. 2d at 1085-87.

10       Where a plaintiff does not challenge a board's decision or action, demand is deemed futile

11   if "particularized factual allegations" in the complaint create a reasonable doubt that the board

12   could have exercised its independent and disinterested judgment in responding to a demand.

13   *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993). A plaintiff seeking to excuse demand must

14   show, through particularized factual allegations, that a majority of the directors either (1) faced a

15   "substantial likelihood" of personal liability, or (2) were controlled by persons who faced a

16   substantial likelihood of personal liability. *Id.* at 930, 934, 936-37; *Sagent*, 278 F. Supp. 2d at

17   1086-88; *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). Conclusory allegations are

18   insufficient to meet this burden. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1209

19   (9th Cir. 1980).

20

21        A.    **Plaintiff Fails to Allege Facts Demonstrating That a Majority of the Board
                 Faced a Substantial Likelihood of Personal Liability.**

22

23       Although styled as various claims, the Amended Complaint alleges, in essence, that some

24   of Riverstone's directors are liable for: (1) violation of their duties of care and loyalty,

25   (2) reimbursement under Sarbanes-Oxley, and (3) contribution and indemnification. *Three board

26   members faced no possibility of personal liability because they are not named as Defendants.*

27   With respect to the four director Defendants, Plaintiff has not pled particularized facts

28   demonstrating a substantial likelihood of personal liability for (1) breach of the duty of care or

1    (2) contribution and indemnification. Moreover, the board was necessarily disinterested with

2    respect to Plaintiff's remaining five claims, which are only asserted against one or two directors:

3          • Violation of California Corporations Code section 25402 (against Pereira and Patel);

4          • Breach of fiduciary duty based on insider selling (against Pereira and Patel);

5          • Breach of fiduciary duty for trading on confidential information (against Pereira);

6          • Breach of fiduciary duty based on receipt of incentive-based compensation (against

7            Pereira); and

8          • Reimbursement under Sarbanes-Oxley (against Pereira).

9    *See, e.g., Yaw v. Talley,* No. 12882, 1994 Del. Ch. LEXIS 35, at *29-*32 (Del. Ch. Mar. 2, 1994)

10    (dismissing conversion claim asserted against only one of three directors).

11            **I.**    **The Director Defendants Did Not Face a Substantial Likelihood of**

                    **Liability for Breach of Their Duty of Care.**

12            According to the Amended Complaint, the four director Defendants breached their duty of

13    care by "allowing," "causing," "failing to prevent," or "participat[ing] in" the release of false and

14    misleading statements. (Amended Complaint ¶¶ 7, 11-12, 26, 34, 97(h), (i), (i)(iv)-(v).) To

15    establish a breach of the duty of care, Plaintiff must allege with specificity that (1) Riverstone's

16    directors knew or should have known of the company's violations of the law, (2) the directors

17    took no steps to prevent or remedy the violations, and (3) the directors' failure to act proximately

18    harmed the company. *See In re Caremark Int'l, Inc. Derivative Litig.,* 698 A.2d 959, 971 (Del.

19    Ch. 1996). The Amended Complaint does not come close to alleging these elements of a breach.

20

21            **a.**    **Plaintiff Fails to Plead Particularized Facts Demonstrating**

                    **That Riverstone's Directors Abdicated Their Oversight Role.**

22            A failure to monitor exposes directors to liability only where there is "a sustained or

23    systematic failure of the board to exercise oversight. . . ." *Id.* This "is possibly the most difficult

24    theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967. The

25    Amended Complaint does not allege "a sustained or systematic failure" by any Riverstone

26    director to perform his responsibilities. Plaintiff claims that the director Defendants breached

27    their oversight duty by allowing Riverstone to prematurely recognize revenue on "sham" sales

28

1    subject to rights of return. *See infra* Argument Part I.A.1.b.(4).  The Amended Complaint also

2    charges the director Defendants with responsibility for Riverstone's supposed misstatements

3    regarding (1) the value of its investments, (2) its cash holdings, and (3) the reach of HGC's

4    anticipated Internet network. *See infra* Argument Part I.A.1.b.(1)-(3).  However, Plaintiff does

5    not show, through particularized factual allegations, that any director Defendants knew or should

6    have known about the company's purported misrepresentations. *See Caremark*, 698 A.2d at 971.

7                            **(1)    Outside Directors**

8         ·   Plaintiff's allegations regarding the three outside directors on Riverstone's Audit

9    Committee – Patel, del Calvo, and Paisley – are particularly inadequate.  According to the

10   Amended Complaint, the Audit Committee members breached their duty of care because:

11       •   They were present in Riverstone's offices on at least thirteen occasions for board and
12           Audit Committee meetings in 2002.  "Thus, [Patel, del Calvo, and Paisley] each
             observed the office renovations necessary to accommodate the massive product
13           returns and storage of returned product in office cubicles." (Amended Complaint ¶
             97(i)(iii).)
14

15       •   Patel, del Calvo, and Paisley "discussed with management . . . and [Riverstone's]
             internal audit group the Company's quarterly and annual financial statements, and
16           internal and external audit controls." (*Id.*)

17       •   Patel, del Calvo, and Paisley "had knowledge of, through their access to sales, quality
             and RMA reports of [*sic*] the sham end-of-quarter sales and enormous product
18           returns." (*Id.*)

19           These conclusory allegations do not demonstrate an oversight failure.  A director cannot

20   be liable for breaching his duty to monitor unless he ignores "obvious danger signs."  *Graham v.*

21   *Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963); *accord Guttman v. Huang*, 823 A.2d

22   492, 507 (Del. Ch. 2003).  The Amended Complaint does not describe any red flags that should

23   have put Patel, del Calvo, or Paisley on notice of accounting irregularities.  Plaintiff's attempt to

24   equate alleged office renovations with accounting fraud are a stretch.  There are obviously many

25   reasons for rearranging office and storage space that have nothing to do with improper revenue

26   recognition.

27

28

1          The Audit Committee's alleged conversations with management and Riverstone's internal

2    audit group are similarly irrelevant. Plaintiff makes no effort to explain how these conversations

3    put Patel, del Calvo, and Paisley on suspicion that something was wrong. *See Graham*, 188 A.2d

4    at 130; *Rattner v. Bidzos*, No. 19700, 2003 Del. Ch. LEXIS 103, at \*35, \*46-\*48 (Del. Ch.

5    Sept. 30, 2003). What did the Audit Committee members discuss with Riverstone's management

6    and its internal audit group? Did Patel, del Calvo, or Paisley learn anything that should have

7    concerned them? Plaintiff leaves these and other questions unanswered.

8          The Amended Complaint is further deficient because it attempts to charge Patel,

9    del Calvo, and Paisley with knowledge of accounting improprieties solely on the basis of their

10    status as directors. According to Plaintiff, the Audit Committee members must have known about

11    Riverstone's revenue recognition practices because they had "access" to "reports." Such

12    conclusory allegations, however, are insufficient to excuse demand because they "fail to allege

13    with particularity what information the directors knew." *Rattner*, 2003 Del. Ch. LEXIS at \*35

14    n.53, \*46-\*48. In *Rattner*, a derivative plaintiff alleged that defendant directors and officers

15    failed to properly oversee their company's accounting practices. *Id.* at \*1-\*4. The court refused

16    to excuse demand because plaintiff had not provided a precise description of the information that

17    allegedly put defendants on notice of their company's accounting problems. *Id.* at \*34-\*35, \*44-

18    \*48. As was the case in *Rattner*, Plaintiff's generic assertions in the Amended Complaint are

19    insufficient to excuse demand.

20                      **(2)    Pereira**

21          Plaintiff's oversight claim against Pereira is flawed as well. The Amended Complaint

22    does not set forth any specific information that should have put Pereira on notice of accounting

23    improprieties. Although Plaintiff broadly alleges that there were "massive returns," he does not

24    provide any details regarding the returns. Nor does Plaintiff link the returns to Pereira. How

25

26

27

28

1    many products were returned? When? Which returns did Pereira learn about? Should Pereira

2    have been concerned in light of Riverstone's historical return rate and the industry return rate?[8]

3                   With respect to the purported "end-of-the-quarter deals," the Amended Complaint also

4    generates more questions than it answers. How did Pereira "originate" the deals? What

5    percentage of Riverstone's revenues came from "end-of-the-quarter deals?" How many products

6    sold at quarter end were returned? Plaintiff does not provide any of this information. Nor does

7    he identify a single "sham" sale. There is nothing wrong with entering into transactions at the

8    end of a quarter. Indeed, businesses often experience an upsurge in sales as employees work

9    harder to meet their quarter-end deadlines.

10                  "Entirely absent from the complaint are well-pled, particularized allegations of fact

11   detailing the precise roles that [Defendant] played at the company ... the information that would

12   have come to [his] attention in those roles, and any indication as to why [Defendant] would have

13   perceived the accounting irregularities." *Guttman*, 823 A.2d at 503, 506-07; *accord Rattner*,

14   2003 Del. Ch. LEXIS at *34-*35, *46-*48. Without such allegations, Plaintiff cannot

15   demonstrate a substantial likelihood of personal liability for breach of the duty of care.

16                              **b.    The Amended Complaint Does Not Set Forth Particularized**
17                                     **Facts to Show That Riverstone Made Material**
                                       **Misrepresentations with Scienter.**

18                  Plaintiff's claim is flawed on another level as well – he has not come forward with

19   specific facts to show that Riverstone violated the law. *See Caremark*, 698 A.2d at 971.

20   Defendants obviously cannot be charged with failing to prevent or correct legal violations that

21   never occurred. Thus, to survive a motion to dismiss, the Amended Complaint must plead the

22   elements of Riverstone's violation – including falsity, materiality, and scienter – with

23   particularity. As discussed below, Plaintiff's allegations do not come close to meeting this

24   standard.

25

26           [8] Plaintiff asserts that "Riverstone's [returns] were much higher in volume than their
27   competitors [*sic*]," (Amended Complaint ¶ 44), but provides no factual allegations to support this
     conclusion.

28

1                              (1)     **Asset Values**

2           On February 28, 2002, Riverstone announced "deteriorating market conditions" and a

3    charge against earnings to account for, among other things, losses on equity investments.

4    (Amended Complaint ¶ 81.) Plaintiff claims that, prior to this write-down, Riverstone overstated

5    the value of its investments. *See id.* ¶¶ 33, 55-56, 59-60.

6           However, it is well-settled that Generally Accepted Accounting Principles provide no

7    bright-line tests to determine, at any given moment, the "correct" carrying value of assets. *In re*

8    *Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994). A plaintiff may not rely on one

9    accounting judgment to plead that an earlier accounting judgment was fraudulent. Instead, a

10   plaintiff must plead contemporaneous facts showing why the earlier valuation was improper when

11   made. *See id.* Here, Plaintiff does not allege any facts showing why Riverstone was required to

12   reduce the carrying value of its investments earlier than it did. Plaintiff does not, for example,

13   plead which investments were impaired, the cause of the impairment, when he believes the assets

14   became impaired, or by how much. Instead, Plaintiff simply adds up Riverstone's investment

15   write-downs in 2002 and concludes that the write-downs "should have been recorded . . . by at

16   least September 2001." (Amended Complaint ¶ 55.)

17                             (2)     **Cash Holdings**

18          Citing a "published report" which paraphrased Pereira, the Amended Complaint charges

19   Riverstone's CEO with overstating the company's cash holdings. (*Id* ¶ 84.) Plaintiff accuses

20   Pereira of representing on March 27, 2002 that Riverstone had "$450 million in cash on hand"

21   when the company had "only a fraction" of that amount. (*Id* ¶¶ 84, 85(b).) In fact, Riverstone's

22   March 26, 2002 press release issued the day before (and quoted at length in the Amended

23   Complaint) included a balance sheet which showed that the company had "Cash and cash

24   equivalents" totaling $123.1 million. (RJN Ex. B; *see also* Amended Complaint ¶ 83.) Plaintiff

25   does not challenge the accuracy of this disclosure; nor does he challenge the accuracy of the same

26   information regarding cash and cash equivalents disclosed in subsequently filed SEC reports, *see,*

27   *e.g.,* RJN Ex. F at 22, 43. Thus, a contemporaneous document quoted in the Amended Complaint

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT          14
Case No. CV 03-0637 PJH
pa-872592

1  disclosed the very information that Plaintiff claims was withheld. In light of these facts, the

2  Amended Complaint fails to allege that Pereira's purported statement was material or made with

3  scienter. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 240 (1988); *In re Silicon Graphics, Inc.*

4  *Secs. Litig.*, 183 F.3d 970, 974-77, 979 (9th Cir. 1999).

5                          **(3)    Projected Size of the HGC Network**

6          On August 20, 2001, Riverstone announced that HGC would deploy "several hundred"

7  Riverstone routers in its planned Hong Kong metropolitan network, providing "nearly one million

8  Hong Kong residents" with "connectivity." (Amended Complaint ¶ 71.) Plaintiff claims that

9  Riverstone's projection concerning the reach of HGC's network was false because HGC had

10  only 150,000 customers. *See id.* ¶ 74(b). Contrary to Plaintiff's allegations, Riverstone predicted

11  that HGC's network would reach "nearly one million Hong Kong <u>residents</u>," (*id.* ¶ 71 (emphasis

12  added)), not one million <u>HGC customers</u>. Even assuming that HGC had 150,000 customers, each

13  would presumably share access with employees, customers, or (in the case of residential

14  customers) family members, making the projection reasonable. There is no inconsistency

15  between Riverstone's prediction and the "true" fact alleged by Plaintiff. *See In re Vantive Corp.*

16  *Sec. Litig.*, 283 F.3d 1079, 1087 n.7, 1089-90 (9th Cir. 2002).

17          Moreover, Plaintiff alleges no facts to show that Riverstone's forecast lacked a reasonable

18  basis when made. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 870-71 (9th Cir. 1993); *In re Oak*

19  *Tech. Sec. Litig.*, No. 96-20552 SW, 1997 U.S. Dist. LEXIS 18503, at *19 (N.D. Cal. Aug. 1,

20  1997). And Plaintiff fails to allege facts demonstrating that Riverstone's projection was material.

21  *See Basic*, 485 U.S. at 231, 240. Indeed, the Amended Complaint makes no claim that HGC

22  failed to purchase hundreds of routers from Riverstone, or that Riverstone improperly recognized

23  revenue on sales to HGC. *See Vantive*, 283 F.3d at 1089.

24                          **(4)    Revenue Recognition**

25          The Amended Complaint charges Riverstone with misstating its revenues, *see* Amended

26  Complaint ¶¶ 33-36, 43, 50-51, 53-54, 74(c)-(g), 78(c)-(g), 85(d)-(f), but does not allege scienter

27  with the requisite particularity. In other words, Plaintiff does not "plead, in great detail, facts that

28

1   constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."

2   *Silicon Graphics,* 183 F.3d at 974. To establish scienter, the Amended Complaint must set forth

3   particularized facts to show that Riverstone's directors and officers knew or must have been

4   aware of the company's alleged misstatements. *Id.* at 976-77, 985; *In re Pacific Gateway Exch.,*

5   *Inc. Sec. Litig.,* 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001) ("plaintiffs must allege facts that

6   connect specific defendants with specific intentionally reckless acts").

7       Plaintiff falls far short of meeting this burden. The Amended Complaint does not plead

8   specific facts to explain how each Individual Defendant learned about Riverstone's purportedly

9   improper recognition of revenue. Although Plaintiff claims that Riverstone's returns were

10  excessive, he provides no details regarding the returns, nor does he link the returns to any

11  Individual Defendant. *See supra* Argument Part I.A.1.a; *Silicon Graphics,* 183 F.3d at 984-85

12  (no scienter where plaintiff failed to provide detailed description of internal reports); *Vantive,*

13  283 F.3d at 1087-88, 1090-91 (no scienter where (1) plaintiffs failed to provide detailed

14  description of information conveyed at meetings and (2) complaint simply alleged that company

15  recognized "excessive" revenues).

16      The Amended Complaint further alleges that "Stanton's sales figures were always higher

17  than the sales reports the financial department received" and "[n]umbers also tended to disappear

18  or fall-off reports." (Amended Complaint ¶ 49.) But it is unclear how large the purported

19  discrepancies were, how often they occurred, and whether they were attributable to the system

20  integration process. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002) ("the court must

21  consider *all* reasonable inferences to be drawn from the allegations, including inferences

22  unfavorable to the plaintiffs"). Plaintiff, in effect, offers no specifics to support his conclusion

23  that Stanton and other Riverstone directors and officers knew or were reckless in not knowing

24  about improper revenue recognition practices.

25                  **c.   Riverstone's Certificate of Incorporation Eliminates Director**
26                         **Liability for Breach of the Duty of Care.**

27      A Delaware corporation may include a provision in its charter which eliminates directors'

28  personal liability for breaches of fiduciary duty (other than breaches of the duty of loyalty,

1   intentional or bad faith acts, or the receipt of improper personal benefits). *See* 8 Del. Code

2   § 102(b)(7). Based on such exculpatory provisions, Delaware courts dismiss actions against

3   directors unless plaintiffs can plead a violation falling within one of the exceptions to section

4   102(b)(7). *See In re Baxter Int'l, Inc. Shareholders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995);

5   *Sagent*, 278 F. Supp. 2d at 1095 n.9. Riverstone's certificate of incorporation includes an

6   exculpatory clause. *See* RJN Ex. G at 3. In addition, as set forth above, the Amended Complaint

7   falls far short of pleading a non-exculpated claim based on intentional or bad faith conduct. *See*

8   *supra* Argument Parts I.A.1.a-b. Thus, Riverstone's charter would have absolved the director

9   Defendants of any liability for breach of their duty of care.

10           **2.**      **Riverstone's Director Defendants Did Not Face a Substantial**

11                   **Likelihood of Liability for Contribution and Indemnification.**

12         Plaintiff's claim for contribution is nothing more than his oversight claim cast in the form

13   of a different legal theory.[9] To establish a substantial likelihood of liability for both breach of the

14   duty of care and contribution, Plaintiff must come forward with particularized factual allegations

15   to show that (1) Riverstone violated the law and (2) the four director Defendants knew or should

16   have known of Riverstone's purported violations of the law. *See Musick, Peeler & Garrett v.*

17   *Employers Ins. of Wausau*, 508 U.S. 286, 292, 297 (1993). Plaintiff has fallen far short of

18   meeting this burden. *See supra* Argument Parts I.A.1.a-b. The exculpatory clause in

19   Riverstone's charter further eliminates any possibility of liability as Plaintiff's contribution claim

20   is based on purported breaches of the duty of care. *See supra* Argument Part I.A.1.c.

21           **3.**      **A Majority of Riverstone's Board Faced No Possibility of Personal**

22                   **Liability for Breach of Their Duty of Loyalty.**

23           **a.**      **Insider Trading**

24         Plaintiff's insider trading allegations cannot excuse demand because they are aimed at

25   only two of Riverstone's seven directors. *See Yaw*, 1994 Del. Ch. LEXIS 35 at *29-*32.

---

26       [9] Plaintiff's claim for indemnification should be dismissed because it is well-settled that

27   "indemnification is not available under federal securities laws." *Employers Ins. of Wausau v.*
*Musick, Peeler & Garrett*, 871 F. Supp. 381, 386 (S.D. Cal. 1994).

28

1    Significantly, the Amended Complaint contends that Pereira and Patel violated their duty of

2    loyalty by selling stock during a 27-month period, *see* Amended Complaint ¶¶ 1, 11-12, 75, 80,

3    97(e), 97(h), 100-09, 121-24, but does not accuse any of Riverstone's other five directors of

4    insider trading.

5        Nor has Plaintiff demonstrated a substantial likelihood of liability with respect to Pereira

6    or Patel. Indeed, Judge Komar held that nearly identical insider trading allegations in the Fourth

7    State Derivative Complaint were insufficient to establish a substantial likelihood of personal

8    liability. *See* RJN Exs. A (Transcript at 7-8), D (4th SDC[10] ¶¶ 1, 12-13, 46, 51, 88(a), 91-100).

9    "[B]are allegations of stock sales are insufficient, because the trading of stock is not in itself

10   improper under Delaware law."[11] *Sagent*, 278 F. Supp. 2d at 1089; *accord McCall v. Scott*, 239

11   F.3d 808, 825 (6th Cir. 2001) (applying Delaware law); *Tuckman v. Aerosonic Corp.*, No. 4094,

12   1982 Del. Ch. LEXIS 452, at *29 (Del. Ch. May 20, 1982). The Amended Complaint fails to

13   plead basic elements of an insider trading claim. In particular, Plaintiff does not allege that

14   Pereira and Patel:

15       • Knew about purported misstatements by Riverstone at the time they sold their shares,
16         *see Sagent*, 278 F. Supp. 2d at 1089, 1092;

17       • "[E]ntered into and completed [each sale] on the basis of, and because of, adverse
           material non-public information," *Stepak v. Ross*, No. 7047, 1985 Del. Ch. LEXIS
18         508, at *14 (Del. Ch. July 24, 1985);

19       • Disposed of a suspiciously high percentage of their holdings, *see Guttman*, 823 A.2d
20         at 504;

21       • Made sales that were inconsistent with their prior trading history, *See id.*; or

22       • Timed their sales to maximize the personal benefit from undisclosed inside
           information, *See id.* at 503-04.
23

     ---
     [10] "4th SDC" refers to the Fourth State Derivative Complaint.
24

     [11] Delaware substantive law governs Plaintiff's claims for breach of fiduciary duty
25   because (1) Riverstone is a Delaware corporation, and (2) these claims are premised on purported
     violations by Defendants of their official duties. *See Sagent*, 278 F. Supp. 2d at 1086-87,
26   1090-92. Since Delaware law applies to Plaintiff's duty of loyalty claims, his claim under
     California Corporations Code section 25402 should be dismissed. *See id.*; *Neubauer v. Goldfarb*,
27   108 Cal. App. 4th 47, 59 n.30 (2003).

28

1
      **b.**    **Incentive-Based Compensation**

2
     Plaintiff's allegations relating to the receipt of incentive-based compensation likewise fail

3
to excuse demand because they only focus on one of Riverstone's six directors. *See Yaw*, 1994

4
Del. Ch. LEXIS 35 at *29-*32. According to the Amended Complaint, Pereira should not have

5
accepted compensation based on Riverstone's performance when he knew that the company's

6
financial condition appeared artificially rosy as a result of his own bad acts. *See* Amended

7
Complaint ¶ 126. These allegations, however, are only directed at Pereira. Moreover, Pereira did

8
not face a substantial likelihood of liability either because the Amended Complaint fails to

9
sufficiently allege (1) misstatements that falsely enhanced Riverstone's apparent financial health,

10
*see supra* Argument Part I.A.1.b, or (2) Pereira's knowledge of any purported misstatements, *see*

11
*supra* Argument Part I.A.1.a.(2). *See Sagent*, 278 F. Supp. 2d at 1090-92; *Orman v. Cullman*,

12
794 A.2d 5, 22-23 (Del. Ch. 2002).

13
     **4.**    **A Majority of Riverstone's Board Faced No Possibility of Personal**

14
            **Liability Under Sarbanes-Oxley.**

15
     Plaintiff cannot plead demand futility with respect to his Sarbanes-Oxley claim asserted

16
against only one director. According to the Amended Complaint, Pereira must return certain

17
profits and compensation received during the 12-month periods following Riverstone's first

18
public issuance of financial documents that needed to be restated. *See* Amended Complaint

19
¶ 120; 15 U.S.C. § 7243(a)(1)-(2). Plaintiff's allegations are insufficient to excuse demand

20
because they are only directed at Pereira. *See Yaw*, 1994 Del. Ch. LEXIS 35 at *29-*32.

21
     Moreover, the Amended Complaint does not even demonstrate a substantial likelihood of

22
liability with respect to Pereira. First, Plaintiff cannot enforce § 7243 through a derivative action.

23
Unlike section 306 of Sarbanes-Oxley (15 U.S.C. § 7245), which specifically authorizes a

24
stockholder derivative action to recover profits illegally realized by a director or officer, § 7243

25
does not set forth a procedure for private recovery. This deliberate choice by Congress shows

26
that the United States Securities & Exchange Commission is the sole entity that can enforce §

27
7243. *See Solomon v. Interior Reg'l Hous. Auth.*, 313 F.3d 1194, 1199 (9th Cir. 2002) ("When

28
Congress includes a provision in one part of a statute but excludes it in another, we deem the

1    difference intentional and assign meaning to the omission."); *Alexander v. Sandoval*, 532

2    U.S. 275, 288 (2001) (judicial creation of private rights of action strongly discouraged). In

3    addition, § 7243 only provides for reimbursement if a company's noncompliance with financial

4    reporting requirements is the "result of misconduct." As discussed in Parts Argument I.A.1.a-b,

5    *supra*, the Amended Complaint sets forth no specific allegations of misconduct.

6        **B.**    **Plaintiff Has Not Pled Particularized Facts Showing That Riverstone's**
7               **Directors Were Incapable of Exercising Independent Judgment.**

8       Plaintiff challenges the independence of six directors – Pereira, Patel, del Calvo, Weyand,

9    Summers, and Lowenthal. Because Plaintiff has not pled facts demonstrating that <u>any</u> director

10   faced a substantial likelihood of personal liability, the Court need not even reach the issue of

11   director independence. *Cf. Rales*, 634 A.2d at 936. In any case, as shown below, Plaintiff has not

12   pled particularized facts showing that any director was "beholden" to an interested director or "so

13   under [his] influence" that the director's discretion was "sterilized." *Id.*

14        **1.**    **Weyand, Summers, and Lowenthal Did Not Lack Independence**
15              **Merely Because They Were Appointed to Riverstone's Board.**

16       According to Plaintiff, Weyand, Summers, and Lowenthal lacked independence because

17   they were appointed to Riverstone's board by "those clearly not independent or disinterested."

18   (Amended Complaint ¶ 97(k)-(m).) However, it is well-settled that a plaintiff cannot undermine a

19   director's independence simply by alleging that an interested director secured his or her

20   appointment to the board. *See White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000), *aff'd*, 783

21   A.2d 543 (Del. 2001); *Aronson*, 473 A.2d at 816; *Andreae v. Andreae*, No. 11,905, 1992 Del. Ch.

22   LEXIS 44, at *14 (Del. Ch. Mar. 3, 1992). Instead, a plaintiff charging domination and control

23   must allege "<u>particularized facts</u>" manifesting control by one director over the corporate conduct

24   of another. *Aronson*, 473 A.2d at 816 (emphasis added). Plaintiff pleads no such particularized

25   facts. The Amended Complaint does not even identify those who allegedly controlled Weyand,

26   Summers, and Lowenthal, much less explain how the interested persons exercised their purported

27

28

1    control. Plaintiff's allegations are thus insufficient to overcome the presumption of independence

2    with respect to Weyand, Summers, and Lowenthal.[12] *Id.* at 816-17.

3          **2.    Pereira's Position as a Riverstone Employee Did Not Undermine His**

4                 **Independence.**

5        According to the Amended Complaint, Pereira was not independent because, as President

6    and CEO, he was an "insider." (Amended Complaint ¶ 97(a).) A plaintiff, however, cannot rebut

7    the presumption of director independence simply by pointing to an inside director's position with

8    the company. *See Sagent*, 278 F. Supp. 2d at 1089. Indeed, if such allegations were sufficient to

9    show lack of independence, "every inside director would be disabled from considering a pre-suit

10    demand." *Id.*[13]

11          **3.    A Bare Allegation of Prior Business Relationships Is Insufficient to**

12                 **Undermine Director Independence.**

13        Plaintiff alleges that Pereira and Patel suffered from "debilitating conflicts of interest" and

14    "prejudicial entanglements" due to their "long-standing and personally beneficial business and

15    professional relationships" with each other. (Amended Complaint ¶ 97(n), (n)(i)-(ii).) This

16    conclusory allegation does not suffice to excuse demand. Indeed, Judge Komar held that

17    identical allegations in the Fourth State Derivative Complaint were insufficient to undermine

18    Pereira and Patel's independence. *See* RJN Exs. A (Transcript at 7-10), D (4th SDC ¶ 88(c),

19    (c)(i)-(ii)). Plaintiff must plead particularized facts which show that Pereira exerted undue

20    influence on Patel, or Patel on Pereira. *See In re Walt Disney Co. Derivative Litig.*, 731 A.2d

21

          ————————————

22    [12] Plaintiff also claims that Lowenthal was not independent because Riverstone bought his company in January 2003. *See* Amended Complaint ¶ 97(m). This conclusory allegation does

23    not come close to pleading domination and control. The Amended Complaint does not explain who controlled Lowenthal or how they controlled him. Without such basic information, Plaintiff

24    cannot begin to undermine Lowenthal's independence.

25    [13] Plaintiff also claims that "because of Periera's [*sic*] Company stock ownership and executive positions with the Company, Riverstone's Proxy Statement for the 2002 Annual

26    Shareholder Meeting admitted that he was not independent." (Amended Complaint ¶ 97(a).) A review of Riverstone's proxy shows that Plaintiff's allegations are without support. The proxy

27    does not even discuss Pereira's independence, much less make the claimed admission. *See* RJN Ex. H.

28

1  342, 355 (Del. Ch. 1998), *aff'd in relevant part sub nom. Brehm v. Eisner*, 746 A.2d 244

2  (Del. 2000); *Kohls v. Duthie*, 765 A.2d 1274, 1284 (Del. Ch. 2000); *State of Wis. Inv. Bd. v.*

3  *Bartlett*, No. 17727, 2000 Del. Ch. LEXIS 42, at *20 (Del. Ch. Feb. 24, 2000).

4      Plaintiff notes that Pereira and Patel co-founded Yago Systems, Inc. ("Yago") and worked

5  together after Cabletron Systems, Inc. ("Cabletron") acquired Yago. *See* Amended Complaint

6  ¶ 97(n)(ii).[14] These allegations fail to plead with particularity the nature of Patel's control over

7  Pereira or Pereira's control over Patel. Who controlled whom? What benefits could one person

8  withhold from or extend to the other? How did any such benefits undermine Patel or Pereira's

9  independent judgment? On all these points, the Amended Complaint is silent and, therefore,

10  inadequate. *See Stein v. Orloff*, No. 7276, 1985 Del. Ch. LEXIS 418, at *10 (Del. Ch.

11  May 30, 1985).

12      **4.   The Mere Receipt of Legal Fees Does Not Undermine Director**
13           **Independence.**

14      Plaintiff asserts that del Calvo, a partner at Pillsbury Winthrop LLP ("Pillsbury"), was

15  corrupted by legal fees earned by his firm from Riverstone. *See* Amended Complaint ¶ 97(n)(iii).

16  But a director's service as counsel for the company does not, standing alone, demonstrate a lack

17  of independence. *See White*, 793 A.2d at 366. Plaintiff must allege specific facts showing that

18  del Calvo's firm received fees from an interested director "so material as to taint [his] judgment

19  as a director." *Id.; accord Guttman*, 823 A.2d at 502-03. The Amended Complaint must also

20  specifically describe the connection between Pillsbury's fees and del Calvo's personal

21  compensation. *See Guttman*, 823 A.2d at 502-03.

22      Plaintiff's allegations fall far short of this standard. Plaintiff claims that Pillsbury earned

23  fees <u>five years ago</u> representing Yago in its merger with Cabletron, and that del Calvo currently

24

25     [14] The Amended Complaint also alleges that "the Company's Proxy Statement for the
26  2002 Annual Shareholder Meeting admitted that [Patel] was not independent because of his
    service to Cabletron as its Chairman of the Board, President and CEO from October 1998 to June
27  1999." (Amended Complaint ¶ 97(g).) Again, a review of the proxy establishes that Plaintiff's
    allegations are completely unsupported. *See* RJN Ex. H.

28

1    receives "substantial compensation" because Pillsbury represents Riverstone in various matters.

2    These allegations do not show that, at the time Plaintiff brought this case, Pillsbury received fees

3    "so material" to the firm and to del Calvo himself that the latter's ability to exercise judgment was

4    "sterilized." If such vague allegations sufficed, no attorney could serve on the board of a

5    company to which his firm provided legal services.[15] *See Maldonado v. Flynn*, 597 F.2d 789, 794

6    (2d Cir. 1979).

7            **C.    Riverstone's Board Never Conceded That Demand Was Futile.**

8            Plaintiff contends that the board has conceded demand futility because Riverstone's

9    directors still have not initiated any litigation on the company's behalf, and Riverstone stated in

10    its Form 8-K filed on or about August 26, 2003 that "[t]he Company intends to vigorously defend

11    [the Federal Derivative Action]." (Amended Complaint ¶¶ 97(j), 98.) Judge Komar recently held

12    that nearly identical allegations in the Fourth State Derivative Complaint were insufficient to

13    excuse demand. *See* RJN Exs. A (Transcript at 7-10), D (4th SDC ¶¶ 88(b), 89). First of all,

14    statements made <u>after</u> the filing of a derivative suit cannot demonstrate that demand would have

15    been futile <u>before</u> the complaint was filed. *See Aronson*, 473 A.2d at 810. What is more, demand

16    is not excused simply because a board and a shareholder come to different conclusions regarding

17    the merits of litigation. *See Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 462 (7th Cir.

18    1991); *In re Mortgage & Realty Trust Sec. Litig.*, 787 F. Supp. 84, 88 (E.D. Pa. 1991);

19    *Richardson v. Graves*, No. 6617, 1983 Del. Ch. LEXIS 466, at *8-*9 (Del. Ch. June 17, 1983).

20    **II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM.**

21            Even aside from Plaintiff's failure to adequately plead demand futility, the Amended

22    Complaint should be dismissed because Plaintiff does not plead sufficient facts to support his

23    claims. Plaintiff asserts generally that each Defendant breached his duty of care by "allowing,"

24    "causing," "failing to prevent," or "participat[ing] in" the release of false and misleading

25    _____

26    [15] Plaintiff relies on a Pillsbury "Client Alert" discussing the propriety of attorney
       membership on an audit committee in light of Sarbanes-Oxley. *See* Amended Complaint
       97(i)(ii) n.3. Plaintiff misses the point. Delaware law, not Sarbanes-Oxley, governs the propriety
27    of attorney participation on a full board of directors for purposes of considering a demand.

28

1    statements. (Amended Complaint ¶¶ 7, 11-13, 16-18, 26, 34, 97(h), (i), (i)(iv)-(v).)  But Plaintiff

2    does not allege that Riverstone made any false statement with scienter, much less how each

3    Defendant "participated in" the issuance of false statements or how each Defendant permitted a

4    "sustained or systematic" oversight failure.[16]  *See supra* Argument Parts I.A.1.a-b.

5         Plaintiff further alleges that the six selling Defendants breached their duty of loyalty by

6    trading on inside information.  *See* Amended Complaint ¶¶ 11-13, 16-18, 75, 79-80, 97(e), (h),

7    101-03, 106-08, 122-23.  To state an insider trading claim, however, a plaintiff must plead

8    specific facts showing, among other things, that:  (1) the selling defendants held material,

9    proprietary, non-public information,[17] and (2) the selling defendants' sales were causally

10   connected to their alleged misappropriation of such information.  *See supra* Argument

11   Part I.A.3.a.  The Amended Complaint fails to allege these essential elements.  *See id.*

12        Finally, Plaintiff does not state a claim under Sarbanes-Oxley because private litigants do

13   not have standing to enforce § 7243.  *See supra* Argument Part I.A.4.  Even if Plaintiff had

14   standing to sue, his claim would still fail because the Amended Complaint does not adequately

15   allege misconduct under Sarbanes-Oxley.  *See id.*

16   **III.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITHOUT LEAVE**

17   **         TO AMEND.**

18        Plaintiff in this case has always followed one step behind his state court counterparts.

19   Plaintiffs in the State Derivative Action have tried and failed four times.  *See* RJN Ex. A at 3, 8.

20   The Amended Complaint represents the *sixth unsuccessful attempt* by a few Riverstone

21   shareholders and their team of plaintiffs' counsel to allege demand futility and state a viable

22        [16] Plaintiff's claims for (1) breach of the duty of care and (2) contribution and
23   indemnification rest on identical allegations and fail for the same reasons.  *See supra* Argument
     Part I.A.2.  Moreover, both these claims should be dismissed as to the director Defendants
24   because of the exculpatory clause in Riverstone's certificate.  *See supra* Argument Parts I.A.1.c,
     I.A.2.

25        [17] Plaintiff's claim that Pereira and Stanton breached their duty of loyalty by accepting
26   incentive-based compensation, *see* Amended Complaint ¶ 126, fails as well because Plaintiff does
     not sufficiently allege (1) misstatements which falsely enhanced Riverstone's apparent financial
     health or (2) Pereira or Stanton's knowledge of any purported misstatements.  *See supra*
27   Argument Part I.A.3.b.

28

1  claim. *See id.* at 13 (plaintiffs in the Federal and State Derivative Actions have been coordinating

2  their efforts). When Judge Komar recently dismissed the Fourth State Derivative Complaint, he

3  observed:

4          I am going to sustain the demurrer, and this is the 4th go-around. I have a
           doubt that you have any other evidence that you can properly plead in this
5          case to establish that demand futility exists and such a demand should have
           been excused.
6
7  (*Id.* at 8.) Moreover, Plaintiff himself concedes that the Complaint – which forms the basis of the

8  Amended Complaint – was deficient. *See* Procedural Background; *Pacific Gateway*, 169 F. Supp.

9  2d at 1166 (by seeking leave to amend in lieu of opposing defendants' motion to dismiss,

10 plaintiffs acknowledged that their complaint was inadequate).

11         It is well settled that an action should be dismissed without leave to amend where the

12 plaintiff fails to set forth any facts which could save his complaint. *See VeriFone*, 11 F.3d at 872.

13 Plaintiff has offered no indication he will ever be able to allege demand futility or state a claim.

14 Plaintiffs in the Federal and State Derivative Actions should not be able to file twice as many

15 defective complaints simply by virtue of bringing the same case in two different fora. The

16 Amended Complaint should be dismissed without leave to amend.

17                              **CONCLUSION**

18         For the reasons set forth above, the Court should dismiss the Amended Complaint with

19 prejudice.

20 Dated: March 26, 2004                    MORRISON & FOERSTER LLP

21

22                              By:   /s/  Paul T. Friedman
                                      Paul T. Friedman
23
                                      Attorneys for Defendants
24                                    Riverstone Networks, Inc., Romulus
                                      Pereira, Piyush Patel, Christopher Paisley,
25                                    Jorge A. del Calvo, Robert Stanton, and
                                      Suresh Gopalakrishnan
26

27

28

1       I, Cynthia L. Lopez, am the ECF user whose ID and password are being used to file

2  Defendants Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of

3  Motion to Dismiss First Amended Complaint.  In compliance with General Order 45, XB., I

4  hereby attest that Paul T. Friedman, has concurred in this filing.

5

6  Dated:  March 26, 2004

7                               MORRISON & FOERSTER LLP

8

9                         By:  s/  Cynthia L. Lopez
                              Cynthia L. Lopez

10                    Attorneys for Defendants

11                   Riverstone Networks, Inc., Romulus Pereira, Piyush
                     Patel, Christopher Paisley, Jorge A. del Calvo,

12                   Robert Stanton, and Suresh Gopalakrishnan

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. CV 03-0637 PJH
pa-872592

# Exhibit - B

1   MURRAY FRANK & SAILER LLP
    ERIC J. BELFI
2   275 Madison Avenue, Suite 801
    New York, NY 10016
3   Telephone: 212/682-1818
    212/682-1892 (fax)
4
    EMERSON POYNTER LLP
5   JOHN G. EMERSON
    SCOTT E. POYNTER
6   2228 Cottondale Lane, Suite 100
    Little Rock, AR 72202
7   Telephone: 501/907-2555
    501/907-2556 (fax)
8
                                            LERACH COUGHLIN STOIA GELLER
    ROBBINS UMEDA & FINK, LLP                 RUDMAN & ROBBINS LLP
9   BRIAN J. ROBBINS (190264)               KEITH F. PARK (54275)
    MARC M. UMEDA (197847)                  MICHAEL J. DOWD (135628)
10  1010 Second Avenue, Suite 2360          JEFFREY D. LIGHT (159515)
    San Diego, CA 92101                     401 B Street, Suite 1600
11  Telephone: 619/525-3990                 San Diego, CA 92101
    619/525-3991 (fax)                      Telephone: 619/231-1058
12                                          619/231-7423 (fax)

13  Attorneys for Plaintiffs

14  [Additional counsel appear on signature page.]

15
                        UNITED STATES DISTRICT COURT
16
                       NORTHERN DISTRICT OF CALIFORNIA
17

18  GREGORY WATTERSON, Derivatively On  )   No. C-03-0637-PJH
    Behalf of RIVERSTONE NETWORKS, INC., )
19                                       )   NOTICE OF MOTION AND MOTION FOR
                              Plaintiff,  )   APPROVAL OF DERIVATIVE
20                                       )   SETTLEMENT AND MEMORANDUM OF
       vs.                               )   POINTS AND AUTHORITIES IN SUPPORT
21                                       )   THEREOF
    ROMULUS PEREIRA, et al.,             )
22                                       )   DATE:      December 15, 2004
                              Defendants, )   TIME:      9:00 a.m.
23                                       )   COURTROOM: The Honorable
       – and –                           )              Phyllis J. Hamilton
24                                       )
    RIVERSTONE NETWORKS, INC., a         )
25  Delaware corporation,                )
                                         )
26             Nominal Defendant.        )
                                         )
27  ─────────────────────────────────── )

28

# TABLE OF CONTENTS

                                                                             Page

I.    PRELIMINARY STATEMENT ...............................................................................1

II.   BACKGROUND OF THE DERIVATIVE LITIGATION ...........................................2

      A.    Summary of Allegations .........................................................................2

      B.    State Court Derivative Actions ...............................................................3

      C.    The Federal Court Derivative Action ......................................................4

      D.    The Settlement Negotiations ...................................................................5

III.  THE SETTLEMENT TERMS....................................................................................5

IV.   THE PROCEDURE FOR PRELIMINARY APPROVAL OF A DERIVATIVE
      ACTION IN FEDERAL COURT IS WELL ESTABLISHED ...................................12

V.    THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE
      SETTLEMENTS.......................................................................................................12

      A.    The Law Favors Settlement ..................................................................12

      B.    The Role of the Court in Approval of a Derivative Settlement .............13

VI.   THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND
      FINALLY APPROVED AFTER NOTICE TO RIVERSTONE
      SHAREHOLDERS ..................................................................................................14

      A.    The Risks of Establishing Liability.......................................................15

      B.    The Settlement Was Negotiated By the Parties With a Thorough
            Understanding of the Strengths and Weaknesses of the Case ...............16

      C.    The Settlement Is Wholly Reasonable in View of the Serious Risks Posed
            by Continued Litigation ........................................................................17

      D.    The Complexity, Expense and Likely Duration of the Litigation Would Be
            Considerable Were the Action to Proceed..............................................18

VII.  THE AGREEMENT FOR THE PAYMENT OF FEES AND EXPENSES IS
      APPROPRIATE.......................................................................................................19

VIII. PROPOSED SCHEDULE OF EVENTS...................................................................20

IX.   CONCLUSION........................................................................................................21

1
2

# TABLE OF AUTHORITIES

Page

3    *Berkey Photo, Inc. v. Eastman Kodak Co.,*
4        603 F.2d 263 (2d Cir. 1979).............................................................18

5    *Boyd v. Bechtel Corp.,*
         485 F. Supp. 610 (N.D. Cal. 1979) .........................................16, 19

6    *Ellis v. Naval Air Rework Facility,*
7        87 F.R.D. 15 (N.D. Cal. 1980),
         *aff'd,* 661 F.2d 939 (9th Cir. 1981) ....................................13, 14, 19

8    *Fisher Bros. v. Cambridge-Lee Industries, Inc.,*
9        630 F. Supp. 482 (E.D. Pa. 1985) ..................................................19

10   *Girsh v. Jepson,*
         521 F.2d 153 (3rd Cir. 1975) .......................................15, 16, 18

11   *Hensley v. Eckerhart,*
12       461 U.S. 424, 103 S. Ct. 1933,
         76 L. Ed. 2d 40 (1983) ....................................................................19

13   *In re Apple Computer Sec. Litig.,*
14       No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
         (N.D. Cal. Sept. 6, 1991) ..................................................................18

15   *In re Continental Illinois Sec. Litig.,*
16       962 F.2d 566 (7th Cir. 1992) ...........................................................20

17   *In re M.D.C. Holdings Sec. Litig.,*
         Master File No. CV 89-0090 E (M),
18       1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) ..............20

19   *In re Mego Financial Corp. Sec. Litig.,*
         213 F.3d 454 (9th Cir. 2000) ...........................................................17

20   *In re Pacific Enterprises Sec. Litig.,*
21       47 F.3d, 373 (9th Cir. 1995) ............................................................16

22   *In re Warner Communications Sec. Litig.,*
         618 F. Supp. 735 (S.D.N.Y. 1985),
23       *aff'd,* 798 F.2d 35 (2d Cir. 1986) ....................................................16

24   *In re Warner Communications Sec. Litig.,*
         798 F.2d 35 (2d Cir. 1986)...............................................................13

25   *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
26       671 F. Supp. 819 (D. Mass 1987) ...................................................13

27   *MWS Wire Industries, Inc. v. California Fine Wire Co.,*
         797 F.2d 799 (9th Cir. 1986) ...........................................................12

28

1

2

                                                                                    **Page**

3  *Maher v. Zapata,*
4        714 F.2d 436 (5th Cir. 1983) ..................................................................12, 13

   *Marshall v. Holiday Magic, Inc.,*
5        550 F.2d 1173 (9th Cir. 1977) .....................................................................13

6  *Newman v. Stein,*
7        464 F.2d 689 (2d Cir. 1972)........................................................................18

   *Officers for Justice v. Civil Service Comm'n,*
8        688 F.2d 615 (9th Cir. 1982) ................................................................ *passim*

9  *Torrisi v. Tucson Electric Power Co.,*
10       8 F.3d 1370 (9th Cir. 1993) ...................................................................13, 14

11 *Williams v. First Nat'l Bank,*
         216 U.S. 582, 30 S. Ct. 441, 54 L. Ed. 625 (1910) ..............................12

12 *Zimmerman v. Bell,*
13       800 F.2d 386 (4th Cir. 1986) .....................................................................12

14 **STATUTES, RULES AND REGULATIONS**

15 15 U.S.C.
16       §78j-1(g) ...................................................................................................9
         §78m(k).....................................................................................................7

17 California Corporations Code
18       §25402........................................................................................................4

   Federal Rule of Civil Procedure
19       Rule 23(e).................................................................................................12
20       Rule 23.1 ..................................................................................................13

21 **SECONDARY AUTHORITIES**

22 *Manual for Complex Litigation* (3d ed. 1995)
23       §23.14......................................................................................................12

24

25

26

27

28

[TITLE] – C-03-0637-PJH

1    TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2            PLEASE TAKE NOTICE that on December 15, 2004, at 9:00 a.m., or as soon thereafter as

3    counsel may be heard, plaintiffs will move before the Honorable Phyllis J. Hamilton, United States

4    District Judge, to grant preliminary approval of the settlement set forth in the Stipulation of

5    Settlement dated as of November 12, 2004, and filed contemporaneously herewith.  Plaintiff's

6    motion is based on the attached Memorandum in Support of Motion for Approval of Derivative

7    Settlement, the Stipulation of Settlement dated as of November 12, 2004 (the "Stipulation"), the

8    declaration of Marc M. Umeda and such additional evidence or argument as may be required by the

9    Court.

10                    **MEMORANDUM OF POINTS AND AUTHORITIES**

11   I.    **PRELIMINARY STATEMENT**

12            This memorandum is submitted by plaintiffs in support of approval of the proposed

13   settlement (the "Settlement") of the derivative claims brought on behalf of Riverstone Networks, Inc.

14   ("Riverstone" or the "Company") against certain of its officers and directors.  The terms of the

15   settlement are set forth in the Stipulation and Agreement of Settlement dated as of November 12,

16   2004 ("Stipulation"), submitted herewith.  The Settlement resolves the derivative claims pending in

17   this Court as well as a consolidated derivative action pending in the Superior Court of the State of

18   California, County of Santa Clara ("State Court" or "Santa Clara Superior Court").  The Settlement

19   is the result of arm's-length negotiations between the parties with the substantial assistance of the

20   Honorable Charles A. Legge (Ret.)  As a result of the pendency and settlement of the litigation,

21   defendants have adopted significant corporate governance measures that directly address plaintiffs'

22   allegations and are designed to preclude the recurrence of the wrongdoing alleged in this litigation.

23   Derivative Plaintiffs were also an instrumental factor in obtaining from defendants' liability

24   insurance carriers approximately $11 million for the benefit of Riverstone in connection with the

25   defense and settlement of the Class Action.  The Settlement constitutes an appropriate resolution of a

26   case of substantial complexity.

27            Plaintiffs currently ask the Court to enter the [Proposed] Order Preliminarily Approving

28   Settlement and Providing for Notice ("Notice Order"), (a) granting preliminary approval of the

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                            - 1 -

1  Settlement, (b) directing that notice be given to Riverstone shareholders, and (c) scheduling a

2  hearing at which the Court will consider final approval of the Settlement.  In determining whether

3  preliminary approval is warranted, the issue before the Court is whether the proposed settlement is

4  within a range of what might be found to be fair, reasonable, and adequate, such that notice of the

5  proposed settlement should be provided to Riverstone shareholders and that a hearing be scheduled

6  for final settlement approval.  In accordance with the Court's past procedures employed in the

7  settlement approval process of representative actions, this Memorandum is intended to be the

8  primary brief in support of both preliminary and final approval.

9  II.   BACKGROUND OF THE DERIVATIVE LITIGATION

10      For the sake of brevity in this Memorandum, a more detailed factual background of this

11  litigation, its procedural history, the claims asserted and the efforts of counsel to obtain the

12  Settlement are set forth in greater detail in the Declaration of Marc M. Umeda in Support of

13  Approval of Settlement ("Umeda Decl."), submitted herewith.

14      A.   Summary of Allegations

15      The shareholder derivative actions filed on behalf of Riverstone against certain directors and

16  officers for insider trading, breaches of fiduciary duty, abuse of control, gross management,

17  corporate waste and unjust enrichment that occurred between August 2001 and December 2002 (the

18  "Relevant Period") alleged that defendants, realizing that Riverstone could not achieve its revenue

19  and earnings per share projections, conspired to create the "appearance" of growth during the

20  Relevant Period.   Plaintiffs alleged that throughout the Relevant Period, defendants caused

21  Riverstone to issue materially false and/or misleading public statements regarding the Company's

22  business, financial condition and prospects.   For instance, in August and September, 2001,

23  defendants caused Riverstone to announce a purportedly lucrative deal with Hutchison Global

24  Crossing ("Hutchison") that promised to provide nearly one million Hong Kong residents with last-

25  mile Ethernet connectivity even though Hutchison had less than 150,000 customers and growth rate

26  of less than 7% per month.

27      Similarly, defendants allegedly regularly caused Riverstone to improperly and prematurely

28  record revenue in violation of Generally Accepted Accounting Principles ("GAAP").  A substantial

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                    - 2 -

1   percentage of Riverstone's quarterly revenue was based on highly suspicious purchase orders that
2   were received and recorded on the last day of the fiscal quarter, allowing Riverstone to falsely claim
3   that it had "made its numbers." Customers would later return massive quantities of the products sold
4   as part of these "end-of-the-quarter" deals claiming them to be defective. But defendants later
5   placed these products back into inventory and re-sold them.

6       In addition to the improper recognition of revenue, several of Riverstone's investments in
7   telecommunications related companies had deteriorated dramatically in value by September 2001.
8   As the deterioration continued, defendants were increasingly aware that the impairment in value was
9   not temporary. Pursuant to GAAP, the Company should have recorded an impairment write-down
10  of millions of dollars. However, as part of their alleged accounting shenanigans, defendants caused
11  Riverstone to delay reflecting such losses, only gradually revealing them and finally fully disclosing
12  the loss on December 18, 2002.

13      By their alleged misconduct, defendants were able to inflate Riverstone's share price so that
14  they could sell their shares, protect and enhance their lucrative and prestigious positions and raise
15  money via a $150 million debt offering. Defendants' alleged misconduct resulted in Riverstone
16  losing over $2.6 billion in market capitalization and suffering damage to its reputation and goodwill.
17  In addition, on April 25, 2003, Riverstone was forced to announce that the SEC requested
18  information on Riverstone's accounting practices related to "certain financial transactions."

19  **B.    State Court Derivative Actions**

20      On August 13, 2002, the first derivative action filed on behalf of Riverstone and entitled
21  *Bruhn v. Pereira, et al.*, Case No. CV 810290 (the "*Bruhn*" action) was filed in Santa Clara Superior
22  Court. The *Bruhn* action alleges breach of fiduciary duty, abuse of control, gross mismanagement,
23  waste of corporate assets, unjust enrichment and violations of California Corporation Code against
24  certain officers and directors of Riverstone. Shortly after the filing of the *Bruhn* action, defendants
25  filed a motion to stay asserting that the *Bruhn* action should be stayed until a resolution was reached
26  in the consolidated federal securities class action, pending in this Court entitled *In re Riverstone*
27  *Networks, Inc. Securities Litigation*, Case No. CV-02-3581 (PJH) ("Class Action"). After briefing
28  and oral argument was complete, the State Court denied the stay.

1    On December 20, 2002, defendants filed a demurrer to the complaint filed in the *Bruhn*

2   action.  Thereafter, on February 25, 2003, plaintiff in the *Bruhn* action filed an Amended

3   Shareholder Derivative Complaint.  On April 9, 2003, *Carrico v. Pereira, et al.*, Case No. CV

4   816188 (the "*Carrico*" action), a shareholder derivative action brought on behalf of Riverstone, was

5   filed in Santa Clara Superior Court.  The allegations in the *Carrico* action were similar to the

6   allegations in the *Bruhn* action. Shortly after the filing of the *Carrico* action, the State Court entered

7   an order consolidating the *Bruhn* and *Carrico* actions ("State Action") and appointed co-lead

8   counsel.

9    On May 28, 2003, plaintiffs Bruhn and Carrico filed the operative complaint in the State

10  Action, the Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint").

11  Thereafter, defendants filed a demurrer to the Consolidated Complaint asserting that plaintiffs had

12  failed to plead sufficient facts to show that a pre-lawsuit demand on the Riverstone's Board of

13  Directors would have been futile and did not plead sufficient facts to state a cause of action.

14  Defendants also argued that under Delaware law Riverstone's Certificate of Incorporation barred

15  plaintiffs' claims.  Concurrently with the filing of the demurrer, defendants filed another motion to

16  stay.  After full briefing and oral argument, on September 17, 2003, the Honorable Jack Komar, the

17  complex civil litigation judge for Santa Clara Superior Court, sustained defendants' demurrer,

18  dismissed plaintiffs' claims for failure to allege demand futility and granted the motion to stay.

19        **C.    The Federal Court Derivative Action**

20    On August 23, 2002, *Watterson v. Pereira, et al.*, a shareholder derivative action on behalf of

21  Riverstone was filed in this Court, Case No. CV-03-0637 (PJH) (the "Federal Action") (collectively,

22  the Federal Action and the State Action are referred to as the "Derivative Actions" or the "Actions").

23  The complaint filed in the Federal Action makes similar allegations as were made in the State

24  Action. The defendants in the Federal Action moved to dismiss the original complaint for failing to

25  adequately plead demand futility and for failure to state a claim.  Instead of opposing defendants'

26  motion, on November 6, 2003, plaintiff filed a Verified First Amended Shareholder Derivative

27  Complaint ("FAC").  The FAC added additional factual information and claims pursuant to the

28  Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and for violations of California Corporations Code

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                          - 4 -

1  §25402. Subsequently, on March 26, 2004, defendants moved to dismiss the FAC asserting similar

2  arguments made in support of their original motion in this Court and the demurrer filed in State

3  Court. Thereafter, the parties to the Federal Action agreed to extend the briefing schedule to allow

4  the parties to concentrate on settlement negotiations.

5  **D.    The Settlement Negotiations**

6  The Settling Parties, through their respective, highly experienced counsel, have engaged in

7  vigorous, good-faith, arm's-length negotiations to resolve the Derivative Actions. The Settlement

8  was only reached after extensive arm's-length negotiations among the parties with the substantial

9  assistance of the Honorable Charles A. Legge (Ret.). Beginning in the fall of 2003 and continuing

10  through the spring of 2004, the parties participated in several mediation sessions with Judge Legge

11  and conducted many telephonic conferences during which the terms of the Settlement were

12  extensively debated and negotiated. These negotiations culminated in the parties entering into a

13  Memorandum of Understanding on May 6, 2004 ("MOU"). The MOU ultimately gave way to the

14  comprehensive Stipulation that was arrived at after extensive negotiations over its terms.

15  **III.    THE SETTLEMENT TERMS**

16  As a result of negotiations among counsel, and with the substantial assistance of Judge

17  Legge, the parties have agreed to significant corporate governance measures that address the issues

18  raised in this litigation and enhance Riverstone's corporate practices.

19  Riverstone has acknowledged that the Derivative Actions were a substantial and material

20  factor in the decision to implement or formalize the following corporate governance enhancements,

21  including, changes to the composition and practices of the Riverstone Board of Directors and the

22  committees thereof, which have been and are being implemented:

23  (a)    The number of directors on Riverstone's Board will increase to seven.

24  (b)    Two-thirds of the members of the Board will be Independent Directors.

25  (c)    The Chairman or Lead Director of Riverstone's Board will be an Independent

26  Director (for purposes of this agreement, the terms "Chairman" and "Lead Director" are

27  synonymous).

28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH            - 5 -

1        (d)    The Chairman or Lead Director of the Board will be selected annually by the

2    independent members of the Board.

3        (e)    The Chairman or Lead Director will serve in that capacity for a maximum of

4    six consecutive years.

5

6        (f)    "Independent Director" means a person other than an officer or employee of

7    the Company or its subsidiaries or any other individual having a relationship which would interfere

8    with the exercise of independent judgment in carrying out the responsibilities of a director. To be

9    deemed "independent" in any calendar year, a director would have to satisfy the following

10    qualifications:

11        (i)    has not been employed by the Company or its subsidiaries or affiliates

12    in an executive capacity within the last five calendar years;

13

14        (ii)    has no personal service contract(s) with the Company, or any member

15    of the Company's senior management;

16        (iii)    is not an officer, director, trustee or fiduciary with a not-for-profit

17    entity that receives significant contributions from the Company; and

18        (iv)    has not accepted (and has no Family Member who has accepted) any

19    payments from the Company or any parent or subsidiary of the Company in excess of $60,000

20    during the current or any of the past three fiscal years, other than the following:

21

22        1)    compensation for Board or Board committee service;

23        2)    payments arising solely from investments in the Company's

24    securities;

25        3)    compensation paid to the director's spouse, parents, children,

26    siblings, mother-in-law, father-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, and

27

28

1    anyone who resides in such person's home ("Family Member") who is a non-executive employee of

2    the Company or a parent or subsidiary of the Company;

3                                    4)    benefits under a tax-qualified retirement plan, or non-

4    discretionary compensation; or

5

6                                    5)    loans permitted under Section 13(k) of the Securities Exchange

7    Act of 1934; or

8                    (g)    Provided, however, that Audit Committee members are subject to the

9    following additional, more stringent requirements. To qualify as an Audit Committee member, he or

10    she:

11                            (i)    is not a Family Member of an individual who is, or at any time during

12    the current or any of the past three years was, employed by the Company or by any parent or

13    subsidiary of the Company as an executive officer;

14                            (ii)    is not, and has no Family Member who is, a partner in, or a controlling

15    shareholder or an executive officer of, any organization to which the Company made, or from which

16    the Company received, payments for property or services in the current or any of the past three fiscal

17

18    years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000,

19    whichever is more, other than the following

20                                    1)    payments arising solely from investments in the Company's

21    securities; or

22

23                                    2)    payments under non-discretionary charitable contribution

24    matching programs.

25                            (iii)    is neither employed nor has a Family Member who is employed as an

26    executive officer of another entity where, at any time during the past three years, any of the

27    executive officers of the Company served on the compensation committee of such other entity;

28

1            (iv)    is not, and has no Family Member who is, a current partner of the

2   Company's outside auditor, or was a partner or employee of the Company's outside auditor who

3   worked on the Company's audit at any time during any of the past three years; or

4            (v)    has not had any of the relationships described in subsections (f)(i)-(iv),

5

6   (g)(i)-(iv) above, with any affiliate of the Company.

7        (h)    Independent Directors will conduct separate meetings in conjunction with

8   regularly scheduled Board meetings, at which only Independent Directors will be present. These

9   meetings will occur at least twice per year.

10       (i)    Riverstone has an Audit Committee, a Compensation Committee, and a

11  Nominating/Corporate Governance Committee. All of these committees have three members, and

12  are comprised entirely of Independent Directors.

13

14       (j)    The Audit Committee will have at least one member who has significant

15  accounting or finance experience, and the remaining members will be generally knowledgeable

16  regarding accounting matters.

17       (k)    The Nominating/Corporate Governance Committee shall be comprised of

18  members who have demonstrated leadership skills or are generally knowledgeable regarding

19

20  corporate governance matters.

21       (l)    The Audit, Compensation, and Nominating/Corporate Governance

22  Committees shall have the authority to retain legal counsel or other advisors, if necessary in the

23  exercise of their business judgment.

24       (m)    Audit partners will be rotated every five years.

25       (n)    Riverstone will not use an auditing firm at which the Company's CFO was an

26  employee during the three years preceding the audit.

27

28

1          (o)     The outside auditor is precluded from providing certain non-audit services to

2   Riverstone, in accordance with 15 U.S.C. §78j-1(g), except for tax services.

3          (p)     Riverstone will have procedures for the confidential, anonymous submission

4   by employees of concerns regarding questionable accounting or auditing matters.

5

6          (q)     The Audit Committee regularly reports all "significant" audit findings to the

7   Board and relays information concerning all "material" aspects of litigation.

8          (r)     The Audit Committee will be responsible for overseeing a procedure

9   implemented and maintained by the Finance Department designed to track revenues for each

10   customer. The revenue tracking system shall be designed to provide the CEO and CFO with the

11   total amount of revenue recognized from sales to each customer on a quarterly basis.

12

13         (s)     The Compensation Committee determines or recommends compensation for

14   the CEO and all other executive officers. The CEO is not present during deliberations on his/her

15   compensation.

16         (t)     Director nominees are selected, or recommended for selection, by the

17   Nominating/Corporate Governance Committee. In assessing nominees, the Committee considers

18   whether the nominees are "independent."

19

20         (u)     The Nominating/Corporate Governance Committee meets at least quarterly.

21         (v)     The Nominating/Corporate Governance Committee recommends

22   compensation levels for the Board, including the Chairman.

23         (w)    The Nominating/Corporate Governance Committee oversees all proposed

24   amendments to the Articles, By-Laws, governance guidelines or committee charters.

25         (x)     The Nominating/Corporate Governance Committee is responsible for

26   reviewing with management the Company's compliance with the Sarbanes-Oxley Act.

27         (y)     The Audit Committee must approve all related party transactions.

28

1    (z)  The Audit Committee shall implement a Company-wide policy prohibiting

2 excessive fraternization between Company personnel and independent auditor personnel.

3

4    (aa) Riverstone's CFO is responsible for formulating and applying the Company's

 revenue recognition policy.

5

6    (bb) The CFO reports to the Board on a regular basis regarding Riverstone's

7 revenue recognition policy.

8    (cc) The revenue recognition policy is distributed to each Riverstone employee

9 who is responsible for determining whether to record revenue.

10    (dd) Riverstone maintains an insider trading policy, which imposes penalties for

11 violations of the policy.

12

13    (ee) Adoption of a Company-wide Code of Business Conduct, and appropriate

14 training regarding the Code.

15    (ff) Implementation of quarterly sales certification process. Everyone from Vice

16 President of Sales to the entire sales force are required to certify compliance with revenue

17 recognition policy.

18    (gg) Implementation of process to ensure that for each customer transaction the

19 Company requires the sales organization to complete a questionnaire to ensure that the Company has

20 enough information properly to determine whether to recognize revenue. This questionnaire must be

21 completed to the satisfaction of the Vice President of Finance before the transaction can be

22  

23 processed for shipment. The Vice President of Finance and/or the CFO review all transactions in

24 excess of $100,000.

25    (hh) New internal audit function will be implemented. Internal audit will report

26 findings and results to the Audit Committee on a quarterly basis.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(ii)    Company will provide quarterly sales force training for revenue recognition policies and proper documentation of sales transactions, and compliance with applicable laws regarding sales of products and services.

In addition, plaintiffs in the Derivative Actions were instrumental in getting the defendants' insurers to pay the sum of approximately $11 million for the benefit of Riverstone in connection with the defense and settlement of the Class Action.

The significant corporate governance provisions adopted as a result of the prosecution and settlement of this litigation directly address plaintiffs' allegations and seek to prevent any future occurrence of the misconduct alleged. As discussed in greater detail in the Umeda Declaration, these changes provide for greater Board independence, strict internal financial controls and a vigorous insider trading policy. Umeda Decl., ¶¶31-32. For example, by adopting a strict definition of "independence," requiring that two-thirds of the Board be independent, ensuring that all members of significant Board committees are independent, and providing for separate meetings of the independent directors, the Settlement provides a structure for a Board that is free of influence from management and capable of undivided loyalties to Riverstone. With respect to the allegations regarding accounting improprieties at Riverstone, the corporate governance provisions put in place protections provided by a proper audit process and procedure including the rotation of Riverstone's audit partners, prohibiting the Company's external auditor from providing non-audit services to Riverstone, and strengthening and expanding the duties and responsibilities of the Audit Committee. As to the allegations that certain Riverstone employees had knowledge of the alleged improper accounting but failed to come forward for fear of retaliation, the corporate governance provisions provide a procedure for the confidential and anonymous submission by employees of any suspected accounting improprieties thus enabling them to assist the Company in preventing and identifying any future misconduct.

1 **IV.    THE PROCEDURE FOR PRELIMINARY APPROVAL OF A
2    DERIVATIVE ACTION IN FEDERAL COURT IS WELL ESTABLISHED**

3        As stated in the *Manual for Complex Litigation* §23.14, at 171 (3d ed. 1995), "[f]irst, the

4 court reviews the [proposed settlement] preliminarily to determine whether it is sufficient to warrant

5 public notice and a hearing." The preliminary approval criteria are as follows:

6            If the preliminary evaluation of the proposed settlement does not disclose
             grounds to doubt its fairness or other obvious deficiencies, such as unduly
7            preferential treatment of class representatives or segments of the class, or excessive
             compensation for attorneys, and appears to fall within the range of possible approval,
8            the court should direct that notice under Rule 23(e) be given to the class members of
             a formal fairness hearing, at which arguments and evidence may be presented in
9            support of and in opposition to the settlement.

10 *Id.* at §30.41, at 237.

11        The proposed settlement meets the foregoing criteria for notice as it is eminently fair,

12 reasonable and adequate and should be preliminarily approved by the Court.

13 **V.    THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE
         SETTLEMENTS**

14        **A.    The Law Favors Settlement**

15        There is a strong policy favoring compromises which resolve litigation. *Williams v. First*

16 *Nat'l Bank,* 216 U.S. 582, 30 S. Ct. 441, 54 L. Ed. 625 (1910); *MWS Wire Industries, Inc. v.*

17 *California Fine Wire Co.,* 797 F.2d 799, 802 (9th Cir. 1986), including those in shareholder

18 derivative actions. *See, Maher v. Zapata,* 714 F.2d 436 (5th Cir. 1983). Derivative actions readily

19 lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome

20 and the typical length of the litigation. *See Maher,* 714 F.2d at 455 (settlements of derivative actions

21 are particularly favored because such litigation is "'notoriously difficult and unpredictable'")

22 (citation omitted). Settlements of derivative actions are "favored for the reasons that settlements

23 generally are favored: disputes are resolved; the resources of litigants and the courts are saved; and,

24 in the case of a derivative action, management can return its attention and energy from the courtroom

25 to the corporation itself." *Zimmerman v. Bell,* 800 F.2d 386, 392 (4th Cir. 1986).

26

27

28

1      **B.**    **The Role of the Court in Approval of a Derivative Settlement**

2          The settlement of a corporate derivative action requires court approval. Federal Rule of Civil

3 Procedure 23.1.[1] In this regard, the court must determine whether a settlement is fair and reasonable.

4 *Maher*, 714 F.2d at 455 (settlement of shareholders' derivative action must be fair, adequate and

5 reasonable and without fraud or collusion). *In re Warner Communications Sec. Litig.*, 798 F.2d 35,

6 37 (2d Cir. 1986); *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982);

7 *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977). The proposed settlement

8 enjoys a presumption that it is fair and reasonable, because it is the product of extensive arm's-length

9 negotiations conducted by capable counsel who are well-experienced in class and derivative actions

10 with the substantial assistance of Judge Legge. *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,

11 671 F. Supp. 819, 822 (D. Mass 1987) ("Where, as here, a proposed class settlement has been

12 reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it

13 is presumptively fair.") (citation omitted); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D.

14 Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).

15          The Ninth Circuit has provided factors which may be considered in evaluating the fairness of

16 a class action settlement:

17          The district court's ultimate determination will necessarily involve a balancing of
      several factors which may include, among others, some or all of the following: the
18      strength of plaintiffs' case; the risk, expense, complexity, and likely duration of
      further litigation; the risk of maintaining class action status throughout the trial; the
19      amount offered in settlement; the extent of discovery completed, and the stage of the
      proceedings; the experience and views of counsel; the presence of a governmental
20      participant; and the reaction of the class members to the proposed settlement.

21 *Officers for Justice*, 688 F.2d at 625 (citations omitted). *Accord Torrisi v. Tucson Electric Power*

22 *Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

23

24 _____

25 [1]   Federal Rule of Civil Procedure 23.1 states:

26
      The action shall not be dismissed or compromised without the approval of the court,
27      and notice ... shall be given to shareholders or members in such manner as the court
      directs.
28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH        - 13 -

1     The district court must exercise "sound discretion" in approving a settlement. *Ellis*, 87

2 F.R.D. at 18; *Torrisi*, 8 F.3d at 1375. Therefore, in exercising its discretion, "the court's intrusion

3 upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit

4 must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the

5 product of fraud or overreaching by, or collusion between, the negotiating parties, and that the

6 settlement, taken as a whole is fair, reasonable and adequate to all concerned." *Officers for Justice*,

7 688 F.2d at 625. The Ninth Circuit defines the limits of the inquiry to be made by the court in the

8 following manner:

9     Therefore, the settlement or fairness hearing is not to be turned into a trial or
    rehearsal for trial on the merits. Neither the trial court nor this court is to reach any

10     ultimate conclusions on the contested issues of fact and law which underlie the
    merits of the dispute, for it is the very uncertainty of outcome in litigation and

11     avoidance of wasteful and expensive litigation that induce consensual settlements.
    The proposed settlement is not to be judged against a hypothetical or speculative

12     measure of what *might* have been achieved by the negotiators.

13 *Id.* (emphasis in original). As explained herein and in the Umeda Declaration, applying these criteria

14 demonstrates that this Settlement warrants the Court's preliminary and final approval.

15 **VI.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND
    FINALLY APPROVED AFTER NOTICE TO RIVERSTONE**

16 **SHAREHOLDERS**

17     Plaintiffs submit that the Settlement is a very good result for Riverstone. Plaintiffs' counsel

18 have achieved important benefits for the Company in the form of corporate governance changes that

19 are described above and were instrumental in obtaining approximately $11 million from defendants'

20 insurers for the benefit of Riverstone in connection with the settlement and defense of the Class

21 Action. The Settlement is the culmination of protracted arm's-length negotiations among the parties

22 with the substantial assistance of Judge Legge. The corporate therapeutics directly address

23 plaintiffs' allegations and provide for, among other things greater Board and committee

24 independence and stricter financial controls which will create a corporate environment where the

25 events complained of are less likely to reoccur. As recent corporate debacles such as Enron, Tyco

26 and WorldCom demonstrate, strong corporate governance is fundamental to a corporation's well-

27 being and success.

28

1    Counsel for plaintiffs have conducted a careful analysis of the law and a thorough

2  examination of the facts relating to the allegations. Plaintiffs' counsel have also carefully weighed

3  the benefits of the Settlement against the substantial risks of continued litigation and have concluded

4  that the benefits to be conferred on Riverstone by the Settlement will, if approved by the Court,

5  result in a very good resolution of the derivative claims and allow Riverstone to prevent a recurrence

6  of similar matters in the future and to put these matters to rest.

7    A.    The Risks of Establishing Liability

8    In assessing the fairness, reasonableness and adequacy of the settlement, the court should

9  balance the benefits of the settlement against the continuing risks of litigation. *Girsh v. Jepson*, 521

10  F.2d 153, 157 (3rd Cir. 1975); *see also Officers for Justice*, 688 F.2d at 625. As discussed herein

11  and in the Umeda Declaration the settlement of this litigation provides substantial benefits to

12  Riverstone in the form of enhanced corporate governance provisions that directly address the

13  wrongdoing alleged and attempt to prevent future reoccurrences. Umeda Decl., ¶¶31-33. Derivative

14  plaintiffs were also an instrumental factor in obtaining from the Defendants' liability insurance

15  carriers a major part ($11 million cash) for the settlement of the Class Action for the benefit of

16  Riverstone.

17    Although plaintiffs believe that the claims asserted in the litigation were meritorious, liability

18  was by no means a foregone conclusion. For example, plaintiffs did not make a pre-litigation

19  demand for action by Riverstone's Board as is typically required and, though the complaints pled

20  excuses from the demand requirement, this issue is always fiercely litigated in derivative cases.

21  Indeed, the State Court granted defendants demurrer for failure to sufficiently allege demand futility.

22  At the time the Settlement was reached, defendants' motion to dismiss in this Court, which argued

23  that plaintiffs had failed to allege demand futility, was pending. As a result, there was a very real

24  risk that this Court would come to the same conclusion as the State Court and grant defendants'

25  motion to dismiss. Defendants also could be expected to contend that their actions were protected by

26  the business judgment rule, that Riverstone's Certificate of Incorporation bars plaintiffs' claims (an

27  argument they make in their motion to dismiss) or were otherwise non-actionable. The continued

28

1    litigation of these issues would utilize an abundant amount of the Court's time and would subject

2    Riverstone and its shareholders to the substantial risk of no recovery.

3        Defendants have vigorously denied the claims asserted by plaintiffs in the litigation. If

4    plaintiffs got past the pleading stage, defendants would assert that, at all times, they exercised sound

5    business judgment, acted in good faith and in a manner they believed to be in the best interest of

6    Riverstone and its shareholders. Based upon the record and applicable law, it is clear, however, that

7    there were serious risks in overcoming potential defenses and in establishing both liability and

8    damages. Indeed, the Ninth Circuit in affirming the district court's approval of a settlement of a

9    derivative action noted that "the odds of winning [a] derivative lawsuit [are] extremely small"

10   because "derivative lawsuits are rarely successful." *In re Pacific Enterprises Sec. Litig.*, 47 F.3d,

11   373, 378 (9th Cir. 1995). Even if liability was established, the amount of recoverable damages

12   would still have posed significant issues and would have been subject to further litigation. Counsel

13   was aware of indemnifying agreements between Riverstone and defendants that could have resulted

14   in Riverstone paying for any judgment entered against defendants. Thus, instead of the risk of

15   failure to achieve a potentially greater benefit for Riverstone inherent in continued litigation, the

16   proposed settlement guarantees a very good result with the implementation of important corporate

17   governance changes.

18   B.      **The Settlement Was Negotiated By the Parties With a Thorough**
             **Understanding of the Strengths and Weaknesses of the Case**
19

20       The stage of the proceedings and the amount of discovery completed is another factor which

21   courts consider in determining the fairness, reasonableness, and adequacy of a settlement. *Officers*

22   *for Justice*, 688 F.2d at 625; *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 741

23   (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Girsh*, 521 F.2d at 157; *see also Boyd v. Bechtel*

24   *Corp.*, 485 F. Supp. 610, 616-17 (N.D. Cal. 1979).

25       This Settlement comes at a relatively early stage of the litigation, foreclosing the

26   extraordinary expense of protracted discovery and trial preparation, the incalculable cost of time and

27   attention diverted from the day-to-day business operations of the Company, and of course the burden

28   to the Court of protracted and complex litigation. Notwithstanding the relatively early stage in the

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                    - 16 -

1   proceedings, both the knowledge of plaintiffs' counsel and the proceedings themselves have reached

2   a stage where an intelligent evaluation of the litigation and the propriety of settlement can be made.

3   As set forth in the Umeda Declaration, plaintiffs' counsel conducted an extensive investigation of the

4   allegations asserted in the Derivative Actions. This investigation included a review and analysis of

5   available documents concerning Riverstone, interviews with numerous former employees of

6   Riverstone and third parties with knowledge of the allegations as well as consultation with experts.

7   In addition, the Settlement was reached only after the State Court had dismissed plaintiffs' claims in

8   response to defendants' demurrer, and the defendants had filed two motions to dismiss plaintiffs'

9   allegations in this Court. The parties also participated in several mediation sessions where the

10  strengths and weaknesses of the parties respective claims and defenses were fully explored. Thus,

11  the parties reached an agreement to settle this litigation at a point when they had a full understanding

12  of the legal and factual issues surrounding the case. *See In re Mego Financial Corp. Sec. Litig.*, 213

13  F.3d 454, 459 (9th Cir. 2000).

14          That the case settled before extensive formal discovery does not stand in the way of approval

15  of the Settlement. Ninth Circuit law is quite clear that "'formal discovery is not a necessary ticket to

16  the bargaining table' where the parties have sufficient information to make an informed decision

17  about settlement." *Mego Financial*, 213 F.3d at 459 (citations omitted). An extensive investigation,

18  the briefing on defendants' demurrers and motions to dismiss, the State Court's order dismissing

19  plaintiffs' claims and the mediation sessions provided plaintiffs and their counsel not only with a

20  clear picture of the strengths and weaknesses of their own case, but also of the sufficiency of the

21  legal and factual defenses that defendants would raise if litigation were to continue. Having

22  sufficient information to properly evaluate the case, plaintiffs' counsel have managed to settle this

23  litigation on terms very favorable to Riverstone and its shareholders without the substantial expense,

24  risk and uncertainty of continued litigation.

25      C.      **The Settlement Is Wholly Reasonable in View of the Serious Risks**
                **Posed by Continued Litigation**
26

27          The determination of a "reasonable" settlement is not susceptible to a mathematical equation

28  yielding a particularized sum. Rather, as one court explained, "there is a range of reasonableness

1    with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). As the Ninth

2    Circuit has made clear, "the very essence of a settlement is compromise, 'a yielding of absolutes and

3    an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624 (citation omitted). Given the

4    obstacles and uncertainties inherent in this complex litigation, the settlement is a very good result

5    and is unquestionably superior to another "possibility" which certainly exists – little or no recovery.

6         It is also clear that even a victory at trial is no guarantee that the judgment would ultimately

7    be sustained on appeal. Substantial judgments awarded by trial courts have been reversed on appeal.

8    *See, e.g., In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608

9    (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v.

10   entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.

11   1979) (reversing $87 million judgment after trial). Add to these appellate risks the difficulty and

12   unpredictability of a lengthy and complex trial – where witnesses could suddenly become

13   unavailable or the factfinder could react to the evidence in unforeseen ways – and the benefits of the

14   Settlement become all the more apparent.

15       **D.**   **The Complexity, Expense and Likely Duration of the Litigation**
16              **Would Be Considerable Were the Action to Proceed**

17       Another factor militating in favor of the settlement is the complexity, expense and likely

18   duration of the litigation. *Officers for Justice*, 688 F.2d at 625; *Girsh*, 521 F.2d at 157. This case is

19   obviously complex. If not for this Settlement, the case would have continued to be fiercely

20   contested by the parties. Continued litigation here would be extremely complex, costly and of

21   substantial duration. Assuming plaintiffs survived defendants' attack on the pleadings, document

22   discovery would need to be completed, depositions would have to be taken, experts would have to be

23   designated and expert discovery conducted. Defendants' expected motion for summary judgment

24   would have to be briefed and argued, a pre-trial order would have to be prepared and motions *in*

25   *limine* would have to be filed and argued. A trial could occupy attorneys on both sides and the Court

26   for weeks. Moreover, any judgment favorable to plaintiffs would likely be the subject of post-trial

27   motions and appeal, which would prolong the case for years with the ultimate outcome uncertain.

28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH      - 18 -

1       **E.**    **The Experience and Views of Counsel Favor Approval**

2       Experienced counsel, operating at arm's length before a neutral and distinguished mediator,

3 have weighed all of the foregoing factors and endorse the proposed settlement. As the courts have

4 explained, the view of the attorneys actively conducting the litigation, is "entitled to significant

5 weight." *Fisher Bros. v. Cambridge-Lee Industries, Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985); *see*

6 *also Ellis*, 87 F.R.D. at 18; *Boyd*, 485 F. Supp. at 616-17.

7       Here, counsel for plaintiffs and defendants are seasoned practitioners in this specialized area

8 of the law. The Settlement was reached only after counsel had conducted a substantial investigation,

9 engaged in motion practice, informal discovery and protracted settlement negotiations. Umeda

10 Decl., ¶¶19, 21, 25-28. These attorneys have considered the relative strengths and weaknesses of

11 their respective cases and have reached the agreement embodied in the Stipulation and believe it is a

12 very good result for Riverstone and its shareholders and therefore recommend its approval. Finally,

13 the assistance of a neutral, respected mediator also assured a sound result for Riverstone's

14 shareholders.

15 **VII.**   **THE AGREEMENT FOR THE PAYMENT OF FEES AND EXPENSES IS**

16         **APPROPRIATE**

17       Significant corporate therapeutic benefits have been conferred upon Riverstone by plaintiffs'

18 efforts in prosecuting the derivative claims and the Settlement that was ultimately obtained. As part

19 of the Settlement, Riverstone has agreed to pay the sum of $1,750,000 in attorneys' fees and

20 expenses to plaintiffs' counsel. The parties negotiated the attorneys' fees to be paid to plaintiffs'

21 counsel after the substantive terms of the Settlement were agreed to and with the assistance of Judge

22 Legge (Ret.).

23       The United States Supreme Court has endorsed this type of consensual resolution of

24 attorneys' fee issues in these kinds of cases as the ideal toward which litigants should strive. In

25 *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), the Supreme

26 Court stated: "A request for attorney's fees should not result in a second major litigation. *Ideally, of*

27 *course, litigants will settle the amount of a fee.*" (Emphasis added.)

28

1    In shareholder derivative cases, where the economic value of corporate therapeutic benefits

2    can be difficult to precisely quantify, an agreement on the parameters of a fee and expense award is

3    particularly appropriate. In *In re M.D.C. Holdings Sec. Litig.*, Master File No. CV 89-0090 E (M),

4    1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) (a decision rendered by former Chief

5    Magistrate Judge Harry R. McCue, the court approved a $3 million fee as part of the settlement of a

6    shareholder derivative case).

7    Also, the fee here was negotiated under market conditions, a process which courts have

8    encouraged. *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market

9    factors, best known by the negotiating parties themselves, should determine the quantum of

10   attorneys' fee). Plaintiffs' counsel wished to maximize the fees to compensate them (as the case law

11   encourages) for their risk, innovation and creativity, while the Company wished to pay the

12   minimum. The amount agreed to reflects the parties' experience as to what is appropriate for the

13   benefits obtained. The result is a fee which was negotiated at arm's length and set by the market and

14   which is, therefore, a reasonable fee.

15   **VIII.   PROPOSED SCHEDULE OF EVENTS**

16   In connection with preliminary approval of the Settlement, the parties are requesting the

17   Court to establish dates by which notice of the Settlement will be sent to Riverstone shareholders,

18   dates by which Riverstone shareholders may object to the Settlement, and a final approval hearing.

19   The following schedule is proposed and may be inserted by the Court into the [Proposed] Order

20   Preliminarily Approving Settlement and Providing for Notice, submitted herewith:

21   | Notice mailed to Riverstone | Ten days after Court enters order |
22   | shareholders ("Notice Date") | preliminarily approving |
     |                              | settlement ("Notice Date") |

23   | Publication of Summary | Ten days after Notice Date |
24   | Notice |

25   | Last day for Riverstone | 45 days after Notice Date |
     | shareholders to object to the |
26   | settlement |

27   | Final Approval Hearing | 60 days after Notice Date |

28

1   This schedule is similar to those used in numerous derivative and class action settlements and

2   provides due process to Riverstone shareholders with respect to their rights concerning the

3   Settlement.

4   IX.   CONCLUSION

5       The Settlement achieved is a good result, given the risks and delays inherent in the litigation

6   and the complexity and expense if the case proceeded to trial.  Accordingly, plaintiffs and their

7   counsel respectfully submit that the Settlement is fair, reasonable and adequate and should be

8   approved by the Court.

9

10   DATED: December 1, 2004                    Respectfully submitted,

11                                              LERACH COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
12                                              KEITH F. PARK
                                                MICHAEL J. DOWD
13                                              JEFFREY D. LIGHT

14

15                                              _____
                                                    MICHAEL J. DOWD

16                                              401 B Street, Suite 1700
                                                San Diego, CA  92101
17                                              Telephone: 619/231-1058
                                                619/231-7423 (fax)

18
                                                MURRAY FRANK & SAILER LLP
19                                              ERIC J. BELFI
                                                275 Madison Avenue, Suite 801
20                                              New York, NY  10016
                                                Telephone: 212/682-1818
21                                              212/682-1892 (fax)

22                                              EMERSON POYNTER LLP
                                                JOHN G. EMERSON
23                                              SCOTT E. POYNTER
                                                2228 Cottondale Lane, Suite 100
24                                              Little Rock, AR  72202
                                                Telephone: 501/907-2555
25                                              501/907-2556 (fax)

26

27

28



1

2    ROBBINS UMEDA & FINK, LLP
     BRIAN J. ROBBINS
3    MARC M. UMEDA
     1010 Second Avenue, Suite 2360
4    San Diego, CA  92101
     Telephone:  619/525-3990
5    619/525-3991 (fax)

6    LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
7    KEITH F. PARK
     MICHAEL J. DOWD
8    JEFFREY D. LIGHT
     401 B Street, Suite 1700
9    San Diego, CA  92101
     Telephone:  619/231-1058
10   619/231-7423 (fax)

11   THE DREHER LAW FIRM
     ROBERT SCOTT DREHER
12   835 Fifth Avenue, Suite 202
     San Diego, CA  92101
13   Telephone: 619/230-8828
     619/687-0136 (fax)

14
     Attorneys for Plaintiffs
15   S:\Setlement\Riverstone.set\BRF00012570.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT - C-03-0637-PJH                    - 22 -

## DECLARATION OF SERVICE BY MAIL

1  I, the undersigned, declare:

2  1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.     That on December 1, 2004, declarant served the NOTICE OF MOTION AND MOTION FOR APPROVAL OF DERIVATIVE SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December, 2004, at San Diego, California.

ADRIANA DEL CARMEN

RIVERSTONE (Settlement)
Service List – 11/18/2004  (03-0124)
Page 1 of 1

**∪ounsel For Defendant(s)**

Williams S. Freeman
Cooley Godward LLP
One Maritime Plaza, Suite 2000
San Francisco, CA  94111-3580
  415/693-2000
  415/951-3699(Fax)

Paul T. Friedman
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105-2482
  415/268-7000
  415/268-7522(Fax)

**Counsel For Plaintiff(s)**

John G. Emerson, Jr.
Scott E. Poynter
Emerson Poynter LLP
2228 Cottondale Lane, Suite 100
Little Rock, AR  72202
  501/907-2555
  501/907-2556(Fax)

Keith F. Park
Michael J. Dowd
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
  619/231-1058
  619/231-7423(Fax)

Eric J. Belfi
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY  10016
  212/682-1818
  212/682-1892(Fax)

Brian J. Robbins
Marc M. Umeda
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101
  619/525-3990
  619/525-3991(Fax)

R. Scott Dreher
The Dreher Law Firm
835 Fifth Avenue, Suite 202
San Diego, CA  92101
  619/230-8828
  619/687-0136(Fax)

# Exhibit - C

1    ROBBINS UMEDA & FINK, LLP
     MARC M. UMEDA (197847)
2    1010 Second Ave., Suite 2360
     San Diego, CA  92101
3    Telephone: 619/525-3990
     Facsimile: 619/525-3991
4
     Attorneys for Plaintiff
5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11   GREGORY WATTERSON, Derivatively    )   Case No. CV-03-0637-PJH
     On Behalf of RIVERSTONE            )
12   NETWORKS, INC.,                    )   DECLARATION OF MARC M. UMEDA IN
                                        )   SUPPORT OF APPROVAL OF SETTLEMENT
13                      Plaintiff,      )
                                        )
14        vs.                           )
                                        )
15   ROMULUS PEREIRA, et al.,           )
                                        )
16                      Defendants,     )
                                        )
17        - and -                       )
                                        )
18   RIVERSTONE NETWORKS, INC., a       )
     Delaware corporation,              )   Date:   December 15, 2004
19                                      )   Time:   9:00 a.m.
                      Nominal Defendant.)   Courtroom: 3
20   _____)   The Honorable Phyllis J. Hamilton

21

22

23

24

25

26

27

28

1    I, MARC M. UMEDA, declare as follows:

2        1.      I am an attorney at law and admitted to practice in the State of California. I am a

3    member of Robbins Umeda & Fink, LLP, counsel to plaintiff in this action and Co-Lead Counsel

4    for the plaintiffs in the derivative action styled *In re Riverstone Network, Inc. Derivative Litigation*,

5    Superior Court of California, County of Santa Clara, Lead Case No. CV 810290 (the "State Action").

6    I was actively involved in the litigation that resulted in the Stipulation of Settlement and agreed upon

7    corporate therapeutics.

8        2.      I submit this declaration in support of the derivative plaintiffs' application for

9    approval of the settlement.  The corporate governance enhancements achieved in this case are

10   positive changes for Riverstone Networks, Inc. ("Riverstone" or the "Company") and its

11   shareholders. These changes provide for greater Board of Directors (the "Board") independence,

12   strict internal financial controls, and a vigorous insider trading policy which will create a corporate

13   environment where the events complained of are less likely to reoccur.  This declaration

14   demonstrates why the settlement is fair, reasonable and adequate and should be approved by the

15   Court.

16   I.    FACTUAL BACKGROUND OF THE ACTIONS

17       3.      The allegations regarding Riverstone's improper accounting, alleged management

18   failures and the problems with Riverstone's relationship with its clients are set forth in detail in the

19   Verified First Amended Shareholder Derivative Complaint, filed in *Watterson v. Periera, et al.*

20   ("FAC"). Specifically, the FAC alleges that Riverstone is a provider of metropolitan area networking

21   solutions that enable service providers to convert raw band-with into profitable services over legacy

22   and next generation infrastructures.  ¶ 10.[1]  The FAC alleges that during the relevant period

23   defendants desperately sought to create the impression that Riverstone was a growing company

24   which had the ability to directly enter markets with a captive client base.  ¶¶ 7, 34. Each defendant

25   was aware that Riverstone's appearance of growth was the result of defendants' manipulation of the

26   Company's revenue earnings and receivables. ¶¶ 7, 34, 35, 40, 42-49, 74(c)-(g), 78(c)-(g), 85(c)-(f),

27

28   [1] All "¶" and "¶¶" references are to the FAC, unless otherwise stated.

1  97(b)-(d), (i)(iii), (i)(iv). Defendants were further aware that the Company could not legitimately
2  meet its projected Q202 and Q103 revenue and earnings per share targets unless they engaged in
3  unlawful accounting practices. ¶¶ 7, 34, 73(c)-(g), 78(c)-(g), 85(c)-(f).

4       4.    The FAC alleges in great detail that throughout the relevant period, defendants caused
5  Riverstone to issue materially false and/or misleading public statements regarding the Company's
6  business, its financial condition and prospects. ¶¶ 70-93. For instance, in August 2001 and
7  September 2001, defendants caused Riverstone to announce a purportedly lucrative deal with
8  Hutchison Global Crossing ("Hutchison") that promised to provide nearly one million Hong Kong
9  residents with last-mile Ethernet connectivity even though Hutchison had less than 150,000
10 customers and a growth rate of less than 7% per month. ¶¶ 71, 74(b).

11      5.    Similarly, defendants regularly caused Riverstone to improperly and prematurely
12 record revenue in violation of Generally Accepted Accounting Principles ("GAAP"). ¶¶ 5, 33-54.
13 A substantial percentage of Riverstone's quarterly revenue was based on highly suspicious purchase
14 orders that were received and recorded on the last day of the fiscal quarter, allowing Riverstone to
15 falsely claim that it had "made its numbers." ¶¶ 7, 35, 36, 41, 43, 53, 54, 74(c)-(g), 78(c)-(g), 85(c)-
16 (f). Many of the suspect end-of-the-quarter deals were put together by Romulus Pereira ("Pereira")
17 and Robert Stanton ("Stanton"), who knew Riverstone was "making the numbers" only because of
18 these deals and the related premature recognition of revenue. ¶¶ 7, 35, 42-49, 97(b)-(d), (f).
19 Customers would later return massive quantities of the products sold as part of these
20 "end-of-the-quarter" deals claiming them to be defective. ¶¶ 7, 36, 37, 38, 40, 44-46, 48, 74(e), (f),
21 78(e), (f), 85(d), (e), 97(c), (h). But defendants later placed these products back into inventory and
22 re-sold them. ¶¶ 38, 74(f), 78(f), 85(e).

23      6.    Plaintiff's investigation further revealed that many of these questionable last minute
24 orders were attributed to Riverstone's larger customers, such as Cox Communications, Qwest, Global
25 Crossing and Verizon. ¶¶ 35, 36, 41, 43, 74(e), 78(e), 85(d). Often during this period, Riverstone
26 would ship product based upon the pretext that a customer was having a system failure of some sort.
27 ¶ 41. Because Riverstone tried to adhere to a 24 hour shipping guarantee (for U.S. customers), it was
28 not uncommon for Riverstone to replace the same shipment for these customers on two or more

1  consecutive *days*, regardless of whether or not the customer had time to install it. *Id.* The types of

2  systems shipped at the end of fiscal quarters to these larger customers, such as Cox, were extremely

3  expensive. *Id.* This duplicate shipping practice also happened with Riverstone's Asia-based

4  customers. *Id.* Riverstone shipped large quantities of equipment to Asia, and sometimes they

5  received the equipment back, and sometimes Riverstone never saw it again. *Id.*

6      7.    Riverstone was improperly recognizing these repeated shipments as revenue, in

7  violation of GAAP. ¶ 43. When a duplicate system was shipped to Cox, the price of the equipment

8  was recorded (on the Remedy database) against the Cox account. *Id.* Cox wouldn't actually know

9  they had this fee charged to their account, and there was never a purchase order issued for these

10 shipments. *Id.* These shipments were recorded as revenue and included in weekly and monthly sales

11 reports. *Id.*

12     8.    Pereira was very concerned about the public and Riverstone's customers finding out

13 about the high return rate caused by these practices. ¶ 45. During meetings with managers, Pereira

14 stressed that the information discussed needed to stay within the confines of the room. *Id.*

15     9.    Another report that was generated from the RMA department's Oracle database

16 contained information about what equipment was shipped out and returned, which products had been

17 tested and classified as "failures," and which products had been tested and classified as

18 "non-failures." ¶ 46. This report contained information about what equipment had been returned

19 and tested. *Id.* According to the RMA reports, there was almost never anything wrong with the

20 equipment that had been returned and tested. *Id.* In other words, most of the returns were classified

21 as "non-failures." *Id.* Once a piece of equipment was tested and classified as a non-failure, the

22 Company would re-stock and then re-ship it to the next customer. *Id.*

23     10.    All of the reports discussed above, were distributed to management and the executive

24 staff. ¶ 47. The reports were also posted on Riverstone's internal website, which gave anybody

25 working at Riverstone the opportunity to access the reports. *Id.*

26     11.    The volume of returned products was so large that Riverstone had to rent offsite

27 storage units and push-out walls while reconfiguring Riverstone's office space so the Company could

28 store returned equipment in the office area. ¶ 37. Riverstone would also put returned products in

<div align="center">3</div>

1  cubicles belonging to employees that did not come to the office on a regular basis. *Id.* When an

2  order was returned, a credit document was issued and a copy was sent (via the Oracle database) to

3  the sales department. *Id.* In addition to the measures described above, Riverstone had to lease a

4  warehouse facility at Flextronics to store returned equipment. ¶48. Pereira had specifically directed

5  that Riverstone's returns be managed by a third party (Flextronics), and that the Company ship many

6  of its returns offsite. *Id.*

7      12.    Remedy and Oracle databases were updated into one Oracle database between

8  approximately April 2002 and July 2002. ¶ 49. During this process accounting irregularities were

9  brought up in meetings with Stanton. *Id.* Financial department employees would question Stanton

10  about accounting variances that showed up on a monthly basis. *Id.* Stanton's sales figures were

11  always higher than the sales reports the financial department received. *Id.* The financial department

12  would ask him where his numbers came from, and he would attribute the difference to the system

13  integration process. *Id.* Stanton's typical excuse was to blame it on the computer systems, and

14  according to him, the sales figures he had were the correct numbers. *Id.* These numbers were always

15  higher than the numbers the financial staff had on their sales reports – and it was difficult to glean

16  where his numbers came from. *Id.* Numbers also tended to disappear or fall-off reports. *Id.*

17      13.    In addition to the improper recognition of revenue, several of Riverstone's

18  investments in telecommunications-related companies had deteriorated dramatically in value by

19  September 2001. ¶¶ 6, 33, 55. As the deterioration continued, defendants were increasingly aware

20  that the impairment in value was not temporary. *Id.* Pursuant to GAAP, the Company should have

21  recorded impairment write-downs of at least $57.1 million. *Id.* However, as part of their accounting

22  shenanigans, defendants caused Riverstone to delay reflecting such losses, only gradually revealing

23  them and finally fully disclosing the loss on December 18, 2002. *Id.*

24  **II.    HISTORY OF THE DERIVATIVE LITIGATION**

25      14.    On August 13, 2002, the first derivative action on behalf of Riverstone entitled *Bruhn*

26  *v. Pereira, et al.*, Case No. CV 810290 (the "*Bruhn*" action) was filed in Santa Clara Superior Court.

27  The *Bruhn* action is a shareholder derivative action, brought on behalf of Riverstone, alleging breach

28

4

1  of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust

2  enrichment and violations of California Corporations Code.

3          15.    On October 30, 2002, defendants filed a Motion to Stay the *Bruhn* action. Defendants

4  asserted that the *Bruhn* action should be stayed until the federal securities class actions, pending in

5  this Court and captioned *In re Riverstone Networks, Inc. Securities Litigation*, Case No. CV-02-3581

6  (PJH), were resolved.  After full briefing and oral argument, the State Court denied the stay as,

7  although the State Action shared common facts with the federal securities class actions, the State

8  Action had different parties, claims and issues.

9          16.    On February 25, 2003, plaintiff filed an Amended Shareholder Derivative Complaint

10  in the *Bruhn* action.

11          17.    On April 9, 2003, *Carrico v. Pereira, et al.*, Case No. CV 816188 (the "*Carrico*"

12  action) was filed in the Santa Clara Superior Court.  The *Carrico* action is a shareholder derivative

13  action, brought on behalf of Riverstone, alleging breach of fiduciary duty, abuse of control, gross

14  mismanagement, waste of corporate assets, unjust enrichment and violations of California

15  Corporations Code.

16          18.    On April 23, 2004, the State Court entered the Stipulation Consolidating Actions,

17  Appointing Co-Lead Counsel, and Related Matters Thereon.

18          19.    Since the filing of the *Bruhn* action, the State Action plaintiffs have conducted an

19  extensive investigation of the allegations they have asserted. Plaintiffs' investigation included a

20  review of Securities and Exchange Commission filings, financial statements, securities analyst

21  reports, press releases, articles and media reports about the Company.  This investigation also

22  included discussions with consultants and interviews with former employees.  Counsel and their

23  investigators spent a significant amount of time and effort in locating witnesses.  As a result of those

24  efforts, plaintiffs' counsel and/or their investigators interviewed numerous former employees and

25  third parties with knowledge of the accounting practices which are at the center of the allegations

26  contained in the Consolidated Complaint.  The information derived from these interviews was

27  important and proved valuable in the preparation of the pleadings in this matter.  In addition,

28  plaintiffs' counsel learned of additional avenues of inquiry to be explored with the defendants and

5

1  non-party witnesses. During the litigation, counsel also conferred with consultants with expertise

2  in accounting issues. The information provided by these consultants was important and proved of

3  great assistance in prosecuting plaintiffs' claims.

4       20.    On May 28, 2003, plaintiffs James Bruhn and Jim Carrico filed the operative

5  complaint in the State Action, the Consolidated Complaint, derivatively on behalf of and for the

6  benefit of Riverstone, against certain of Riverstone's officers and directors for breaches of fiduciary

7  duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and

8  violations of California Corporations Code.

9       21.    On or about July 2, 2003, defendants in the State Action filed a demurrer to plaintiffs'

10  Consolidated Complaint contending that plaintiffs failed to plead sufficient facts to adequately allege

11  demand futility and to adequately allege any of their causes of action. Defendants also argued that,

12  pursuant to Delaware law, Riverstone's Certificate of Incorporation barred plaintiffs' claims. After

13  full briefing and oral argument, the State Court sustained defendants' demurrer on September 17,

14  2003 because the Consolidated Complaint did not adequately allege demand futility.

15       22.    Also on July 2, 2003, defendants in the State Action filed another Motion to Stay.

16  This Motion to Stay sought to stay the State Action in favor of this action. After full briefing and

17  oral argument, the State Court granted defendants' Motion to Stay on September 17, 2003. The State

18  Court plaintiffs then shared the results of their internal investigation with the Federal plaintiff to

19  assist him in the preparation of his complaint and the prosecution of his action.

20       23.    On February 14, 2003, *Watterson v. Pereira, et al.* was filed in this Court, Case No.

21  CV-03-0637 (PJH) (the "Federal Action") (collectively, the Federal Action and the State Action will

22  be referred to as the "Derivative Actions" or the "Actions"). The Federal Action is a shareholder

23  derivative action, brought on behalf of Riverstone, alleging breach of fiduciary duty, abuse of

24  control, gross mismanagement and unjust enrichment.

25       24.    On or about September 8, 2003, defendants in the Federal Action filed a Notice of

26  Related Cases indicating that a consolidated Federal Court case known as *In re Riverstone Networks,*

27  *Inc. Securities Litigation*, Case No. CV-02-3581(PJH) was then pending before the Honorable

28  Phyllis J. Hamilton involving substantially identical factual allegations and defendants as the Federal

DECLARATION OF MARC M. UMEDA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT - CV-03-0637-PJH

1    Action, such that the Federal Action should be and was requested by defendants to be assigned to
2    Judge Hamilton.

3        25.    On September 25, 2003, the defendants in the Federal Action moved to dismiss the
4    original complaint for failing to adequately plead demand futility and for failure to state a claim.
5    Plaintiff's counsel studied the arguments of their adversaries and the applicable law, and determined
6    that plaintiff should amend his complaint as a matter of right pursuant to Federal Rule of Civil
7    Procedure 15(a). This decision was coordinated with counsel for the defendants and a schedule for
8    filing the amended complaint and responses thereto was then determined.  A stipulation and
9    proposed order was drafted and filed reflecting this agreement.  The FAC was filed on November
10   6, 2003.  In addition to the breach of fiduciary duty claims of the original complaint, the FAC also
11   asserted claims pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and for violations
12   of California Corporations Code §25402. On March 26, 2004, the defendants moved to dismiss the
13   FAC, asserting similar arguments made in support of their original motion in this Court and the
14   demurrer filed in State Court. Before responding to the motion to dismiss, the parties to the Federal
15   Action began settlement discussions and agreed to extend the briefing schedule to allow the parties
16   to concentrate on the negotiations.

17   III.    SETTLEMENT EFFORTS

18       26.    Beginning in the Fall of 2003 and continuing throughout the Spring of 2004, the
19   parties, through their respective highly experienced counsel, commenced settlement negotiations.
20   These negotiations were protracted and hard fought. Specifically, the parties participated in several
21   mediation sessions with the assistance of the Honorable Charles A. Legge (Ret). Additionally, the
22   parties conducted numerous lengthy telephonic conferences in furtherance of negotiating the
23   settlement. During the negotiations, defendants took the position that plaintiffs' claims were barred
24   because they had failed to make a demand on the Board and had not pleaded and could not plead
25   demand futility.

26       27.    The settlement discussions were conducted by senior lawyers from both sides
27   experienced in negotiating settlement of complex cases. Each side had a thorough understanding
28   of the allegations made, the facts supporting the allegations, and the facts and arguments supporting

<div align="center">7</div>

1  the defenses to the charges made. The merits of each side's case were hotly disputed. However, both

2  plaintiffs and defendants recognized that the facts at issue were subject to contradictory

3  interpretations and allowed for both sides to advocate varying views of potential liabilities and

4  damages. During these good-faith arm's-length negotiations, the terms of the settlement were

5  extensively debated and negotiated. On May 6, 2004, the culmination of these efforts resulted in the

6  parties entering into a Memorandum of Understanding.

7       28.    Although the plaintiffs are steadfast in their belief that the claims alleged have merit,

8  plaintiffs recognize and acknowledge the risk, expense and length of continued proceedings

9  necessary to prosecute the litigation against the defendants through trial and through appeals.

10  Plaintiffs have also taken into account the uncertain outcome and the risks of any litigation,

11  especially in complex actions, including difficulties and delays inherent in such litigation.

12  **IV.    THE BENEFITS TO RIVERSTONE THAT PLAINTIFFS HAVE OBTAINED**
13  **        THROUGH SETTLEMENT**

14       29.    In settlement of the Derivative Actions, and in accordance with their determination

15  that such payment is in the best interests of Riverstone, the individual defendants shall approve,

16  support and take all reasonable actions to cause the payment, from funds made available by the

17  individual defendants' Directors' and Officers' liability Insurers, the sum of approximately $11

18  million for the benefit of Riverstone in connection with the defense and settlement of *In re*

19  *Riverstone Networks, Inc. Securities Litigation*, Case No. CV-02-3581 (PJH), and related litigation

20  and proceedings.

21       30.    Defendants have also acknowledged that during the pendency of the Actions,

22  Riverstone implemented, or began to make best efforts to implement by the end of 2004, the

23  following measures. These measures were (or will be) adopted in material part due to the efforts of

24  plaintiffs' counsel in the Actions, and/or implementation of certain measures was accelerated due to

25  their efforts. These measures will remain in effect for four years, unless a prior modification is

26  necessary in the good faith business judgment of a unanimous vote of all of the independent

27  members of Riverstone's Board, as a result of a change in law or regulations, or other business

28  necessity.

1        (a)    The number of directors on Riverstone's Board will increase to seven;

2        (b)    Two-thirds of the members of the Board will be independent directors;

3        (c)    The Chairman or Lead Director of Riverstone's Board will be an independent

4    director (for purposes of this agreement, the terms "Chairman" and "Lead Director" are

5    synonymous);

6        (d)    The Chairman or Lead Director of the Board will be selected annually by the

7    independent members of the Board;

8        (e)    The Chairman or Lead Director will serve in that capacity for a maximum of

9    six consecutive years;

10       (f)    "Independent director" means a person other than an officer or employee of

11   the Company or its subsidiaries or any other individual having a relationship which would interfere

12   with the exercise of independent judgment in carrying out the responsibilities of a director. To be

13   deemed "independent" in any calendar year, a director would have to satisfy the following

14   qualifications:

15       (i)    has not been employed by the Company or its subsidiaries or affiliates

16   in an executive capacity within the last five calendar years;

17       (ii)    has no personal service contract(s) with the Company, or any member

18   of the Company's senior management;

19       (iii)    is not an officer, director, trustee or fiduciary with a not for profit

20   entity that receives significant contributions from the Company;

21       (iv)    has not accepted (and has no Family Member, as defined below, who

22   has accepted) any payments from the Company or any parent or subsidiary of the Company in excess

23   of $60,000 during the current or any of the past three fiscal years, other than the following:

24

25       (1)    compensation for Board or Board committee service;

26       (2)    payments arising solely from investments in the Company's

27   securities;

28

1              (3)     compensation paid to the director's spouse, parents, children,

2    siblings, mother-in-law, father-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, and

3    anyone who resides in such person's home ("Family Member") who is a non-executive employee of

4    the Company or a parent or subsidiary of the Company;

5              (4)     benefits under a tax-qualified retirement plan, or

6    non-discretionary compensation; or

7              (5)     loans permitted under Section 13(k) of the Act.

8        (g)    Provided, however, that audit committee members are subject to the following

9    additional, more stringent requirements. To qualify as an audit committee member, he or she:

10              (i)     is not a Family Member of an individual who is, or at any time during

11    the past three years was, employed by the Company or by any parent or subsidiary of the Company

12    as an executive officer;

13              (ii)     is not, and has no Family Member who is, a partner in, or a controlling

14    shareholder or an executive officer of, any organization to which the Company made, or from which

15    the Company received, payments for property or services in the current or any of the past three fiscal

16    years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000,

17    whichever is more, other than the following:

18              (1)     payments arising solely from investments in the Company's

19    securities; or

20              (2)     payments under non-discretionary charitable contribution

21    matching programs.

22    is neither employed nor has a Family Member who is employed as an executive officer of another

23    entity where, at any time during the past three years, any of the executive officers of the Company

24    serve on the compensation committee of such other entity;

25              (iii)     is not, and has no Family Member who is, a current partner of the

26    Company's outside auditor, or was a partner or employee of the Company's outside auditor who

27    worked on the Company's audit at any time during any of the past three years; and

28

**10**

1              (iv)     has not had any of the relationships described in subsections (i)-(iv)

2 above, with any affiliate of the Company.

3              (h)     Independent directors will conduct separate meetings in conjunction with

4 regularly scheduled Board meetings, at which only independent directors will be present.  These

5 meetings will occur at least twice per year;

6              (i)     Riverstone has an Audit Committee, a Compensation Committee, and a

7 Nominating/Corporate Governance Committee.  All of these committees have three members, and

8 are comprised entirely of independent directors;

9              (j)     The Audit Committee will have at least one member who has significant

10 accounting or finance experience, and the remaining members will be generally knowledgeable

11 regarding accounting matters;

12              (k)     The Nominating/Corporate Governance Committee shall be comprised of

13 members who have demonstrated leadership skills or are generally knowledgeable regarding

14 corporate governance matters;

15              (l)     The Audit, Compensation, and Nominating/Corporate Governance

16 Committees shall have the authority to retain legal counsel or other advisors, if necessary in the

17 exercise of their business judgment;

18              (m)     Audit partners will be rotated every 5 years;

19              (n)     Riverstone will not use an auditing firm at which the Company's Chief

20 Financial Officer ("CFO") was an employee during the three years preceding the audit;

21              (o)     The outside auditor is precluded from providing certain non-audit services to

22 Riverstone, in accordance with 15 U.S.C. §78j-1(g), except for tax services;

23              (p)     Riverstone will have procedures for the confidential, anonymous submission

24 by employees of concerns regarding questionable accounting or auditing matters;

25              (q)     The Audit Committee regularly reports all "significant" audit findings to the

26 Board and relays information concerning all "material" aspects of litigation;

27              (r)     The Audit Committee will be responsible for overseeing a procedure

28 implemented and maintained by the Finance Department designed to track revenues for each

1   customer. The revenue tracking system shall be designed to provide the Chief Executive Officer
2   ("CEO") and CFO with the total amount of revenue recognized from sales to each customer on a
3   quarterly basis;

4          (s)    The Compensation Committee determines or recommends compensation for
5   the CEO and all other executive officers. The CEO is not present during deliberations on his/her
6   compensation;

7          (t)    Director nominees are selected, or recommended for selection, by the
8   Nominating/Corporate Governance Committee. In assessing nominees, the Committee considers
9   whether the nominees are "independent";

10          (u)    The Nominating/Corporate Governance Committee meets at least quarterly;

11          (v)    The Nominating/Corporate Governance Committee recommends
12   compensation levels for the Board, including the Chairman;

13          (w)    The Nominating/Corporate Governance Committee oversees all proposed
14   amendments to the Articles, By-Laws, governance guidelines or committee charters;

15          (x)    The Nominating/Corporate Governance Committee is responsible for
16   reviewing with management the Company's compliance with Sarbanes-Oxley;

17          (y)    The Audit Committee must approve all related party transactions;

18          (z)    The Audit Committee shall implement a Company-wide policy prohibiting
19   excessive fraternization between Company personnel and independent auditor personnel;

20          (aa)    Riverstone's CFO is responsible for formulating and applying the Company's
21   revenue recognition policy;

22          (bb)    The CFO reports to the Board on a regular basis regarding Riverstone's
23   revenue recognition policy;

24          (cc)    The revenue recognition policy is distributed to each Riverstone employee
25   who is responsible for determining whether to record revenue;

26          (dd)    Riverstone maintains an insider trading policy, which imposes penalties for
27   violations of the policy;

28

1          (ee)    Adoption of a Company-wide Code of Business Conduct, and appropriate
2    training regarding the Code;

3          (ff)    Implementation of quarterly sales certification process. Everyone from the
4    Vice President of Sales to the entire sales force is required to certify compliance with revenue
5    recognition policy;

6          (gg)    Implementation of process to ensure that for each customer transaction the
7    Company requires the sales organization to complete a questionnaire to ensure that the Company has
8    enough information properly to determine whether to recognize revenue. This questionnaire must
9    be completed to the satisfaction of the Vice President of Finance before the transaction can be
10   processed for shipment. The Vice President of Finance and the CFO review all transactions in
11   excess of $100,000;

12         (hh)    New internal audit function will be implemented. Internal audit will report
13   findings and results to the Audit Committee on a quarterly basis; and

14         (ii)    The Company will provide quarterly sales force training for revenue
15   recognition policies and proper documentation of sales transactions, and compliance with applicable
16   laws regarding sales of products and services.

17       31.    The terms of the settlement are intended to meaningfully address the major points of
18   contention raised in the litigation. These changes provide for more Board independence and greater
19   ability to more easily and efficiently monitor the financial performance of Riverstone.

20       32.    The definitive procedures for corporate governance established by the settlement
21   provide the certainty of known benefits for Riverstone. These benefits seek to prevent any future
22   instances of similar misconduct as alleged in the FAC. Specifically:

23         (a)    The Derivative Actions allege that defendant Pereira, a director, President and
24   CEO, and defendant Stanton, Riverstone's CFO, were instrumental in causing the improper
25   accounting and practices. By adopting a strict definition of "independence," requiring that two-thirds
26   of the entire Board be independent, ensuring that every member of the Board committees are
27   independent, requiring that the Chairman be independent, and providing for separate bi-annual
28   meetings of the independent directors, the settlement ensures that Riverstone will have a Board

1   which is free of influence from management and capable of undivided loyalties to Riverstone. The

2   independent directors are also guaranteed a forum in which they can discuss issues related to

3   Riverstone's operations and performances, free from the possibility of undue influence from

4   management and potentially interested or biased parties. Allowing the Board the ability to

5   recommend the retention of independent consultants will also equip the Board with the ability to use

6   the knowledge, skill and experience of professionals whose loyalty will be strictly to the Board as

7   a whole and not to management;

8          (b)     The Derivative Actions allege various types of improper accounting which

9   was not prevented or remedied by the defendants. By ensuring that at least one member of the Audit

10  Committee has significant accounting or finance experience, by mandating that all members of the

11  Audit Committee be generally knowledgeable regarding accounting matters, by adopting and

12  maintaining strict accounting internal controls and procedures, including implementing a procedure

13  to track each customer's revenues, providing such information to Riverstone's CEO and CFO,

14  creating a revenue recognition policy, and mandating the distribution of the policy and the training

15  of the sales force to ensure compliance with the policy, the settlement seeks to prevent future

16  accounting improprieties of the types alleged in the Actions;

17         (c)     As the Derivative Actions allege numerous accounting improprieties at

18  Riverstone, the settlement seeks to ensure that Riverstone puts in place the protections provided by

19  a proper audit process and procedure. The settlement thus provides for the rotation of Riverstone's

20  audit partners. Also, ensuring auditor independence and prohibiting the Company's external auditor

21  from providing non-audit services to Riverstone will provide Riverstone with an independent third-

22  party check of its accounting policies and practices. The implementation of a new internal audit

23  function, with the internal auditor reporting its findings and results to the Audit Committee on a

24  quarterly basis, will provide added protections against further accounting problems;

25         (d)     The Derivative Actions allege a failure by the Audit Committee in its

26  oversight responsibilities which caused the improper accounting. The settlement seeks to strengthen

27  and expand the duties of the Audit Committee, providing it with greater powers and responsibilities

28  to prevent future occurrences of similar wrongdoing. Specifically, the Audit Committee shall report

DECLARATION OF MARC M. UMEDA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT - CV-03-0637-PJH

1   all "significant" audit findings to the full Board, relay information concerning all "material" aspects

2   of litigation, oversee a procedure implemented and maintained by the Finance Department designed

3   to track revenues for each customer, which tracking system shall be designed to provide the CEO

4   and CFO with the total amount of revenue recognized from sales to each customer on a quarterly

5   basis, approve all related party transactions and implement a Company-wide policy prohibiting

6   excessive fraternization between Company personnel and independent auditor personnel;

7        (e)    The Derivative Actions detail the knowledge and suspicions of certain

8   Riverstone employees concerning the improper accounting.  By providing for the confidential and

9   anonymous submissions by employees of their concerns regarding accounting or auditing matters,

10   Riverstone's employees will be free to assist the Company in preventing further accounting

11   improprieties.  The training of the sales force to ensure compliance with the Company's revenue

12   recognition policies, and the added safeguards provided by the implementation of a process to ensure

13   the proper recognition of all revenues, including stricter approval procedures for all transactions in

14   excess of $100,000, also add further assurances that the Company's employees are aware of and

15   comply with proper revenue recognition procedures;

16        (f)    The Derivative Actions allege a general breakdown in the operations and

17   effectiveness of the Company's Board which contributed to the improper accounting and statements.

18   The settlement seeks to strengthen the Board and its powers by having the membership of the

19   Nominating/Corporate Governance, Compensation and Audit Committees consist solely of

20   independent directors, ensuring adequate corporate governance as initiated, reviewed and updated

21   by the Nominating/Corporate Governance Committee, empowering every Board committee to retain

22   legal counsel or other advisors, and adopting a Code of Business Conduct and training employees

23   to effectuate the Code;

24        (g)    The Derivative Actions allege millions of dollars of illegal insider stock sales

25   by certain of the defendants.  The settlement seeks to prevent future illegal stock sales through the

26   adoption, maintenance, monitoring and enforcement of insider trading policies and procedures which

27   will prevent insiders from wrongfully profiting by reason of their positions.  The adoption of the

28

DECLARATION OF MARC M. UMEDA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT - CV-03-0637-PJH

1  policies and procedures will also promote confidence in management on the part of employees,

2  shareholders and the investing public; and

3  (h)  The Derivative Actions allege that the officers of Riverstone were

4  overcompensated as they participated in the improper conduct. The settlement seeks to prevent such

5  overcompensation by empowering an independent Compensation Committee to determine the CEO's

6  and other executive officer's compensation, free from any influence by the CEO.

7  33.  Plaintiffs' counsel have litigated the actions on a wholly contingent basis. Pursuant

8  to the Memorandum of Understanding, plaintiffs' counsel will be paid $1,750,000 in attorneys' fees

9  and expenses by defendants' directors' and officers' insurance carrier as part of a unitary settlement.

10  This agreement is fair, reasonable and adequate and warrants approval by the Court. The amount

11  was negotiated at arm's-length under market conditions, with the assistance of Judge Legge, after all

12  material terms of the settlement had been agreed to, and is wholly justified in light of the benefits

13  obtained, the risks undertaken, and the quality, nature and extent of the services rendered.

14  V.    CONTESTED LIABILITY ISSUES AND RISKS INVOLVED IN LITIGATION

15  34.  The plaintiffs believe the claims asserted in the litigation have merit. However,

16  plaintiffs recognize and are aware that there are substantial obstacles and risks to overcome to

17  achieve a judgment at trial. Plaintiffs are also mindful of the inherent problems of proof under and

18  possible defenses to the violations asserted in the Litigation. Plaintiffs also believe that the

19  settlement set forth in the stipulation confers substantial benefits on the Company.

20  35.  After the filing of the amended complaint in the *Bruhn* action, the State Court ruled

21  on the defendants' demurrer to the State Action complaint. The Court found that plaintiff *Bruhn* had

22  not stated a cause of action and had not shown facts to allege that demand on the Board was excused.

23  After the filing of the Consolidated Complaint in the State Action, defendants filed a new demurrer

24  and it too was sustained. The fact that the State Action had already been dismissed, and the

25  defendants had twice moved for similar motions in the Federal Action, cast some doubt on the

26  claims in that Court.

27  36.  Further, the claims for insider selling created problems in trying to obtain a recovery

28  from the individual defendants. The individual defendants, particularly the Riverstone executives

16

DECLARATION OF MARC M. UMEDA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT - CV-03-0637-PJH

1    and the members of the Riverstone Board, were indemnified by Riverstone for the claims alleged

2    in the Actions.    Thus, even if plaintiffs were able to establish negligence, scienter, or actual

3    knowledge on the part of individual defendants, these defendants were insured for such conduct and

4    were indemnified by Riverstone for such liability and damages as they might have to pay.

5         37.    Further, assuming that liability was eventually established, it is not clear what amount

6    of damages plaintiffs could recover on behalf of Riverstone at trial.  The amount of damages would

7    be sharply disputed and it is impossible to predict which arguments on damages would find favor

8    with the trier of fact.  Even had plaintiffs established liability, additional risks remain in establishing

9    the amount of damages.  Were this settlement not achieved, years of costly and risky litigation lay

10   ahead with ultimate success far from certain.  By contrast, the settlement of the Actions has

11   established definitive procedures for corporate governance and therefore has provided the certainty

12   of a known benefit.

13   **VI.    THE SETTLEMENT IS IN THE BEST INTERESTS OF RIVERSTONE AND**

14   **        WARRANTS APPROVAL**

15        38.    It is the considered and informed judgment of plaintiffs' counsel based on all the

16   proceedings to date and their extensive experience in litigating derivative actions that the settlement

17   now before this Court is fair, reasonable, adequate and in the best interests of Riverstone and its

18   shareholders and should be approved by the Court.

19        39.    There can be no dispute that the settlement was the result of substantial good-faith,

20   arm's-length negotiations.

21        40.    The settlement represents an excellent result for Riverstone under the circumstances,

22   thanks to the efforts of plaintiffs.  Plaintiffs faced significant risks given the complex factual and

23   legal issues in the case, including demand futility, and intricate choice of law questions surrounding

24   these issues.  Defendants vigorously denied any wrongdoing.

25   **VII.   EXPERIENCE AND EXPERTISE OF PLAINTIFFS' COUNSEL**

26        41.    It is the collective opinion of plaintiffs' counsel that the settlement achieved in the

27   Derivative Actions is fair and adequate and should be approved by the Court.  The expertise of

28   plaintiffs' counsel is an important factor in assessing the adequacy of a settlement and in setting a

17

1  fair fee. Plaintiffs' counsel are experienced and skilled practitioners in the field of shareholder

2  derivative litigation.    In addition, plaintiffs' counsel further brought to bear their collective

3  experience in the field of complex stockholder litigation. As the Court is no doubt aware, plaintiffs'

4  counsel are responsible for significant settlements as well as legal decisions that enable litigation

5  such as this to be successfully prosecuted.

6       42.    Attached hereto are true and correct copies of the following:

7            Ex. 1          Resume of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP;

8            Ex. 2          Resume of Robbins Umeda & Pink, LLP;

9            Ex. 3          Resume of Emerson Poynter, LLP; and

10           Ex. 4          Resume of Murray Frank & Sailer, LLP.

11      43.    For the reasons set forth above and in the accompanying Memorandum of Points and

12  Authorities in Support of Final Approval of Settlement, I respectfully submit that the agreed upon

13  settlement with defendants is in the best interests of Riverstone and its shareholders, is fair,

14  reasonable and adequate, and should therefore be approved.

15       I declare under penalty of perjury under the laws of the State of California that the foregoing

16  is true and correct.  Executed this __ day of December, 2004, at San Diego, California.

17

18

19                                          MARC M. UMEDA

20

21

22

23

24

25

26

27

28  I:\Riverstone\Settlement\Long DecN.org Declaration.wpd

DECLARATION OF MARC M. UMEDA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT - CV-03-0637-PJH

1

## DECLARATION OF SERVICE BY MAIL

2      I, the undersigned, declare:

3      1.     That declarant is and was, at all times herein mentioned, a citizen of the United States

4  and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in

5  the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California

6  92101.

7      2.     That on December 1, 2004, declarant served the DECLARATION OF MARC M.

8  UMEDA IN SUPPORT OF APPROVAL OF SETTLEMENT by depositing a true copy thereof in a

9  United States mailbox at San Diego, California in a sealed envelope with postage thereon fully

10 prepaid and addressed to the parties listed on the attached Service List.

11     3.     That there is a regular communication by mail between the place of mailing and the

12 places so addressed.

13     I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day

14 of December, 2004, at San Diego, California.

15

16                                              ADRIANA DEL CARMEN

17

18

19

20

21

22

23

24

25

26

27

28

RIVERSTONE (Settlement)
Service List - 11/18/2004 (03-0124)
Page 1 of 1

Counsel For Defendant(s)

Williams S. Freeman
Cooley Godward LLP
One Maritime Plaza, Suite 2000
San Francisco, CA 94111-3580
   415/693-2000
   415/951-3699 (Fax)

Paul T. Friedman
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
   415/268-7000
   415/268-7522 (Fax)

Counsel For Plaintiff(s)

John G. Emerson, Jr.
Scott E. Poynter
Emerson Poynter LLP
2228 Cottondale Lane, Suite 100
Little Rock, AR 72202
   501/907-2555
   501/907-2556 (Fax)

Keith F. Park
Michael J. Dowd
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
   619/231-1058
   619/231-7423 (Fax)

Eric J. Belfi
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
   212/682-1818
   212/682-1892 (Fax)

Brian J. Robbins
Marc M. Umeda
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA 92101
   619/525-3990
   619/525-3991 (Fax)

R. Scott Dreher
The Dreher Law Firm
835 Fifth Avenue, Suite 202
San Diego, CA 92101
   619/230-8828
   619/687-0136 (Fax)

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| RNI WIND DOWN | ) | |
| CORPORATION, et al., | ) | Case No. 06-10110 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

ORDER

**AND NOW**, this **23rd** day of **August, 2006,** upon consideration of the evidence and the arguments presented in the briefs and at the hearing on (i) the Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 (the "9019 Motion"); and (ii) the Motion of Charles L. Grimes for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 of the Bankruptcy Code (the "Stay Relief Motion"), it is hereby

**ORDERED**, that the 9019 Motion is **GRANTED**; and it is further

**ORDERED**, that the Stay Relief Motion is **DENIED** without prejudice.

BY THE COURT:


Christopher S. Sontchi
United States Bankruptcy Judge
Dated:    August 23, 2006

# EXHIBIT I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| RNI WIND DOWN | ) | |
| CORPORATION, et al., | ) | Case No. 06-10110 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## MEMORANDUM OPINION[1]

Before the Court is the Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 (the "9019 Motion"), and the Motion of Charles L. Grimes for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 of the Bankruptcy Code (the "Stay Relief Motion"). The 9019 Motion is opposed by Charles L. Grimes and the Stay Relief Motion is opposed by the Debtors, the Official Committee of Equity Security Holders, and the Official Community of Unsecured Creditors. For the reasons stated below, the 9019 Motion will be granted and the Stay Relief Motion will be denied without prejudice.

## I.   Factual and Procedural Background

This controversy arises from a series of derivative suits that were filed between August 2002 and March 2004 in the

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Superior Court of California and the United States District Court for the Northern District of California (the "District Court") against Riverstone Networks, Inc. ("RNI") and its directors and officers.[2] The derivative actions asserted claims against RNI's directors and officers for insider trading, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment. Specifically, plaintiffs alleged that between August, 2001 and December, 2002 the defendants realized that RNI could not achieve its revenue and earnings projections and conspired to create the "appearance" of growth during the relevant period by issuing false and/or misleading public statements regarding RNI's business, financial condition and prospects.

In May 2004, the plaintiffs in the derivative actions reached a settlement in principle with RNI and its directors and officers. On November 12, 2004, all parties to the pending derivative actions entered into a Stipulation and Agreement of Settlement (the "Original Settlement"). The Original Settlement provided for the settlement of both the state court and District Court derivative actions. The principle terms of the Original Settlement included changes to the number and independence of, members of the Board of Directors; the implementation of new

---

[2] On May 24, 2006, RNI changed its name to RNI Wind Down Corporation. For convenience, "RNI" will be used throughout this opinion to refer to RNI Wind Down Corporation formerly known as Riverstone Networks, Inc., regardless of which formal name of the corporation was applicable at any given time.

2

corporate governance measures; and a payment of $11 million for
the benefit of RNI.    Further, section 5.1 of the Original
Settlement provides, in part, that "Riverstone agrees to pay . .
. the fees and expenses of all experts retained by Derivative
Plaintiffs' Counsel in an aggregate amount of $1,750,000, as a
unitary part of the Settlement."    Original Settlement, at 14, §
5.1, ll. 14-18 (Nov. 12, 2005).

On January 26, 2005, the District Court granted preliminary
approval of the Original Settlement, subject to objections from
stockholders.  On May 2, 2005, Charles Grimes filed both a motion
to intervene and an objection to the unitary nature of the
payment of $1,750,000 for plaintiffs' attorneys' fees included in
the Original Settlement.  On July 22, 2005, the District Court
overruled Mr. Grimes' objection and entered an order granting
final approval of the Original Settlement.  The District Court
also dismissed the District Court derivative action with
prejudice and granted Mr. Grimes' motion to intervene, giving him
the right to appeal.

On August 11, 2005, Mr. Grimes filed his appeal with the
United States Court of Appeals for the Ninth Circuit (the "Ninth
Circuit").  Subsequently, the former derivative plaintiffs and
defendants (the "Settlement Parties") agreed to unbundle the fee
award from the Original Settlement, i.e., to strike the "unitary
nature of the settlement," and filed a joint motion to dismiss

3

the Ninth Circuit appeal as moot, which the Ninth Circuit denied on March 17, 2006. The appeal before the Ninth Circuit remains pending.

On February 7, 2006, RNI and its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

On May 5, 2006, Mr. Grimes filed the Stay Relief Motion, seeking relief from the automatic stay to proceed with his Ninth Circuit appeal.[3]

On June 8, 2006, the Debtors filed the 9019 Motion. Through the 9019 Motion, the Debtors seek to amend the Original Settlement in the following ways:

   a. Deletion of the provision that makes granting the derivative plaintiffs' attorneys' fees and expenses "a unitary part of the settlement."

   b. Derivative plaintiffs' counsel will repay to RNI's estate $950,000 of the $1,750,000 previously paid to them as attorneys' fees. Those funds are to be transferred to RNI's estate within ten business days of this Court confirming the Debtors' pending plan of reorganization. The transfer of those funds to RNI's estate is subject to refund of the full amount, plus

---

[3] The Debtors' commencement of Chapter 11 proceedings on February 7, 2006 stayed the appeal before the Ninth Circuit, pursuant to section 362 of the Bankruptcy Code.

4

interest, in the event of a reversal or modification of this Court's order confirming the Debtors' pending plan of reorganization.

c. The Debtors will bring a motion to approve the settlement amendment before this Court and file a motion to dismiss the Ninth Circuit Appeal.

This Court's approval of the Amendment to the Stipulation and Agreement of Settlement Dated as of November 12, 2004 (the "Amended Settlement") under Bankruptcy Rule 9019 is a condition to the effectiveness of the *Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders* (the "Plan") filed on June 30, 2006. A hearing on confirmation of the Plan is scheduled for September 12, 2006.

On June 30, 2006, the Court convened an evidentiary hearing on the 9019 Motion and the Stay Relief Motion.[4] At the conclusion of the hearing, the Court requested the submission of supplemental briefs in connection with the 9019 Motion, which were filed on July 24, 2006. On July 27, 2006, the Court heard oral argument in connection with the issues discussed in the

---

[4] Charles Grimes did not present any independent evidence in support of the Stay Relief Motion at the hearing on the motion.

supplemental briefs.  This is the Court's decision on the 9019 Motion and the Stay Relief Motion.

## II.    **The 9019 Motion**

Bankruptcy Rule 9019 provides that "[o]n a motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Whether the Court may approve the Amended Settlement under Bankruptcy Rule 9019 is governed by well-settled principles of law and does not present a difficult issue in this case.

There are, however, three threshold issues that must be addressed before the Court may consider the merits of the Amended Settlement under Bankruptcy Rule 9019: (1) does the Bankruptcy Court have subject-matter jurisdiction over the Amended Settlement; (2) can the Court approve the Amended Settlement over the objection of Mr. Grimes, who is a party to the pending appeal before the Ninth Circuit but is not a party to the Amended Settlement; and (3) in light of the pending Ninth Circuit appeal, should the Court abstain from considering the 9019 Motion under principles of comity.

This Court finds that it has subject-matter jurisdiction to consider the Amended Settlement under Bankruptcy Rule 9019; Mr. Grimes is not a necessary party to the Amended Settlement; and the Court will not abstain from considering the 9019 Motion because principles of comity are not invoked and the standard for

6

permissive abstention is not satisfied.   The Court further finds that the Debtors have satisfied the standard under Bankruptcy Rule 9019 and the Amended Settlement will be approved.

### A.    This Court Has Subject-Matter Jurisdiction Over the Amended Settlement

The basic statutory grant of bankruptcy court subject-matter jurisdiction is contained in 28 U.S.C. § 1334.   Specifically, section 1334(a) provides the district court with "original and exclusive jurisdiction of all cases under title 11."   Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."   Section 1334(e)(1) provides the district court in which a case under title 11 is commenced or is pending with "exclusive jurisdiction (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." *Compare Arbaugh v. Y&H Corporation dba The Moonlight Café*, ___ U.S. ___, 126 S.Ct. 1235, 1244, 163 L.Ed. 2d 1097, 1109 (2006) (setting forth the statutory bases for federal court subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332).[5] The property of the estate referenced in section 1334(e)(1) is defined in 11 U.S.C. § 541 and includes "all legal and equitable

---

[5] 28 U.S.C. § 157(a) provides that the district court may provide that any and all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.   The United States District Court for the District of Delaware has so provided.

interests of the debtor in property . . . ." 11 U.S.C. § 541(a)(1)(2005).

Assuming the district court has subject-matter jurisdiction under 28 U.S.C. § 1334 and the district court has referred the matter to the bankruptcy court under 28 U.S.C. § 157(a), a related question arises -- whether the matter before the bankruptcy court is a core or non-core proceeding under 28 U.S.C. § 157(b). Importantly, 28 U.S.C. § 157(b) is **not** an independent basis for conferring subject-matter jurisdiction to a bankruptcy court. Rather, 28 U.S.C. § 157(b) delineates the scope of the bankruptcy court's power to exercise the subject-matter jurisdiction granted to the district court under 28 U.S.C. § 1334. Core proceedings include "matters concerning administration of the estate" and "other proceedings affecting . . . the adjustment of the debtor-creditor relationship." 28 U.S.C. § 157(b)(2)(A),(O)(2005). The consideration of the Amended Settlement under Rule 9019 is a core proceeding.

The underlying cause of action at issue here is a derivative action.

> Where a corporation has suffered an injury from actionable wrongs committed by its officers and directors, the remedy under a state's incorporation laws is a suit on behalf of the corporation. Such a suit may be brought by the corporation, or, in some circumstances, can be brought by the shareholders or creditors on its behalf. Regardless of who initiates the suit, the

8

> recovery goes to the corporation. When the
> action is brought on behalf of the
> corporation, it is referred to as a
> derivative action.

*Reliance Acceptance Group, Inc. v. Levin (In re Reliance Acceptance Group, Inc.)*, 235 B.R. 548, 554 (D. Del. 1999).

Upon the filing of a bankruptcy petition, however, any claims for injury to the debtor from actionable wrongs committed by the debtor's officers and director become property of the estate under 11 U.S.C. § 541 and the right to bring a derivative action asserting such claims vests exclusively to the trustee. *Mitchell Excavators Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984) (*citing Pepper v. Litton*, 308 U.S. 295, 306-07, 84 L. Ed. 281, 289-90, 60 S.Ct. 238, 245 (1939)). *See also Skolnick v. Atlantic Gulf Communities Corp. (In re Gen. Development Corp.)*, 179 B.R. 335, 338 (S.D. Fla. 1995) ("[t]he bankruptcy estate includes all legal claims owned by [the] corporate debtor, including derivative actions. . . ."). This is true regardless of whether the derivative action is brought prior to or after the filing of the petition. *Compare Mitchell Excavators Inc.*, 734 F.2d at 130 (derivative action brought after filing of petition); and *Gen. Development Corp.*, 179 B.R. at 337 (derivative action brought prior to filing of petition).

Thus, the claims asserted by the plaintiffs in the derivative actions in this case are property of the estate under

9

section 541 of the Bankruptcy Code and, pursuant to 28 U.S.C. §
1334(e)(1), this Court has exclusive subject-matter jurisdiction
over those claims, including settlement of those claims.[6]

This conclusion is not in dispute.   In his brief in
opposition, Mr. Grimes agreed that when a corporation files for
protection under the Bankruptcy Code, causes of action, including
derivative actions, become property of the estate.   Rather, Mr.
Grimes argues (without citation to authority) that the same is
not true with respect to an appeal of a court-approved settlement
of a derivative action because state law does not give the
corporation the right to assert that claim.

Mr. Grimes' argument is without merit.   First, the fact that
the derivative actions have been settled and dismissed does not
divest this Court of subject-matter jurisdiction over the claims
for injury to the debtor.   Whether the trustee would ultimately
prevail on such claims in the face of a previously approved
settlement may be at issue, but the settlement and dismissal has
no effect on the bankruptcy court's subject-matter jurisdiction
over the claims.   Second, the fact that settlement and dismissal
of the derivative actions was followed by an appeal to the Ninth

---

[6]Because the trustee has the exclusive right to prosecute the derivative
actions, the trustee is the only party with the right to settle the actions.
*See, e.g., In Re Ontos,* No. 05-4773, 2006 U.S. Dist. LEXIS 4198 at *14 (D.N.J.
Jan. 4, 2006) ("it would be a strange and illogical interpretation of the law
that recognized on the one hand the exclusive right of the Trustee to
prosecute a fraudulent transfer claim, while on the other hand denying him the
power to settle or compromise that very same claim").

Circuit that is still pending does not change the analysis. The bankruptcy court's subject-matter jurisdiction over the claims for injury to the debtor is based upon the claims themselves and not the procedural posture of the derivative actions asserting those claims.

The Court also finds the absence of authority in support of Mr. Grimes' argument significant. As set forth above, the bankruptcy court's subject-matter jurisdiction over property of the estate, including claims for injury to the debtor, is created by statute. *See* 11 U.S.C. § 1334(e)(1). Similar authority is required to divest the bankruptcy court of its statutorily granted subject-matter jurisdiction based upon the procedural posture of the derivative actions. No such authority exists and, thus, the subject-matter jurisdiction created by Congress remains intact. *See Arbaugh*, ___ U.S. ___, 126 S.Ct. at 1244, 163 L. Ed. 2d at 1110 (rather than constricting the scope of the federal court's subject-matter jurisdiction, the "sounder course" is to refrain from constricting the court's subject-matter jurisdiction and "to leave the ball in Congress' court").

**B.    <u>Mr. Grimes is Not a Necessary Part to the Amended Settlement</u>**

Mr. Grimes argues that the Court cannot approve the Amended Settlement over his objection because he is a party to the

pending appeal before the Ninth Circuit, but is not a party to the Amended Settlement.

Mr. Grimes incorrectly collapses the Amended Settlement into the pending appeal. The Debtors are not seeking to settle or to dismiss the pending appeal. Rather, they are seeking this Court's authority under Bankruptcy Rule 9019 to enter the Amended Settlement. While such approval may moot the pending appeal, the settlement or dismissal of the Ninth Circuit appeal is not before this Court.

What is before the Court is a proposed settlement of claims for injury to the debtor from actionable wrongs committed by the debtor's officers and directors, which were the subject of the derivative actions. As set forth above, upon the filing of a bankruptcy petition, those claims became property of the estate under 11 U.S.C. § 541 and the right to bring a derivative action asserting such claims vested exclusively to the trustee, including the right to settle such claims. As a result of the bankruptcy filing, even if Mr. Grimes had been the plaintiff in the derivative actions (which he was not) those claims could be settled over Mr. Grimes' objection. *Compare Ontos*, 2006 Lexis 4198, at *14 (because the trustee has the exclusive right to prosecute a fraudulent transfer claim, he also has the power to settle or compromise the same claim). Certainly, if the consent of the plaintiff in a derivative action is not required to settle

claims for injury to the debtor, Mr. Grimes is in no greater position to exercise a veto over the Amended Settlement.

Mr. Grimes argues that the Debtors cannot amend the Original Settlement without first having the District Court's decision approving the Original Settlement vacated. He further argues that the Debtors do not meet the "exceptional circumstances standard" required for a court of appeals to grant *vacatur*.

Mr. Grimes cites *Teachers Insurance & Annuity Association v. Butler*, which stands for the proposition "that a bankruptcy court is precluded from relitigating judgments rendered by courts of competent jurisdiction . . . ." 803 F.2d 61, 66 (2d Cir. 1986). Debtors are not seeking to relitigate the derivative actions in this Court. This Court is merely reviewing the validity of the Amended Settlement in the context of the 9019 motion.

Grimes also cites *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994). The issue in *Bancorp* is not on point to the case at hand. In *Bancorp*, the issue on appeal was "whether appellate courts in the federal system should vacate civil judgments of subordinate courts in cases that are settled after appeal is filed or certiorari sought." *Id.* at 19.

In *Bancorp*, the Supreme Court explained reasons behind the strict standards on post-judgments *vacatur*. *Id.*

The Supreme Court reasoned that:

> [s]ome litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court, or in the court of appeals, if, but only if, an unfavorable outcome can be washed away with settlement-related vacatur. And the judicial economies achieved by settlement at the district-court level are ordinarily much more extensive than those achieved by settlement on appeal.

*Id.* at 28 (emphasis omitted). Here, the Debtors previously settled the derivative actions in the District Court and are merely seeking an amendment of the Original Settlement. Therefore the concerns raised by the Supreme Court in *Bancorp* are not implicated in this case.

### C. **This Court Will Not Abstain From Considering the 9019 Motion**

The principle of comity is that "the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect." *Brown v. Babbitt Ford, Inc.*, 571 P.2d 689, 695 (Ariz. Ct. App. 1977). The principle of comity applies among federal courts and requires federal courts of coordinate jurisdiction and equal rank to exercise care to avoid interference with each other's affairs. *West Gulf Maritime Association v. ILA Deep Sea Local 24, et al.*, 751 F.2d 721, 728 (5th Cir. 1985).

14

The principle of comity is not applicable in this case because the claims asserted by the plaintiffs in the derivative actions are property of the estate under section 541 of the Bankruptcy Code and, pursuant to 28 U.S.C. § 1334(e)(1), this Court has exclusive subject-matter jurisdiction over those claims, including settlement of those claims. As a result, this is not a case where two federal courts of equal rank are exercising coordinate or concurrent jurisdiction.

Nonetheless, this Court has authority under 11 U.S.C. § 1334(c)(1) in the interest of justice to abstain from hearing a particular proceeding arising under title 11 or arising or related to a case under title 11. Thus, notwithstanding that the principle of comity is not applicable in this case, the Court will consider whether it should abstain from considering the 9019 Motion.

"Permissive abstention from core proceedings under 28 U.S.C. § 1334(c)(1) is left to the bankruptcy court's discretion." *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 232 (2d Cir. 2002). Bankruptcy courts consider twelve nonexclusive factors to determine whether permissive abstention is appropriate:

> (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the

15

difficulty or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with the enforcement left to the bankruptcy court; (9) the burden of the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of nondebtor parties.

*In re Sun Healthcare Group*, 267 B.R. 673, 678-79 (Bankr. D. Del. 2000). "Evaluating the twelve factors is not a mathematical formula." *Id.* at 679.

In this case, factors (2), (3) and (8) do not apply as they pertain to issues of state law and comity with state courts that are simply not present in this case. Factor (5) does not apply because this Court's subject-matter jurisdiction arises under 28 U.S.C. § 1334. In addition, factors (9), (10) and (11) are inapplicable because this Court's docket is not burdened, there is no evidence of forum shopping and there is no right to a jury trial, respectively.

16

This leaves factors (1), (4), (6), (7), and (12) as the relevant factors for this Court to consider in determining whether it will abstain from considering the 9019 Motion.

**(1)    *The effect or lack thereof on the efficient administration of the estate.***

Abstention would have an adverse impact on the efficient administration of the Debtors' estates.  The Plan has not yet been confirmed and approval of the Amended Settlement is an express condition to the effectiveness of the Plan, assuming, *arguendo*, the Plan is confirmed.  The confirmation hearing is scheduled for September 12, 2006.  Any further delay in resolving the issues raised by the 9019 Motion would have an adverse effect on the timely administration of this case.  Therefore, this factor does not favor abstention.

**(4)    *The presence of a related proceeding commenced in state court or other non-bankruptcy court.***

The issue before this Court is the Debtors' 9019 Motion, which seeks approval of an Amended Settlement.  The issue before the Ninth Circuit is an appeal of the District Court's order approving the Original Settlement.  The issues stated on appeal by Mr. Grimes are

> 1)   whether   unitary   settlements   are permissible at all in derivative actions; 2) if  unitary  settlements  are  permissible, should  a  district  court  evaluate  their fairness   solely   under   the   standards

17

applicable to ordinary settlement agreements,
or should it evaluate the attorneys' fee
provision pursuant to the stricter standard
normally applied in fee application cases;
and 3) if ordinary settlement agreement
standards are applicable, did the District
Court abuse its discretion by approving the
settlement agreement even though it found the
agreed fee exorbitant and unreasonable?

Opening Brief of Charles L. Grimes, No. 05-16588, at 2, filed in
the United States Court of Appeals for the Ninth Circuit (Nov.
23, 2005).

Both proceedings arise from the settlement of the claims
asserted in the derivative actions, however, the issues before
each court are separate and distinct. While both the 9019 Motion
and the issues on appeal were precipitated by the derivative
actions, the 9019 Motion does not directly involve the validity
of the Original Settlement or any of the issues presented to the
Ninth Circuit on appeal.  See also *Seguros del Estado, S.A. v.
Scientific Games, Inc.*, 262 F.3d 1164 (11th Cir. 2001).

While the approval of the 9019 Motion alters the underlying
facts of the Ninth Circuit Appeal, it does not change or
determine any of the legal issues that were raised on appeal.
Therefore, this factor does not favor abstention.

18

**(6)** *The degree of relatedness or remoteness of the proceeding to the main bankruptcy case.*

Consideration of the Amended Settlement through the 9019 Motion is a core proceeding and therefore related to the main bankruptcy case.   This factor does not favor abstention.

**(7)** *The substance rather than the form of an asserted "core" proceeding.*

This is a core proceeding.   This factor does not favor abstention.

**(12)** *The presence in the proceeding of nondebtor parties.*

While Mr. Grimes is a party to the appeal in the Ninth Circuit, his participation is not necessary for the Amended Settlement.   This factor does not favor abstention.

All of the relevant factors considered by bankruptcy courts in determining whether to abstain under 11 U.S.C. § 1334(c)(1) do not favor abstention.   Thus, it would not be in the interest of justice for this Court to abstain from considering the 9019 Motion and this Court will not do so.

**D.    The 9019 Motion Is Approved**

Bankruptcy Rule 9019 provides that "[o]n a motion by the trustee an after notice and a hearing, the court may approve a compromise or settlement."   Fed. R. Bankr. P. 9019(a).   "Four criteria that a bankruptcy court should consider . . . [are] (1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

The Debtor clearly meets the standard under Rule 9019. As a preliminary matter, it is important to note that the Amended Settlement is an amendment to the Original Settlement previously approved by the District Court under the more stringent standards applicable to the settlement of a derivative action under Rule 23.1 of the Federal Rules of Civil Procedure. Moreover, the Amended Settlement results in an additional benefit to the Debtors' estates in the amount of $950,000. The Amended Settlement is significantly more favorable to the Debtors' estates than the Original Settlement previously approved by the District Court over Mr. Grimes' objection -- this fact alone weighs heavily in favor of approving the Amended Settlement.

Given the procedural posture of the pending appeal before the Ninth Circuit and the terms of the Amended Settlement it is somewhat difficult to apply the *Martin* factors. Nonetheless, to the extent the *Martin* factors are relevant, taken as a whole they favor approval of the Amended Settlement.[7]

---

[7] While the Amended Settlement is not a settlement of the Ninth Circuit appeal it will have an effect on that appeal by, in all likelihood, rendering it moot. Thus, the discussion of the *Martin* factors focuses almost exclusively on the Ninth Circuit appeal. Nonetheless, the Court reiterates that the issue before the Court is not the Ninth Circuit appeal but rather is the proposed settlement of claims for injury to the debtor from actionable wrongs committed

The first *Martin* factor is the probability of success in litigation. In this case, this means the probability that the Original Settlement will survive the appeal before the Ninth Circuit. It is quite possible that Mr. Grimes would be successful in his appeal before the Ninth Circuit. If so, it is possible that the entire $1.75 million in attorneys' fees and not just $950,000 would be returned to the Debtors' estates. Of course, if the approval of the Original Settlement by the District Court is affirmed by the Ninth Circuit, the entire $1.75 million in attorneys' fees would remain in the hands of the plaintiffs' attorneys. Thus, the Courts finds that the return of approximately 54% of the attorneys fees previously approved by the District Court fairly and accurately reflects the possibility that the Original Settlement will be overturned on appeal.

The second *Martin* factor is the likely difficulty in collection. In this case, this means the difficulty that the Debtors may face in collecting the $1.75 million in attorneys' fees in the event that the Original Settlement is overturned on appeal. There would be little if any difficulty in collecting the $1.75 million in attorneys' fees in the event the Original Settlement is overturned on appeal and, thus, this factor weighs against approving the Amended Settlement.

---

by the debtor's officers and directors, which were the subject of the derivative actions.

The third *Martin* factor is the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it. In this case, this means the complexity of the appeal before the Ninth Circuit and the expense, inconvenience and delay necessarily attending the appeal and any subsequent proceeding in the event that the Original Settlement is overturned on appeal. This factor weighs heavily in favor of approving the Amended Settlement.

The final *Martin* factor is the interest of creditors. Generally speaking, adding $950,000 to a debtor's estate would inure to the benefit of a debtor's creditors. In this case, however, under the proposed Plan, creditors are "in the money" by approximately $100 million. Thus, an additional $950,000 in the Debtors' estates will have no effect on creditor recoveries in this case.

Nonetheless, the Court finds that this factor favors approving the Amended Settlement for two reasons. First, there is a significant benefit that inures to the Debtors' creditors under the Amended Settlement other than the return of $950,000. Specifically, approval of the Amended Settlement is a condition to the effectiveness of the proposed Plan. Under the proposed Plan, the Debtors' creditors will receive timely payment of their allowed claims in full in cash and, in some cases, with interest. Since approval of the Amended Settlement is a condition to the

receipt of those funds, the approval of the Amended Settlement is in the best interest of creditors.

Second, approval of the Amended Settlement also inures to the benefit of RNI's shareholders. Although in most bankruptcy cases there is little or no chance for payment to equity, this is not the case here. Although *Martin* does not specify that the interest of equity should be considered, the Court finds that in appropriate circumstances, *e.g.*, in a case where there is a likelihood of a recovery for equity, the Court can and should consider the interest of equity holders in applying the fourth *Martin* factor.

Thus, considered together, the *Martin* factors weigh in favor of this Court granting the 9019 Motion.

### III. **The Stay Relief Motion**

As discussed at length above, the claims asserted by the plaintiffs in the derivative actions are property of the estate under section 541 of the Bankruptcy Code. Pursuant to section 362(a) of the Bankruptcy Code, the filing of the Debtors' petitions for relief on February 7, 2006, operates as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay also applies to "the commencement

23

or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor." 11 U.S.C. § 362(a)(1).

Since the claims asserted in the derivative actions are property of the estate, and RNI is a party to the pending appeal in the Ninth Circuit, the automatic stay prevents Mr. Grimes from continuing his appeal. Mr. Grimes has filed the Stay Relief Motion, seeking relief from the automatic stay for "cause" to pursue his appeal.

Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay for "cause." 11 U.S.C. § 362(d)(1). In order to establish cause for relief under section 362(d)(1), "the party seeking relief from the stay must show that 'the balance of hardships from not obtaining relief tips significantly in [its] favor.'" *Atl. Marine, Inc v. Am. Classic Voyages, Co. (In re American Classic Voyages, Co.)*, 298 B.R. 222, 225 (D. Del. 2003) (quoting *In Re FRG*, 115 B.R. 72, 74 (E.D. Pa. 1990).

Section 362(g) of the Bankruptcy Code provides that the party requesting relief from the automatic stay has the burden of proof on the question of the debtor's equity in property and that the party opposing relief has the burden on all other issues. 11 U.S.C. § 362(g). Nonetheless, the moving party first must establish its *prima facie* case. 3-362 *Collier on Bankruptcy* P 362.10 (Alan N. Resnick, Henry J. Sommer eds. 15th Ed. Rev.

24

2005). Failure to prove a *prima facie* case requires denial of the requested relief. *See Sonnax Industries, Inc. v. Tri Component Prods. Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("[s]ection 362(d)(1) requires an initial showing of cause by the movant . . . . If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("[w]hile section 362(g) allocates the burden of ultimate persuasion, under either ground, the movant must still make a prima facie showing that it is entitled to the relief that it seeks."); and *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994). A *prima facie* case requires a showing by the movant of "a factual and legal right to the relief that it seeks." *In re Elmira Litho, Inc.*, 174 B.R. at 902.

In this case, the movant did not submit any evidence in support of its Stay Relief Motion. Mr. Grimes filed the Declaration of Kathleen M. Miller In Support of Motion for Relief from Stay Pursuant to 11 U.S.C. § 363 of the Bankruptcy Code Filed by Charles Grimes [D.I. 351], which lists and attaches as exhibits several public documents previously filed in other proceedings. Neither the Declaration nor the documents attached thereto, however, were moved into evidence at the hearing on the

25

Stay Relief Motion. Moreover, even if the documents attached to the Declaration had been admitted into evidence, they are insufficient to establish a *prima facie* case that cause exists to lift the automatic stay. Mr. Grimes failed to make a *prima facie* case by not establishing a factual and legal right to the relief he requests in the Stay Relief Motion and, thus, the motion is denied without prejudice.

**IV.  Conclusion**

For the reasons stated above, the Court will grant the 9019 Motion and will deny without prejudice the Stay Relief Motion.

An appropriate order is attached.


                              BY THE COURT:


                              Christopher S. Sontchi
                              United States Bankruptcy Judge


Dated:    August 23, 2006

26

# EXHIBIT J

.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 06-10110 (CSS) |
| RNI Wind Down Corp., et al.,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hearing Date: September 12, 2006 at 9:30 a.m. |
| | ) | Re: Docket No. 630 |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER UNDER
11 U.S.C. §§ 1129(a) AND (b) AND FED. R. BANKR. P. 3020 CONFIRMING
JOINT PLAN OF REORGANIZATION AND LIQUIDATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, AS REVISED**

WHEREAS, on June 30, 2006, the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), the Official Committee of Unsecured Creditors

appointed in the above-captioned chapter 11 cases (the "Creditors Committee") and the Official

Committee of Equity Security Holders appointed in the above-captioned chapter 11 cases (the

"Equity Committee," together with the Creditors Committee, the "Committees," and together

with the Creditors Committee and the Debtors, the "Proponents") as "proponent[s] of the plan"

within the meaning of section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code"), filed the Joint Plan of Reorganization and Liquidation Under Chapter

11 of The Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured

Creditors and the Official Committee of Equity Security Holders, as Revised (as amended,

---

[1] The Debtors are RNI Wind Down Corporation, formerly known as Riverstone Networks, Inc. (Tax ID No. XX-XXX6178), BlueCoast Software (Tax ID No. XX-XXX9415), The OASys Group, Inc. (Tax ID No. XX-XXX8093), Riverstone Networks SPC, Inc. (Tax ID No. XX-XXX3518) and Pipal Systems, Inc. (Tax ID No. XX-XXX6850) each with a mailing address of 5200 Great America Parkway, Santa Clara, CA 95054.

modified or supplemented, the "Plan")[2] and the Debtors' Disclosure Statement for Joint Plan of

Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, as Revised (as

amended, modified or supplemented, the "Disclosure Statement") with the United States

Bankruptcy Court for the District of Delaware (the "Court"); and

WHEREAS, on August 9, 2006, the Court entered an order (the "Disclosure

Statement Order") that, among other things, (a) approved the Disclosure Statement under section

1125 of the Bankruptcy Code and Bankruptcy Rule 3017, (b) established September 12, 2006, as

the date for the commencement of the hearing to consider confirmation of the Plan (the

"Confirmation Hearing"), (c) approved the form and method of notice of the Confirmation

Hearing (the "Confirmation Hearing Notice") and (d) established certain procedures for

soliciting and tabulating votes with respect to the Plan; and

WHEREAS, the Confirmation Hearing Notice, the Disclosure Statement, the Plan

and the appropriate ballots (each, a "Ballot" and collectively, the "Ballots") were transmitted in

accordance with Bankruptcy Rule 3017(d) and the Disclosure Statement Order, as set forth in the

Affidavit of Mailing, dated September 7, 2006 [Docket No. 838]; and

WHEREAS, notice of the Confirmation Hearing was published, as required by

the Disclosure Statement Order, in the national edition of The New York Times on August 21,

2006, as evidenced by the Affidavit of Publication, dated August 22, 2006 [Docket No. 832]; and

WHEREAS, on September 8, 2006, the Proponents filed the Affidavit of Jeffrey

Pirrung Certifying the Ballots Accepting or Rejecting the Proponents' Methodology for the

Tabulation of and Results of Voting with Respect to Joint Plan of Reorganization and

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which reflecting the additional modifications described herein is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official

Committee of Unsecured Creditors and the Official Committee of Equity Security Holders, as

Revised, as per Docket No. 840 and as supplemented on the record at the Confirmation Hearing

by the approval of the Stipulation and Agreed Order with respect to the Claims of Suresh

Gopalakrishnan under Bankruptcy Rule 3018, attesting and certifying the method and results of

the ballot tabulation for the Classes of Claims and Equity Interests voting to accept or reject the

Plan (collectively, the "Ballot Affidavit"); and

WHEREAS, on September 7, 2006, the Debtors filed the Debtors' Memorandum

in Support of Confirmation of Joint Plan of Reorganization and Liquidation Under Chapter 11 of

the Bankruptcy Code Proposed by the Debtors, the Official Committee of Unsecured Creditors

and the Official Committee of Equity Security Holders, as Revised [Docket No. 844] (the

"Confirmation Memorandum") and the Affidavit of Alan B. Miller in Support of Confirmation

of the Joint Plan of Reorganization and Liquidation Under Chapter 11 of The Bankruptcy Code

Proposed by the Debtors, the Official Committee of Unsecured Creditors and the Official

Committee of Equity Security Holders, as Revised [Docket No. 842] (the "Confirmation

Affidavit") each of which have been supported by testimony at the Confirmation Hearing; and

WHEREAS, certain objections or purported objections to confirmation of the

Plan were timely filed and served (the "Objections"); and

WHEREAS, the Objections have been withdrawn or resolved on the terms and

conditions described on the record of the Confirmation Hearing or on the basis of language

added to the Plan as set forth in this Order and in Exhibit A annexed hereto and the remaining

Objections are overruled on the merits pursuant to this Confirmation Order; and

WHEREAS, the Confirmation Hearing was held on September 12, 2006.

- 3 -

NOW, THEREFORE, based upon the Court's review of the Ballot Affidavit, the Confirmation Affidavit and the Confirmation Memorandum, and upon all of the evidence proffered or adduced at, memoranda and Objections filed in connection with, and arguments of counsel made at, the Confirmation Hearing and the entire record of these chapter 11 cases (the "Chapter 11 Cases"); and after due deliberation thereon and good cause appearing therefor:

I. **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

1. Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)). This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the standing order of reference, dated September 6, 2001, of the United States District Court for the District of Delaware. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2. Judicial Notice. This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the adequacy of the Disclosure Statement.

---

[3] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

3. <u>Burden of Proof</u>. The Debtors and the Committees, as Proponents of the Plan, have the burden of proving the elements of Bankruptcy Code §§ 1129(a) and (b) by a preponderance of evidence.

4. <u>Transmittal and Mailing of Materials; Notice</u>. The Disclosure Statement, the Plan, the Ballots and the Confirmation Hearing Notice were transmitted and served in compliance with the Disclosure Statement Order and the Bankruptcy Rules, and such transmittal and service were adequate and sufficient. Adequate and sufficient notice of the Confirmation Hearing and the other deadlines and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Rules and the Disclosure Statement Order, and no other or further notice is or shall be required.

5. <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code § 1129(a)(1).

(a) <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>. In addition to Administrative Expense Claims and Priority Tax Claims, which need not be classified under Section 1122, the Plan designates seven (7) Classes of Claims and Equity Interests. Each Secured Claim shall be deemed to be separately classified in a subclass of Secured Claims, and shall have all rights associated with separate classification under the Bankruptcy Code. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests. The Plan satisfies Bankruptcy Code §§ 1122 and 1123.

- 5 -

(b)    Specify Unimpaired Classes (11 U.S.C. § 1123(a)(2)). Articles III and IV of the Plan specifies the Classes that are unimpaired under the Plan, thereby satisfying Bankruptcy Code § 1123(a)(2). Specifically, these unimpaired Classes are Classes 1, 2, and 3 (including all subclasses where applicable).

(c)    Specify Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article IV of the Plan designates the Classes that are Impaired and specifies the treatment of Claims and Equity Interests in those Classes, thereby satisfying Bankruptcy Code § 1123(a)(3). Specifically, these impaired Classes are Classes 4, 5, 6, and 7 (including all subclasses where applicable).

(d)    No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest expressly has agreed in writing to a less favorable treatment of such Claim or Equity Interest, thereby satisfying Bankruptcy Code § 1123(a)(4).

(e)    Implementation of Plan (11 U.S.C. § 1123(a)(5)). The Plan provides adequate and proper means for its implementation, thereby satisfying Bankruptcy Code § 1123(a)(5).

(f)    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). The Plan provides that, upon the Effective Date, the certificates of incorporation and bylaws of the Reorganized Debtors shall be deemed amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code including, without limitation, providing, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities. Accordingly, Bankruptcy Code § 1123(a)(6) is satisfied.

064952.1001

(g)    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

6.    Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code § 1129(a)(2).  Specifically:

(a)    The Debtors are proper debtors under Bankruptcy Code § 109.

(b)    The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

(c)    The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order in transmitting the Plan, the Disclosure Statement, the Ballots and related documents and notices and in soliciting and tabulating votes on the Plan.

7.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).  The Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Bankruptcy Code § 1129(a)(3).  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan and the Chapter 11 Cases.  The Chapter 11 Cases were filed, and the Plan and all modifications thereto were proposed, with legitimate and honest purpose of liquidating and maximizing the value of the Debtors' estates and the recovery to holders of Claims and Equity Interests.

8.    Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).  Any payment made or to be made by the Proponents or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with

- 7 -

the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying Bankruptcy Code § 1129(a)(4).

9.    Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)).  The Proponents have complied with Bankruptcy Code § 1129(a)(5).  Section 6.1 of the Plan provides for (i) the establishment of a Liquidating Trust pursuant to the terms of a Liquidating Trust Agreement, if necessary, which agreement will provide for the appointment of a Liquidating Trustee who will carry out his duties under the Liquidating Trust Agreement, in consultation with the Post-Effective Date Committee and (ii) the appointment of a Plan Administrator, who will serve as the sole officer and director of the Reorganized Debtors pursuant to Section 6.13 of the Plan.  The Plan further provides that no current or former officer, director, stockholder, employee or professional of the Debtors nor member of either of the Committees shall serve as the Liquidating Trustee or Plan Administrator.  These provisions of the Plan are consistent with the interests of Creditors and Equity Interest Holders, thereby satisfying Bankruptcy Code § 1129(a)(5).

10.    No Rate Changes (11 U.S.C. § 1129(a)(6)).  The Plan does not provide for the changes in any rates that are subject to regulatory approval.  Thus, Bankruptcy Code § 1129(a)(6) is not applicable in these Chapter 11 Cases.

11.    Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).  The Plan satisfies Bankruptcy Code § 1129(a)(7).  The Confirmation Affidavit and other evidence proffered or adduced at the Confirmation Hearing are persuasive and credible, and establish that each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the

Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

12.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). As demonstrated by the Ballot Affidavit, each Impaired Class entitled to vote has accepted the Plan in accordance with Bankruptcy Code §§ 1126(c) and (d). The Plan therefore satisfies Bankruptcy Code § 1129(a)(8).

13.    Treatment of Administrative and Tax Claims § 1129(a)(9)). The treatment of Administrative Claims in Article II of the Plan satisfies the requirements of Bankruptcy Code § 1129(a)(9).

14.    Acceptance By Impaired Class (11 U.S.C. § 1129(a)(10)). All Impaired Classes of Claims or Equity Interests entitled to vote have accepted the Plan, determined without including any acceptance of the Plan by any insider, thus satisfying Bankruptcy Code § 1129(a)(10). Moreover, at least one Class of Impaired Claims that has accepted the Plan has met the statutory conditions for acceptance without including any acceptances by an insider.

15.    Feasibility (11 U.S.C. § 1129(a)(11)). The Plan calls for the liquidation of the Debtors and, therefore, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thus satisfying the requirements of Bankruptcy Code § 1129(a)(11).

16.    Payment of Fees (11 U.S.C. § 1129(a)(12)). All fees payable under § 1930 of title 28, United States Code, as determined by the Court, have been paid or will be paid on the Effective Date pursuant to the Plan, thus satisfying the requirements of Bankruptcy Code § 1129(a)(12).

064952.1001

17.    **Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).** The Plan does not alter retiree benefits to the extent any such benefits currently exist. Thus, the requirements of Bankruptcy Code § 1129(a)(3) are satisfied.

18.    **Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).** The Plan does not discriminate unfairly and is fair and equitable as to all Holders of Impaired Claims and Equity Interests in the Debtors.

19.    **Principal Purpose of the Plan (11 U.S.C. § 1129(d)).** The principal purpose of the Plan is to distribute the proceeds of sale of the Debtors' Assets and any other recoveries for the benefit of the Debtors' Estates to Creditors and shareholders, and thus is not for the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

20.    **Modifications to the Plan.** The modifications to the Plan set forth in paragraph 25, and where applicable, paragraph 26 hereof, constitute technical changes and do not materially adversely affect or change the treatment of any Claims or Equity Interests other than those Settling Officers and Directors who have expressly agreed in writing to accept the terms and conditions of a settlement with Mr. Grimes as set forth in paragraph 26 hereof. Accordingly, pursuant to Bankruptcy Rule 3019, those modifications do not require additional disclosure under Bankruptcy Code § 1125 or re-solicitation of votes under Bankruptcy Code § 1126, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

21.    **Good Faith Solicitation (11 U.S.C. § 1125(e)).** Based on the record before the Court in these Chapter 11 Cases, the Proponents and each of their respective directors, officers, employees, shareholders, members, agents, advisors, accountants, investment bankers,

consultants, attorneys, and other representatives have acted in "good faith" within the meaning of Bankruptcy Code § 1125(e) in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in Bankruptcy Code § 1125, and are entitled to the protections afforded by Bankruptcy Code § 1125(e).

22.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the requirements for Confirmation set forth in Bankruptcy Code § 1129.  In addition, the Conditions to Confirmation as set forth in section 11.22 of the Plan have been satisfied; provided further, that since no stay is in effect with respect to this Court's Order of September 7, 2006 approving the settlement between the Plan Proponents and Noah D. Mesel, such condition to Confirmation has been satisfied.

23.    <u>Satisfaction of Bankruptcy Rule 9019</u>.  The settlement of the Indemnification Claims of the Settling Officers and Directors as proposed in the Plan meets the standards governing the approval of settlements under Bankruptcy Rule 9019 as the settlement is fair and equitable and provides benefits to the estate.

24.    <u>Retention of Jurisdiction</u>.  The Court may properly retain jurisdiction over the matters set forth in Article X of the Plan and Bankruptcy Code § 1142.

## II.    <u>DECREES</u>

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

25.    <u>List of Plan Modifications</u>.  At the request of the Proponents, the Plan is hereby modified pursuant to Bankruptcy Code § 1127(a) as follows:

(a)     The exculpation and release provisions contained in Sections 9.1, 9.2 and 9.3 of the Plan and the waiver of Chapter 5 Avoidance Actions contained in Section 6.7 of the Plan shall specifically exclude Morrison & Foerster, LLP.

(b)     Section 9.1 of the Plan is replaced with the following: "On the Effective Date of this Plan, no Person who was serving as an officer, director or employee of the Debtors on or after the Commencement Date, acting in their capacity as such, nor the Debtors, the Debtors' Estates, the Reorganized Debtors, the Committees or their present or former members, the Plan Administrator, the Liquidating Trustee or any of the foregoing's respective affiliates, members, stockholders, advisors, agents or Professionals, except with respect to Morrison & Foerster, LLP (collectively, the "Exculpated Parties") shall have or incur any liability to any Person for any act or omission taken or omitted on or after the Commencement Date in connection with, related to, or arising out of, the Chapter 11 Cases, the postpetition negotiation and/or sale of Debtors' assets to Lucent Technologies, Inc. ("Lucent"), the preparation, filing, negotiation or formulation of this Plan, the pursuit of confirmation of this Plan including without limitation, the consummation of this Plan or the implementation or administration of this Plan or the property to be distributed under this Plan, and any such Claim or Cause of Action shall be deemed released, except for: (i) any Claim or Cause of Action arising from the fraud or willful misconduct of any Exculpated Party; (ii) any Claim or Cause of Action arising from the gross negligence of any Professional; and (iii) any Claim or Cause of Action commenced by the Equity Committee on or before the Cause of Action Commencement Date, but solely as it may relate to the timing of the Lucent closing and/or any EC Computer Cause of Action. In all respects the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; provided, however,

that nothing in this Plan shall, or shall be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect, to any of the Exculpated Parties' obligations or covenants arising pursuant to this Plan or the Confirmation Order."

(c)     Section 9.3 of the Plan is replaced with the following: "Except as set forth in Section 9.5(f) hereof and except with respect to Morrison & Foerster, LLP, on the Effective Date, each Holder of a Claim or Equity Interest (including Allowed Option Holders and Disallowed Option Holders) who voted in favor of the Plan and/or who checked the box on the ballot marked "Third Party Release" shall be deemed to unconditionally release and forever waive all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any transactions or matters with the Debtors, their Estates or in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the sale of the Debtors' assets to Lucent, or for any act or omission that occurred or could have occurred on or prior to the Effective Date (collectively "Released Claims") against (i) any Debtor or Reorganized Debtor, (ii) any affiliate or subsidiary of any Debtor or Reorganized Debtor, (iii) the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (iv) each member of the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (v) any Officer, Director and Employee and (vi) any Settling Officer and Director.  For the avoidance of doubt, nothing in this Plan or the Disclosure

Statement shall affect the right of any Creditor or Equity Interest Holder who votes to reject the Plan or who fails to vote on the Plan or who otherwise objects to the Plan to receive a distribution under the Plan."

(d)      The first sentence of Section 6.2 of the Plan is replaced with the following: "The Post-Effective Date Committee shall be comprised of four (4) members designated by the Equity Committee."

(e)      Section 4.7(f)(ii) of the Plan is replaced with the following: "such objection sets forth the specific factual and legal bases why the Option Holder should not be treated as an Allowed Option Holder, including, but not limited to, on the grounds that such option or options, under applicable law, were not validly issued or amended, not timely exercised or not properly modified."

26.      Resolution of the Objection of Charles L. Grimes.  It has been agreed between Charles L. Grimes ("Mr. Grimes") and those Settling Officers and Directors who on or before the Effective Date expressly agree in writing with Mr. Grimes, with a copy thereof delivered to each of the Plan Proponents, that Mr. Grimes's objection to the Plan shall be resolved as follows:

(a)      the Third Party Commencement Deadline, approved as part of the Plan, shall be extended solely as to Mr. Grimes (or his executor or administrator) for 180 days following the Effective Date; provided however that any additional Claims or Causes of Action Mr. Grimes chooses to assert shall be filed as an amendment to the existing complaint previously filed by him in the Court of Chancery for the State of Delaware on August 31, 2006 (Case No. 2388) and shall only be brought in an individual, not a class, capacity;

(b)    Mr. Grimes has represented that he did not vote the five million shares he owns directly/beneficially in favor of the Plan, nor did he check the box on the ballot marked "Third Party Release";

(c)    Mr. Grimes shall be forever barred and estopped from asserting any Claim or Cause of Action against any Settling Officer or Director that is not commenced within 180 days of the Effective Date;

(d)    nothing in this Order shall be deemed to extend any applicable statute of limitations that may otherwise bar, or affect any other defense that may be applicable, to any Claim or Cause of Action belonging to Mr. Grimes;

(e)    the Equity Committee has agreed (with the consent of the Settling Officers and Directors) to produce certain documentation to Mr. Grimes, subsequent to the execution of an appropriate confidentiality agreement; any disputes over such agreement or the scope of production shall be resolved by the Bankruptcy Court; and

(f)    the objection filed by Mr. Grimes with respect to the Post-Effective Date reporting of fees and expenses has been resolved by Paragraph 44 of this Order.

27.    Resolution of the Objection of the United States Trustee.  The objection filed by the Office of the United States Trustee has been resolved by the technical modifications contained in Paragraph 25(b) and (c) of this Order.

28.    Confirmation.  The Plan (as modified), a copy of which is annexed hereto as Exhibit A, is approved and confirmed under Bankruptcy Code § 1129. The terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.

29.  Objections. All Objections that have not been withdrawn, waived or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

30.  Provisions of Plan and Order Non-Severable and Mutually Dependent. The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are non-severable and mutually dependent.

31.  Plan Classification Controlling. The classifications of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered to or returned by the Debtors' Creditors and Equity Interest Holders in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Equity Interests under the Plan for distribution purposes, and (c) shall not be binding on the Debtors, the Liquidating Trustee, the Plan Administrator, Creditors or Equity Interest Holders.

32.  Binding Effect. The Plan and its provisions shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the Holders of Claims and Equity Interests (including any governmental entities), whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder or entity has accepted the Plan, the members of the Post-Effective Date Committee and each of the foregoing's respective successors and assigns, including, without limitation, the Plan Administrator, the Liquidating Trustee, and any affiliates thereof.

DB02:5692319.16                                                          664932.1001

33. <u>Assumption and Assignment, or Rejection of Real Property Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>. Pursuant to Section 8.2 of the Plan, entry of the Confirmation Order shall constitute approval pursuant to Bankruptcy Code § 365(a) of the rejection of executory contracts and unexpired leases rejected pursuant to the Plan.

34. <u>Assumption and Assignment, or Rejection of Non-Real Property Executory, Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>. Pursuant to Section 8.1 of the Plan, all executory contracts and unexpired leases that exist between any of the Debtors and any Person, whether or not previously listed by the Debtors on their respective Schedule G, shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (1) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (2) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date.

35. <u>Insurance Policies</u>. Notwithstanding anything to the contrary in the Plan, this Order or any other documents, any insurance policy to which one or more of the Debtors is a party shall remain in full force and effect and shall not be deemed rejected pursuant to this Order.

36. <u>Bar Date for Rejection Damage Claims</u>. Pursuant to Section 8.3 of the Plan, Claims arising out of rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than fifteen (15) days after the entry of the Confirmation Order. Any Claims not filed within such applicable time period shall be forever barred.

37. <u>Bar Date for Non-Professional Administrative Expense Claims</u>. Any Person that believes it holds an Administrative Expense Claim (other than Professional Fee Claims, claims for United States Trustee fees and the expense of the members of either

Committee) that accrued or was incurred from June 1, 2006 through the Effective Date shall file with the Bankruptcy Court, not later than forty-five (45) days after the Effective Date, a request for payment of such Claim. Any Person that believes it holds a Non-Professional Administrative Expense Claim that does not file a request for such Claim with the Bankruptcy Court in accordance with such forty-five (45) day period will be forever barred from asserting that Claim against the Debtors or any property of the Debtors' estates.

38. <u>Bar Date for Professional Administrative Expense Claims</u>. Pursuant to Sections 2.2(b) and 7.11 of the Plan, each Professional retained with approval by order of the Bankruptcy Court or requesting compensation pursuant to Bankruptcy Code §§ 330 or 503 shall be required to file a Final Fee Application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases incurred through the Effective Date no later than thirty (30) days after the Effective Date. Objections to any application shall be filed not later than five (5) Business Days prior to the hearing set by this Court to consider such Final Fee Applications, unless extended by agreement of the parties.

39. <u>Advancement</u>. All claims for the advancement of defense costs, contribution, indemnification and/or reimbursement by the Debtors or the Reorganized Debtors shall be treated and paid in accordance with Section 4.6 of the Plan.

40. <u>General Authorizations</u>. Pursuant to Section 11.2 of the Plan, the Debtors or the Reorganized Debtors, the Liquidating Trustee and the Plan Administrator are authorized to accept, execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents without any further act or deed of the Debtors, the Board of Directors of the shareholders, and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan.

41.   **Plan Administrator and Liquidating Trustee Compensation**.  The Plan Administrator shall render his services to the Debtors on an hourly basis according to his customary hourly rate in effect when services are rendered; provided however, that compensation for the first year of employment shall not exceed $250,000.  The Plan Administrator shall not receive any additional compensation for his position as Liquidating Trustee.

42.   **Bond**.  The Plan Administrator shall post a bond to secure his or her obligations under the Plan in an initial amount of $10,000,000, which amount may be reduced as distributions are paid to Holders of Allowed Claims and Equity Interests (as directed from time to time by the Plan Administrator with the consent of a majority of the Post-Confirmation Committee).

43.   **Post-Effective Date Expenses**.  The Debtors and/or the Plan Administrator shall reserve funds to satisfy Post-Effective Date expenses incurred in administering the Plan; provided however, that the Plan Administrator may also utilize released or excess other reserves for the purpose of satisfying Post-Effective Date expenses including, without limitation, any indemnification claims made by Alan B. Miller pursuant to the terms of his employment and indemnification agreement.

44.   **Post-Effective Date Reporting**.  After the Effective Date, the Plan Administrator shall use his best efforts to prepare and post on a web-site available to all parties in interest quarterly reports as to the receipt and disbursement of funds, professional fees and other expenses incurred, material litigation and other events, and distributions made.  The first such report shall be posted no later than January 15, 2007 for the period ending December 31, 2006, and subsequent postings shall be made within 15 days of the end of each calendar quarter.

- 19 -

45.    <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

46.    <u>Exemption from Certain Taxes</u>.  Pursuant to Bankruptcy Code § 1146(c) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of Assets contemplated by this Plan, will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

47.    <u>Termination of Injunction or Stays</u>.  Pursuant to Section 6.3 of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed or dismissed or the property affected by such stay is no longer property of the Debtors' estates.

48.    <u>Release and Exculpation</u>.  As modified herein, the release and exculpation provisions contained in Sections 9.1, 9.2 and 9.3 of the Plan are hereby approved in their entirety.

49.    <u>Injunction</u>.  On and after the Confirmation Date, except as provided in the Plan or this Confirmation Order, all Persons that have held, currently hold or may hold a Claim,

Equity Interest, or other debt or liability that is addressed in the Plan are permanently enjoined from taking any of the following actions on account of any such Claims, Equity Interests, or other debts or liabilities, other than actions brought to enforce any rights or obligations under the Plan: (i) commencing or continuing in any manner any action or other proceedings against the Debtors or the Reorganized Debtors or their respective properties that was or could have been commenced prior to the Effective Date; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective properties; (iv) asserting a setoff of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective properties; and (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.

50.    Retention of Jurisdiction.  The Court shall retain jurisdiction in accordance with the terms of Article X of the Plan, any other provision of this Confirmation Order and Bankruptcy Code § 1142 until these Chapter 11 Cases are closed.  Any party in interest may commence a proceeding in this Court in respect of any matter as to which jurisdiction has been retained.

51.    Notice of Entry of Confirmation Order.  In accordance with Bankruptcy Rules 2002(f)(7) and 3020(c), within fifteen (15) Business Days of the entry of this Confirmation Order, the Debtors or the Plan Administrator, as applicable, shall give notice of the entry of this Confirmation Order, by United States mail, first class, postage prepaid to (a) the Office of the United States Trustee for the District of Delaware, (b) all entities who requested notice of the

DA03:3503319.10                                    064952.1001

Plan or the Disclosure Statement or who objected to the Plan or Disclosure Statement, (c) all

entities entitled to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (d)

all parties to executory contracts or unexpired leases rejected pursuant to the Plan, (e) all

Creditors who have filed proofs of claim in the Chapter 11 Cases or who are scheduled in the

Debtors' Schedules and (f) all other known parties in interest in the Chapter 11 Cases. Notice

provided in the manner described herein shall be adequate under the circumstances and no other

or further notice is necessary.

52.    <u>Notice of Effective Date</u>.  Within five (5) Business Days following the

occurrence of the Effective Date, the Plan Administrator shall file notice of the occurrence of the

Effective Date and shall serve a copy of same (a) on counsel to the Debtors; (b) counsel to each

of the Committees, and (c) all parties who have filed a request for special notice in the Chapter

11 Cases.  Notice of the Effective Date may be sent simultaneously with the notice of the entry

of this Confirmation Order required pursuant to paragraph 42 hereof.

53.    <u>Enforceability</u>.  Pursuant to Bankruptcy Code §§ 1123(a) and 1142(a) and

the provisions of this Confirmation Order, the Plan, and all Plan related documents shall apply

and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

Dated: September /2, 2006
       Wilmington, Delaware

_____
The Honorable Christopher S. Sontchi
United States Bankruptcy Judge

DB02:5502319.19                                                              064952.1001

**Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x

In re:                                          :     Chapter 11

                                                :     Case No. 06-10110 (CSS)
RNI WIND DOWN CORPORATION, f/k/a                :     Jointly Administered
RIVERSTONE NETWORKS, INC., et al.,              :

                                                :
                        Debtors.                :

------------------------------------------------------x

## JOINT PLAN OF REORGANIZATION AND LIQUIDATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS, AS REVISED

**MORGAN, LEWIS & BOCKIUS LLP**
Co-Counsel to Debtors
101 Park Avenue
New York, NY 10178
Tel:    (212) 309-6000
Fax:    (212) 309-6001
Attn:   Neil E. Herman, Esq.
        Andrew D. Gottfried, Esq.
        Rebecca L. Booth, Esq.

**SCHULTE ROTH & ZABEL LLP**
Co-Counsel to the Official
Committee of Unsecured Creditors
919 Third Avenue
New York, NY 10022
Tel:    (212) 756-2000
Fax:    (212) 593-5955
Attn:   Jeffrey S. Sabin, Esq.
        Adam Harris, Esq.

**BROWN RUDNICK BERLACK ISRAELS LLP**
Co-Counsel to the Official
Committee of Equity Holders
One Financial Center
Boston, Massachusetts 02111
Tel:    (617) 856-8200
Fax:    (617) 856-8201
Attn:   William R. Baldiga, Esq.
        Sunni P. Beville, Esq.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Co-Counsel to Debtors
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Attn:   Michael R. Nestor, Esq.
        Edmon L. Morton, Esq.

**LANDIS RATH & COBB LLP**
Co-Counsel to the Official
Committee of Unsecured Creditors
919 Market Street
Suite 600
Wilmington, Delaware 19801
Tel:    (302) 467-4400
Fax:    (302) 467-4450
Attn:   Adam Landis, Esq.
        Kerri K. Mumford, Esq.

**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**
Co-Counsel to the Official
Committee of Equity Holders
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Tel:    (302) 426-1189
Fax:    (302) 426-9193
Attn:   Steven K. Kortanek, Esq.

Dated: September 12, 2006

# TABLE OF CONTENTS

**Page**

ARTICLE I.    DEFINITIONS AND INTERPRETATION ..................................... 3
    1.1    Definitions ......................................................................................... 3
    1.2    Other Terms ..................................................................................... 15
    1.3    Construction of Certain Terms ......................................................... 15

ARTICLE II.    TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
                 PRIORITY TAX CLAIMS ............................................................... 16
    2.1    Non-Classification ........................................................................... 16
    2.2    Administrative Expense Claims ....................................................... 16
           (a)    Administrative Expense Claims (other than Professional
                  Fee Claims) ........................................................................ 16
           (b)    Professional Fee Claims and Expense Reimbursement
                  Claims ............................................................................... 16
           (c)    Administrative Expense Claims Bar Date .......................... 17
           (d)    Insurance ............................................................................ 17
    2.3    U.S. Trustee Fees ............................................................................ 17
    2.4    Priority Tax Claims ......................................................................... 17

ARTICLE III.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .......... 17
    3.1    Identification of Classes ................................................................... 17
    3.2    Elimination of Classes ..................................................................... 18

ARTICLE IV.    TREATMENT OF CLAIMS AND EQUITY INTERESTS ................. 19
    4.1    Classes 1a, 1b, 1c, 1d and 1e (collectively, "Class 1") - Secured Claims ........... 19
           (a)    Impairment and Voting ...................................................... 19
           (b)    Treatment and Distributions .............................................. 19
           (c)    Deletion of Class ................................................................ 19
    4.2    Classes 2a, 2b, 2c, 2d and 2e (collectively, "Class 2") - Priority Claims ........... 19
           (a)    Impairment and Voting ...................................................... 19
           (b)    Distributions to Class 2 ...................................................... 19
           (c)    Deductions for Prior Payments .......................................... 19
           (d)    Deletion of Class ................................................................ 19
    4.3    Class 3 — Personal Injury/ Insured Claims ..................................... 20
           (a)    Impairment and Voting ...................................................... 20

# TABLE OF CONTENTS
## (continued)

| | | | Page |
|---|---|---|---|
| | (b) | Distributions to Class 3 | 20 |
| 4.4 | | Classes 4a, 4b, 4c, 4d and 4e (collectively, "Class 4") – General Unsecured Claims | 20 |
| | (a) | Impairment and Voting | 20 |
| | (b) | Distributions to Class 4 | 20 |
| | (c) | Interest | 20 |
| | (d) | Deletion of Class | 20 |
| 4.5 | | Class 5 – Bondholder Claims | 20 |
| | (a) | Allowance of Claims | 20 |
| | (b) | Impairment and Voting | 20 |
| | (c) | Distributions to Class 5 | 21 |
| | (d) | Method of Distributions | 21 |
| | (e) | Fees and Expenses of Bond Trustee | 21 |
| | (f) | Cancellation of Bonds | 21 |
| 4.6 | | Classes 6a, 6b, 6c, 6d or 6e (collectively, "Class 6") – Indemnification Claims | 21 |
| | (a) | Impairment and Voting | 21 |
| | (b) | Sub-classification | 21 |
| | (c) | Distributions to Class 6 | 22 |
| | (d) | Effect of Insurance Coverage | 22 |
| | (e) | Interest | 22 |
| | (f) | Undertaking to Return | 22 |
| | (g) | Settlement and Treatment of Claims of Settling Officers and Directors | 22 |
| | (h) | Additional Settlement in Respect of Class 6a-2 Claims | 22 |
| | (i) | Class 6a-2 Reserve | 23 |
| | (j) | Additional Reserves | 24 |
| | (k) | Electing Directors/Officers | 25 |
| | (l) | Invalidation of Election | 26 |
| | (m) | Non-Complying Persons | 26 |

## TABLE OF CONTENTS
(continued)

Page

(n)   Payment of Indemnification Claims of Officers, Directors and Employees ................................................................ 26

(o)   Cooperation ..................................................................... 27

4.7   Class 7a - Equity Interests (in Riverstone Networks, Inc.) .................... 27

(a)   Impairment and Voting ..................................................... 27

(b)   Distributions to Class 7 ..................................................... 27

(c)   Method of Distributions ..................................................... 27

(d)   Cancellation of Equity ..................................................... 27

(e)   Holders of Options ..................................................... 28

(f)   Option Holder Schedule ..................................................... 28

4.8   Classes 7b, 7c, 7d and 7e – Equity Interests in Debtors other than Riverstone Networks, Inc. ............................................................. 30

(a)   Impairment and Voting ..................................................... 30

(h)   Cancellation of Equity Interests ............................................ 30

ARTICLE V.   ACCEPTANCE OR REJECTION OF THIS PLAN ................... 31

5.1   Voting of Claims and Equity Interests ............................................ 31

5.2   Acceptance by a Class of Creditors or Equity Interest Holders ............... 31

5.3   Classes Entitled to Vote/Presumed Acceptances and Rejections of Plan ...... 31

5.4   Cram Down ............................................................................. 31

ARTICLE VI.   IMPLEMENTATION OF THE PLAN .................................... 31

6.1   Implementation of the Plan ......................................................... 31

(a)   Creation of Liquidating Trust .............................................. 31

(b)   Transfers to the Liquidating Trust ......................................... 31

(c)   The Liquidating Trustee ..................................................... 32

(d)   Responsibilities of Liquidating Trustee .................................... 32

(e)   Powers of the Liquidating Trustee ......................................... 32

(f)   Compensation of Liquidating Trustee ...................................... 32

(g)   Termination of Liquidating Trust .......................................... 33

(h)   Appointment of the Plan Administrator .................................... 33

(i)   Rights, Powers and Duties of the Reorganized Debtors and the Plan Administrator ..................................................... 33

# TABLE OF CONTENTS
(continued)

Page

      (j)     Compensation of Plan Administrator............................33

      (k)    Resignation of Officers and Directors .........................34

      (l)     Certificate of Incorporation and By-laws ....................34

6.2    Post-Effective Date Committee ...........................................34

6.3    Continuation of Bankruptcy Injunction or Stays ...................35

6.4    Substantive Consolidation ...................................................35

6.5    Intercompany Claims...........................................................35

6.6    Full and Final Satisfaction...................................................35

6.7    Chapter 5 Avoidance Actions ..............................................35

6.8    Administration Pending Effective Date .................................35

6.9    Closing of Chapter 11 Cases................................................36

6.10   Permanent Injunction..........................................................36

6.11   No Discharge ......................................................................36

6.12   Continued Corporate Existence; Dissolution of the Reorganized Debtors..........36

6.13   Directors and Officers; Effectuating Documents; Further Transactions .............36

ARTICLE VII.    DISTRIBUTIONS AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS ..........................37

7.1    Method of Distributions Under this Plan................................37

      (a)    In General...................................................................37

      (b)    Distributions of Cash ..................................................37

      (c)    Timing of Distributions................................................37

      (d)    Distributions to Holders as of the Confirmation Date ...............37

7.2    Fund Reserve ......................................................................37

7.3    Objections to and Resolution of Administrative Expense Claims, Claims and Equity Interests................................................37

7.4    Establishment and Maintenance of Reserve for Disputed Claims........38

7.5    Distributions Upon Allowance or Disallowance of Disputed Claims ................38

7.6    Distributions Upon Allowance of Class 6 Indemnification Claims..................38

7.7    Estimation ..........................................................................39

7.8    Disputed Payments..............................................................39

## TABLE OF CONTENTS
### (continued)

Page

7.9    Unclaimed Distributions ........................................................... 39

7.10   Setoffs ..................................................................................... 40

7.11   Professional Fees and Expenses ............................................... 40

7.12   Minimum Distributions ............................................................ 40

7.13   Final Distribution ................................................................... 40

ARTICLE VIII.   EXECUTORY CONTRACTS; UNEXPIRED LEASES; RETIREE
              BENEFITS ...................................................................... 40

8.1    Executory Contracts and Unexpired Leases ............................. 40

8.2    Approval of Rejection of Executory Contracts and Unexpired Leases ............... 40

8.3    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
       Unexpired Leases Rejected Pursuant to this Plan .................... 40

8.4    Retiree Benefits ....................................................................... 41

8.5    Employee Benefit Plans ........................................................... 41

ARTICLE IX.    EXCULPATION, INJUNCTIONS AND RELEASES ............... 41

9.1    Exculpation ............................................................................. 41

9.2    Releases by the Debtors ........................................................... 41

9.3    Releases by Holders of Claims and Equity Interests ................. 42

9.4    Injunctions .............................................................................. 42

9.5    Investigation Period; Time to Bring Causes of Action Against Settling
       Officers and Directors ............................................................. 43

ARTICLE X.     RETENTION OF JURISDICTION ................................... 44

10.1   Jurisdiction of Bankruptcy Court .............................................. 44

10.2   Venue ...................................................................................... 45

ARTICLE XI.    MISCELLANEOUS PROVISIONS ................................... 46

11.1   Successors and Assigns ............................................................ 46

11.2   Effectuating Documents and Further Transactions .................... 46

11.3   Exemption from Transfer Taxes ............................................... 46

11.4   Amendment, Modification, Withdrawal or Failure of this Plan ... 46

11.5   Post-Effective Date Fees and Expenses of Professionals and of Winding
       up the Estates ......................................................................... 47

11.6   Payment of Statutory Fees ....................................................... 47

# TABLE OF CONTENTS
## (continued)

Page

11.7    Dissolution of the Committees and of the Post-Effective Date Committee ........ 47

11.8    Courts of Competent Jurisdiction ............................................................... 47

11.9    Binding Effect ........................................................................................ 48

11.10   Notices .................................................................................................. 48

11.11   Reservation of Rights ................................................................................ 49

11.12   Section 1146 Exemption ............................................................................ 49

11.13   Further Assurances .................................................................................. 49

11.14   Filing of Additional Documents ................................................................ 50

11.15   Plan Supplement ..................................................................................... 50

11.16   Withholding and Reporting Requirements ................................................ 50

11.17   Headings ................................................................................................ 50

11.18   Inconsistency .......................................................................................... 50

11.19   Severability ............................................................................................ 50

11.20   Waiver of Ten Day Stay ............................................................................ 50

11.21   Governing Law ....................................................................................... 51

11.22   Conditions to Confirmation ..................................................................... 51

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

In re:                                                      :      Chapter 11
                                                            :
RNI WIND DOWN CORPORATION, f/k/a                            :      Case No. 06-10110 (CSS)
RIVERSTONE NETWORKS, INC., et al.,                          :      Jointly Administered
                                                            :
                                                            :
                          Debtors.                          :
                                                            :
------------------------------------------------------------x

### JOINT PLAN OF REORGANIZATION AND LIQUIDATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
### PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
### CREDITORS AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

### INTRODUCTION

Each of (i) RNI Wind Down Corporation, f/k/a Riverstone Networks, Inc. ("Riverstone") and its wholly owned subsidiaries, Blue Coast Software, The OASys Group, Inc., Riverstone Networks SPC, Inc. and Pipal Systems, Inc. (collectively, the "Debtors"), each a debtor and debtor in possession in the above-captioned cases pending under chapter 11 of the Bankruptcy Code[1], (ii) the Official Committee of Unsecured Creditors and (iii) the Official Committee of Equity Security Holders, jointly submit the following Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, as Revised, for the resolution of outstanding Claims against and Equity Interests in the Debtors.  Reference is made to the "Disclosure Statement for Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, as Revised, dated August 9, 2006" for, among other things, (i) a discussion of the Debtors' history, business and results of operations, and (ii) a summary and analysis of the Plan. All Holders of Claims or Equity Interests entitled to vote to accept or reject the Plan are encouraged to review the Disclosure Statement and the Plan before voting to accept or reject the Plan.  To the extent that the Plan is inconsistent with the Disclosure Statement, the Plan will govern.

This Plan provides for the liquidation and conversion of all of the Debtors' Assets to Cash and the Distribution of the net Proceeds therefrom to Creditors and Equity Interest holders in accordance with the priorities established by the Bankruptcy Code, this Plan and the orders of the Bankruptcy Court.

The Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders are co-proponents of this Plan and fully support confirmation of this Plan and

---

[1] Except as otherwise indicated, capitalized terms shall have the meanings ascribed to them in Article I hereof.

the treatment of Allowed Claims and Equity Interests as described herein.

## OVERVIEW OF TREATMENT UNDER THE PLAN

| Class | Treatment | Recovery |
|---|---|---|
| Unclassified Administrative Claims | Paid in full | 100% |
| Unclassified Priority Tax Claims | Paid in full | 100% |
| Classes 1(a)–1(e): Secured Creditors | Paid in full | 100% |
| Classes 2(a) – 2(e): Priority Claims | Paid in full | 100% |
| Classes 3(a) – 3(e): Personal Injury Claims | Covered by insurance; any portion of claim not covered by insurance will be a Class 4 General Unsecured Claim | 100% |
| Classes 4(a) – 4(e): General Unsecured Claims (trade claims, landlord claims, rejection claims, etc.). | Paid in full (including, where applicable, postpetition interest) | 100% |
| Class 5: Bondholder Claims | Paid in full plus pre- and postpetition interest, and including payment of Bond Trustee's reasonable, documented fees and expenses, including attorneys' fees. | 100% |

| Class | Treatment | Recovery |
|---|---|---|
| Classes 6(a) – 6(e): Indemnification Claims | Paid in full (including, where applicable, postpetition interest); provided, however, that Class 6 Indemnification Claims of Settling Officers and Directors shall be limited to available D&O Insurance and the Class 6a-2 Reserve. Settling Officers and Directors have also agreed to be subject to additional limitations as set forth herein | 100% of amount fixed by Court; provided, however, that Class 6 Indemnification Claims of Settling Officers and Directors are treated in an inferior manner and any such claims in excess of D&O Insurance and the Class 6a-2 Reserve are waived. |
| Class 7(a): Equity Interests in Riverstone Networks, Inc., including any Claim for damages by any current or former Shareholder of RNI Wind Down Corporation | Stock and options cancelled, but given effect for purpose of calculating amount of cash distribution. | Payment to each Holder of their Pro Rata share of all Available Cash after payment in full or reserves for Allowed Claims in Classes 1-6 |
| Classes 7(b) – 7(z): Equity Interests in all other Debtors | No distribution | 0% |

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

**1.1    Definitions.** As used in this Plan, and unless the context otherwise requires, the following terms shall have the meanings specified below:

"Administrative Expense Claim" means any Claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Assets of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, all compensation and reimbursement of expenses allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees and charges assessed against the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, all as may arise prior to the Confirmation Date.

"Administrative Claims Bar Date" means August 7, 2006 with respect to all Administrative Claims (other than Professional Fee Claims) arising from and after the Commencement Date through June 1, 2006 and such additional other date or dates as may be established by the Bankruptcy Court as the last day or days by which requests for payment of Administrative Expense Claims must be filed against the Debtors with respect to Administrative Claims arising after June 1, 2006 (other than Professional Fee Claims).

"Allowed" means, with respect to a Claim, proof of which was timely and properly filed or, if no proof of Claim was filed, which has been or hereafter is listed by the Debtors on their Schedules as liquidated in amount and not disputed or contingent and, in either case, as to which no objection to allowance has been interposed on or before the expiration of the time within which to object to such Claim, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder. Unless otherwise specified in this Plan or by order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of computation of distributions under this Plan, include interest on such Claim from and after the Commencement Date or include any penalty on such Claim. If a Claim is Allowed in part and Disputed in part, the Allowed portion shall be paid and the balance treated as a Disputed Claim. Any claim estimated for allowance purposes under Bankruptcy Code Section 502(c) shall not be allowed unless a Final Order has been entered with respect thereto.

"Allowed Option Holder" means, to the extent the failure to timely exercise was legally excused, legally barred or was legally impossible under applicable law, (i) the holder of any option, warrant or right, contractual or otherwise, to acquire or receive an Equity Interest in the Debtors and (ii) any current or former employee of the Debtors who would have been entitled to "deferred stock grants" or "restricted stock units" had the Debtors not declined to issue such shares as of April 2, 2006, in both instances solely to the extent such Person is identified on the Option Holder Schedule approved by the Court at or prior to the Confirmation Hearing.

"Asset" means any asset, property or interest therein of the Estates as provided for under section 541 of the Bankruptcy Code.

"Available Cash" means all Cash of the Estates, net of the aggregate amounts deposited in the Plan Funding Reserve and/or transferred to the Plan Administrator and the Liquidating Trust pursuant to this Plan, available to be (i) distributed to the Holders of Allowed Claims and Allowed Equity Interests under the Plan, (ii) reserved for distribution on account of Disputed Claims that may subsequently become Allowed Claims (in whole or in part) in the Disputed Claims Reserve and (iii) reserved for distribution on account of Class 6a-2 Claims in the Class 6a-2 Reserve.

"Avoidance Actions" means the Estates' causes of action for, or defenses to Claims with respect to, any avoidance or recovery action under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such causes of action as of the Cause of Action Commencement Date.

"Ballots" means each of the ballots and/or master ballots distributed with the Disclosure Statement to Holders of Impaired Claims or Impaired Equity Interests entitled to vote on this Plan, for the purpose of indicating an acceptance or rejection of this Plan.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq., as now in effect or hereafter amended and as applicable to these Chapter 11 cases or proceedings herein, as the case may be.

"Bankruptcy Court" means the United States District Court for the District of Delaware, having jurisdiction over these Chapter 11 Cases and, to the extent of the reference of the Chapter 11 Cases pursuant to 28 U.S.C. § 157(a), the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, and the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"Bar Date" or "Unsecured Claims Bar Date" means June 1, 2006, the date designated by the Bankruptcy Court as the last date for creditors to file Proofs of Claim in the Chapter 11 cases, or, with respect to governmental units, August 7, 2006.

"Bondholder Claim" means any Claim held by the holder of a bond issued pursuant to the Bond Indenture or the Registration Rights Agreement. The Bondholder Claims (excluding Claims relating to the fees and expenses of the Bond Trustee) shall be equal to the sum of (a) the aggregate principal amount outstanding under the Bond Indenture as of the Commencement Date of $65,875,000, together with interest accrued on such principal from December 1, 2005 through and including the Commencement Date, computed on the basis of a 360-day year at a combined annual rate of 3.75%, plus (b) pursuant to section 2(e) of the Registration Rights Agreement, an amount equal to .5% of the aggregate principal amount outstanding as of the Commencement Date, plus (c) pursuant to sections 3.1 and 7.2 of the Bond Indenture, an amount equal to .75% of the aggregate principal amount outstanding as of the Commencement Date, plus (d) interest on the aggregate of all such amounts set forth in clauses (a), (b), and (c) from the Commencement Date through the Initial Distribution Date at the rate of 3.75% calculated on the basis of a 360-day year. In addition, pursuant to the terms of the Bond Indenture, the Debtor shall pay the reasonable and documented fees and expenses of the Bond Trustee; provided, however, that any dispute with respect to the amount and/or payment by the Debtor of such fees and expenses shall be resolved by the Bankruptcy Court in accordance with section 4.5(c) of this Plan.

"Bond Indenture" means that certain indenture, dated as of November 21, 2001, as subsequently amended, by Riverstone Networks, Inc. to State Street Bank and Trust Company of California, N.A., as trustee.

"Bond Trustee" means U.S. Bank, N.A., or its successors and assigns, in its capacity as trustee under the Bond Indenture.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"Cash" means cash and cash equivalents.

"Cause of Action" means any Claim, right of action, suit, or proceeding, if any, whether in law or in equity, whether known or unknown, that the Debtors, their Estates or the Equity Committee or the Liquidating Trustee on behalf of the Debtors, may assert against any Person.

"Cause of Action Commencement Date" means, with respect to a particular Cause of Action and Person, (i) with respect to Causes of Action against Named Defendants relating to conduct exculpated and released pursuant to Sections 9.1 and 9.2 hereof, the Effective Date or (ii) with respect to all other Causes of Action other than any EC Computer Cause of Action, the Effective Date or such other, later date as may be ordered by the Bankruptcy Court with respect to a Non-Complying Person, or (iii) with respect to an EC Computer Cause of Action, the tenth day after the date on which the Bankruptcy Court enters an order adjudicating the EC NC Motion.

"Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled and jointly administered under *In re RNI Wind Down Corporation f/k/a Riverstone Networks, Inc., et al.*, Case No. 06-10110 (CSS), currently pending in the Bankruptcy Court.

"Claim" shall have the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Claim Objection Deadline" means (i) for all Claims other than Administrative Expense Claims and Rejection Claims, one (1) business day before the Effective Date, (ii) for Rejection Claims, the later of (a) one business day before the Effective date or (b) such other period of time as may be specifically fixed by the Bankruptcy Rules or order of the Bankruptcy Court, and (iii) for Administrative Expense Claims (other than Professional fee Claims), one business day before the Effective Date.

"Claims Administrator" means JPMorgan Trust Company or such other entity as may be selected by Debtors, the Plan Administrator or the Court.

"Class" means any group of substantially similar Claims or Equity Interests classified by this Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

"Class 6a-2 Reserve" means the Cash to be set aside in an interest-bearing escrow account as described in Section 4.6 hereof and which, together with available insurance proceeds, shall be the sole and exclusive source of recovery of Indemnification Claims of Settling Officers and Directors.

"Collateral" means any Asset or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance

under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or other applicable law.

"Commencement Date" means February 7, 2006, the date on which the Debtors commenced their Chapter 11 Cases.

"Committees" means, collectively, the Creditors' Committee and the Equity Committee.

"Confirmation" means entry by the Clerk of the Bankruptcy Court of the Confirmation Order.

"Confirmation Date" means the date of entry of the Confirmation Order by the Clerk of the Bankruptcy Court.

"Confirmation Hearing" means the hearing to consider Confirmation of this Plan under section 1129 of the Bankruptcy Code.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be reasonably satisfactory in form and substance to each of the Committees and the Debtors.

"Creditor" means any Person who holds a Claim against any Debtor.

"Creditors' Committee" means the Official Committee of Unsecured Creditors, appointed by the United States Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as constituted from time to time.

"D&O Non-Indemnification Claims and Equity Interests" means (a) any Claim of a Settling Officer and Director that is not for the advancement of defense costs, contribution, indemnification and/or reimbursement to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law, and shall include, without limitation, any wage, salary, commission, fee, expense, bonus, severance, benefit, change-in-control or the like claim and (b) any stock, stock option interest or other Equity Interest belonging to any Settling Officer and Director.

"Debtors" means collectively RNI Wind Down Corporation f/k/a Riverstone Networks, Inc., and its wholly owned subsidiaries Blue Coast Software, The OASys Group, Inc., Riverstone Networks SPC, Inc. and Pipal Systems, Inc., as debtors in possession, pursuant to section 1107 of the Bankruptcy Code.

"Debtors Intercompany Claims" means a Claim held by a Debtor or any subsidiary or affiliate of a Debtor against any other Debtor.

"Disallowed Option Holder" means the holder of any option, warrant or right, contractual or otherwise, to acquire or receive an Equity Interest in the Debtors who is

not listed on the Option Holder Schedule in the form approved by the Court in connection with the Disclosure Statement Hearing.

"Disclosure Statement" means the Disclosure Statement for Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, approved by the Bankruptcy Court on August 9, 2006.

"Disclosure Statement Hearing" means the hearing to consider approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"Disputed Claim" means any (or such portion of a) Claim or Equity Interest (including any Option Holder listed on the Option Holder Schedule where an objection has been timely filed in accordance with section 4.7(f) of the Plan) that has not been Allowed by Final Order and (a) that is disputed pursuant to Sections 4.3(b), 4.4(e) or 4.6(c) hereof; (b) for which a proof of Claim was timely and properly filed and (i) which has been or hereafter is listed on the Schedules as unliquidated, disputed, or contingent, or (ii) as to which a timely objection or request for estimation has been or may be interposed, which objection or request for estimation has not been withdrawn or determined by Final Order, (c) for which a proof of Claim was required to be filed but as to which no proof of Claim was filed or was filed untimely or improperly; or (d) except with respect to Settling Officers and Directors, in respect of which there is a filed Cause of Action joined with a proper claim objection pursuant to section 502(d) of the Bankruptcy Code. Unless previously Allowed, prior to (x) the time that an objection has been filed and (y) the expiration of time within which to object to such Claim, for purposes of this Plan, a Claim shall be considered a Disputed Claim (A) to the extent that the amount of the Claim specified in the proof of Claim exceeds the amount of the claim scheduled by the Debtors as other than disputed, contingent or unliquidated, or (B) in the full amount of such Claim in the event that the Claim is not listed on the Schedules.

"Disputed Claims Reserve" means, in the event there exists any Disputed Claim on or after the Effective Date, Cash to be set aside by the Reorganized Debtors (or the Plan Administrator where applicable) in one or more separate, interest-bearing account(s), in amounts sufficient to pay in full all such Disputed Claims with postpetition interest as provided in this Plan through the Initial Distribution Date; provided, however, that a lesser amount may be estimated by the Proponents or the Plan Administrator, as the case may be, but only if approved by the Court.

"Distribution" means any payment of Cash or property required under the Plan.

"Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims and Allowed Equity Interests, which date shall be the Confirmation Date.

"EC Computer Cause of Action" means any Cause of Action commenced on or before the Cause of Action Commencement Date against any of the Named Defendants to the extent such Cause of Action arises from or relates to (i) the facts or occurrences described in the report of the Equity Committee delivered to the Debtors' board of

directors and the Office of the U.S. trustee in accordance with the Implementation Order, or (ii) information and/or documents, including without limitation, any electronic documents not provided to the Equity Committee prior to August 2, 2006 or otherwise discovered or obtained by the Equity after August 23, 2006.

"EC NC Motion" means the motion of the Equity Committee, dated August 17, 2006 seeking to designate Noah Mesel as a non-complying person under Section 4.6(m) of the Plan.

"Effective Date" means the first Business Day that is (a) at least ten (10) days after the Confirmation Date, and (b) on which no stay of the Confirmation Order shall be in effect.

"Electing Director/Officer" means any Settling Officer or Director who, if named (i) as a defendant in any suit timely filed by the Equity Committee on or before the Cause of Action Commencement Date or (ii) as a potential defendant in the Equity Committee's Statement of Reserved Causes of Action (as defined in Section 4.6(j)(i) hereof), elects (in his or her sole discretion) in writing on or before the Effective Date to (a) defer his or her Distributions under this Plan on account of his or her D&O Non-Indemnification Claims and Equity Interests until the later of (x) the Cause of Action Commencement Date and (y) the date in which such lawsuit against that named individual is settled, withdrawn or resolved by a Final Order and (b) allow his or her Distributions under this Plan on account of his or her D&O Non-Indemnification Claims and Equity Interests to be at risk for satisfaction of any judgment in such lawsuit, as described in Section 4.6(k) of this Plan. For the avoidance of doubt, Allowed Indemnification Claims of an Electing Director/Officer may be paid from the Class 6a-2 Reserve notwithstanding such Electing Director/Officer's election under Section 4.6(k) hereof.

"Employee Benefit Plans" means all employee benefit plans, policies, and programs sponsored by the Debtors, including, without limitation, all savings plans, health plans, disability plans, life insurance plans, deferred compensation plans, retirement plans, pension plans, severance plans, and executive incentive plans.

"Entity" means an 'entity' as defined in section 101(15) of the Bankruptcy Code.

"Equity Committee" means the Official Committee of Equity Security Holders, appointed by the United States Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as constituted from time to time.

"Equity Interest" means (i) the interest of any holder of equity securities of any of the Debtors represented by any issued and outstanding shares of common, preferred or any other type of stock, and (ii) any option, warrant or right, contractual or otherwise, to acquire or receive any such interest to the extent such option warrant or right is held by an Allowed Option Holder.

"Estates" means collectively the Debtors' estates in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code.

"Exculpated Parties" has the meaning set forth in Section 9.1 of this Plan.

"Face Amount" means, at any time, with respect to a particular Claim: (a) if the Holder of such Claim has not filed a Proof of Claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, the amount of such Claim that is listed in the Schedules as noncontingent, undisputed and liquidated; (b) if the Holder of such Claim has filed a Proof of Claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, and such Claim has not become an Allowed Claim or been estimated by Final Order of the Bankruptcy Court, the amount stated in such Proof of Claim; or (c) in all other cases, zero ($0) or such amount as shall be fixed or estimated by a Final Order of the Bankruptcy Court.

"Final Decree" means an order entered by the Bankruptcy Court closing the Chapter 11 Cases after substantial consummation of the Plan.

"Final Distribution Date" means the date on which a final Distribution of Available Cash is made pursuant to this Plan. The Final Distribution Date shall be a date that is after (i) the liquidation into Cash of all Assets of the Debtors or the Reorganized Debtors as applicable (other than those Assets abandoned by the Debtors, the Reorganized Debtors or the Liquidating Trustee) and collection of other sums due or otherwise remitted or returned to the Estates, (ii) all Allowed Claims have been paid in full plus postpetition interest as provided herein and (iii) all remaining Cash in the Disputed Claims Reserve and Class 6a-2 Reserve becomes available to the Reorganized Debtors for Distribution pursuant to this Plan, and (iv) the Plan Administrator receives a written notice from the Liquidating Trustee stating that the Liquidating Trust has been fully administered.

"Final Order" means an order or judgment of the issuing court entered by the Clerk of such court on the docket in which the order or judgment was entered, which has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for *certiorari*, or other reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, new trial, reargument, or rehearing thereof has been sought or (ii) which shall have been affirmed by the highest Court to which such order or judgment was appealed, or for which *certiorari*, a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

"Foreign Subsidiaries" means the entities set forth on Schedule 1 hereto.

"General Unsecured Claim" means any Claim against the Debtors other than any Administrative Expense Claim, Priority Claim, Secured Claim, Bondholder Claim, a Personal Injury Claim or Class 6 Claim.

"Holder" means a Person or Entity holding a Claim or Equity Interest as of the applicable Distribution Record Date, and with respect to a vote on the Plan, a Person or Entity holding the beneficial interest in a Claim or Equity Interest as of the Voting Record Date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Ballot has been completed and executed in accordance with the Voting Instructions.

"Impaired" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code and applicable law.

"Implementation Order" means that certain Agreed Order in Aid of Plan Process (Including Designation of Equity Committee to Investigate and Prosecute Certain Estate Causes of Action), dated May 28, 2006, as it may be amended from time to time, pursuant to which the Bankruptcy Court established procedures for the Equity Committee to investigate the acts, conduct, affairs and transactions relating to the Debtors.

"Indemnification Claims" means solely those Claims for the advancement of defense costs, contribution, indemnification and/or reimbursement by the Debtors of (i) Officers, Directors and Employees, (ii) the Settling Officers and Directors, and/or (iii) Specified Former Officers and Directors to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law. Excluded from this definition is (i) any claim for indemnity based on any commercial contract with the Debtors and (ii) any claim by any Person that is not for the advancement of defense costs, contribution, indemnification and/or reimbursement to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law, including, without limitation, any wage, salary, commission, fee, expense, bonus, severance, benefit, change-in-control or the like claim.

"Initial Distribution Date" means the first date on which Distributions of Available Cash are made to Holders of Allowed Claims and/or Equity Interests in accordance with this Plan, which date shall be no later than ten (10) days after the Effective Date and in no event later than September 30, 2006.

"Investigation Deadline" means that date which is fourteen (14) days prior to the first date fixed by the Bankruptcy Court for the Confirmation Hearing.

"Lien" means a lien, security interest, mortgage, deed of trust, right of setoff, or other charge or encumbrance on or in any Asset to secure payment of a debt or performance of an obligation of the Debtors.

"Liquidating Trust" means the trust created pursuant to the Liquidating Trust Agreement and this Plan.

"Liquidating Trust Assets" means the Causes of Action, if any, and proceeds thereof commenced on or before the Cause of Action Commencement Date, and Cash (in an amount to be determined by the Equity Committee, subject to objections by any party in interest and approval by the Bankruptcy Court), which shall be initially transferred to the Liquidating Trust on the Effective Date (and thereafter transferred in accordance with this Plan).

"Liquidating Trust Agreement" means the agreement filed by the Equity Committee with the Bankruptcy Court at least five (5) days prior to the Confirmation Hearing prescribing the powers, duties, rights and obligations of the Liquidating Trustee in administering the Liquidating Trust.

"Liquidating Trustee" means the independent third party designated by the Equity Committee to administer the Liquidating Trust. The Equity Committee will file with the Bankruptcy court a written notice of the identity of the Liquidating Trustee and the terms of his or her engagement at least five (5) days before the Confirmation Hearing. The Liquidating Trustee and the Plan Administrator may be the same person. If no Cause of Action has been commenced by the Cause of Action Commencement Date, all provisions in this Plan relating to the Liquidation Trust and the Liquidating Trustee shall be deemed eliminated and of no force or effect.

"Mesel" means Noah Mesel.

"Mesel Settlement Motion" means the motion of the Equity Committee and the Debtors dated August 29, 2006 to settle and compromise the treatment of claims against the Debtors by Mesel and certain potential claims by the Debtors against Mesel.

"Non-Complying Person" shall have the meaning provided to it in Section 4.6(m) hereof.

"Officers, Directors and Employees" means any present or former officer, director or employee of the Debtors other than the Specified Former Officers and Directors and the Settling Officers and Directors.

"Option Holder Schedule" means the list filed by the Debtors and approved by the Bankruptcy Court at or prior to the Confirmation Hearing setting forth each of the Allowed Option Holders, the number of each Allowed Option Holder's options and the "strike price" to be paid by each such Allowed Option Holder.

"Pending Action" means (i) any action, suit or legal proceeding commenced after June 30 2006, pursuant to a complaint or other moving paper then on file with any court, which has not been dismissed or withdrawn by Final Order, or (ii) any action commenced after June 30, 2006, for which a complaint or other moving paper (x) previously was filed with any court after June 30, 2006 (y) thereafter was dismissed or withdrawn without prejudice and (z) for which the applicable statue of limitations to recommence such

action has not yet expired.  For the avoidance of doubt, Pending Action shall not include the investigation by the Equity Committee.

"Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"Personal Injury/Insured Claims" means the portion of any Claim against the Debtors (other than Indemnification Claims) that is covered by insurance to pay all or any portion of the Allowed amount of such Claim.

"Plan" means this chapter 11 joint plan of reorganization and liquidation for the Debtors as proposed by the Debtors, the Creditors' Committee, and the Equity Committee, as the same may be amended, modified, or supplemented from time to time.

"Plan Administrator" means the independent third party designated by the Equity Committee to serve as the sole director and officer of the Reorganized Debtors on and after the Effective Date.  The Equity Committee will file with the Bankruptcy Court a written notice of the identity of the Plan Administrator and the terms of his or her engagement at least five (5) days before the Confirmation Hearing.  The Plan Administrator and the Liquidating Trustee may be the same person.

"Plan Funding Reserve" shall mean one or more reserves to be established on the Effective Date in an amount sufficient to satisfy the estimated costs of administering the Plan and closing the Chapter 11 Cases after paying all Allowed Claims in full plus postpetition interest to the extent required by this Plan.

"Post-Effective Date Committee" means the entity formed under Article 6 of this Plan.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expenses Claim.

"Priority Tax Claim" means any Priority Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Proceeds" means any Cash or other property obtained by the Estates through the liquidation of any of the Assets.

"Professional" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code.

"Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of expenses relating to services rendered, or any member of the Committees for reimbursement of expenses incurred, on and after the Commencement Date and prior to the Confirmation Date.

"Proponents" means collectively, the Debtors, the Creditors' Committee and the Equity Committee.

"Pro Rata Share" means, as of the date of any determination, (a) with respect to the share of any Claim within a Class of Claims, a fraction (expressed as a percentage) having as its numerator the Face Amount of such Claim and having as its denominator the aggregate Face Amount as of such date of all Allowed Claims and Disputed Claims in such Class and (b) with respect to an Equity Interest, a fraction (expressed as a percentage) having as its numerator the number of shares owned by a Holder and having as its denominator the aggregate number of all issued and outstanding shares in the same Class entitled to the same Distribution (after giving effect to the conversion or exercise of any options).

"Proof of Claim" means a proof of claim pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

"Registration Rights Agreement" means that certain agreement, dated as of November 21, 2001, between Riverstone Networks, Inc., and Morgan Stanley & Co. Inc., and Salomon Smith Barney Inc.

"Rejection Claims" means Claims arising from the rejection of an executory contract or unexpired lease of the Debtors.

"Reorganized Debtors" mean the Debtors, on and after the Effective Date.

"Riverstone" means RNI Wind Down Corporation f/k/a Riverstone Networks, Inc.

"Schedules" means the schedules of assets and liabilities and the statements of financial affairs, filed by the Debtors, as such schedules or statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

"Secured Claim" means a Claim held by any Person to the extent of the value, as agreed to by the Holder of such Claim and the Debtors or the Plan Administrator, as the case may be, or as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Estate securing such Claim; provided, however, that a Secured Claim shall not include any portion of the Claim that exceeds the value of the interest in property of the Estate securing such Claim.

"Settling Officers and Directors" means those Persons identified on Schedule 2 hereto.

"Solicitation Agent" means JP Morgan Trust Company, or such other Person or Entity as may be selected by the Debtors, in either case in its capacity as information, balloting, and noticing agent for the Debtors.

"Solicitation Procedures Order" means the order of the Bankruptcy Court or other court of competent jurisdiction approving the Debtors' proposed procedures to govern their solicitation of votes on this Plan.

"Specified Former Officers and Directors" means, collectively, Rom Pereira, Robert Stanton, William McFarland, John Kern, Daniel Harding, Andrew Feldman, Piyush Patel and any other former officer or director of the Debtors who as of the date of this Plan has received a "Wells Letter" from the Securities and Exchange Commission.

"Subsequent Distribution Date" means any date after the Initial Distribution Date (including the Final Distribution Date) on which a Distribution of Available Cash is made to Holders of Allowed Claims and/or Equity Interests in accordance with this Plan.

"Third Party Commencement Deadline" means September 1, 2006, the date established by the Bankruptcy Court for parties in interest other than the Equity Committee or the Liquidating Trustee to commence a cause of action against the Settling Officers and Directors.

"Transfer Agent" means Mellon Investor Services.

"Voting Deadline" means the date and time, as fixed by an order of the Bankruptcy Court and set forth in the Disclosure Statement, by which all Ballots to accept or reject this Plan must be received by the Solicitation Agent.

"Voting Instructions" means the instructions and related procedures for voting to accept or to reject this Plan, as approved by the Solicitations Procedures Order and set forth in the Disclosure Statement and on the Ballots.

"Voting Nominee" means any record holder, such as brokers, banks, commercial banks, transfer agents, trust companies, dealers and other agents or nominees of one or more Allowed Equity Interests or Allowed Bondholder Claims.

"Voting Record Date" means the record date for determining the Holders of Claims and Equity Interests entitled to vote to accept or to reject this Plan, as fixed by the Solicitation Procedures Order.

1.2   **Other Terms.** A term used in this Plan that is not defined shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

1.3   **Construction of Certain Terms.**

(a)   The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan;

(b)   wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter;

(c)   any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means

that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented;

(e)    unless otherwise specified, all references in this Plan to Sections and Articles are references to Sections and Articles of this Plan;

(f)    captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and

(g)    the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## ARTICLE II.
## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1    **Non-Classification.**  As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for the purposes of voting on or receiving distributions under this Plan.  All such Claims are treated in accordance with the terms set forth in this Article 2.

2.2    **Administrative Expense Claims.**

(a)    **Administrative Expense Claims (other than Professional Fee Claims).**  All Allowed Administrative Expense Claims shall be paid in full, in Cash, or otherwise reserved for (1) when and as such Administrative Expense Claims become due and owing by their ordinary course terms, (2) in such amounts as are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (3) as may be agreed upon between the Holder of such Administrative Expense Claim and the Plan Administrator on or after the Effective Date.

(b)    **Professional Fee Claims and Expense Reimbursement Claims.**  All Persons or entities seeking an award by the Bankruptcy Court of professional fees, or of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, including members of the Committees, (1) shall provide the Debtors with an invoice for all accrued and unpaid fees and expenses as of the date of such invoice and an estimate of their fees and expenses to be incurred from the Confirmation Date through the Effective Date no later than ten (10) days before the Confirmation Hearing, (2) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date (each, a "Final Fee Application")

within thirty (30) days after the Effective Date, and (3) if such Final Fee Application is granted by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Administrative Expense Claim and the Plan Administrator or, on and after the Effective Date. Objections to Final Fee Applications must be filed and served on or before five (5) Business Days prior to the hearing set by the Bankruptcy Court to consider such Final Fee Applications, unless extended by agreement of the parties. All Professional Fee Claims for services rendered in connection with the Chapter 11 Cases and this Plan after the Effective Date, including, without limitation, relating to the resolution of Disputed Claims, shall be paid by the Plan Administrator upon receipt of an invoice therefor, or on such other terms as may be agreed by the applicable Professional and the Plan Administrator, without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Plan Administrator and any professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such professional, such amount shall be determined by the Bankruptcy Court. The Debtors shall reserve an amount sufficient to pay the aggregate sum of all unpaid Professional Fees that have been or are estimated to be incurred through the Effective Date.

(c)  Administrative Expense Claims Bar Date. Holders of Administrative Expense Claims, other than Professional Fee Claims and United States Trustee fees, or the expenses of the members of the Committee, not paid prior to the Effective Date must submit proofs of Administrative Expense Claim on or before the applicable Administrative Claims Bar Date. Failure to file a proof of Administrative Expense Claim on or before the applicable Administrative Expense Claims Bar Date shall cause such Administrative Expense Claim to be disallowed and be considered null and void and such Creditors shall have no further Claim against the Debtors and their Estates.

(d)  Insurance. Notwithstanding anything to the contrary herein, and except as set forth in Section 4.6(d) hereof, if any Allowed Administrative Claim is covered by insurance, such Claim shall first be paid from such insurance with the balance, if any, paid by the Debtors.

2.3  U.S. Trustee Fees. Quarterly fees of the United States Trustee arising under 28 U.S.C. §1930(a)(6) have been regularly paid during the case and on the Effective Date any outstanding amount will be paid in full. Amounts payable after the Confirmation Date until the Debtors' cases are closed shall be payable pursuant to Section 11.6 of this Plan.

2.4  Priority Tax Claims. Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) such other date and on such other terms as may be agreed to between Debtors or the Liquidating Trustee and any Holder of an Allowed Priority Tax Claim.

## ARTICLE III.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**3.1    Identification of Classes.**  Pursuant to section 1122 of the Bankruptcy Code, Claims (other than Administrative Expense Claims and Priority Tax Claims) and Equity Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to this Plan, as follows:

| | | |
|---|---|---|
| Class 1a – | Secured Claims (Riverstone Networks, Inc.) | Unimpaired |
| Class 1b – | Secured Claims (The OASys Group, Inc.) | Unimpaired |
| Class 1c – | Secured Claims (Riverstone Networks SPC, Inc.) | Unimpaired |
| Class 1d – | Secured Claims (Pipal Systems, Inc.) | Unimpaired |
| Class 1e – | Secured Claims (Blue Coast, Inc.) | Unimpaired |
| Class 2a – | Priority Claims (Riverstone Networks, Inc.) | Unimpaired |
| Class 2b – | Priority Claims (The OASys Group, Inc.) | Unimpaired |
| Class 2c – | Priority Claims (Riverstone Networks SPC, Inc.) | Unimpaired |
| Class 2d – | Priority Claims (Pipal Systems, Inc.) | Unimpaired |
| Class 2e – | Priority Claims (Blue Coast, Inc.) | Unimpaired |
| Class 3 – | Personal Injury and Other Insured Claims against Riverstone Networks, Inc. | Unimpaired |
| Class 4a – | General Unsecured Claims (Riverstone Networks, Inc.) | Impaired |
| Class 4b – | General Unsecured Claims (The OASys Group, Inc.) | Impaired |
| Class 4c – | General Unsecured Claims (Riverstone Networks SPC, Inc.) | Impaired |
| Class 4d – | General Unsecured Claims (Pipal Systems, Inc.) | Impaired |
| Class 4e – | General Unsecured Claims (Blue Coast, Inc.) | Impaired |
| Class 5 – | Bondholder Claims | Impaired |
| Class 6a – | Indemnification Claims (Riverstone Networks, Inc.) | Impaired |
| Class 6b – | Indemnification Claims (The OASys Group, Inc.) | Impaired |

| Class 6c -- | Indemnification Claims (Riverstone Networks SPC, Inc.) | Impaired |
| Class 6d -- | Indemnification Claims (Pipal Systems, Inc.) | Impaired |
| Class 6e -- | Indemnification Claims (Blue Coast, Inc.) | Impaired |
| Class 7a -- | Equity Interests (in Riverstone Networks, Inc.) | Impaired |
| Class 7b -- | Equity Interests (in The OASys Group, Inc.) | Impaired |
| Class 7c -- | Equity Interests (in Riverstone Networks SPC, Inc.) | Impaired |
| Class 7d -- | Equity Interests (in Pipal Systems, Inc.) | Impaired |
| Class 7e -- | Equity Interests (in Blue Coast, Inc.) | Impaired |

**3.2    Elimination of Classes.**  Any Class of Claims that does not consist, as of the date of the Confirmation Hearing, of at least one Allowed Claim, Disputed Claim or a Claim temporarily Allowed under Rule 3018 of the Bankruptcy Rules, shall be deemed deleted from this Plan for all purposes.

## ARTICLE IV.
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Classes 1a, 1b, 1c, 1d and 1e (collectively, "Class 1") - Secured Claims.**

(a)    **Impairment and Voting.**  Class 1 is unimpaired by this Plan. Consequently, each Holder of an Allowed Secured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    **Treatment and Distributions.**  Each Holder of an Allowed Secured Claim shall receive, in full and final satisfaction thereof, either (i) Cash in an amount equal to such Allowed Secured Claim, (ii) a return of its Collateral, or (iii) such other treatment as shall satisfy the requirements of section 1124(2) of the Bankruptcy Code, on the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Secured Claim agrees to a different treatment thereof.

(c)    **Deletion of Class.**  Currently, the Debtors are not aware of any claims in Class 1. The Debtors reserve the right to delete this Class in accordance with Section 3.2.

**4.2**    **Classes 2a, 2b, 2c, 2d and 2e (collectively, "Class 2") - Priority Claims**.

(a)    **Impairment and Voting**. Class 2 is unimpaired by this Plan. Each Holder of an Allowed Priority Claim in Class 2 is presumed to have accepted this Plan and not entitled to vote to accept or reject this Plan.

(b)    **Distributions to Class 2**. Each Holder of an Allowed Priority Claim in Class 2 shall be entitled to receive Cash (w) in an amount equal to such Allowed Claim as soon as practicable on or after the later of (i) the Effective Date and (ii) the third (3rd) Business Day following the date on which such Claim becomes an Allowed Claim; (x) in such amounts and on such other terms as may be agreed between the Holder of the Priority Claim and the Debtors; or (y) with respect to any Allowed Priority Claim other than a Priority Tax Claim, in accordance with the terms of the particular agreement under which such Priority Claim arose.

(c)    **Deductions for Prior Payments**. All amounts previously paid on account of a Holder's Allowed Priority Claim shall be credited towards the amounts to be paid under this Section 4.2.

(d)    **Deletion of Class**. Currently, the Debtors are not aware of any claims in classes 2b, 2c, 2d or 2e. The Debtors reserve the right to delete such classes in accordance with Section 3.2.

**4.3**    **Class 3 — Personal Injury/ Insured Claims**.

(a)    **Impairment and Voting**.  Class 3 is unimpaired by this Plan. Consequently, each Holder of an Allowed Personal Injury/Insured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    **Distributions to Class 3**. All Personal Injury/Insured Claims are Disputed Claims under this Plan, and the Debtors' liability, if any, shall be determined by the court with jurisdiction over each such Personal Injury/Insured Claims. Any and all stays or injunctions imposed by this Plan shall be modified on the Effective Date for the limited purpose of allowing any pending litigation that may give rise to a Class 3 Claim to proceed to judgment. Once judgment has been entered in any such litigation the holder of such judgment shall be deemed to hold an Allowed Class 3 Claim in the face amount of such judgment. Distribution on account of such Allowed Class 3 Claims may be made exclusively from either available insurance or, to the extent any such Allowed Class 3 Claim is not covered by insurance, the uninsured portion of such Claim shall be treated as a General Unsecured Claim and paid in accordance with Section 4.4 below.

**4.4**    **Classes 4a, 4b, 4c, 4d and 4e (collectively, "Class 4") - General Unsecured Claims**.

(a)    **Impairment and Voting**. Class 4 is impaired by this Plan. Each Holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject this Plan.

(b)    **Distributions to Class 4**. Each Holder of an Allowed General Unsecured Claim shall be entitled to receive Cash in an amount equal to 100% of the principal amount of

such Allowed Claim on or as soon as practicable after the Effective Date, but in any event no later than the Initial Distribution Date.  Any other due date or maturity date in any agreement with a Class 4 claimant shall be disregarded and unenforceable.

(c)    Interest.  Allowed General Unsecured Claims shall receive interest on the Allowed Portion of their Claims from and after the Commencement Date through the Initial Distribution Date at the rate of 5.00 percent per annum.  No penalties or default rates of interest shall be paid.

(d)    Deletion of Class.  Currently, the Debtors are not aware of any claims in classes 4b, 4c, 4d or 4e.  The Debtors reserve the right to delete such classes in accordance with Section 3.2.

## 4.5    Class 5 – Bondholder Claims

(a)    Allowance of Claims.  Subject to the provisions of Section 4.5(e) with respect to the payment of the reasonable documented fees and expenses of the Bond Trustee, the Bondholder Claims shall constitute Allowed Claims for purposes of this Plan and distributions to be made hereunder.

(b)    Impairment and Voting.  Class 5 is impaired by this Plan.  Each Holder of an Allowed Bondholder Claim in Class 5 is entitled to vote to accept or reject this Plan.

(c)    Distributions to Class 5.  Each Holder of an Allowed Bondholder Claim in Class 5 shall be entitled to receive Cash in an amount equal to its Pro Rata Share of the Allowed Bondholder Claim.  Notwithstanding anything in the Plan, the Confirmation Order, or any other document to the contrary, for the purpose of distributions to the holders of Bondholder Claims, the Bond Trustee shall be deemed to be the sole holder of all Bondholder Claims.  Accordingly, all distributions on account of Bondholder Claims shall be distributed to the Bond Trustee on or as soon as practicable after the Effective Date, but in any event no later than the Initial Distribution Date for further distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date pursuant to Section 4.5 of the Plan.  The Distribution Record Date shall be used as the record date for the distributions pursuant to the Bond Indenture.

(d)    Method of Distributions.  Any and all Cash to be distributed to Holders of Allowed Bondholder Claims shall be distributed by the Plan Administrator to the Bond Trustee on behalf of the Holders of Allowed Bondholder Claims, and promptly thereafter from the Bond Trustee to Holders of Allowed Bondholder Claims in accordance with the terms of the Bond Indenture.

(e)    Fees and Expenses of Bond Trustee.  Within ten (10) days of the Confirmation Date, the Bond Trustee shall provide the Debtors with a detailed statement of its fees and expenses incurred and/or estimated to be incurred in connection with the Chapter 11 Cases from and including the Commencement Date through the Confirmation Hearing.  To the extent of legal fees and expenses incurred, such fees shall be described in sufficient detail to evaluate the reasonableness of such legal fees and expenses according to applicable standards and shall contain detailed time records, subject to protection for any privileged information.  On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Debtors shall

pay the documented fees and expenses of the Bond Trustee, to the extent it agrees such fees and expenses are reasonable, as required by the terms of the Bond Indenture and this Plan. The Debtors shall simultaneously notify the Bond Trustee of any disputes it may have to any portion of the amount and/or payment by the Debtors of such fees and expenses, which dispute may thereafter, and if the parties so agree, be resolved by the Bankruptcy Court applying the applicable state law standard of reasonableness unless the Bankruptcy Court determines, after notice and a hearing, that state law does not apply, provided that the Debtors shall reserve any amounts in dispute pursuant to this section, pending resolution. In connection with any such dispute, the Debtors shall not object to any request made by a Holder of an Allowed Bondholder Claim to intervene in or be heard with respect to such dispute.

In addition, the fees and expenses of the Bond Trustee from and after the Confirmation Hearing and through the date of cancellation of the Bonds in accordance with subsection (f) of this Section, shall be paid in the same manner as provided for in the foregoing paragraph of this subsection 4.5(e), except that the Bond Trustee shall submit monthly invoices to the Plan Administrator who shall retain sufficient funds to ensure that all such fees and expenses shall be paid in full, and shall notify the Bond Trustee of any dispute it has concerning the reasonableness of such post-Confirmation fees and expenses within ten (10) Business Days of receipt of the invoice detailing the fees and expenses for which it has a dispute. Accordingly, the portion of any such invoice which has not been disputed within ten (10) Business Days of receipt by the Plan Administrator, shall be paid on the tenth (10th) Business Day after receipt of any such invoice detailing such fees and expenses. Thereafter, any dispute with respect to the amount and/or payment by the Plan Administrator of such monthly fees and expenses may, if the parties so agree, be resolved by the Bankruptcy Court applying the applicable state law standard of reasonableness unless the Bankruptcy Court determines, after notice and a hearing, that state law does not apply.

(f)    Cancellation of Bonds.  Upon final payment to the Bond Trustee for distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date, the Bonds shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule.

4.6    Classes 6a, 6b, 6c, 6d or 6e (collectively, "Class 6") – Indemnification Claims.

(a)    Impairment and Voting.  Class 6 is impaired by this Plan. Each Holder of a Class 6 Indemnification Claim is entitled to vote to accept or reject this Plan in the liquidated portion of their claim or in such amount fixed by the Court.

(b)    Sub-classification.  Holders of Claims in Class 6a shall be divided into three sub-classes, as follows: Class 6a-1 (Specified Former Officers and Directors), Class 6a-2 (Settling Officers and Directors) and Class 6a-3 (Officers, Directors and Employees).

(c)    Distributions to Class 6.  Unless otherwise specified herein, each Holder of a Claim in Class 6 shall be entitled to receive Cash in an amount equal to 100% of the amount of such Claim as fixed and determined by the Bankruptcy Court (or in such amount agreed to by the affected Creditor, the Debtors and the Committees in writing and approved by the Bankruptcy Court), with Distributions to be made in accordance with Section 7.6 hereof. Any

Class 6 Indemnification Claim filed by a Specified Former Officer or Director shall be deemed and treated as a Class 6 Disputed Claim. The amount of any reserves, if any, to be set aside in the Disputed Claims Reserve for each such claim shall be estimated for purposes of allowance under Bankruptcy Code Section 502(c), if necessary, and established by the Bankruptcy Court on or prior to the Confirmation Hearing.

(d)    Effect of Insurance Coverage.  To the extent any Class 6 Indemnification Claim is or may be covered by available insurance, the Reorganized Debtors or the Plan Administrator, as applicable, shall pay the Holder of such Class 6 Indemnification Claim in accordance with the provisions of this Plan and shall bear the burden of recovery of any Distributions made to Holders of Class 6 Indemnification Claims from the applicable insurance company (subject to any insured person's duty to cooperate under Section 4.6(o) hereof).

(e)    Interest.  Unless otherwise specified herein, interest on Class 6 Claims shall be paid in the same manner and rate as provided for holders of Class 4 General Unsecured Claims.

(f)    Undertaking to Return.  Each Holder of a Class 6 Indemnification Claim shall provide a reasonable undertaking as required under any applicable law or agreement in respect of advancement of fees, expenses or costs.  To the extent advancement is made from the Debtors, Reorganized Debtors or the Class 6a-2 Reserve, each recipient shall promptly return such amounts (i) with interest at the rate applicable to Class 4 Claims if a Final Order is entered under which the right of advancement is held to be unavailable under any applicable law or agreement or (ii) if the fees, expenses or costs covered by such advancement are later paid to the indemnitee from the applicable insurance carrier(s).

(g)    Settlement and Treatment of Claims of Settling Officers and Directors. Pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019, and by way of a settlement in order to assure payment in full to holders of Allowed Claims and maximize the recovery to holders of Allowed Equity Interests, each Settling Officer and Director agrees, and shall be deemed to have consented to, (i) limit his or her Indemnification Claim solely to the D&O Insurance and the Class 6a-2 Reserve, and (ii) waive and release any and all Indemnification Claims such Settling Officer and Director may have for amounts in excess of the D&O Insurance and the Class 6a-2 Reserve. Included in such waiver and release is any right that any Settling Officer and Director has or may have under his or her indemnification agreement with the Debtors to require the Debtors to obtain an irrevocable stand-by letter of credit in an amount no less than $1 million per indemnified individual

(h)    Additional Settlement in Respect of Class 6a-2 Claims.  Pursuant to section 365 of the Bankruptcy Code, any executory contract (other than any insurance policies or related documents) giving rise to an Indemnification Claim shall be rejected as of the Confirmation Date.  In lieu of assuming such executory contracts (and to satisfy any damages arising from rejection of such executory contracts), and in order to settle the Indemnification Claims of Settling Officer and Director, the Debtors (i) have purchased a six-year "tail" insurance policy (the "D&O Insurance") to cover claims made through April 27, 2012 under the existing D&O insurance policy relating to (x) acts or omissions of certain of the Debtors' Officers, Directors and Employees and Settling Officers and Directors that occurred on or before

April 27, 2006 and (y) acts or omissions of the employees of Riverstone who are executing the wind-down of the Debtors from April 27, 2006 through April 27, 2007 and (ii) shall, subject to Bankruptcy Court approval and at such times as the Bankruptcy Court may direct, advance or reimburse any reasonable and documented fees, expenses or costs, upon presentment, relating to (x) any investigation by any Committee or party in interest or by the Liquidating Trustee and (y) any threatened, asserted, filed or actual cause of action against any Officer, Director or Employee or Settling Officer and Director (to the extent covered by advancement or indemnification rights under existing agreements, Debtors' organizational documents or applicable law as approved by the Bankruptcy Court). Except as provided in an Order of the Bankruptcy Court, nothing in this Plan shall be deemed to affect whether such payments are entitled to be made ahead of payments on account of other Claims or in any manner different from payment on account of other Claims pursuant to this Plan. The Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, shall, after expending the retention amount provided in the applicable D&O Insurance policy, seek to have any indemnification Claims of the Settling Officers and Directors reimbursed first from available D&O Insurance. Indemnification Claims of the Settling Officers and Directors shall be capped in the aggregate amount of, channeled solely to, and paid solely from the Class 6a-2 Reserve and/or the D&O Insurance. Each of those Settling Officers and Directors shall waive the rights they have under any indemnification agreements to require the Debtors to establish irrevocable stand-by letters of credit in an amount no less than $1 million per individual. Moreover, any Settling Officer or Director that elects to become an Electing Director/Officer shall also defer receipt of Distributions under this Plan until such time as all Causes of Action pending against them as of the Cause of Action Commencement Date are finally resolved. All of the Settling Officers and Directors agree that the amount of the initial reserve to be set aside for Class 6a-2 Indemnification Claims shall be Seven Million Dollars ($7,000,000) or such greater amount or lesser amount as may be established pursuant to this Plan. Thereafter, the Class 6a-2 Reserve shall be reduced as provided in Section 4.6(i), below. Moreover, as additional consideration, each Settling Officer and Director agrees to waive and release any right he or she may have to seek (i) disgorgement of any sums paid to the Holders of Equity Interests or to Holders of Allowed General Unsecured Claims or Allowed Bondholder Claims under this Plan in the event such Settling Officer and Director's Claim is not paid in full, despite the "absolute priority" rule and (ii) reconsideration of any Claim pursuant to section 502(j) of the Bankruptcy Code.

(i)    Class 6a-2 Reserve. The Class 6a-2 Reserve shall be established on the Effective Date. If there is no Pending Action against any Settling Officer and Director on the first anniversary of the Effective Date, the Class 6a-2 Reserve shall be reduced to $1 million on the first anniversary of the Effective Date. If there is no Pending Action against any Settling Officer and Director on the third anniversary of the Effective Date, the Class 6a-2 Reserve shall be reduced to $0 on the third anniversary of the Effective Date. If there exists a Pending Action against a Settling Officer and Director on the third anniversary of the Effective Date, any reduction of the Class 6a-2 Reserve shall be determined by the Bankruptcy Court. Any Cash removed from the Class 6a-2 Reserve in connection with a reduction thereof under this Section 4.6(i) shall be immediately available for distribution in accordance with the provisions of the Plan.

(j)    Additional Reserves.  The initial amount of the Class 6a-2 Reserve set forth in Section 4.6(h) shall be adjusted by the Bankruptcy Court utilizing the following procedure:

(i)    On August 29, 2006, the Equity Committee shall submit to the Bankruptcy Court (under seal and solely for *in camera* review), and to the Creditors Committee, the Debtors, counsel for the Settling Officers and Directors and all potential defendants (the "Named Defendants") on a confidential basis, a detailed written explanation of those claims or Causes of Action the Equity Committee may commence as a result of the investigation described in Section 9.5 of the Plan (the "Reserved Causes of Action"), which statement shall include all Claims or Causes of Action, the name of each and every potential defendant, the form of relief requested, a description of the damages suffered by the Debtor, if any, the maximum amount of the claim or Cause of Action and the legal theory and summary of essential facts upon which the Reserved Cause of Action is based (the "Statement of Reserved Causes of Action"), provided however, that the Mesel Settlement Motion shall be deemed to constitute the Statement of Reserved Causes of Action with respect to Settling Officers and Directors.  Any Claim, Cause of Action or person not identified in the Statement of Reserved Causes of Action shall be deemed exculpated and released in accordance with Sections 9.1 and 9.2 of the Plan.  The Equity Committee may, but is not required, to disclose to third parties the scope of any releases it recommends be provided by the Debtors' Estates pursuant to the Plan or may disclose such other non-privileged information as it may decide in its sole discretion and may share such non-privileged information with other parties in interest for the purpose of requesting that such parties affirmatively consent to the releases to be provided under the Plan or such other purpose as the Equity Committee may determine consistent with the Plan.

(ii)    If the Equity Committee does not identify any Reserved Causes of Action as specified in (i), above, then (1) the releases and exculpation set forth in Sections 9.1 and 9.2 hereof shall become effective on the Effective Date and (2) the Class 6a-2 Reserve shall be $7 million and shall be administered as set forth in Section 4.6 hereof.

(iii)    If the Equity Committee does identify Reserved Causes of Action as specified in (i), above, then seven (7) days after receipt of the Equity Committee's Statement of Reserved Causes of Action, as applicable, the Named Defendants and the Equity Committee shall simultaneously submit to the Bankruptcy Court (under seal and solely for *in camera* review), with a copy to each other, the Creditors' Committee, the Debtors and counsel to the Settling Officers and Directors on a confidential basis, a written proposal for and explanation of each respective parties' proposed amount for the Class 6a-2 Reserve (which amount shall not be less than $7 million).  To the extent that the Mesel Settlement Motion is approved by the Court on or before the commencement of the Confirmation Hearing, $7,000,000 shall be the proposed amount for the Class 6a-2 Reserve, which amount shall become the aggregate amount of the Class 6a-2 Reserve for all purposes without further order of the Court.  If the Mesel Settlement Motion is not approved by the Court, or if approval thereof is subject to a stay by any court order, on or before the commencement of the Confirmation Hearing, the Court shall, in accordance with the provisions of Section 4.6 of this Plan determine the amount of the Class 6a-2 Reserve.  The aggregate dollar value of all claims and Causes of Action set forth in the Equity Committee's Statement of Reserved Causes of Action will be the maximum amount recoverable on account of such Claims and Causes of Action.

(iv)     Thereafter, if the parties cannot agree on the amount of the Class 6a-2 Reserve, the Bankruptcy Court shall select one of the two proposals as the initial amount of the Class 6a-2 Reserve.

(v)     If the Bankruptcy Court has not selected one of the above-noted proposals by the Effective Date, then the amount of the Class 6a-2 Reserve shall be fixed at the higher of the amounts proposed by the Named Defendants and the Equity Committee in Section 4.6(j)(iii) (and shall remain at such amount) until the Bankruptcy Court has determined otherwise by entry of an order of the Bankruptcy Court.

(vi)     Under no circumstance shall any of the Debtors, the Named Defendants, or the Equity Committee (or other persons who have standing) request that Bankruptcy Court delay its selection of one of the above-noted proposals beyond the Confirmation Date. Moreover, each of the Named Defendants and the Equity Committee shall reasonably cooperate with any discovery ordered by the Bankruptcy Court in connection with this Subsection 4.6(j).

(vii)     Any Settling Officer and Director who may be affected by the amount of the Class 6a-2 Reserve shall have standing to be heard in response to the proposed amounts to be reserved. The Debtors and the Committees may be heard on this matter.

(viii)     Upon resolution or release of all such Reserved Causes of Action, all funds in the Class 6a-2 Reserve in excess of $7 million reserved in accordance with Section 4.6(j)(ii) of this Plan shall be released to the Plan Administrator for distribution in accordance with the provisions of this Plan (unless a Settling Officer or Director obtains an Order prohibiting a release of such funds or a portion thereof due to additional reserves warranted and/or on account of any additional litigation brought or threatened by any third party and/or on account of the fact that a particular Cause of Action was so reserved or prosecuted).

(k)     Electing Directors/Officers. As additional consideration for the releases and exculpation contained in Article 9 hereof, any Settling Officer or Director shall have the option, in his or her sole discretion, to elect to (i) defer his or her distributions under this Plan for D&O Non-Indemnification Claims and Equity Interests and (ii) have such D&O Non-Indemnification Claims and Equity Interests distributions (collectively, the "At Risk Assets") be at risk of collection and/or setoff or as an asset available for the enforcement of a judgment obtained by the Liquidating Trustee for any Cause of Action commenced on or before the Cause of Action Commencement Date. For the avoidance of doubt, Indemnification Claims of an Electing Director/Officer may be paid notwithstanding such Electing Director/Officer's election under this Section. In exchange for such consideration, any Electing Director/Officer who has made such election shall have his or her liability for any Cause of Action limited solely to the D&O Insurance, the Class 6a-2 Reserve and such Electing Director/Officer's At Risk Assets (and, for the avoidance of any doubt, no assets of any Electing Director/Officer other than the At Risk Assets shall be at risk or otherwise subject to any collection, seizure, judgment, attachment, foreclosure or enforcement action of any kind relating to any Cause of Action, except for Causes of Action in which such court as identified in this Plan makes a finding of fraud, willful misconduct or some other action that is not indemnifiable or exculpated under Delaware law).

Notwithstanding the foregoing, (y) if the damages sought in the Cause of Action against an Electing Director/are less than the amount of his or her At Risk Assets, then the amount of At Risk Assets in excess of the damages sought in such Cause of Action shall be distributed on the Initial Distribution Date to such Electing Director/Officer and (z) if the Liquidating Trustee obtains a judgment on a Cause of Action against a Electing Director/Officer, then the Liquidating Trustee shall seek to satisfy such judgment first from the D&O Insurance, second from the Class 6a-2 Reserve and, only if the judgment then remains unsatisfied, third from the Settling Director/Officer's At Risk Assets. Any At Risk Assets of an Electing Director/Officer shall be held in a segregated interest-bearing account.

        (l)      Invalidation of Election. If the Bankruptcy Court enters a Final Order determining that an Electing Director/Officer has (i) engaged in fraud, willful misconduct or some other action that is not indemnifiable or exculpated under applicable Delaware law, or (ii) materially and unreasonably obstructed or delayed the Equity Committee's investigation, then the election to immunize that Person's assets as set forth in subparagraph (k) above shall not be valid or available.

        (m)     Non-Complying Persons. The Equity Committee may, at any time on or before the deadline established pursuant to Section 4.6(j)(i) hereof, seek an order of the Bankruptcy Court finding that an individual named Settling Officer and Director has materially and unreasonably obstructed or delayed the Equity Committee's investigation (each, a "Non-Complying Person"). Any such request by the Equity Committee shall be considered on an expedited basis by the Bankruptcy Court, subject to the Bankruptcy Court's availability. The entry of an order finding that a Settling Officer and Director is a Non-Complying Person shall excuse the Equity Committee from complying with the disclosure requirements set forth in Section 4.6(j)(i) hereof solely with respect to such Non-Complying Person, but shall not (i) excuse the Equity Committee from identifying the Non-Complying Person as a Named Defendant in its Statement of Reserved Causes of Action as set forth in Section 4.6(j)(i) nor (ii) alter the provisions of Sections 4.6(j)(ii) – (vi), above.

        (n)     Payment of Indemnification Claims of Officers, Directors and Employees. Indemnification Claims of Class 6a-3 Creditors (Officers, Directors and Employees) shall be allocated between the Debtors' Estates and the Class 6a-2 Reserve as follows:

        (i)     Indemnification Claims of Holders of Claims in Class 6a-3 that do not arise from the Equity Committee's investigation as described herein and are actually incurred through the earlier of (x) the commencement of a Cause of Action and (y) the Effective Date, shall be funded exclusively from the Debtors' Estates to the extent such Claims are reasonable, actual, necessary and properly documented in accordance with the Court's Order dated June 30, 2006.

        (ii)    Indemnification Claims of Holders of Claims in Class 6a-3 arising from the Equity Committee's investigation and incurred prior to the Effective Date shall be paid by Debtors' Estates, but shall be allocated between the Debtors' Estates and the Class 6a-2 Reserve such that (x) the first $100,000 of such Claims shall be allocated to the Debtors' Estates, (y) the next $500,000 of such Claims shall be allocated fifty per cent (50%) to the

Debtors' Estates and fifty per cent (50%) to the Class 6a-2 Reserve[2] and (z) thereafter all such Claims shall be allocated to the Debtors' Estates.

(iii)    Indemnification Claims of Holders of Claims in Class 6a-3 incurred subsequent to the Effective Date shall be paid upon Allowance of such Claim from the Disputed Claims Reserve, but allocated 50% each to the Debtors' estates and the Class 6a-2 Reserve (provided, however, that in no event shall the reductions to the Class 6a-2 Reserve on account of claims paid under Sections 4.6(n) (ii) and (iii) exceed $250,000 in the aggregate).

(o)    Cooperation. Any Creditor holding a Class 6 Indemnification Claim shall, as a condition to receiving any Distribution hereunder with respect to such Claim, cooperate with the Debtors, the Reorganized Debtors and the Plan Administrator as necessary to recover such Distributions from any applicable insurance company.

4.7    Class 7a - Equity Interests (in Riverstone Networks, Inc.).

(a)    Impairment and Voting. Class 7 is impaired by this Plan. Each Holder of an Allowed Equity Interest in Class 6 is entitled to vote to accept or reject this Plan.

(b)    Distributions to Class 7. Each Holder of an Allowed Equity Interest in Class 7 shall be entitled to receive one or more Distributions of Available Cash in an amount equal to its Pro Rata Share of (i) the Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, the Class 6a-2 Reserve and all Allowed Claims or Disputed Claims in Classes 1-6 and (ii) the Liquidation Trust, if any, established under the Plan. Such distribution shall be made on the Initial Distribution Date and any Subsequent Distribution Date on which Available Cash is available for distribution, provided, however, that the initial distribution to Class 7 Equity Interests may be reduced by additional reserves being added to the Class 6a-2 Reserve in accordance with Section 4.6, above. Any surplus remaining in the Class 6a-2 Reserve following the settlement, withdrawal, dismissal, or payment of a judgment on the last remaining filed cause of action shall be paid to Class 7 Equity Interests on a Pro Rata basis. In addition, any recoveries by the Liquidating Trustee on a Cause of Action shall be treated as Available Cash and distributed to the Holders of Allowed Class 7 Equity Interests.

(c)    Method of Distributions. Any and all Cash to be distributed to Holders of Allowed Equity Interests shall be distributed by the Plan Administrator to the Transfer Agent on behalf of the Holders of Allowed Equity Interests, and thereafter from the Transfer Agent to each Holder of an Allowed Equity Interest. Any subsequent distributions to be made by the Liquidating Trustee shall be made in the same manner by payment to the Transfer Agent.

(d)    Cancellation of Equity. On the Effective Date, the common stock certificates and other instruments evidencing Equity Interests in Riverstone Networks, Inc. shall

---

[2] Allocations to the Class 6a-2 Reserve shall be paid in the form of a fifty cent per dollar reduction in the Class 6a-2 Reserve. Any funds deducted from the Class 6a-2 Reserve as a result of this allocation shall immediately be treated as Available Cash and shall be returned to the Plan Administrator for Distribution in accordance with this Plan.

be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby shall be extinguished.

(e)     Holders of Options.  All Allowed Option Holders shall be treated as Holders of Class 7 Equity Interests, provided, however, that the initial distribution to any Allowed Option Holder shall be reduced by an amount equal to the option price which such Allowed Option Holder would have had to pay to exercise such option. By way of example, if an Allowed Option Holder held options to purchase 1,000 shares of stock at a strike price of $.50 per share, and if the initial distribution to Class 6 was $1.00 per share, then such Holder would be entitled to an initial distribution of $500 (i.e., 1,000 shares x $1.00 = $1,000 less the cost of exercising the options of $.50 x 1,000 results in a net initial distribution of $500 to such option Holder). After the initial Distribution made pursuant to this Plan, all Allowed Option Holders determined to be "in-the-money" as of the Initial Distribution Date will be treated as Equity Holders in all subsequent Distributions made under this Plan.  In addition, because the final calculation of the Available Cash to be distributed to Class 7a Equity Interests will not be made until all Disputed Claims are resolved, the Plan Administrator shall reserve such amounts as may be necessary to ensure that, if the per-share amount ultimately distributed to Class 7a Equity Holders results in additional Allowed Option Holders' options being "in-the-money," there will be sufficient funds available to make a Distribution to such additional option holders equal to the Distributions made to all other Equity Holders. Disallowed Option Holders shall not be entitled to any Distributions under this Plan.  Nothing contained in this Plan shall create any new rights or extend any applicable deadline with respect to the exercise of options.

(f)     Option Holder Schedule.  The Option Holder Schedule setting forth the list of all Allowed Option Holders shall be approved by the Court in connection with the Disclosure Statement hearing.  A copy of the Option Holder Schedule setting forth the list of all Allowed Option Holders shall be filed within fifteen (15) days prior to the Disclosure Statement hearing. An Option Holder set forth on the Option Holder Schedule shall become and shall be deemed and treated as an Allowed Option Holder upon entry of the order approving the Disclosure Statement. Notwithstanding the forgoing, an Allowed Option Holder shall be subject to becoming a Disputed Claim if (i) a written objection to the treatment as an Allowed Option Holder is timely filed and served upon such Option Holder on or before the Claims Objection Deadline, and (ii) such objection sets forth the specific factual and legal bases why the Option Holder should not be treated as an Allowed Option Holder, including, but not limited to, on the grounds that such option or options, under applicable law, were not validly issued or amended, not timely exercised or not properly modified.  If a timely and proper objection is filed, then the Option Holder shall be treated as holding a Disputed Claim and the Bankruptcy Court will determine the extent of any Allowed Option Holder's rights.

ANY PERSON OR ENTITY THAT IS NOT LISTED ON THE ALLOWED OPTION HOLDER SCHEDULE SHALL NOT RECEIVE ANY DISTRIBUTION AS AN EQUITY INTEREST UNDER THE PLAN UNLESS SUCH PERSON OR ENTITY (i) FILES A WRITTEN OBJECTION WITH THE UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 MARKET STREET, WILMINGTON, DELAWARE  19801, WITH COPIES TO THE PARTIES SET FORTH BELOW, BY THE DATE SET BY THE COURT FOR THE FILING OF OBJECTIONS TO APPROVAL OF THE DISCLOSURE STATEMENT

AND (ii) THE COURT APPROVES THE ADDITION OF SUCH PERSON OR ENTITY TO
THE ALLOWED OPTION HOLDER SCHEDULE.

NOTICE OF SUCH OBJECTION MUST BE IN WRITING AND SERVED UPON:

Debtors:

 RNI Wind Down Corporation,
 f/k/a Riverstone Networks, Inc.
 5200 Great America Parkway
 Santa Clara, CA 95054
 Attn: Noah D. Mesel

Debtors' counsel:

 Morgan, Lewis & Bockius LLP
 101 Park Avenue
 New York, NY 10178
 Attn: Neil E. Herman, Esq.
   Andrew D. Gottfried, Esq.
   Fax: (212) 309-6001

    and

 Young Conaway Stargatt & Taylor, LLP
 The Brandywine Building
 1000 West Street, 17th Floor
 P.O. Box 391
 Wilmington, Delaware 19899
 Attn: Michael R. Nestor, Esq.
   Edmon L. Morton, Esq.
   Fax: (302) 571-1253

Creditors Committee:
    Schulte Roth & Zabel, LLP
    Attorneys for the Official Committee of Unsecured Creditors
    919 Third Avenue
    New York, NY 10022
    Attn:   Jeffrey S. Sabin, Esq.
            Adam Harris, Esq.
    Fax:    (212) 593-5955

Equity Committee:
    Brown, Rudnick, Berlack, Israels LLP
    Attorneys for the Official Committee of Equity Holders
    One Financial Center
    Boston, Massachusetts 02111
    Attn:   William R. Baldiga, Esq.
    Fax:    (617) 856-8201

THE SAME PROCEDURE SHALL BE UTILIZED IF ANY PERSON OR ENTITY DISAGREES WITH THE DESCRIPTION OF THE AMOUNT OR STRIKE PRICE OF THEIR OPTIONS AS DESCRIBED ON THE ALLOWED OPTION HOLDER SCHEDULE (i.e., IF YOU DISAGREE WITH THE DESCRIPTION OF YOUR OPTIONS, YOU MUST FILE A WRITTEN OBJECTION WITH THE COURT AND THE ABOVE-NOTED PARTIES BEFORE THE DISCLOSURE STATEMENT HEARING AND OBTAIN COURT APPROVAL TO MODIFY YOUR DESCRIPTION ON THE ALLOWED OPTION HOLDER SCHEDULE).

4.8    **Classes 7b, 7c, 7d and 7e – Equity Interests in Debtors other than Riverstone Networks, Inc.**

(a)    *Impairment and Voting*. RNI Wind Down Corporation, as the sole member of classes 7b, 7c, 7d and 7e, will not receive any distribution of property under the Plan on account if its Equity Interest in each of the other Debtors. Accordingly, classes 7b, 7c, 7d and 7e are impaired by this Plan, but are not entitled to vote thereon and are deemed to have rejected this Plan pursuant to section 1129(g) of the Bankruptcy Code.

(b)    *Cancellation of Equity Interests*. RNI Wind Down Corporation holds, either directly or indirectly, 100 per cent of the Equity Interests of each of the other Debtors. On the Effective Date, the common stock certificates and other instruments evidencing RNI Wind Down Corporation's Equity Interests in each of the other Debtors shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and RNI Wind Down Corporation's Equity Interests in each of the Debtors evidenced thereby shall be extinguished.

# ARTICLE V.
## ACCEPTANCE OR REJECTION OF THIS PLAN

**5.1    Voting of Claims and Equity Interests.**  Except as provided in this Article V, Holders of Claims and Equity Interests in an impaired Class shall be entitled to vote to accept or reject this Plan as provided for in the Solicitation Procedures Order (a summary or copy of which was distributed together with the Disclosure Statement).

**5.2    Acceptance by a Class of Creditors or Equity Interest Holders.**  Consistent with section 1126(c) and (d) of the Bankruptcy Code and except as provided for in section 1126(e) of the Bankruptcy Code, (i) a Class of Creditors shall have accepted this Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan and (ii) a Class of Equity Interests shall have accepted this Plan if it is accepted by Holders of such Equity Interests that hold at least two-thirds in amount of the Allowed Equity Interests of such Class that have timely and properly voted to accept or reject this Plan.

**5.3    Classes Entitled to Vote/Presumed Acceptances and Rejections of Plan.**  Classes 4, 5, 6 and 7a are impaired and may vote to accept or reject this Plan. Classes 1, 2 and 3 are unimpaired under the Plan and, therefore, are conclusively presumed to accept this Plan. Classes 7b, 7c, 7d and 7e will receive no Distribution under this Plan and, therefore, are conclusively presumed to have rejected this Plan.

**5.4    Cram Down.**  The Proponents of the Plan reserve the right to utilize the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation if any Class or Classes rejects this Plan.

# ARTICLE VI.
## IMPLEMENTATION OF THE PLAN

**6.1    Implementation of the Plan.**

(a)    _Creation of Liquidating Trust._  If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then the Liquidating Trust shall be created as of the Cause of Action Commencement Date, in accordance with the Liquidating Trust Agreement and funded by the Debtors' transfer to the Liquidating Trust of the Liquidating Trust Assets. The Liquidating Trust shall be a newly-formed Delaware trust with no prior assets or liabilities. The Liquidating Trustee shall serve as the trustee of the Liquidating Trust. The Holders of Allowed Equity Interests shall each hold a Pro Rata beneficial interest in the Liquidating Trust.

(b)    _Transfers to the Liquidating Trust._  If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then such Causes of Action shall be fully preserved and the Debtors and their Estates shall initially transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, for and on behalf of the Beneficiaries (as defined in the Liquidating Trust Agreement) of the Liquidating Trust, all of the Liquidating Trust Assets (but subject to all rights, defenses and setoffs of any defendant).

(c)  **The Liquidating Trustee.**  Prior to the Cause of Action Commencement Date, the Equity Committee shall have standing as "Liquidator" and shall have sole authority to commence any Causes of Action belonging to the Debtors and their bankruptcy Estates and/or any claims derivative thereof.  If any Cause of Action has been timely commenced as of the Cause of Action Commencement Date, then from and after the Cause of Action Commencement Date, the Liquidating Trustee shall serve pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation, or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.  The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets under title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  No current or former officer, director, stockholder, employee or professional of the Debtors nor member of either committee shall serve as the Liquidating Trustee.

(d)  **Responsibilities of Liquidating Trustee.**  The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following: (a) the receipt of the Liquidating Trust Assets; (b) the prosecution of any Cause of Action of the Debtors' Estates not otherwise released under the Plan; (c) the filing of all required tax returns and operating reports and paying of taxes and all other obligations on behalf of the Liquidating Trust, if any; and (d) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other Bankruptcy Court orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan, in accordance with the Liquidating Trustee's reasonable business judgment.

(e)  **Powers of the Liquidating Trustee.**  The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement.  The Liquidating Trustee, subject to Section 10.2 hereof, may seek pre-judgment remedies against any Settling Officer and Director who is not an Electing Director/Officer (provided that nothing herein shall be construed as granting or expanding any such rights or limiting or waiving any defenses).  The Liquidating Trustee shall have the sole and exclusive power and standing to prosecute any Cause of Action by or on behalf of the Estates and any derivative action on behalf of the Debtors, including, but not limited to, the pending derivative suit and appeal in the United States Court of Appeals for the Ninth Circuit.  The Liquidating Trustee shall not engage in any business activities on behalf of the Liquidating Trust and shall promptly distribute out any cash or other investment assets or proceeds of any Causes of Action to the Plan Administrator when no longer needed to prosecute any Cause of Action or pay expenses.

(f)  **Compensation of Liquidating Trustee.**  The Liquidating Trustee shall be compensated pursuant to the terms of the Liquidating Trust Agreement to be approved by the Bankruptcy Court.  Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee. The Liquidating Trustee may retain any professional of his or her choosing, including Professionals retained in the Chapter 11 Cases.  The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

(g)    Termination of Liquidating Trust.  The Liquidating Trust shall terminate the earlier of (a) the fifth (5th) anniversary of the Confirmation Date or (b) the distribution of all property in accordance with the terms of the Liquidating Trust Agreement and the Plan; provided, however, that the Liquidating Trustee may extend the term of the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement.

(h)    Appointment of the Plan Administrator.  Prior to the Confirmation Date, the Plan Administrator shall be designated by the Equity Committee.  No current or former officer, director, stockholder, employee or professional of the Debtors nor member of either Committee shall serve as Plan Administrator.  The Person selected to be the Plan Administrator shall be approved by the Bankruptcy Court at the Confirmation Hearing.  If the Person so selected is approved by the Bankruptcy Court, such approval shall be made part of the Confirmation Order.  The Plan Administrator shall serve in such capacity (i.e., as Plan Administrator) until his or her resignation or discharge and the appointment of a successor Plan Administrator.  The Plan Administrator shall post a bond to secure his or her obligations under this Plan.

(i)    Rights, Powers and Duties of the Reorganized Debtors and the Plan Administrator.  The Reorganized Debtors shall retain and have all the rights, powers and duties necessary to carry out their responsibilities under the Plan, which shall be carried out by the Plan Administrator in his or her reasonable business judgment and to the extent in the best interest of the Holders of Allowed Claims and Equity Interests, on behalf of the Reorganized Debtors.  These rights, powers and duties, which shall be exercised by the Plan Administrator on behalf of the Reorganized Debtors and their Estates include, without limitation, the right to, without further Bankruptcy Court approval, (i) invest all or a portion of the Available Cash in any investment vehicle permitted by section 345 of the Bankruptcy Code; (ii) make, file and settle or otherwise resolve objections to Claims; (iii) hold Assets of the Estates for the benefit of Creditors and Equity Interest Holders; (iv) establish the various reserves required by or contemplated by under this Plan; (v) make Distributions to Holders of Allowed Claims and Equity Interests in accordance with the terms of this Plan, (vi) wind-down and dissolve (as may be necessary) the Foreign Subsidiaries and distribute any surplus proceeds of such non-Debtors to the Reorganized Debtors and (vii) take any and all other actions reasonably necessary to effectuate the purposes of this Plan.  Moreover, the Plan Administrator shall have the power, subject to Section 10.2 hereof, to seek pre-judgment remedies against any Settling Officer and Director who is not an Electing Director/Officer (provided however that nothing herein shall be construed as granting or expanding any such rights or limiting or waiving any defenses).  In addition, the Plan Administrator shall be responsible for establishing, maintaining and making timely distributions from the Class 6a-2 Reserve in accordance with this Plan and any orders entered relating thereto.

(j)    Compensation of Plan Administrator.  The Plan Administrator shall be compensated on an hourly basis at a rate to be agreed upon between the Plan Administrator and the Post-Effective Date Committee.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Plan Administrator in consultation with the Post-Effective Date Committee.  The Plan Administrator may retain any professional of his or her choosing, including Professionals retained in the Chapter 11 Cases.  The payment of fees and expenses of

the Plan Administrator and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

        **(k)**    <u>Resignation of Officers and Directors</u>.  Upon the Effective Date, all of the Debtors' officers and directors in office immediately prior to the Effective Date shall be deemed to have resigned from their positions with the Debtors (without the necessity of any further action or writing or Bankruptcy Court order) and shall have no further responsibilities, duties and obligations arising after the Effective Date.  None of the Debtors' present officers or directors shall have any liability for the acts or omissions of the Reorganized Debtors, Plan Administrator, Liquidating Trust, Liquidating Trustee or Post-Effective Date Committee, and each such person or entity will have a continuing obligation to enforce the Confirmation Order and the terms of this Plan so as to ensure that the Debtors' officers and directors are "held harmless" for any and all acts or omissions of the Reorganized Debtor, Plan Administrator, Liquidating Trust, Liquidating Trustee and/or the Post-Effective Date Committee.

        **(l)**    <u>Certificate of Incorporation and By-laws</u>.  The certificates of incorporation and by-laws and/or other applicable organizational documents of the Reorganized Debtors shall be deemed amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and in accordance with applicable Delaware law.  The applicable certificates of incorporation or other applicable organizational documents of the Reorganized Debtors shall be deemed amended to, among other things:  (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized Debtors to matters related to the implementation of this Plan.  The amended certificates of incorporation and by-laws will be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.  Upon cancellation of the Equity Interests, the Reorganized Debtor shall issue to the Plan Administrator one new share of stock of the Reorganized Debtor.

    **6.2**    <u>Post-Effective Date Committee</u>.  The Post-Effective Date Committee shall be comprised of four (4) members designated by the Equity Committee.  The Plan Administrator shall consult regularly with the Post-Effective Date Committee when carrying out the purpose and intent of this Plan.  The members of the Post-Effective Date Committee shall not receive compensation, but shall be reimbursed for their reasonable and necessary expenses by the Reorganized Debtors.

        **(a)**    In the case of an inability or unwillingness of any member of the Post-Effective Date Committee to serve, such member shall be replaced by designation by the remaining members of the Post-Effective Date Committee.  If any position on the Post-Effective Date Committee remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Plan Administrator and without the requirement of a vote by the members of the Post-Effective Date Committee.

        **(b)**    Upon the certification by the Plan Administrator that all Assets of the Reorganized Debtors have been distributed, abandoned or otherwise disposed of, the members of the Post-Effective Date Committee shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(c)    The Post-Effective Date Committee may, by majority vote, remove the Plan Administrator in its discretion. The Plan Administrator also may be removed by the Bankruptcy Court for cause shown after a hearing on notice to all interested parties and the Post-Effective Date Committee by the movant. In the event of the resignation or removal of the Plan Administrator, the Post-Effective Date Committee shall, by a majority vote, designate a person to serve as successor Plan Administrator. In the event majority consent cannot be obtained, the Bankruptcy Court shall select a new Plan Administrator.

(d)    The Post-Effective Date Committee may, by majority vote, enter into one or more agreements to carry out, implement and enforce the Plan, including but not limited to entering into one or more agreements with the Plan Administrator providing for the Plan Administrator's compensation.

(e)    Notwithstanding anything to the contrary in the Plan, neither the Post-Effective Date Committee nor any of its members, designees or any duly designated agent or representative of such party shall be liable for the act, default or misconduct of any other member of the Post-Effective Date Committee, nor shall any member be liable, and the Reorganized Debtors shall indemnify each member, for anything other than such member's own gross negligence or willful misconduct.

6.3    **Continuation of Bankruptcy Injunction or Stays**. All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed or dismissed or the property affected by such stay is no longer property of the Debtors' Estates.

6.4    **Substantive Consolidation.** For the purposes of fully administering this Plan, the Debtors will not be substantively consolidated.

6.5    **Intercompany Claims**. The Debtors or Reorganized Debtors, as applicable, shall pay or otherwise provide for any liabilities of any debtor and Foreign Subsidiaries, with any remaining surplus to be distributed as a dividend to the estate of RNI Wind Down Corporation. Upon such receipt, such funds shall constitute Available Cash and shall be distributed in accordance with the provisions of this Plan. Thereafter, all Debtor subsidiaries and Foreign Subsidiaries of Riverstone shall be dissolved in accordance with local law and any Intercompany Claims extinguished. Notwithstanding anything to the contrary in this Plan, each Debtor shall continue to be responsible for the payment of Quarterly Fees to the Office of the United States Trustee until a particular case is closed, dismissed or converted.

6.6    **Full and Final Satisfaction**. All payments and all distributions hereunder shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests, except as otherwise provided in this Plan.

6.7    **Chapter 5 Avoidance Actions**. Except with respect to Morrison & Foerster, LLP, except as provided in Section 7.10 hereof generally and except as provided in sections 549 and 550 of the Bankruptcy Code solely as such Bankruptcy Code sections relate to the Debtors' postpetition award or deemed exercise of certain stock options or shares of stock on behalf of

their directors, officers and employees and others, because the Debtors were solvent at all times prior to the Commencement Date the Debtors are not preserving any Avoidance Actions pursuant to this Plan.

**6.8    Administration Pending Effective Date.**    During the period after the Confirmation Date and prior to the Effective Date, the Debtors shall continue to operate their businesses in the ordinary course of business and in accordance with any applicable Orders of the Bankruptcy Court, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.    After the Effective Date, the Plan Administrator (in consultation with the Post-Effective Date Committee) shall administer and close the Estates subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article 10 hereof.

**6.9    Closing of Chapter 11 Cases.**    When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by a Final Order, or otherwise resolved, and all Cash and Assets of the Reorganized Debtors have been distributed in accordance with this Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**6.10    Permanent Injunction.**    From and after the Confirmation Date, as provided for in the Confirmation Order, and except as otherwise expressly provided herein or as may be agreed to in writing by the Plan Administrator and approved by the Bankruptcy Court on notice, there shall be in place with regards to the Assets and any Claims against the Debtors or the Reorganized Debtors, their Estates, the Liquidating Trust or any Assets of the foregoing a permanent injunction (i) to the same extent and with the same effect as the stay imposed by section 362 of the Bankruptcy Code, and (ii) permanently enjoining all Persons from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, right or Cause of Action against the Debtors or their Assets.    Such permanent injunction shall remain in effect notwithstanding the closure of the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

**6.11    No Discharge.**    Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge the Debtors.

**6.12    Continued Corporate Existence; Dissolution of the Reorganized Debtors.** The Reorganized Debtors shall continue to exist after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certification of incorporation, by-laws and/or other applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended in accordance with the Plan.    The Plan Administrator, as applicable, may (a) effectuate the dissolution of any the remaining Reorganized Debtors and subsidiaries, and (b) cause the termination of the officers and directors of such Reorganized Debtors and subsidiaries.

**6.13    Directors and Officers; Effectuating Documents; Further Transactions.** From and after the Effective Date, the Plan Administrator (i) shall serve as the sole officer and sole director of the Reorganized Debtors and any subsidiaries thereof, including the Foreign

Subsidiaries and (ii) shall be the sole Person authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VII.
## DISTRIBUTIONS AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS

**7.1    Method of Distributions Under this Plan.**

(a)    In General.    Subject to Bankruptcy Rule 9010, unless otherwise expressly provided for herein, all distributions under this Plan shall be made (i) to the Holder of each Allowed Claim at the address of such Holder as listed in the Debtors' books and records or on the Schedules as of the Confirmation Date, unless the appropriate party has been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim or notice of transfer of claim filed by such Holder that provides an address, if any, for such Holder different from the address reflected in the Debtors' books and records or on the Schedules, (ii) to the Holders of Bondholder Claims, by payment to the Bond Trustee for distribution in accordance with Section 4.5(d) hereof, and (iii) to the Holders of Equity Interests, at the address of such Holder set forth in the records of the Transfer Agent on the Confirmation Date.

(b)    Distributions of Cash.    Any payment of Cash shall be made by check drawn on a domestic bank or by wire transfer of same day funds, provided, however, that any payment made to the Bond Trustee shall be made by wire transfer of same day funds.

(c)    Timing of Distributions.    Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    Distributions to Holders as of the Confirmation Date.    As of the close of business on the Confirmation Date, the claims register and stock transfer ledgers of the Debtors (including those registers maintained by the Bond Trustee and the Transfer Agent) shall be closed, and there shall be no further changes in the record Holders of any Claims or Equity Interests.  The Plan Administrator shall not have any obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Confirmation Date.

**7.2    Fund Reserve.**  The Debtors shall reserve funds to satisfy potential and/or contingent or unliquidated claims as required under the Plan and Disputed Claims as required under the Plan as of the Effective Date.  The total amount of such reserves cannot be determined at this time as such amounts will be fixed by the Bankruptcy Court on or prior to the Confirmation Hearing.

**7.3    Objections to and Resolution of Administrative Expense Claims, Claims and Equity Interests.**  Except as to Professional Fee Claims (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of this Plan, the Confirmation Order or

other order of the Bankruptcy Court), any party in interest may make and file objections to Claims, including Administrative Expense Claims, through and until the Claim Objection Deadline. All objections shall be litigated to Final Order; provided, however, that the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections without Bankruptcy Court approval, after consultation with the Post-Effective Date Committee. Unless extended by the Bankruptcy Court, upon motion of the Plan Administrator without notice or hearing, all objections to Claims (other than Professional Fee Claims), including Administrative Expense Claims, shall be filed and served upon the Holder of the Claim or the Administrative Expense Claim as to which the objection is made as soon as is practicable, but in no event later than the Claims Objection Deadline.

7.4    Establishment and Maintenance of Reserve for Disputed Claims.    The Disputed Claims Reserve shall (i) be established on the Effective Date and (ii) equal the estimated aggregate of any distributable amounts of Cash to which Holders of Disputed Claims would be entitled under this Plan if such Disputed Claims had been Allowed Claims on the Initial Distribution Date in the amount set forth in the Face Amount of such Disputed Claim or, if no amount was set forth in the Proof of Claim, in such other amount as provided by an Order of the Bankruptcy Court, plus any additional funds necessary to adequately provide for postpetition interest on such Claims in the amount provided for in this Plan. For the purposes of effectuating the provisions of this Section 7.4 and the distributions to Holders of Allowed Claims, the Bankruptcy Court, on appropriate motion made prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set (or as set forth in this Plan), may fix, estimate or liquidate the amount of Disputed Claims pursuant to section 502(c) or other provisions of the Bankruptcy Code and Section 7.7 of this plan. The Allowed amount of any Disputed Claim may be fixed by agreement in writing by and between the Debtors or the Plan Administrator, as applicable, and the Holder of a Disputed Claim.

7.5    Distributions Upon Allowance or Disallowance of Disputed Claims.    Except as otherwise provided in this Plan, no payments shall be made in respect of any Disputed Claim until (and only to the extent) it becomes an Allowed Claim. If a portion of a Disputed Claim becomes Allowed, such portion shall be paid and the balance shall continue to be treated as a Disputed Claim. The Holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order, but in no case more than five (5) business days after the date of the Final Order. Such distributions shall be made in accordance with this Plan based upon the distributions that would have been made to such Holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus applicable interest as required by Sections 4.4(c) or 4.6(e) plus actual interest accrued on the funds reserved to pay such Disputed Claim while in the Disputed Claims Reserve. Except as otherwise provided in this Plan, no Holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve until such Disputed Claim shall become an Allowed Claim. Cash resulting from disallowance or settlement of Disputed Claims (and any interest earned thereon) shall be treated as Available Cash and distributed, from time to time, to Holders of Allowed Equity Interests in accordance with the Plan.

**7.6    Distributions Upon Allowance of Class 6 Indemnification Claims.** Notwithstanding anything in Section 7.5 hereof to the contrary, the Settling Officers and Directors and Holders of Allowed Class 6 Indemnification Claims shall be entitled to submit to the Plan Administrator on or before the 15th day of each month an invoice detailing the actual incurred amount of their Indemnification Claims for the immediately preceding month. The Plan Administrator shall have twenty (20) days from receipt of any such invoice and detailed time records to review and object thereto. If no objection is timely made, the Plan Administrator shall pay such invoice promptly from the Disputed Claims Reserve (for Holders of Class 6 Indemnification Claims in Classes 6a-1 and 6a-3) or the Class 6a-2 Reserve (for Holders of Class 6 Indemnification Claims in Class 6a-2), subject to any allocation as may be required by Section 4.6. Any disputes regarding the Allowance or Disallowance of any such invoice that cannot be resolved by the parties shall be submitted to the Bankruptcy Court.

**7.7    Estimation.** Any of the Proponents of this Plan and/or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) or other provisions of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated (the "Estimated Amount") shall constitute the maximum Allowed amount, if any, for such Claim, as determined by the Bankruptcy Court. With respect to Indemnification Claims asserted by Settling Officers and Directors, the Estimated Amount shall be placed in the Class 6a-2 Reserve and the amount thereof fixed in accordance with Section 4.6 above. With respect to Indemnification Claims of Officers, Directors and Employees (other than Settling Officers and Directors) and Specified Former Officers and Directors, the Estimated Amount shall be placed in the Disputed Claims Reserve and the amount thereof fixed in accordance with this section 7.7. If the Estimated Amount constitutes a maximum limitation on the amount of such Claim, the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned rights (i.e., objection, estimation, and resolution procedures) are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. All rights, arguments, defenses and/or setoffs of any party to an estimation hearing are fully preserved.

**7.8    Disputed Payments.** In the event of any dispute between and among Holders of Claims, Equity Interests and/or the Holders of a Disputed Claim as to the right of any Person to receive or retain any payment or distribution to be made to such Person under this Plan, the Plan Administrator may, in lieu, of making such payment or distribution to such Person, instead hold such payment or distribution, until the disposition thereof shall be determined by a Final Order of the Bankruptcy Court or other court with appropriate jurisdiction.

**7.9    Unclaimed Distributions.** Any Person who receives a check pursuant to this Plan must present such check for payment within six (6) months of its date of issuance. Any checks not presented within such six (6) month period (including checks that have been returned to the Reorganized Debtors as undeliverable) will be void, and such funds shall be returned to the Reorganized Debtors for distribution by the Plan Administrator in accordance with this Plan.

None of the Reorganized Debtors, the Plan Administrator or the Liquidating Trustee shall have any obligation to attempt to redeliver any check returned as undeliverable unless notified in writing of a new or alternative address for the Person whose check was returned.

**7.10  Setoffs.**  All rights of setoff and/or recoupment of the Debtors and of any other Person, and any and all defenses thereto are fully preserved, together with the rights to assert disallowance in whole or in part of Claims under section 502(d) of the Bankruptcy Code, if any, arising from the Avoidance Actions preserved under section 6.7 of this Plan.

**7.11  Professional Fees and Expenses.**  In accordance with Section 2.2(b), each Professional or other Person requesting compensation in the Chapter 11 Cases pursuant to sections 330 or 503(b) of the Bankruptcy Code shall file an application for an allowance of final compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases (i.e., a "Final Fee Application"). Objections to any such application shall be filed on or before five (5) Business Days prior to the hearing set by the Bankruptcy Court to consider such Final Fee Application, unless extended by agreement of the parties. Any Professional fees and expenses arising on and after the Effective Date shall be paid in accordance with this Plan.

**7.12  Minimum Distributions.**  No Distribution in the aggregate amount of $10.00 or less shall be made to a Holder of an Allowed Claim or Equity Interest on the Initial Distribution Date or any Subsequent Distribution Date, notwithstanding any contrary provision of this Plan. Any undistributed Cash pursuant to Section 7.8 will become Available Cash for Distribution on the Final Distribution Date.

**7.13  Final Distribution.**  If after the estate has been fully administered there remains Cash on hand in an amount less than $15,000, the Plan Administrator, in consultation with the Post-Effective Date Committee, may donate the same to a registered charity of his or her choice in lieu of making a final Distribution.

## ARTICLE VIII.
## EXECUTORY CONTRACTS; UNEXPIRED LEASES; RETIREE BENEFITS

**8.1  Executory Contracts and Unexpired Leases.**  On the Effective Date, all remaining executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or, (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to the Confirmation Date.

**8.2  Approval of Rejection of Executory Contracts and Unexpired Leases.**  The Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of this Plan.

**8.3    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan.**  Claims arising out of the rejection of executory contracts or unexpired leases pursuant to Section 8.1 of this Plan and the Confirmation Order must be filed with the Bankruptcy Court and/or served upon the Plan Administrator or as otherwise may be provided in the Confirmation Order by no later than fifteen (15) days after the entry of the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtors, the Reorganized Debtors, their Estates or the Liquidating Trust.

**8.4    Retiree Benefits.**  The Debtors have never funded nor maintained any retiree benefit plans, funds or programs, as defined in section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants for medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise). Accordingly, the Plan does not make provisions to pay any such benefits under section 1129(a)(13) of the Bankruptcy Code.

**8.5    Employee Benefit Plans.**  The Plan Administrator, on behalf of the Reorganized Debtors, shall consummate the termination of the Debtors' pension plan and the transfer of vested interest in the assets of such plan to the beneficiaries entitled thereto.  The Plan Administrator, on behalf of the Reorganized Debtors, shall also effectuate the termination of any 401(K) plan that the Debtors administer and the transfer of the assets of such plan to the beneficiaries thereof.

## ARTICLE IX.
## EXCULPATION, INJUNCTIONS AND RELEASES

**9.1    Exculpation.**  On the Effective Date of this Plan, no Person who was serving as an officer, director or employee of the Debtors on or after the Commencement Date, acting in their capacity as such, nor the Debtors, the Debtors' Estates, the Reorganized Debtors, the Committees or their present or former members, the Plan Administrator, the Liquidating Trustee or any of the foregoing's respective affiliates, members, stockholders, advisors, agents or Professionals, except with respect to Morrison & Foerster, LLP (collectively, the "Exculpated Parties") shall have or incur any liability to any Person for any act or omission taken or omitted on or after the Commencement Date in connection with, related to, or arising out of, the Chapter 11 Cases, the postpetition negotiation and/or sale of Debtors' assets to Lucent Technologies, Inc. ("Lucent"), the preparation, filing, negotiation or formulation of this Plan, the pursuit of confirmation of this Plan including without limitation, the consummation of this Plan or the implementation or administration of this Plan or the property to be distributed under this Plan, and any such Claim or Cause of Action shall be deemed released, except for:  (i) any Claim or Cause of Action arising from the fraud or willful misconduct of any Exculpated Party; (ii) any Claim or Cause of Action arising from the gross negligence of any Professional; and (iii) any Claim or Cause of Action commenced by the Equity Committee on or before the Cause of Action Commencement Date, but solely as it may relate to the timing of the Lucent closing and/or any EC Computer Cause of Action.  In all respects the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this

Plan; provided, however, that nothing in this Plan shall, or shall be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect, to any of the Exculpated Parties' obligations or covenants arising pursuant to this Plan or the Confirmation Order.

9.2  Releases by the Debtors.  Except as set forth in Section 9.1 of this Plan and except with respect to Morrison & Foerster, LLP, on the Effective Date of this Plan, each of the Debtors and the Estates shall unconditionally release, and hereby are deemed to forever release unconditionally, each of the Settling Officers and Directors from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and Causes of Action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, any prepetition act or omission and/or the negotiation and sale of the Debtors' assets to Lucent; provided, however, that in the event a Cause of Action has been timely commenced as provided for herein against any such Settling Officer and Director on or prior to the Cause of Action Commencement Date, then this release shall be suspended (i) solely with respect to the Settling Officer or Director named as a defendant in such suit, (ii) to the extent of the Cause of Action asserted in such suit and (iii) only to the extent of (x) available insurance, (y) the Class 6a-2 Reserve and (z) the amount of any At Risk Assets if the Settling Officer and Director elects to be a Electing Director/Officer.  Except with regard to the right of setoff solely as it relates to the Settling Officers and Directors, nothing in the Plan or the releases set forth herein shall affect any rights of the Plan Administrator to object to the allowance, amount, priority or secured status of the claims of any party receiving a release under the Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment.  For the avoidance of doubt, no personal assets of a Settling Officer and Director who elects to be a Electing Director/Officer (other than the At Risk Assets) shall be subject to any judgment, garnishment, collection, attachment, seizure or risk for any Cause of Action brought, assigned to and prosecuted by the Liquidation Trustee, except for Causes of Action in which a court of competent jurisdiction makes a finding of fraud or willful misconduct, and the sole source of recovery of any such Cause of Action shall be first, the D&O Insurance, second, the Class 6a-2 Reserve, and third such Electing Director/Officer's At Risk Assets.

9.3  Releases by Holders of Claims and Equity Interests.  Except as set forth in Section 9.5(f) hereof and except with respect to Morrison & Foerster, LLP, on the Effective Date, each Holder of a Claim or Equity Interest (including Allowed Option Holders and Disallowed Option Holders) who voted in favor of the Plan and/or who checked the box on the ballot marked "Third Party Release" shall be deemed to unconditionally release and forever waive all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any transactions or matters with the Debtors, their Estates or in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the sale of the Debtors' assets to Lucent, or for any act or omission that occurred or could have occurred on or prior to the Effective Date (collectively "Released Claims") against (i) any Debtor or Reorganized Debtor, (ii) any affiliate or subsidiary of any Debtor or Reorganized Debtor, (iii) the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (iv) each member of the Committees, except for any Claim or Cause of Action arising from gross negligence or willful misconduct, (v) any Officer, Director and Employee and (vi) any Settling Officer and Director. For the avoidance of doubt, nothing in this Plan or the Disclosure Statement shall affect the right of any Creditor or Equity Interest Holder who votes to reject the Plan or who fails to vote on the Plan or who otherwise objects to the Plan to receive a distribution under the Plan.

9.4    **Injunctions.** As of the Effective Date, except as otherwise provided in this Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, or pursing any cause of action or Claim, or effectuating any set-off, whether directly, derivatively or otherwise against any or all of the Exculpated Parties, on account of or respecting any Claims, debts, causes of action, rights, Causes of Action (including Released Claims) or liabilities released or discharged pursuant to this Plan, except to the extent expressly permitted under this Plan.

9.5    **Investigation Period; Time to Bring Causes of Action Against Settling Officers and Directors.**

(a)    The primary purposes of this Plan are to (1) provide for the prompt payment in full of all Allowed Claims, (2) maximize the recovery to holders of Allowed Equity Interests and (3) ensure that distributions are made to holders of Allowed Equity Interests as quickly as reasonably possible. In order to implement these goals, the Debtors wish to reduce or avoid having to reserve Cash at the Effective Date to provide for payment of contingent or unliquidated claims that rank senior in priority to the rights of Holders of Allowed Equity Interests. For example, the Debtors are currently obligated to indemnify their officers, directors and employees under various indemnification agreements, under the By-laws and Certificate of Incorporation and under existing law. These obligations are broad and cover not only certain actual suits and claims but also certain "threatened" claims and even certain "investigations" of potential claims as well as certain defense and other costs such as legal fees.

(b)    In an effort to reduce the potential reserves and increase the initial distribution to Holders of Allowed Equity Interests, the Settling Officers and Directors have agreed to the following settlement to be implemented in the Plan: (i) the Debtors and its officers and directors will comply with the Implementation Order so that the investigation results may be presented in accordance with Section 4.6 of the Plan (thus, if no Claim or Cause of Action is discovered, then the Class 6a-2 Reserve initially will be fixed with certainty at $7 million and the risk of an increased Class 6a-2 Reserve can be eliminated), (ii) ANY STOCKHOLDER, FORMER STOCKHOLDER, CREDITOR OR OTHER THIRD PARTY WHO WISHES TO FILE A CAUSE OF ACTION AGAINST AN INDIVIDUAL OFFICER OR

DIRECTOR OF THE DEBTORS AS OF THE COMMENCEMENT DATE SHALL COMMENCE ANY SUCH ACTION ON OR BEFORE THE THIRD PARTY COMMENCEMENT DEADLINE (i.e. SEPTEMBER 1, 2006), (iii) ALL SUCH CAUSES OF ACTION NOT TIMELY BROUGHT BY THE THIRD PARTY COMMENCEMENT DEADLINE (FOR THIRD PARTIES) OR BY THE CAUSE OF ACTION COMMENCEMENT DATE (i.e. SEPTEMBER 1, 2006) (FOR THE COMMITTEES) SHALL BE DEEMED RELEASED AND WAIVED and (iv) the Settling Officers and Directors will agree to reduce and limit their potential Indemnification Claims against the Debtors solely to the D&O Insurance and the Class 6a-2 Reserve and to limit any Indemnification Claims against the Debtors for amounts in excess thereof, will waive their existing contractual right to have the Debtors obtain irrevocable letters of credit in the amount of $1 million for each current officer and director, and will further agree that all Available Cash (after funding all required reserves including the Class 6a-2 Reserve) may be distributed on the Effective Date to Allowed Equity Interests without any right of recovery or disgorgement from Equity Interests in the event the Class 6a-2 Reserve is insufficient to cover all Class 6 Claims in full. Notwithstanding the foregoing, the Third Party Commencement Deadline shall not be effective to the extent that this Plan (including, without limitation, the third party releases contained herein), or any amendment, modification or supplement hereto, does not become effective.

(c)     The Debtors are not aware at this time of any viable Claim or Cause of Action against any Person who has served as a Settling Officer or Director. However, in order to support the exculpation and releases described in this Article 9, and to increase the distribution to Holders of Allowed Equity Interests by reducing the amount of potential reserves, the Debtors (i) have requested that the Equity Committee commence an investigation of the conduct, affairs, acts, omissions and transactions relating to the Debtors and/or its officers or directors, (ii) produced numerous documents to the Equity Committee (and have agreed to produce documents as the Equity Committee may reasonably request which are in the possession and/or control of Debtors and/or its officers and directors), and (iii) made their officers and directors available to meet with or to be deposed under oath by the Equity Committee.

(d)     The Debtors and their officers and directors shall continue to reasonably cooperate with the Equity Committee and to reasonably make themselves and their documents available for any investigation by the Equity Committee in accordance with the Implementation Order.

(e)     Any Cause of Action commenced by or on behalf of the Debtors or the Estates on or prior to the Cause of Action Commencement Date shall be deemed property of the Debtors' Estates and, to the extent not settled, dismissed or withdrawn as of the Cause of Action Commencement Date, shall be transferred and assigned to the Liquidating Trustee to prosecute as the sole and exclusive agent for the Debtors and the Estates, and shall be treated in accordance with the terms of this Plan.

(f)     Any cause of action properly commenced on or before the Third Party Commencement Date by any third party (including any creditor or former or current stockholders) against an Settling Officer and Director (other than a Cause of Action commenced by or on behalf of the Debtors or the Estates or any derivative claim on behalf of the Debtors or

the Estates) shall remain in effect and shall not be waived, released or affected by the Plan. **HOWEVER, ANY SUCH CAUSE OF ACTION DESCRIBED IN SECTION 9.5 OF THE PLAN WHICH HAS NOT BEEN BROUGHT ON OR BEFORE THE THIRD PARTY COMMENCEMENT DATE BY A PERSON WHO RECEIVED ACTUAL NOTICE OF THE PLAN, OTHER THAN THE EQUITY COMMITTEE OR THE LIQUIDATING TRUSTEE, SHALL BE DEEMED RELEASED AND WAIVED IN ACCORDANCE WITH SECTION 9.3 ABOVE.**

## ARTICLE X.
## RETENTION OF JURISDICTION

**10.1   Jurisdiction of Bankruptcy Court.** The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under or arising in or related to the Chapter 11 Cases and this Plan, pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, among other things, the following:

(a)   To hear and determine any motions for the assumption, assignment or rejection of executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

(b)   To determine any and all pending adversary proceedings, applications, and contested matters;

(c)   To hear and determine any objection to any Claim or Equity Interest;

(d)   To estimate or liquidate any Disputed Claim;

(e)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)   To issue orders in aid of execution of this Plan pursuant to section 1142 of the Bankruptcy Code;

(g)   To interpret or consider any modifications of this Plan, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)   To hear and determine all applications for compensation and reimbursement of expenses of Professionals, the Bond Trustee, any transfer agent or similar persons, or other Persons under sections 330, 331, and 503(b) of the Bankruptcy Code;

(i)   To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan and/or the Implementation Order;

(j)   To recover all Assets and property of the Estates wherever located;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code Filed, or to be Filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through, and including entry of the Final Decree);

(l)    To hear any other matter consistent with the provisions of the Bankruptcy Code or as otherwise provided in this Plan;

(m)    To adjust, as necessary, the Class 6a-2 Reserve and/or the Disputed Claims Reserve; and

(n)    To enter the Final Decree.

10.2    **Venue.** Any Claim or Cause of Action against any Settling Officer and Director shall be filed solely in a federal or state court situated within the state of Delaware (each, a "Delaware Court" and collectively, the "Delaware Courts"). Each Settling Officer and Director shall be deemed to have consented to the personal jurisdiction of the Delaware Courts for any Cause of Action or Claim. Should the initial Delaware Court (and not at the request of the Liquidating Trustee or Equity Committee) decline to exercise or abstain from exercising jurisdiction over any Claim or Cause of Action filed against any Settling Officer and Director and should the Liquidating Trustee or the Equity Committee desire to recommence such Claim or Cause of Action, the Liquidating Trustee or Equity Committee shall first use its best efforts to commence such Claim or Cause of Action in another Delaware Court until all available Delaware Court venue options have been exhausted and (ii) thereafter the Liquidating Trustee or the Equity Committee may recommence such Claim or Cause of Action in any court of competent jurisdiction.

# ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    **Successors and Assigns.** The rights and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of that Person.

11.2    **Effectuating Documents and Further Transactions.** The Debtors or the Reorganized Debtors, the Liquidating Trustee and the Plan Administrator are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

11.3    **Exemption from Transfer Taxes.** Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of Assets contemplated by this Plan, shall not be subject to any stamp,

11.4  **Amendment, Modification, Withdrawal or Failure of this Plan.**  The Proponents of this Plan may alter, amend or modify this Plan at any time prior to the Confirmation Date, provided that this Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code. Material modifications to this Plan made prior to the Effective Date must be approved by each of the Proponents; provided, however, that such approval may not be unreasonably withheld.  No amendment or modification to this Plan after the Effective Date can be effective without the written approval of the Post-Effective Date Committee; provided, however, that such approval may not be unreasonably withheld. A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder. The Debtors may, with written notice to the Committees but without notice to Holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such Holders, correct any defect or omission in this Plan and any exhibit hereto.  Furthermore, no party may withdraw this jointly proposed Plan without the consent of each of the Proponents unless, at the time of such withdrawal, it has been determined by the Bankruptcy Court that one or more conditions to confirmation or the Effective Date cannot occur.  If the Effective Date shall not have occurred on or before September 29, 2006, this Plan shall be deemed automatically revoked unless extended by agreement of each of the Plan Proponents. In the even the Plan is revoked or withdrawn, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.  If revoked or withdrawn, all provisions of this Plan shall be deemed null and void.

11.5  **Post-Effective Date Fees and Expenses of Professionals and of Winding up the Estates.**  After the Effective Date until the entry of the Final Decree, the Plan Administrator shall, without further approval by the Bankruptcy Court, except as otherwise provided herein, pay the reasonable fees and expenses, accruing on and after the Confirmation Date, of the Professionals employed by the Reorganized Debtors and the Liquidating Trustee in accordance with the procedures herein. The Plan Administrator shall retain sufficient funds to ensure that all such ongoing fees and expenses of the Professionals employed by the Reorganized Debtors and the Liquidating Trustee shall be paid in full.  Such fees and expenses shall be paid within fifteen (15) Business Days after submission of detailed invoices to the Plan Administrator, except as otherwise provided herein. If the Plan Administrator objects to any invoice, the Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for determination and the disputed portion of such invoice shall not be paid until the dispute is resolved. After the Effective Date, the costs associated with winding up the affairs of the Estate including statutory fees, if any, payable to the United States Trustee's Office, shall be paid in the ordinary course as they become due and without further approval by the Bankruptcy Court.

**11.6    Payment of Statutory Fees.** All fees payable pursuant to chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date. Any such statutory fees accruing on and after the Confirmation Date shall be paid in accordance with Section 11.5 of this Plan. In the event of a dispute as to the amount of such fees, the Bankruptcy Court will determine the amount, if any owed by the Debtors. Notwithstanding anything to the contrary in this Plan, each Debtor shall continue to be responsible for the payment of Quarterly Fees to the Office of the United States Trustee until a particular case is closed, dismissed or converted.

**11.7    Dissolution of the Committees and of the Post-Effective Date Committee.** The Post-Effective Date Committee shall continue in existence until entry of the Final Decree. Upon entry of the Final Decree, the Post-Effective Date Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases. The Equity Committee and the Creditors' Committee shall each be deemed dissolved as of the Effective Date and the members thereof deemed released and discharged from further duties relating thereto; provided, however, that the Equity Committee and Creditors' Committee shall remain in effect for the purpose of preparing, filing and prosecuting to Final Order any Professional Fee Claim.

**11.8    Courts of Competent Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**11.9    Binding Effect.** This Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and Equity Interests, the members of the Post-Effective Date Committee and their respective successors and assigns, including, without limitation, the Plan Administrator, the Liquidating Trustee, and any affiliates thereof.

**11.10    Notices.** Any notices to or requests by parties in interest under or in connection with this Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Debtors:

    RNI Wind Down Corporation,
    f/k/a Riverstone Networks, Inc.
    5200 Great America Parkway
    Santa Clara, CA 95054
    Attn: Noah D. Mesel

With a copy to:

> Morgan, Lewis & Bockius LLP
> 101 Park Avenue
> New York, NY 10178
> Attn:   Neil E. Herman, Esq.
>         Andrew D. Gottfried, Esq.
> Fax:    (212) 309-6001
>
>       - and -
>
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899
> Attn:   Michael R. Nestor, Esq.
>         Edmon L. Morton, Esq.
> Fax:    (302) 571-1253

If to the Creditors Committee:

> Schulte Roth & Zabel, LLP
> Attorneys for the Official Committee of Unsecured Creditors
> 919 Third Avenue
> New York, NY 10022
> Attn:   Jeffrey Sabin, Esq.
>         Adam Har ris, Esq.
> Fax:    (212) 593-5955

If to the Equity Committee:

> Brown, Rudnick, Berlack, Israels LLP
> Attorneys for the Official Committee of Equity Holders
> One Financial Center
> Boston, Massachusetts 02111
> Attn:   William R. Baldiga, Esq.
> Fax:    (617) 856-8201

   11.11   **Reservation of Rights.**   Except as expressly set forth herein, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

   11.12   **Section 1146 Exemption.**   In accordance with Section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the making or

delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any stamp tax or other similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax or other similar tax.

**11.13 Further Assurances.** The Debtors, the Plan Administrator, the Liquidating Trustee and all Holders of Claims and Equity Interests receiving distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**11.14 Filing of Additional Documents.** On or before substantial consummation of the Plan, the Proponents of the Plan and such other parties as necessary shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**11.15 Plan Supplement.** Except as otherwise provided herein, as early as practicable (but in no event later than five (5) Business Days) prior to the first date set for the Confirmation Hearing, the Proponents of the Plan shall file with this Court copies of all documents necessary for confirmation of the Plan, including the Liquidation Trust Agreement (the "Plan Supplement"). Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Debtors or their counsel. The Plan Supplement is incorporated into and a part of the Plan as if set forth in full thereto.

**11.16 Withholding and Reporting Requirements.** In connection with the consummation of the Plan, the Reorganized Debtors, the Liquidating Trustee and/or the Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**11.17 Headings.** Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**11.18 Inconsistency.** In the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

**11.19  Severability.**  In the event that the Bankruptcy Court determines, on or prior to Confirmation, that any provision of this Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Proponents (which consent shall not be unreasonably withheld), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such determination, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such determination, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.20  Waiver of Ten Day Stay.**  The Confirmation Order shall contain a provision waiving any stay of the Confirmation Order imposed by Bankruptcy Rules 3020(e) and/or 6004(h).

**11.21  Governing Law.**  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

**11.22  Conditions to Confirmation.**  It shall be a condition to the confirmation and effectiveness of this Plan that (a) an order has been entered approving the settlement of the 9th Circuit appeal of the consolidated derivative actions, captioned *Watterson v. Pereira*, et al., Case No. C-03-0637-PJII (N.D. Cal.) in form and substance satisfactory to the Debtors and the Committees, which order has not been stayed or vacated and remains in full force and effect, (b) the Bankruptcy Court shall have entered such orders as may be necessary to determine that, after giving effect to the funding of all reserves contemplated or required by this Plan with respect to Disputed Claims (including, without limitation, the Plan Funding Reserve and the Class 6a-2 Reserve) the Debtors shall have sufficient Available Cash to make all distributions, and establish all reserves, to or for the benefit of the Holders of Administrative Expense Claims, Secured Claims, General Unsecured Claims and Bondholder Claims required or contemplated by this Plan and (c) an order approving the Mesel Settlement Motion has been entered and is not stayed.

**[SIGNATURES FOLLOW ON NEXT PAGE(S)]**

Respectfully Submitted

RNI WIND DOWN CORPORATION,
f/k/a RIVERSTONE NETWORKS, INC.
BLUECOAST SOFTWARE
THE OASYS GROUP, INC.
RIVERSTONE NETWORKS SPC, INC.
PIPAL SYSTEMS, INC.

By:_____
Name:  Alan B. Miller
Title:  Interim President RNI Wind Down Corporation


OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By:_____
Name:  Jeffrey Sabin
Title:  Counsel to the Official Committee of Unsecured Creditors


OFFICIAL COMMITTEE OF EQUITY HOLDERS

By:_____
Name:  William R. Baldiga
Title:  Counsel to the Official Committee of Equity Holders

# *Schedule 1*

[Foreign Subsidiaries]

## Foreign Subsidiaries

Riverstone Networks India Private Limited India

Riverstone Networks Ireland Limited

Riverstone Networks International Limited

Riverstone Networks (Singapore) Pte Ltd

Riverstone Networks K.K.

Riverstone Networks UK Limited

Riverstone Networks UK Limited -Italian Branch

Riverstone Networks UK Limited Branch -Sweden

Riverstone Networks UK Limited Branch - Belgium

Riverstone Networks UK Limited Branch - Germany

Riverstone Networks UK Limited, Sucursal en Espana

Riverstone Networks UK Limited Branch - France

Riverstone Networks, Inc. Taiwan Representative Office

Riverstone Networks Limited (Hong Kong)

Hong Kong Riverstone Networks Limited Beijing Representative Office

Riverstone Networks Korea Yuhan Hoesa

Riverstone Networks Brasil LTDA

# *Schedule 2*

[Settling Officers and Directors]

## Settling Officers and Directors

Dale Booth

Jorge del Calvo

Michael P. Ressner

William Weyand

George McClelland

Sylvia Summers Couder

Oscar Rodriquez

Roger A. Barnes

Praveen K. Mandal

David Ginsburg

Scott McMillan

Michelle Mitchell

Dan Middleton

Noah D. Mesel

Michael W. Overby

Thomas M. Hecht

# EXHIBIT K

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re                                              )
                                                   )   Chapter 11
RNI WIND DOWN CORPORATION.,                        )
et al.,                                            )   Case No. 06-10110 (CSS)
                                                   )
          Debtors.                                 )   RE: Docket No. 629
                                                   )

**CHARLES L. GRIMES' OBJECTION TO THE PROPOSED JOINT PLAN OF
REORGANIZATION AND LIQUIDATION UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE PROPOSED BY THE DEBTORS, THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, AS REVISED**

Charles L. Grimes, an equity security holder, objects to the proposed Joint Plan of

Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors,

the Official Committee of Unsecured Creditors and the Official Committee of Equity Security

Holders, as Revised (the "Plan") and in support states as follows:

**Background**

On February 7, 2006 (the "Petition Date"), Riverstone Networks, Inc. and certain of

its affiliated entities ("Debtors") each filed voluntary petitions for relief under Chapter 11 of Title

11. The Debtors then filed a motion seeking to sell substantially all their assets. At the Petition

Date, the Debtors had approximately $91 million in cash on hand, no significant secured debt and

were current on their trade debt.

After an auction in March, the Debtors sought approval of a sale of substantially all

of their assets to Lucent Technologies, Inc. ("Lucent"). The sale to Lucent closed in April 2006

bringing approximately $197 million into the estates. Thus, from the beginning of these cases, it was

clear that the equity holders were "in the money."

Since the sale of their assets, the Debtors' principal focus appears to have been on how to protect their directors and officers (the "D&Os"). The Debtors goal of protecting the D&Os has been achieved in the proposed plan, at the expense of the equity holders. The Plan provides for non-consensual releases by all parties (including the equity holders) of the third party D&Os. Mr. Grimes believes that these releases are not appropriate or justified in this case and that the Debtors will not be able to satisfy their burden of proof.

### The Proposed Plan

Section 9.3 of the Plan provides:

> **Releases by Holders of Claims and Equity Interests**. On the Effective Date, each Holder of a Claim or Equity Interest (including Allowed Option Holders and Disallowed Option Holders) **who voted in favor of the Plan (and/or who checked the box on the ballot marked "Third Party Release") or who receives a distribution under this Plan, shall be deemed to unconditionally release and** forever waive all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever (other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated, or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any transactions or matter with the Debtors, their Estates or in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the sale of the Debtors' assets to Lucent, or for any act or omission that occurred or could have occurred on or prior to the Effective Date (collectively, "Released Claims") against (i) any Debtor or Reorganized Debtor, (ii) any affiliate or subsidiary of any Debtor or Reorganized Debtor, (iii) the Committees, (iv) each member of the Committees, (v) **any Officer, Director and Employee and (vi) any Settling Officer and Director.**

(emphasis added). The Debtors seek to justify this broad non-consensual release by the settlement

10016423.WPD                                    2

they proposed with certain of the D&Os. Under the proposed settlement, the Settling Officers and Directors[1] have agreed to limit their Indemnification Claims to the D&O Insurance and the Class 6a-2 Reserve. The Settling Officers and Directors have agreed to waive any Indemnification Claim in excess of those two sources[2] and waive any right to seek disgorgement from other claimants/holders in the event that the Indemnification Claims are not satisfied by the D&O Insurance and the Class 6a-2 Reserve.[3]

Post-petition, the Debtors purchased a six year tail insurance policy (at a cost of $2.4 million) so that claims made through April 27, 2012 will be covered. Thus, there is coverage for the D&Os for several years. It is unclear exactly how much insurance coverage is available to the D&Os, but Mr. Grimes believes that it is about $40 million.

In addition to the D&O Insurance, the Plan establishes a Class 6a-2-Reserve for the benefit of the D&Os. This reserve is being set initially at $7 million dollars. There are provisions for the reduction in this reserve. However, there is also a provision for the increase in this reserve.

After the Equity Committee submits a confidential list of potential defendants (which

---

[1]Terms not defined here shall have the meaning defined in the Plan.

[2]The Settling Officers and Directors have also waived their right to require the Debtors to obtain an irrevocable stand-by letter of credit in an amount no less than $1 million per indemnified individual. Because there is a reserve being established for these D&Os, Mr. Grimes does not believe that this waiver really adds any value.

[3]Directors and Officers can elect to become "Electing Directors/Officers", by which they agree to defer his/her distribution of non-indemnification claims and have those assets at risk for collection on any claim against them by the Liquidating Trustee. In exchange, the Liquidating Trustee agrees to limit any recovery to the D&O Insurance, the Class 6a-2 Reserve and the At Risk Assets. However, this provision does not apply to claims asserted against the D&Os by equity holders, and thus it provides no additional value for the releases being sought from the equity holders.

it did), the Committees, the Debtors, and the Settling Officers and Directors, also on a confidential basis, are to submit to the Court their respective proposals on the amount of the Class 6a-2 Reserve.[4] If those parties can not agree on the amount of the reserve, they will ask the Court to decide between the proposals.[5] If the Court has not selected the amount of the reserve by the Effective Date, the Class 6a-2 Reserve shall be set at the higher amount proposed by the Named Defendants and the Equity Committee, until such time as the Court rules.

Nowhere in the Plan can Mr. Grimes find a cap on the Class 6a-2 Reserve, by dollar amount, by a percentage of claims asserted, or by some other formula. Obviously, the D&Os will want the reserve set so high that there will be no risk that between the reserve and the D&O Insurance their assets will be exposed.

The Plan also attempts to cut off rights of the equity holders in another way. By motion filed on July 24, 2006, the Debtors sought approval of a Third Party Commencement Deadline. That deadline is the date by which any equity holder that wished to assert a claim against the D&Os must file a lawsuit or have his/her claim forever barred. The motion that sought approval of this deadline was not served on the very parties which the Debtors sought to bind – the equity holders. At the hearing on August 9, 2006, the Third Party Commencement Deadline was set for September 1, 2006. By the time the equity holders received notice of the Third Party

---

[4]It appears that the Debtors seek to confer standing to object to any increase in the amount of the Class 6a-2 Reserve only on the Debtors, the Named Defendants and the Committees. The amount of the reserve clearly affects the equity holders and thus they have standing to object. Mr. Grimes objects to the Plan to the extent that it seeks to strip the equity holders of standing to object to the increase in the amount of the Class 6a-2 Reserve above its initial funding of $7 million.

[5]It is unclear what standard the parties would be asking the Court to use in selecting the appropriate amount of the reserve.

Commencement Deadline, they had less than three weeks to retain counsel, determine whether they had a claim and file a lawsuit.   Such time constraints obviously make it difficult for the equity holders to bring any action they may have.   Moreover, this provision penalizes equity holders by forcing them to file complaints without the benefit of any tools commonly used in order to investigate potential causes of action, such as a demand under Section 220 of the Delaware General Corporation Law.   Mr.  Grimes believes that the Third Party Commencement Deadline is also not appropriate or justified and that the Debtors can not satisfy their burden to obtain such release.

<center>**Objections to the Plan**</center>

At confirmation, the Debtors bear the dual burdens of introduction of evidence and persuasion that each of the sixteen subsections of 11 U.S.C. § 1129(a) has been satisfied[6].  These burdens cannot be met here as set forth below.

### A.    The Plan violates 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) requires that the Plan comply with the applicable provisions of Title 11.  11 U.S.C. § 524(e) provides in pertinent part that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

Courts in this jurisdiction have, in very limited circumstances, allowed debtors to circumvent Section 524(e)'s bar to non-consensual non-debtor releases.  The Third Circuit in *In re Continental Airlines,* 203 F.3d 203, 214 (3d Cir 2000), cautiously avoided creating a blanket rule with regard to the propriety of non-consensual third party releases, stating instead that "a rule would provide guidance prospectively, but would be ill-advised...".  *Id.* at 214.  After citing several cases

---

[6] A limited exception exists for the requirement of 11 U.S.C. § 1129(a)(8) in 11 U.S.C. § 1129(b) (commonly referred to as the "cramdown" provision).

such as *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D.Del. 1999) where non-debtor releases of direct (as opposed to derivative) claims were found impermissible without consent, the Third Circuit stated, "because the release and permanent injunction of Plaintiffs' claims are so clearly invalid under any standard, we need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Id.* The "flexible test" applied in *Continental* requires that the debtor show the necessity of the releases to the reorganization, fairness and specific factual findings to support those conclusions. *Id.* The question of necessity requires a demonstration that the success of the debtor's reorganization bears a relationship to the release by the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtor's plan that is necessary to make the plan feasible in exchange for receiving a release of liability. *Continental*, 203 F.3d. at 215; *See also In re Genesis Health Ventures*, Inc., 266 B.R. 591, 608 (Bankr.D.Del. 2001)("As to fairness of the releases to the Senior Lenders, the issue is whether nonconsenting creditors were given reasonable considerations in exchange for the release.")

The Debtors have not (and Mr. Grimes believes they can not) satisfy their burden to obtain non-consensual releases of the D&Os. First, the Debtors must establish that the success of the reorganization bears a relationship to the release by the non-consenting parties. The Debtors have made no such showing. This case is a liquidating Chapter 11 of a solvent debtor. Thus, this is not a situation where the services of the D&Os will be critical to the success of the reorganized company. In fact, most of the D&Os are no longer employed by the Debtors. Additionally, there is nothing to suggest that a Chapter 11 plan could not be confirmed without these releases.

In addition to the relationship to the reorganization, the Debtors must show that the

releasees have provided a *critical* financial contribution to the debtors' plan that is *necessary* to make the plan feasible in exchange for receiving a release of liability. *Continental*, 203 F.3d. at 215 (emphasis added). The Debtors attempt to satisfy this requirement for the release of the Settling Officers and Directors by seeking approval of the settlement reached with them. Under this agreement, the Settling Officers and Directors have agreed to limit their Indemnification Claims solely to the D&O Insurance and the Class 6a-2 Reserve. As discussed above, there is no cap to the amount of the Class 6a-2 Reserve. The reserve can be set so high that there is no risk that the D&Os will have any exposure beyond the D&O Insurance and the Class 6a-2 Reserve. Thus, the "consideration" by the D&Os of waiving their claim for indemnification beyond those two sources is illusory at worst and certainly not "critical."

The Debtors have stated that they believe that there are no viable causes of action against any of the D&Os. *See* Disclosure Statement at Article III, F, 5, c. The Debtors have presented no evidence that there is any likelihood that a claim would be asserted with a value more than the D&O Insurance and the Class 6a-2 Reserve (even at its initial level of $7 million). Because the Debtors have not (and can not) show any value to the waiver of the Indemnification Claims above the insurance and the reserve, they can not show that the releasees have made a critical financial contribution to the equity holders in exchange for the releases.

Not only can the Debtors not show that the Settling Officers and Directors made a financial contribution, they go a step further and seek to withhold the receipt of a rightful distribution as extortion for the release of the D&Os. The equity holders have been "in the money" from the beginning of this case and are entitled to a distribution under the Plan. However, this Plan, instead of adding to the recovery available to the equity holders in exchange for the release, proposes to *take*

7

*away* that distribution unless a release is granted. The Plan provides that each Holder of a Claim or Equity Interest shall be deemed to have granted a Third Party Release if they (i) vote in favor of the Plan, (ii) affirmatively agree to the Third Party Release by checking the appropriate box on the ballot *OR (iii) receive a distribution under this Plan. See* Plan Section 9.2 (emphasis added). Later, in Section 9.3, the Debtors state "nothing in this Plan or Disclosure Statement shall affect the right of any Creditor or Equity Interest Holder [no matter if they vote or do not vote, accept the release or do not accept the release] ... to receive a distribution under the Plan. Therefore an equity holder who votes to reject the Plan, for example, because he or she does not agree with the releases, will at some point in the future receive a check from the Debtors on account of their status as an equity holder and then shall be deemed to have granted the releases. This passive-aggressive approach to obtain a non-consensual release should not be approved.

The Debtors' attempt to obtain releases through the use of the Third Party Commencement Deadline suffers from the same fatal flaws. The Debtors have not made a showing that the releases obtained in this manner are fair or necessary to the plan, or that any financial contribution was made in exchange for these releases. Additionally, the Debtors provided the equity holder less then three weeks notice of the proposed deadline. Because the Debtors can not satisfy their burden, this provision too makes the Plan unconfirmable.

**B.**    **The Plan violates 11 U.S.C. § 1129(a)(3)**

The Plan does not satisfy the fundamental fairness requirement.  The United States District Court for the District of Delaware summarized the standard under 11 U.S.C. ¶¶1129(a)(3) as follows:

> The Bankruptcy Code does not define the term "good faith" but case law has defined the term as requiring, alternatively that (1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) **there was fundamental fairness in dealing with the creditors.**

*In re Lernout & Hauspie Speech Products, N.V.*, 308 B.R. 672 (D.Del. 2004)(emphasis added).

The Plan is not consistent with the objectives of the Bankruptcy Code and does not deal with all creditors in a fundamentally fair manner.  First, as set forth above, the Plan is nothing more than a mechanism for the Debtors' D&Os to obtain releases to which they otherwise never would be entitled.

Moreover, the Plan fails to allow for interested party input.  "Notice ... is the cornerstone underpinning bankruptcy procedure."  *In re Beyond.Com Corporation*, 289 B.B. 138, 143) (Bankr. N.D.Cal. 2003).  Dispensing with notice, or providing only for the least amount of notice to the fewest people, reduces oversight by parties in interest and by the Court. *Id.*  Instead of providing notice and oversight, several of the Plan's provisions open the door for money otherwise payable to equity holders to be spent without Court approval or any type of reporting of expenditures.  For example, the Plan provides no mechanism for monitoring of fees and expenses of either the Plan Administrator or the Liquidating Trustee[7] post confirmation.

---

[7]Section 1129(a)(5) requires that the Plan disclose the identity and affiliations of post confirmation management.  However, this Plan fails to disclose the identity of the Plan

In accordance with the provisions of Article 6 of the Plan, a Liquidating Trust is being established with Liquidating Trust Assets (defined to include Cash) that would have been available for distribution to Holders of Allowed Equity Interests and eventually will be payable to the equity holders, if any Liquidating Trust Assets remain. *See* Plan, Article 6. While Holders of Allowed Equity Interests shall each hold a pro rata beneficial interest in the Liquidating Trust, the Liquidating Trustee has been given the authority to pay fees and expenses to itself and its professionals in the ordinary course of business and such payments shall not be subject to Bankruptcy Court approval. Section 6.1(e). As beneficiaries of the Liquidating Trust, Holders of Allowed Equity should be aware of how their money is being spent and retain some ability to object to excessive fees as they occur.

As with the Liquidating Trustee, the Plan Administrator is compensated on an hourly basis at a rate to be agreed upon between the Plan Administrator and the Post-Effective Date Committee with funds that could be payable to Holders of Allowed Equity. No provision for further oversight or review of the fees and expenses of the Plan Administrator is provided. The money that is being allocated to and spent by both the Liquidating Trustee and the Plan Administrator is money otherwise attributable to Holders of Allowed Equity, yet those holders have no mechanism for oversight of this process.

---

Administrator and the Liquidating Trustee. Presumably, the Debtors will do so prior to the hearing on confirmation. Because that disclosure will come after Mr. Grimes was required to file his objection to confirmation, he reserves his right to object to if the disclosures are not made or to the selection of the proposed Plan Administrator or Trustee.

WHEREFORE, for all the reasons set forth herein, the proposed Plan cannot be confirmed.

Dated: September 5, 2006                SMITH, KATZENSTEIN & FURLOW, LLP

David A. Jenkins (DE ID 932)
Michele C. Gott (DE ID 2671)
Kathleen M. Miller (DE ID 2898)
Etta R. Wolfe (DE ID 4164)
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19801
*Attorneys for Mr. Grimes*